**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY, GILBERTO HINOJOSA, Chair of the Texas Democratic Party, JOSEPH DANIEL CASCINO, SHANDA MARIE SANSING, and BRENDA LI GARCIA | § § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 5: 20-CV-00438-FB |
| GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State, DANA DEBEAUVOIR, Travis County Clerk, and JACQUELYN F. CALLANEN, Bexar County Elections Administrator | § § § § § § | |
| *Defendants.* | § § | |

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

TO THE HONORABLE JUDGE FRED BIERY:

The Rule of Law has broken down in the State of Texas, and it has become clear that the federal courts will have to ensure basic constitutional protections for the U.S. Citizens within. On April 15, 2020, some of these plaintiffs appeared before a state district court seeking an interpretation of the state law that provides that voters with a physical condition that could cause them injury were they to vote in person entitles them to vote by mail. After an evidentiary hearing in which the State participated and cross-examined witnesses, the court (state district judge Tim Sulak) announced from the bench its finding that state law permits vote by mail to every eligible voter, amid the COVID-19 pandemic. As that ruling was announced in an

1

extraordinary display of disrespect for orders of the state judiciary, Attorney General Paxton[1]
issued an advice letter threatening to prosecute people and groups who complied with the state
court ruling. After the written order was entered on April 17, the state appealed but it appears in
no hurry to reverse the trial Court, having taken no steps to expedite its appeal.

In the days since the state Court ruling, counties around the state have begun to comply.
Many counties have posted notice of their websites that they are accepting vote by mail
applications in compliance with Judge Sulak's ruling.  City and school district elections going
forward in early May, are accepting vote by mail applications in compliance with Judge Sulak's
ruling.  After waiting well more than a week watching the state election apparatus turn to comply
with the state court order and after watching tens of thousands of Texans submit vote by mail
applications, Defendants appear willing to allow the circumstances where the state's judicial
branch has so far reached one view of the law while, at least part of, the executive branch of state
government threatens prosecution for complying with the Court order.

Texas citizens can no longer have confidence that the Executive branch of the state will
comply with the Rule of Law. Now, even if the state is never successful in overturning the state
court order, the Attorney General has shown he will not comply with orders of his state's
judiciary.  Furthermore, Texans will continue to reasonably fear that the executive branch will
not comply with state court rulings and/or that they could be subjected to criminal prosecution
for attempting to vote by mail. Under these circumstances, the State is no longer functioning to
protect the federal rights of U.S. citizens, and even if it to begin to do so, voters can have no
confidence their rights will be preserved. Moreover, the behavior of the executive branch of
Texas government threatens to upset the state's election apparatus which is largely complying

---

[1] Herein known as Attorney General Paxton, General Paxton, or AG Paxton.

with the state court order and where the state is successful in strong arming local officials to defy the state court order, election procedures throughout the state will be administered non-uniformly.  Because election deadlines are swiftly approaching, this Court should schedule proceedings to request appropriate preliminary injunctive relief such that a ruling can be complete by May 15, 2020.

## I.   Facts

Millions of Texas voters under the age of 65 face a stark choice in the coming elections. Either they risk infection from a dangerous, often deadly disease by voting in person, or they vote by mail utilizing the disability excuse provided for under state law, or they are disfranchised. One level of the judicial branch of state government has ruled that these voters can vote utilizing the disability excuse while at least one member of the state's executive branch has openly defied this ruling and threatened criminal prosecution for voters who rely on this provision to vote and political actors for engaging in political speech concerning vote by mail.

The plaintiffs rely on the following exhibits to this motion as well as the testimony and documentary evidence submitted at evidentiary hearing:

| Exhibit # - Description | Summary |
|---|---|
| Exhibit 1 – State Court Hearing Record | Transcript of T.I. Hearing |
| Exhibit 2 – OAG Press Release and Opinion Letter | Press Release from the Attorney General April 15, 2020 |
| Exhibit 3 – State of Texas's Plea to the Jurisdiction | State of Texas's Plea to the Jurisdiction |
| Exhibit 4 – Court Order on T.I. | Judge Tim Sulak's Court Order on Temporary Injunction and Plea to the Jurisdiction |

## A.  COVID-19 is an Immediate Danger to all Texans

COVID-19 infection is caused by the SARS-CoV-2 virus and is spread by passing through mucous membranes. Reported illnesses have ranged from mild symptoms to severe illness and death. *Id*. Anyone can be infected with the novel coronavirus. *Id.* Certain groups, such

as those over 60 years of age and those with certain underlying medical conditions, are at higher risk of serious illness and death should they be infected. However, data to date in Texas demonstrates higher than expected infection rates in younger persons.  Some infected persons do not appear to have any symptoms although they may still be able to infect others. Meanwhile, other people with no pre-existing conditions are dying of stroke without ever displaying the typical COVID-19 symptoms.

Coronavirus is spread through droplet transmission. These droplets are produced through coughing, sneezing, and talking. The virus can be spread when an infected person transmits these droplets to a surface like a polling machine screen. Any place where people gather and cannot maintain physical distancing, such as a polling place, represent a heightened danger for transmission of COVID-19 disease. *Id*. Crowding and exposure to a range of surfaces at the polls make polling places likely transmission sites for the virus. *Id*. It is highly likely that COVID-19 will be a threat to the public both in July and through November. *See general* Ex. 1, Testimony and Declarations of Dr. Carroll and Troisi.

 COVID-19 is highly contagious and is quickly becoming one of the leading causes of death in the United States.[2] Texas has many cases of the virus. As of April 25, 2020, the highest number of reported cases of COVID-19 in Texas are among 50-59-year-olds and 40-49-year-olds, with 599 reported cases and 572 reported cases, respectively.[3] 20-29-year-olds represent 426 cases, while those aged 65-74 make up 354 reported cases in Texas. *Id.* As of April 25, the State has seen 623 deaths from the virus. *Id.*

---

[2] Dan Keating and Chiqui Esteban, *Covid-19 is Rapidly Becoming America's Leading Cause of Death*, WASHINGTON POST (April 16,2020), https://www.washingtonpost.com/outlook/2020/04/16/coronavirus-leading-cause-death/?arc404=true.
[3] TEXAS DEPARTMENT OF STATE HEALTH SERVICES, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last visited April 25, 2020).

Neither vaccines nor "Herd Immunity" will reduce the threat of COVID-19 transmission anytime soon. No vaccine will be widely, if at all, available for at least 12-18 months. *See general* Ex. 1, Testimony and Declarations of Dr. Carroll and Troisi. Herd Immunity occurs when a high percentage of people in a community become immune to an infectious disease. *Id*. at ¶ 15. This can happen through natural infection or through vaccination. *Id*. In most cases, 80-95% of the population needs to be immune for herd immunity to take place. *Id*. This population requirement makes herd immunity to COVID-19 unlikely to happen before a vaccine is available. *Id*.

### B.  Voting by mail is Safe with No Risk of COVID-19 Transmission

There is no evidence the virus can be spread by paper, including mail. *Id*. at ¶ 17. Voting by mail would virus transmission between voters standing in line, signing in, and casting votes as well as eliminate viral transmission through environmental surfaces like voting machines. *Id*. Due to the pandemic, voting by mail is much safer for the public than voting in person. *Id*.

### C.  Voting by Mail in Texas

Texas law allows voting by mail for registered voters who meet one of the qualifications stated in the Election Code. *See* Tex. Elec. Code Ch. 82. A voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail. Tex. Elec. Code §§ 82.001-4. Voters apply to vote by mail with a mail ballot application sent to the early voting clerk. The early voting clerk is responsible for conducting early voting and must "review each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a). An early voting ballot application must include the applicant's name and the address at which the applicant is registered to vote and an indication of the grounds

for eligibility for voting by mail. Tex. Elec. Code § 84.002. Mail ballot applications are certified by the applicant that "the information given in this application is true, and I understand that giving false information in this application is a crime." Tex. Elec. Code § 84.011. It is a crime to "knowingly provide false information on an application for ballot by mail." Tex. Elec. Code § 84.0041.

If the clerk determines the applicant is entitled to vote by mail, the clerk shall provide the voter a ballot by mail. Tex. Elec. Code § 86.001. If the voter is not entitled to vote by mail, the clerk shall reject the application and give notice to the applicant. *Id.* A rejected applicant is not entitled to vote by mail. *Id*. July 3 is the deadline for an early voting clerk to receive an application to vote by mail for the upcoming July 14, 2020 Democratic Party Run off. Tex. Elec. Code § 84.007 (c). Mail ballots are expected to start being sent to voters in response to their request, on May 24, 2020. Thousands of vote by mail applications are pouring in now.

### D.  The Parties

The Texas Democratic Party ("TDP" or "the Party") is a political party formed under the Texas Election Code. The TDP is the canvassing authority for many of the imminent run-off elections to be held on July 14, 2020. The election of July 14 is, in part, to determine runoff elections and therefore award the Democratic Party Nominations to those who prevail. TDP is the political home to millions of Texas voters and thousands of Texas' elected officials. The TDP expends resources to try to help its eligible voters vote by mail. TDP is injured by the uncertainty of the laws associated with voting by mail because of the expenditure of financial resources used to help its members vote by mail, and the potential disfranchisement of its members. TDP is harmed by the state forcing it to award its nominations in an un-democratic process.

Gilberto Hinojosa is the elected Chair of the TDP. He is one of the administrators of the upcoming run-off elections for the Texas Democratic Party. He is the head of the canvassing authority for the July run-off elections and is the leader of the Party by and through his statutory and rule-based powers. Chair Hinojosa is also a registered voter in Texas. Chair Hinojosa is injured by the Defendants, because of the uncertainty of Texas law's regarding qualifications to vote by mail.

Joseph Daniel Cascino is a Travis County voter, who voted in Democratic primary election on March 3, 2020. He intends to vote by mail in the upcoming run-off elections and general elections. He is not 65 years of age. He intends to be in Travis County during the early vote period and Election Day. He has not been deemed physically disabled by any authority. He wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.

Shanda Marie Sansing is a Travis County voter, who has voted in Democratic primary, run-off elections and general elections in the past. She intends to vote by mail in the upcoming run-off elections and general elections. She is not 65 years of age. She intends to be in Travis County during the early vote period and Election Day. She has not been deemed disabled by any authority. She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.

Brenda Li Garcia is a Bexar County voter, who has voted in Democratic primary, run-off elections and general elections in the past. She intends to vote by mail in the upcoming run-off elections and general elections. She is not 65 years of age or older. She intends to be in Bexar County during the early vote period and Election Day. She has not been deemed disabled by any authority. She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.

The Honorable Gregg Abbott is the Governor of Texas and a defendant in this case. He is the chief executive officer in this State. Tex. Const. Art. IV § 1. Gov. Abbott has injured the plaintiffs by acting with discriminatory intent to make it much less likely that the plaintiffs will cast a vote in the upcoming elections during this pandemic.

The Honorable Ruth Hughs is the Secretary of State of Texas and its chief election officer. Tex. Elec. Code § 31.001. Secretary Hughes has injured the plaintiffs by creating a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State.

The Honorable Ken Paxton is the Attorney General of Texas and its chief legal officer. Tex. Const. Art. IV § 22. The Attorney General of Texas may investigate and assist local jurisdictions in prosecuting election-related crimes. Tex. Elec. Code §§ 273.001 (d); 273.002. Recently, General Paxton has issued a letter threatening "third parties [who] advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code." General Paxton has created a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State. *Id*.  General Paxton's letter also threatens U.S. citizens for exercising their Right to Vote.

The Honorable Dana DeBeauvoir is the Travis County Clerk. She is the early voting clerk for the upcoming run-off and general elections. Pursuant to the advice issued by General Abbott in his April 14, 2020 letter, Clerk DeBeauvoir may not issue mail ballots to voters seeking a mail ballot because of the physical risk of COVID-19. However, Clerk DeBeauvoir has also been ordered by a Texas district court to issue voters like the plaintiffs a mail ballot for this reason.

Ms. Jacquelyn Callanen is the elections administrator for Bexar County. She is the administrator of the run-off and general elections in Bexar County. She is the early voting clerk that will grant or deny mail ballots to applicants in the coming elections.

### E.  Election Officials Need Clarity to Prepare for Imminent Elections

Governor Abbot has set both the date of the special election for Senate District 14 in Bastrop and Travis County and the Democratic Primary Run-Off election in all 254 Counties on July 14, 2020. During the primary or for the November General Election state election law requires all ballot information be complete by 74 days before the election. During that time, clerks must do all of the following:

- proof ballot submissions, order races appropriately, merge with many jurisdictions appearing on the ballot;

- work with ballot companies to lay out for printing multiple ballot styles;

- program ballot scanners, controllers, and related technology;

- prepare ballot carriers for vote by mail applications and returned ballots for the use of signature verification committees and ballot boards;

- hire election workers for polling locations, early voting locations, and central counting;

- train all workers;

- determine polling locations for election day and early voting, negotiate contracts with locations;

- manage payroll issues of dozens to thousands of temporary workers; and,

- manage delivering and picking up equipment while keeping it secure and free from tampering before, during and after the polling locations open and close.

*Id.* Most election clerks and election administrators will need at least 74 days to complete these tasks. 74 days from July 14, 2020 is May 1, 2020.

### F.  Sequence of Events Since the Outbreak in Texas

By mid-March, Texas had more than 30 confirmed cases of COVID-19 located in multiple counties. On March 13, 2020, Governor Abbott declared that COVID-19 poses an imminent threat of disaster. On March 19, 2020, Dr. John W. Hellerstadt, Commissioner of the Department of State Health Services declared a state of public health disaster. The disaster demanded that people not gather in groups larger than 10 members and limit social contact with others by social distancing or staying six feet apart. On March 19, 2020, the Governor closed schools temporarily. He also closed bars and restaurants, food courts, gyms and massage parlors. On April 27, 2020, Governor Abbott issued a new order that purports to open the state's business affairs, in "phases." The Governor has indicated that case testing will be monitored and that if and when cases begin to increase, the opening will be slowed and/or reversed.  Dr. Deborah Leah Birx, the Coronavirus Response Coordinator for the White House Coronavirus Task Force, has stated that "social distancing will be with us through the summer to really ensure that we protect one another as we move through these phases."[4]

While addressing the pandemic, the state orders referenced above made no effort to protect the votes of millions of Texans during this pandemic. An advisory issued by the Secretary of State's Office instructed counties to begin preparing for larger than normal vote by mail while also giving guidance to local officials to seek court orders, as appropriate, to adjust election procedures.  In order to seek clarity of the requirements of state law, some of these Plaintiffs sought declaratory and injunctive relief in Texas district court in Travis County. *Texas*

---

[4] https://www.washingtonpost.com/politics/social-distancing-could-last-months-white-house-coronavirus-coordinator-says/2020/04/26/ad8d2f84-87de-11ea-8ac1-bfb250876b7a_story.html

*Democratic Party, et al. v. DeBeauvoir*, *et al.*, No. D-1-GN-20-001610 (201st Dist. Ct., Travis

Cnty., Tex. filed March 20, 2020).[5] Texas intervened and asserted a plea to the jurisdiction based

on standing, ripeness, and sovereign immunity. Ironically, Texas argued in its Plea to the

Jurisdiction that vote by mail administration is a county level decision.[6]   On April 15, the state

court heard the plaintiffs' temporary injunction motion and Texas' plea to the jurisdiction. The

state court verbally announced the denial of the plea to the jurisdiction and the granting of the

temporary injunction.

    In response to the order, the Attorney General made public a letter he had sent to the

Chair of the House Committee on Elections of the Texas House of Representatives. In the letter,

General Paxton gave a non-official, advisory opinion regarding whether or not the risk of

transmission of COVID-19 would entitle Texas voters to cast a mail-in ballot. "We conclude

that, based on the plain language of the relevant statutory text, fear of contracting COVID-19

unaccompanied by a qualifying sickness or physical condition does not constitute a disability

under the Election Code for purposes of receiving a ballot by mail." It did so, literally in defiance

of a judicial order being announced.

    Making it clear that Texas would not be bound by the state district court's ruling, General

Paxton stated:

> "I am disappointed that the district court ignored the plain text of the Texas Election
> Code to allow perfectly healthy voters *to take advantage of special protections*
> *made available to Texans with actual illness or disabilities.* This unlawful
> expansion of mail-in voting will only serve to undermine the security and integrity
> of our elections and to facilitate fraud. Mail ballots based on disability are
> specifically reserved for those who are legitimately ill and cannot vote in-person
> without needing assistance or jeopardizing their health. Fear of contracting

---

[5] Initially, the State of Texas was also sued. After being sued, Texas made it clear that it believed that the state court did not have jurisdiction to consider the filed claims against the State. Responding to Texas' belief, the plaintiffs non-suited their claims against Texas on March 25, 2020.
[6] Exhibit 15.

COVID-19 does not amount to a sickness or physical condition as required by state law."

This statement and the actions of the State have added to the terrible uncertainty that voters and early voting clerks face in administering upcoming elections.  As of April 25, 2020, Texas has 23,773 reported cases of COVID-19.[7]

To make matters worse, Attorney General Paxton threatened political speech by TDP and other political actors in the state. "To the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." The public statements and actions of the Attorney General reveal that voters should have a reasonable fear that they will be prosecuted. Given the public statements by General Paxton and his track record, a voter would reasonably fear that he or she would face criminal sanction if he or she checks the disability box on a mail ballot application because of the need to avoid the potential contraction of the virus. *Id.*

### G.  Texas is a Large, Diverse State Whose Voters Need Protection

As of July 1, 2019, there are 28,995,881 Texans.. People over the age of 65 are 12.6% of the population or about 3,653,481 people. Children below the age of 18 are 25.8% of the population or 7,480,937 people. Texans between age of 18 and 65 are 61.6% of the population or 17,861,463 people. On January 23, 2020, the Secretary of State announced that Texas had set a new state record of registered voters with 16,106,984 registered voters. *Id.*

---

[7] TEXAS DEPARTMENT OF STATE HEALTH SERVICES,
https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last visited April 25, 2020).

Texas is a racially diverse state. U.S. Census data show that Anglos make up 41.5% of the population. These demographic trends are shown in the following tables.

**Table 1 – Texas Racial Demographic Totals & Percentages**

| Demographic | Percentage | Number |
|---|---|---|
| Anglo | 41.5% | 12,033,290 |
| Latino | 39.6% | 11,482,368 |
| African American | 12.8% | 3,711,472 |
| Asian American | 5.2% | 1,507,785 |

**Table 2 – Number of Texans by Age & Race (July 1, 2018)**

| Age | Total | Anglo | Latino | African American | Asian American | Other |
|---|---|---|---|---|---|---|
| Children (under 18) | 7,350,017 | 2,298,822 | 3,618,258 | 859,927 | 315,789 | 257,221 |
| Voting Age (18 - 65) | 17,714,919 | 7,419,262 | 6,829,660 | 2,200,787 | 936,019 | 329,191 |
| Elderly (65 or older) | 3,637,307 | 2,290,219 | 840,003 | 334,258 | 130,091 | 42,736 |
| **Totals** | 28,702,243 | 12,008,303 | 11,287,921 | 3,394,972 | 1,381,899 | 629,148 |

62.9% of Texans who are 65 years of age or older are Anglos. The average age of all Texas Anglos is 41.5 years old. Anglos are only 41.8% of Texans 18 to 65 years of age. Elderly Anglos outnumber elderly Latinos nearly 3 to 1. Elderly Anglos outnumber elderly African Americans nearly 7 to 1.

Election regulations and prosecutions that have the effect of burdening the right to vote based on the voter's age, necessarily has a racially discriminatory impact.

Elections in Texas are racially polarized in all or nearly all levels of state elections. The Anglo majority statewide votes as a bloc against the minority preferred candidate. Minority voters vote as a bloc for their preferred candidates. Anglos vote in sufficiently large numbers and in concert to defeat the minority-preferred candidate most of the time. Texas campaigns have

13

been typified by racial appeals and minority-preferred candidates are rarely, if ever, successful. Socio-economic disparities exist in Texas that impact the ability of the minority community to influence state officials, state elections and state policy. Elected officials are not responsive to the needs of the minority community. Finally, Texas has long and despicable history of disfranchisement and racial discrimination..

## II.   Preliminary Injunction

In order to secure a preliminary injunction, a plaintiff must establish the following four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

### Plaintiff has Established a Likelihood of Success on the Merits

The Plaintiff seeks a preliminary injunction pursuant to its as-applied claims relating to: (1) the 26th Amendment of the U.S. Constitution; (2) vagueness in violation of the "Due Process" clause of the 5th and 14th Amendment; (3) voter intimidation in violation of 52 U.S.C. § 10307(b); and (4) the First Amendment of the U.S. Constitution.

### A.  Plaintiffs will Succeed on their 26th Amendment Claim[8]

Plaintiffs are likely to prevail on their claim that the Attorney General's interpretation of state election law discriminates against young voters on account of age, in violation of the

---

[8] Plaintiffs seek a preliminary injunction on the as-applied 26th Amendment claim.  To the extent that the state is purporting, in these pandemic circumstances, to apply different voting burdens based on the voter's age, that condition does not comply with the 26th Amendment.  Plaintiffs also claim that the 26th Amendment prohibits limiting vote by mail by age, even when not under pandemic circumstances but such a claim is preserved for a final trial on the merits.

Twenty-Sixth Amendment. The Twenty-Sixth Amendment forbids abridging or denying the

voting rights of young voters by singling them out for disparate treatment. *See Jolicoeur v.*

*Mihaly*, 5 Cal.3d 565, 575 (1971); *see also Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971)

(holding Twenty-Sixth Amendment violated by statute that required heightened standard for

individuals under 21 to establish residency for voting); *U.S. v. Texas*, 445 F. Supp. 1245, 1257

(S.D. Tex. 1978). The Twenty-Sixth Amendment tracks language of the Fifteenth, which forbids

intentional efforts to deny or abridge the right to vote on account of race. *Compare* U.S. Const.

Amend. XXVI, with U.S. Const. Amend. XV.

### i.      Paxton's interpretation of Tex. Elec. Code § 82.003 Fails Strict Scrutiny

Claims under the Twenty-Sixth Amendment must be evaluated by this court under strict

scrutiny, and Tex. Elec. Code §§ 82.003 is *prima facie* discriminatory. *See U.S. v. State of Tex.*,

445 F. Supp. 1245,126 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States,* 439 U.S. 1105

(1979) (When determining whether the Whatley registrar violated the Twenty-Six Amendment,

the Court found that "before that right [to vote] can be restricted, the purpose of the restriction

and the assertedly overriding interests served by it must meet close constitutional scrutiny.")  It is

precedent of the Supreme Court to apply strict scrutiny to a statute or practice that is "patently

discriminatory on its face." *Lynch v. Donnelly,* 465 U.S. 668, 687 n. 13 (1984). Under strict

scrutiny analysis, the burden is on the State to justify that its policy, statute, or decision is

narrowly tailored to serve a compelling state interest. *See League of United Latin Am. Citizens v.*

*Perry,* 548 U.S. 399, 475 (2006).

Texas' election law cannot meet this standard. Texas' law discriminates on its face

against younger voters by creating two classes of voters: those 65 or older and are able to access

absentee ballots and those under 65, who generally cannot.  While the state Court has ruled that

under age 65 voters can use the disability exemption to vote absentee, the Attorney General has threatened to prosecute those who engage in this activity. Texas is unable to present a compelling state interest in this discrimination; there is no compelling interest in imposing arbitrary obstacles on voters on account of their age especially when the enacted state law does not clearly demand this result during this pandemic.

All voters are able to contract, spread, and die from the virus, not just the elderly and disabled. If Texas has any compelling state interest here, it is to allow all voters to use mail ballots to avoid the possibility of transmission of COVID-19.

A healthy 64-year-old and a healthy 65-year-old are both equally capable of going to the polls and being dangerously infected with the virus, but only one voter is able to use an absentee ballot because they are simply a year older. There is no discernable difference between these voters besides this one-year age difference.

Further, voters under the age of 65 represent a majority of the COVID-19 cases in Texas. As of April 25, 2020, the highest number of reported cases of COVID-19 in Texas are among 50-59-year-olds and 40-49-year-olds with 599 reported cases and 572 reported cases respectively. Exhibit 3.[9] There are more reported cases of COVID-19 in Texas among 20-29-year-olds than those of 65-75 years of age. *Id.* 20-29-year-olds comprise 426 cases, while those aged 65-74 make up only 354 reported cases in Texas. *Id.*

ii.     **Alternatively, Paxton's Interpretation is Unconstitutional Using the Test in**
        ***Arlington Heights***
        Alternatively, some federal courts have chosen to use the *Arlington Heights* framework to access Twenty-Six Amendment claims. *See e.g. One Wis. Inst., Inc. v. Thomsen*, 198 F.Supp.3d

---

[9] TEXAS DEPARTMENT OF STATE HEALTH SERVICES,
https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last visited April 25, 2020).

896, 926 (W.D. Wis. 2016) (Finding that the Twenty-Sixth Amendment's text is "patterned on the Fifteenth Amendment ... suggest[ing] that Arlington Heights provides the appropriate framework."); *Lee v. Va, State Bd. of Election,* 188 F. Supp.3d 577, 609 )E.D. Va. 2016), aff'd, Lee 843 F. 3d 592 (4th Cir. 2016); *League of Women Voters of Fla. v. Detzner,* 314 F. Supp.3d 1205, 1221 (N.D. Fla 2018).  The *Arlington Heights* framework is well-settled law, evaluating: (1) the impact of the official action and whether it bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequences of events leading up to the decision challenged in the case, including departures from normal procedures in making decisions and substantive departure; and (4) contemporary statements made by the governmental body who created the official action. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Here the challenged action is two-fold. First, Paxton's interpretation of the law related to mail ballot eligibility in Texas is discriminatory to every voter under the age of 65 and untenable given the COVID-19 pandemic. Second, the official decision by the Attorney General to threaten to enforce that law in the most disenfranchising and severe manner possible, through criminal sanction, is strong evidence of invidious discrimination. All voters face significant risk of transmission of the novel coronavirus at polling locations. Texas' law has a disparate effect on younger voters because they will be unable to access mail ballots and are, therefore, forced to risk their lives, the lives of their loved ones, and the lives of the public at-large in order to vote. This risk is imminent and tangible. As seen in Wisconsin, several cases of COVID-19 have been directly linked to in-person voting.[10] During the COVID-19 pandemic, Texas's refusal to extend

---

[10] Veronica Stracqualursi and Abby Phillip, *19 Coronavirus Cases Connected to Wisconsin Primary Election, State Health Official Says*, CNN (April 22, 2020), https://www.cnn.com/2020/04/22/politics/wisconsin-april-7-election-coronavirus-cases/index.html.

access to mail ballots to younger voters would affirmatively disenfranchise hundreds of thousands of Texas voters simply because of their age. Of course, voters over the age of 65 will not face these same burdens on the right to vote; they are able to avoid crowded polling locations and cast their ballot from the safety of their homes. The application of the law in this manner absolutely "bears more heavily on one group" —an age group—"than another." *Arlington Heights* at 266.

There have also been significant departures from normal procedures resolving the meaning of state election law. In order to alleviate this discriminatory effect, some of the above plaintiffs brought suit against an election authority and obtained temporary relief from a state court, which held that all Texas voters are entitled to obtain a mail-in ballot because of the health risk involved in voting in person. Directly after voters were granted this relief, and in response to this relief, Attorney General Paxton issued an advisory, non-official opinion threatening to prosecute people and groups who complied with the state court ruling. He called the ruling an "unlawful expansion of mail-in voting." Further, he opined that to help or advise a voter to seek a mail-in ballot pursuant to this provision of the Election Code was a crime. Despite these opinions, he has taken no urgency in obtaining such a ruling from a higher court and instead, he threatens the public with criminal prosecution.  These are abnormal departures from normal legal or policy procedure for multiple reasons. First, the Attorney General has no authority to offer an "informal letter of legal advice offered for the purpose of general guidance." The Attorney General rarely, if ever, "opine[s] through the formal opinion process on questions … that are the subject of pending litigation.". Second, it is uncommon that a modern Attorney General would threaten voters and voting groups explicitly for working to help lawful voters cast ballots in the safest manner possible. Finally, General Paxton circumvented the entire Texas judicial process

by announcing as the Court was ruling, that he would criminally prosecute voters in defiance of the emerging court order. The only legitimate course of action for the Attorney General to void a Texas court order is to allow the trial court to issue its order, appeal the order for a stay, and then proceed expeditiously on appeal to make the best case for the order to be overturned. Even if it is true that the state court order was automatically stayed by General Paxton's appeal, the order remained in effect for Travis County and other counties, cities, and school districts which are following it.  General Paxton has followed no legal channel to curb this election activity. Instead, he disrespected the judicial process in order to chill voter's ability to access the ballot. These significant departures from normalcy were all in service of preventing legal, registered voters from casting ballots without exposing themselves to a deadly virus.

General Paxton offered a bizarre and unfounded rationale for this abnormal behavior, which only bolsters the notion that he intended his actions to disenfranchise voters. He stated that allowing Texans to vote by mail because of the risk of transmission of COVID-19 "will only serve to undermine the security and integrity of our elections and to facilitate fraud." These explanations are internally contradictory and irrational. Either mail-in balloting offers special protections for the aged and infirm or it is a vector for election fraud. It cannot be both.

Under the pandemic circumstances, Texas' age-based classification system for mail ballot eligibility bears more heavily on voters younger than 65 years of age. Even in this age of pandemic, Texas is undeterred in its aggressive intention to police mail ballot eligibility in the strictest possible way, with highest discriminatory effect. The state executive branch has shown no interest in complying with the rulings of its state judiciary and does not even bother to expeditiously overturn a ruling that at least part of the executive branch, evidently disagrees. As a result, hundreds of thousands if not millions of Texans must face the risk of possible criminal

prosecution or submit to face life or death burdens because of the risk of transmission of COVID-19 at polling locations.

When in-person voting becomes physically dangerous, age-based restrictions on mail ballot eligibility become constitutionally unsound. "If a unanimous Senate, near-unanimous House of Representatives, and 38 ratifying states intended the Twenty-Sixth Amendment to have any teeth, then the Amendment must protect those blatant and 'unnecessary burdens and barriers' on young voters' rights." *League of Women Voters of Fl, Inc. v. Detzner,* 314 F. Supp. 3d 1205, 1223 (N.D. Fl July 24, 2018), *quoting Worden v. Mercer Cty. Bd. of Elections,* 61 N.J. 325, 345 (1972). Here, the discrimination is a blatant and unnecessary barrier to younger voters, enforced simply because the State does not want these voters to access mail voting during a deadly pandemic. As such, the plaintiffs will prevail on their Twenty-Sixth Amendment claim.

## B. The Plaintiffs Will Succeed on Their Denial of Free Speech Claim

Paxton's letter opinion is presently harming core political speech.  Indeed, the very letter he issued, threatens political speech with criminal prosecution.  TDP, as well as other political actors, would be engaging in communications with voters concerning who is eligible to and how to vote by mail.  Paxton has outwardly threatened to prosecute these communications but he has made no real effort to expeditiously settle the state law legal question of his interpretation of the state law.  Even if he did, given the state's division of criminal and civil jurisdictions between its courts, it is unclear if a higher ruling in a civil case would give meaningful relief to people fearful of prosecution.  At the same time, Paxton has argued that the vote by mail statutes are up to the county election administrators.  These conditions are designed to prevent political speech and they have been effective at doing so.

Voters also enjoy a "Right to Vote" as a form of political speech.  This political speech is also harmed by Paxton's interpretation of Tex. Elec. Code §§ 82.001–4. It is widely recognized that political speech, including the right to vote, is strongly protected as a "core First Amendment activity." *League of Women Voters of Fl.,* 863 F. Supp.2d at 1158. When determining whether there has been a violation of this right, the court inquires as to (1) what sort of speech is at issue, and (2) how severe of a burden has been placed upon the speech. *See Burdick v. Takushi, 504 U.S.* 428, 433 (1992). Strict scrutiny is applied if the law "places a severe burden on fully protected speech and associational freedoms." *Lincoln Club of Orange County v. City of Irvine,* 292 F.3d 934, 938 (9th Cir. 2002).

First, the speech at issue here is the highest form of political expression, casting a vote. While the Supreme Court has applied a rational basis review to state laws prohibiting write-in voting, *Burdick,* 504 U.S. 428 (1992), the burden at issue in the present case is on the ability to cast a ballot at all. "[V]oting is of the most fundamental significance under our constitutional structure," meaning the speech at issue is undeniably fully protected First Amendment activity. *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Second, the burden on this speech is heavy. Voters are, off and on, ordered to stay at home to avoid transmission of COVID-19. To go to the polls is to risk exposure and transmission of the deadly virus. Especially given the visibility of the fallout from the Wisconsin primary election, voters are deeply discouraged from emerging from their homes to participate in democracy. As voters face the choice between casting their ballot and paying the ultimate price, there can be no doubt that their political speech is heavily burdened. Because the speech at issue is fully protected First Amendment activity and the burden on this speech is heavy, the court should apply strict scrutiny. For the reasons stated under (A)(i) and (F)(i) of this Section, Tex. Elec. Code §§

82.003–4 fails strict scrutiny; it is not narrowly tailored to serve compelling government interests. As such, plaintiffs are likely to succeed on their First Amendment claim.

### C.  The Plaintiffs Will Succeed on their Void for Vagueness Claim

TDP and some of these plaintiffs maintained in the state court proceeding that state law clearly allows all voters, regardless of age, to vote by mail because they have a disability based on the risk of transmission of COVID-19. A state court agreed that a plain reading of Texas election law.  General Paxton evidently holds a different interpretation. These factual conditions result in an environment where the public cannot reasonably determine what state law allows. The consequences to this indeterminacy are dire. If voters seek a mail-in ballot, then General Paxton threatens prosecution. If they do not, they risk the spread of the virus in order to vote in person.

Texas law allows voters to vote by mail on account of a disability. Tex. Elec. Code § 82.002(a). Disability is defined as a physical condition that prevents the voter from appearing at the polling place on Election Day without a likelihood of injuring the voter's health. *Id.* According to Judge Sulak, this definition includes people who are social distancing because of COVID-19.  Prior to the pandemic, General Paxton has advised that no specific definition of disability is required to be met in order to qualify to vote by mail. Op. Tex. Att'y Gen. No. KP-0009 (2015).  General Paxton has also previously opined that a court-ruled sexual deviant under the age of 65 meets the definition of "disabled" under this statute.  Op. Tex. Att'y Gen. No. KP-0149 (2017).

It is a basic principle of due process that a statutory provision ought to be voided for vagueness if its prohibitions are not clearly defined. Specifically, a statute is unconstitutionally vague under the Fourteenth Amendment if its terms "(1) 'fail to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, (1972); *Johnson v. United States*, 576 U.S. ___, 135 S.Ct. 2551, 2556-58, 192 L.Ed.2d 569 (2015); *Papachristou v. Jacksonville*, 405 U. S. 156, 162 (1972); *Kolender v. Lawson*, 461 U. S. 352, 357– 358 (1983). Importantly, when a vague statute infringes upon basic First Amendment freedoms, as does Tex. Elec. Code §§ 82.003–4, "'a more stringent vagueness test should apply.'" *Grayned*, 408 U.S. at 246. While civil enactments, as opposed to criminal ones, are subject to less strict vagueness standards, General Paxton has suggested that advocating for an expanded definition of disability in relation to obtaining a mail-in ballot "could subject … parties to criminal sanctions." Exh. 7; *See e.g. Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498–499 (1982). If criminal prosecution hinges on the definition of disability in the Election Code, that weighs in favor of a higher vagueness standard because "the consequences of imprecision are … severe." *Hoffman* at 498-499.

Paxton's interpretation leaves Tex. Elec. Code § 82.001–4 as vague because it is not clear which voters qualify to vote by mail under its provisions. According to these statutes, a voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail. Tex. Elec. Code §§ 82.001–4. More specifically, condition (2) is met when "the voter has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." Tex. Elec. Code § 82.002(a). There are two operative parts to this definition. First, the voter must have "a sickness or physical condition." Second, this condition requires the voter to determine whether voting in person has a

likelihood of injuring the voter's health. Both parts are impermissibly vague. A voter might

reasonably consider susceptibility to a deadly virus as a "physical condition" and contraction of

that virus has a likelihood an injury to their health.

General Paxton interpreted the statute differently. For instance, he chooses to define

"condition" as "an illness or other medical problem". (citing the New Oxford Am. Dictionary

1341(3d ed. 2010)). The Legislature cannot have intended to define condition as "a sickness or

medical problem" because that would be duplicative of other parts of the statute (i.e., "sickness"

would appear twice).[11] General Paxton also stated that "mental or emotional condition[s]" do not

qualify a voter to vote by mail. This would preclude voters suffering from severe post-traumatic

stress disorder or agoraphobia (fear of being in public and/or crowds) from qualifying for a mail-

in ballot. (This new interpretation also undermines that entire rationale Paxton gave in his

official AG Opinion finding that sexual deviants can vote because of their mental condition.)

General Paxton's construction of the statute is implausible both because it results in surplus

language in the statute and because it is hardly consistent with its plain meaning. Yet these

multiple constructions (coupled with Paxton's threat of prosecution) lend substantial vagueness

as to what voters qualify to vote by mail under its provisions.

Even the statute under which General Paxton proclaimed voters and third parties might

be prosecuted is impermissibly vague. General Paxton threatened these parties with prosecution

under Tex. Elec. Code § 84.0041. Tex. Elec. Code § 84.0041 provides that a person commits an

offense if the person "(1) knowingly provides false information on an application for ballot by

mail;" or "(2) intentionally causes false information to be provided on an application for ballot

---

[11] It also would mean that "likely confinement for childbirth" would have been considered "a sickness or medical problem" by the Legislature. See Tex. Elec. Code § 82.002 (b). Pregnancy is neither a sickness nor medical problem, so it cannot be that the statute was meant to only authorize voters suffering from some physical malady to access mail voting.

by mail." § 84.0041(a)(1)–(2). Given the conflicting orders from the state court and the Attorney General, it is simply impossible to know what qualifies as "false information" under the statute. The breakdown of the Rule of Law in Texas has generated two opposing legal schemes: one in which voters who fear COVID-19 qualify to vote by mail by order of the state judiciary, and one in which the executive branch subjects them to criminal prosecution for doing so. Voters cannot know which reality is their own. General Paxton unhelpfully advised: "whether specific activity constitutes an offense under these provisions will depend upon the facts and circumstances of each individual case." Not only would any voter find this proclamation vague, but it encourages arbitrary enforcement.

These statutory provisions are impermissibly vague on their face and General Paxton's communication with the public has lent substantial murkiness as to what voters and enforcement officials are permitted to do. This lack of clarity has the effect of leading "citizens to "steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'" *Grayned v. City of Rockford*, 408 U.S. at 109. It will also create uneven prosecution of voters and third parties between jurisdictions throughout the State. This provision is especially troublesome because it infringes upon core First Amendment activity. Thus, Plaintiffs have a likelihood of success on the merits of their void for vagueness claim.

### D. Voter Intimidation

General Paxton has made the extraordinary choice to upend the rule of law, disturb the state judiciary from fulfilling its mission, and to outwardly intimidate rightful voters and the third parties who assist voters in elections. "[T]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." This

advisory opinion was made just as a state court ruled that Texas voters are entitled to a mail-in ballot because of the risk of transmission of COVID-19. Hours later, General Paxton stated that expanding mail ballot eligibility to all Texans "will only serve to undermine the security and integrity of our elections." These statements operate to discourage voters from seeking mail-in ballots because of their fear of criminal sanction or victimization by fraud.

"Title 42 U.S.C. § 1985, part of the Civil Rights Act of 1871, creates a private civil remedy for three prohibited forms of conspiracy to interfere with civil rights under that section." *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 149 (5th Cir. 2010). Plaintiff must prove the following elements for a claim under § 1985(3): (1) a conspiracy of two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprives her of a right or privilege of a United States citizen. *See Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994); *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987).

General Paxton has worked in concert with employees, including the signatory to the letter in question and others, in issuing his threats. These statements have the intention and the effect of depriving legal voters their franchise. It goes without saying that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307  (b). Making a threat is an act in furtherance of this conspiracy to deprive access to the franchise from legal, rightful voters. An injury is caused when a state official acting in concert with others prevents legal voters from

26

casting a ballot free from fear of risk of transmission of a deadly illness or criminal retribution. General Paxton must be enjoined from threatening voters with criminal prosecution and spreading misinformation about access to mail-in ballots.

### E.  The Defendants Violated the Equal Protection Clause of the 14th Amendment

The Defendants, who are state actors and/or acting under color of law as administrators of elections, have violated the Fourteenth Amendment Equal Protection Clause because the state is treating similarly situated voters differently from one another. The Equal Protection Clause "is essentially a mandate that all persons similarly situated must be treated alike." *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). When a "challenged government action classifies or distinguishes between two or more relevant groups," courts must conduct an equal protection inquiry to determine the validity of the classifications. *Qutb v. Strauss*, 11 F.3d 488, 491 (5th Cir. 1993). Texas' has violated the equal protection clause in two ways: 1)  it has created an unconstitutional burden on the fundamental right to vote; and 2) this burden is also racially discriminatory.

#### i. Unconstitutional Burden on the Right to Vote under *Anderson-Burdick*

In *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 667 (1966) the Court held that voting is a fundamental right. As such, state election laws or enactments that place a burden on the right to vote will be evaluated under the *Anderson-Burdick* analysis, in which a court weighs "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by the rule." *Burdick v. Takushi,* 504 U.S. at 434. If the burden on the right to vote is severe, a court will apply strict scrutiny; if the burden is minimal, a court will weigh the burden against the state's interest under rational

basis review. *Id.* To survive strict scrutiny, a classification created by the state must promote a compelling governmental interest, and it must be narrowly tailored to achieve this interest. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). "However slight [the] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weight to justify the limitation.'" *Crawford v. Marion Ct. Election Bd.,* 553 U.S. 181, 191 (2008).

The burden placed on the voting rights of Texas voters is both disproportionate across all voters and extremely severe. First, it is only voters under the age of 65 that are burdened by Paxton's interpretation of Tex. Elec. Code § 82.003. These voters also comprise more COVID-19 cases than voters over the age of 65 in Texas. The *Crawford* Court determined that [disparate impact] "'matters' in the *Anderson-Burdick* analysis ... whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). It is clear that the effects of the law are unevenly distributed to voters under the age of 65. Since the magnitude of the injury is severe and disproportionate across all voters, these voters are entitled to strict scrutiny.

Under strict scrutiny, Texas is unable to supply any legitimate or reasonable interest to justify such a restriction. To deny mail ballots to Texas voters during a pandemic is to force voters to choose between risking their lives and participating in their democracy. Texas has no interest in denying rightful voters the franchise. Quite the opposite, it is a Texas principle that "[a]ll statutes tending to limit the citizen in his exercise of this right should be liberally construed in [the voter's] favor." *Owens v. State ex rel. Jennett*, 64 Tex. 500, 502 (1885). General Paxton, however, proffers two interests in order to deny millions of Texans a mail-in ballot: (1) mail-in

ballots are a special protection for the aged or disabled and (2) mail ballots enable election fraud. These justifications are hypocritical, contradictory, baseless and non-compelling.

First, the special protections afforded the aged or disabled are also afforded to other voters, including those voters who will be out of the County during Election Day and the early vote period. Tex. Elec. Code § 82.001. It also includes those voters confined in jail. Tex. Elec. Code § 82.004. It includes those voters who have been civilly committed for sexual violence. Op. Tex. Att'y Gen. No. KP-0149 (2017). It applies to those confined for childbirth. Tex. Elec. Code § 82.002(b). To begin with, these categories of mail ballot eligibility are not narrowly tailored to avoid constitutional scrutiny. If offering mail-in voting to sexually violent offenders does not invalidly extend the "special protections made available to Texans with actual illness or disabilities," then how might allowing voters at risk of COVID-19 infection invalidly extend those purportedly special protections? Second, these concerns contradict each other. If mail-ballots are a source of rampant vote fraud, then how do they offer "special protections made available to Texans with actual illness or disabilities?" There are built-in protections to ensure the security of Texas mail ballots, including many criminal penalties. If these protections are good enough to offer special protections to some voters, then they are sound enough for all Texas voters. There are no compelling reasons offered by the State to overcome the strict scrutiny required by the Fourteenth Amendment.

Even if this court finds that this statute should only receive a lesser scrutiny, it cannot be found that there is any rational state interest offered by Texas. A state's interest must be to protect its citizens' public health and safety. By forcing voters to visit the polls in-person during a global pandemic, Texas ensures that citizens' health will be put in jeopardy. Nor does Texas have a rational state interest in fencing out from the franchise a sector of the population because

the way they may vote. "'The exercise of rights so vital to the maintenance of democratic institutions' . . . cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents." *U. S. v. State of Tex.*, 445 F. Supp. 1245, 1260 (S.D. Tex. 1978), aff'd sub nom. *Symm v. United States*, 439 U.S. 1105, 99 S. Ct. 1006, 59 L. Ed. 2d 66 (1979).

### ii.  Racial Discrimination

The Fourteenth Amendment to the U.S. Constitution prohibits states from treating U.S. citizens differently based on their race. As applied in this instance, Texas mail-ballot eligibility law functions to create classifications that are invidiously discriminatory. Most mail ballots are provided to Texas's seniors who are 65 years of age or older. Texas' population of voters older than 65 is overwhelmingly Anglo, creating a disparate impact on mail ballot eligibility. In the pandemic circumstances, General Paxton's interpretation of vote by mail statutes results in racially discriminatory effects on racial minority's right to vote by decreasing turnout of racial minorities and increasing the percentage of the electorate that is Anglo.

### <u>Plaintiffs are Irreparably Injured and Outweighs any Harm to the Defendants</u>

Voting is a constitutional right for those that are eligible. The violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981) (citing, e.g., *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."); *see also Mitchell v. Cuomo*, 748 F.2d

804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). In addition, forcing voters to unnecessarily risk their lives in order to practice their constitutional rights while allowing other voters a preferred status so they do not have to face this same burden, is also irreparable injury. There is no harm to the State allowing registered, legal voters the right to vote in the safest way possible. The State has no interest in forcing voters to choose between their wellbeing and their votes.  Furthermore, the state has no interest in allowing a situation where the Attorney General can sow confusion, un-even election administration and threaten criminal prosecutions on these circumstances.

## Public Interest

The public is best served by both preserving the public health of Texans and by fervent and competitive races for public office. It is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally. There is no justification nor public interest in denying the ballot to eligible voters. This cannot be put more plainly.

Furthermore, it is "always" in the public interest to prevent violations of individuals' constitutional rights. *Deerfield Med. Ctr.*, 661 F.2d at 338-39. It is also in the public interest not to prevent the State from violating the requirements of federal law. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The government has no interest in enforcing an unconstitutional law. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Protecting the right to vote is of particular public importance because it is "preservative of all rights." *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)). Plaintiff clearly meets all the requirements necessary for a preliminary injunction.

### III.     Abstention

Abstention here is not warranted because resolution by the State court will not render this case moot nor materially alter the constitutional questions presented. Plaintiffs allege injury of their Federal constitutional rights in addition to injuries arising from the ambiguity of state law. A Texas state court has already interpreted the ambiguity of Texas' election code and many counties are complying. Yet, General Paxton's letter ruling is preventing meaningful political speech, confuses mail ballot applicants and leaves these voters having to risk criminal prosecution if they seek to protect their health by voting by mail.  Meanwhile, the state lollygags its appeal of Judge Sulak's order while thousands of vote by mail applications are being submitted daily and many counties, cities, and school districts are complying with Judge Sulak's ruling.  Under these circumstances, abstaining from exercising federal court jurisdiction is not warranted.

Anyway, "[t]he abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). In fact, the stay of federal decision is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 1062, 3 L.Ed.2d 1163 (1959) (quoted in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). As such, "abstention is the exception rather than the rule..." *Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. 1981).

*Pullman* abstention must be "narrow and tightly circumscribed" and is "to be exercised only in *special* or '*exceptional*' circumstances." *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir.

1983). But "voting rights cases are particularly inappropriate for abstention," *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000), because in voting rights cases plaintiffs allege "impairment of [their] fundamental civil rights," *Harman v. Forssenius*, 380 U.S. 528, 537 (1965). Abstention is even more inappropriate where the inevitable delay it will cause could preclude resolution of the case before the upcoming elections. *Detzner*, 354 F. Supp. 3d at 1284 (citing *Harman*, 380 U.S. at 537).

In this case, time is of the essence—the runoff election is mere weeks away, and the 2020 general election comes not long after. There is no guarantee that state court proceedings will be completed in time and given the Attorney General's defiance of the state district court ruling, a final state court ruling would not fully vindicate Plaintiffs' *federal* constitutional rights.

Even if Defendants' reading of Tex. Elec. Code § 82.003 was plausible, it is not the sole, mandatory reading of the text, and the constitutional avoidance canon requires that it be rejected. "[W]hen one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." *Pine v. City of W. Palm Beach, Fla.*, 762 F.3d 1262, 1270 (11th Cir. 2014).

Resolution of the state court case, is neither "dispositive of the case" before this Court, nor would its resolution "materially alter the constitutional questions presented" by Plaintiffs' claims. *Siegel*, 234 F.3d at 1174.

Even if the Texas Supreme Court upholds the lower court's reading of Tex. Elec. Code §§ 82.001–4, and even if the Executive branch of the Texas government complies with this reading, this does not properly counsel for abstention. To find otherwise is to depend upon a series of questionable "mights." *See Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (relying on *U.S. v. Stevens*, 559 U.S. 469, 480 (2010), for the proposition that courts

should not decline to enforce constitutional rights in reliance on the "benevolence" of enforcing officials). And even if this long series of "mights" come to pass, that would not change the constitutional questions presented in this case. Plaintiffs allege that Texas' election code is prima facie discriminatory in violation of the constitution. Only this Court can resolve this matter.

Abstention would take considerable time and meanwhile, these Plaintiffs' constitutional speech, right to assemble as a political party and to vote, are all harmed. As it stands, this Court faces a tight schedule for adjudicating this case. Abstention is inappropriate in this case, for the same reason that it is "particularly inappropriate" in voting cases. *See Siegel*, 234 F.3d at 1174. Constitutional "deprivations may not be justified by some remote administrative benefit to the State." *Harman*, 380 U.S. at 542. Therefore, Plaintiffs' injuries are redressable by this Court and abstention is not appropriate.

### IV.    Conclusion & Prayer

For the foregoing reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

A.    Appropriate preliminary injunctive relief to allow the plaintiffs and voters like the plaintiffs to be eligible to receive a mail ballot, to cast that ballot, and to have that ballot counted by the appropriate authority; and,

B.    To enjoin General Paxton and Defendants from threatening voters or voter groups with criminal or civil sanction for voting by mail or communicating with or assisting voters in the process of vote by mail.

**DATED**: April 29, 2020

Respectfully submitted,

TEXAS DEMOCRATIC PARTY

By: /s/ Chad W. Dunn
Chad W. Dunn
General Counsel
State Bar No. 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn, LLP
13231 Champion Forest Drive, Suite 406
Houston, Texas 77069
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
scott@brazilanddunn.com

Dicky Grigg
State Bar No. 08487500
Law Office of Dicky Grigg, P.C.
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: 512-474-6061
Facsimile: 512-582-8560
dicky@grigg-law.com

Martin Golando
The Law Office of Martin Golando, PLLC
SBN #: 24059153
405 N. Saint Mary's, Ste. 700
San Antonio, Texas 78205
(210) 892-8543
martin.golando@gmail.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that, on April 29, 2020, I filed the foregoing Plaintiffs' Motion for Preliminary Injunction *via* the Court's ECF/CM system, which will serve a copy on all counsel of record.

*/s/Chad W. Dunn*
Chad W. Dunn
