IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Texas Democratic Party, Gilbert Hinojosa, | § | |
| Chair of the Texas Democratic Party, | § | |
| Joseph Daniel Cascino, Shanda Marie | § | |
| Sansing, and Brenda Li Garcia, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 5:20-CV-00438-FB |
| | § | |
| Greg Abbott, Governor of Texas; Ruth | § | |
| Hughs, Texas Secretary of State, Dana | § | |
| Debeauvoir, Travis County Clerk, and | § | |
| Jacquelyn F. Callanen, Bexar County | § | |
| Elections Administrator, | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant
Attorney General

DARREN L. MCCARTY
Deputy Attorney General for
Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

MICHAEL R. ABRAMS
Texas Bar No. 24087072
ANNE MARIE MACKIN
Texas Bar No. 24078898
CORY A. SCANLON
Texas Bar No. 24104599
Assistant Attorneys General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Facsimile: 512-320-0667

**ATTORNEYS FOR STATE DEFENDANTS**

**TABLE OF CONTENTS**

BACKGROUND ...................................................................................................... 2

A.  Texas Voters Will Be Able to Safely Cast an In-Person Ballot. ....................... 2

B.  Texas Law Allows Voters to Vote by Mail Only in Limited Circumstances ...... 4

C.  The Texas Democratic Party and Others Sued in Travis County Trial Court .... 5

D.  Texas's Appeal Superseded the State Court's Temporary Injunction ............... 6

E.  The Texas Democratic Party Brought This Duplicative Lawsuit ...................... 8

ABSTENTION ........................................................................................................ 9

PRELIMINARY INJUNCTION STANDARD ........................................................ 11

ARGUMENT ......................................................................................................... 12

A.  Plaintiffs Cannot Overcome Sovereign Immunity and Lack Standing ........... 12

     i.    Sovereign Immunity .......................................................................... 12

     ii.   Standing ............................................................................................ 16

B.  Plaintiffs Are Unlikely to Prevail on the Merits of Their Twenty-Sixth
     Amendment or Equal Protection Claims ...................................................... 19

     i.    The legal standard .............................................................................. 20

     ii.   Plaintiffs' Twenty-Sixth Amendment claim fails ................................ 22

           a.   Under rational-basis review, Plaintiffs cannot prevail ................. 22

           b.   Plaintiffs' Twenty-Sixth Amendment claim also fails under
                *Anderson-Burdick* ................................................................... 24

     iii.  Plaintiffs' Equal Protection claims also fails ...................................... 27

           a.   Age ............................................................................................ 27

           b.   Race ........................................................................................... 28

C.  The Election Code's Definition of "Disability" is Not Unconstitutionally Vague .......... 28

D.  Attorney General Paxton Did Not Intimidate Plaintiffs or Any Other Voters .......... 30

E.  Plaintiffs Will Not Prevail on Their First Amendment Claims ....................... 33

INJUNCTIVE RELIEF AT THIS POINT IN THE ELECTION CYCLE IS IMPROPER .... 34

AN INJUNCTION WOULD UNDERMINE THE PUBLIC INTEREST ................ 35

PLAINTIFFS' PROPOSED INJUNCTION IS OVERBROAD ............................... 36

CONCLUSION ...................................................................................................... 37

CERTIFICATE OF SERVICE ................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ............................................................................................ 2, 35

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ...................................................................................................... 32

*Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,*
   878 F.2d 806 (5th Cir.1989) ......................................................................................... 35

*Am. Fed'n of St., Cnty. & Mun. Emps., Council 25 v. Lan1d,*
   583 F. Supp. 2d 840 (E.D. Mich. 2008) ..................................................................... 32

*Ammex Warehouse Co. v. Archer,*
   381 S.W.2d 478 (Tex. 1964) .......................................................................................... 7

*Anderson v. Celebrezze,*
   420 U.S. 780 (1983) ...................................................................................................... 20

*Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees,*
   19 F.3d 241 (5th Cir. 1994) .......................................................................................... 17

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017) ........................................................................................ 17

*Brooks v. Walker Cty. Hosp. Dist.,*
   688 F.2d 334 (5th Cir. 1982) ........................................................................................ 10

*Bruni v. Hughs,* 5:20-cv-35 (S.D. Tex. Mar. 5, 2020) ...................................................... 8

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .............................................................................................. passim

*Cantu v. Moody,*
   933 F.3d 414 (5th Cir. 2019) ........................................................................................ 31

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019) .......................................................................... 13, 14, 16

*Clapper v. Amnesty Int'l U.S.A,*
   568 U.S. 398 (2013) ...................................................................................................... 18

*Crawford v. Marion Cnty Election Bd.,*
   553 U.S. 181 (2008) ................................................................................................ 22, 24

*Ctr. for Biological Diversity v. EPA,*
   937 F.3d 533 (5th Cir. 2019) ........................................................................................ 18

*Deubert v. Gulf Fed. Sav. Bank,*
   820 F.2d 754 (5th Cir. 1987) ........................................................................................ 31

*Dillard Dep't Stores v. Owens,*
   951 S.W.3d 915 (Tex. App.—Corpus Christi 1997, no writ) ..................................... 11

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) ...................................................................................................... 36

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   878 F.3d 371 (D.C. Cir. 2017) ..................................................................................... 18

*Ford Motor Co. v. Tex. Dep't of Transp.,*
   264 F.3d 493 (5th Cir. 2001) ........................................................................................ 29

*Gilby v. Hughs,* 1:19-cv-1063 (W.D. Tex. Oct. 30, 2019) ................................................ 8

*Groome Resources, Ltd. v. Parish of Jefferson,*
   234 F.3d 192 (5th Cir.2000) ......................................................................................... 29

*Harris Cnty. Comm'r Court v. Moore,*
    420 U.S. 77 (1975) ...........................................................................................10

*Harris v. Samuels,*
    440 F.2d 748 (5th Cir. 1971) ...........................................................................11

*Harrison v. NAACP,*
    360 U.S. 167, 177 (1959) ..................................................................................10

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...........................................................................................18

*Hilliard v. Ferguson,*
    30 F.3d 649 (5th Cir. 1994) ...........................................................................30

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ...........................................................................................17

*In re Abbott,*
    954 F.3d 772 (5th Cir. 2020) ...........................................................................36

*In re State Bd. for Educator Certification,*
    452 S.W.3d 802 (Tex. 2014) ...............................................................................7

*Inclusive Cmtys. Project v. Abbott,*
    2018 WL 2415034 (N.D. Tex. May 29, 2018) ...............................................13

*Jacobson v. Fla. Sec'y of State, -- F.3d --,*
    2020 WL 2049076 (11th Cir. Apr. 29, 2020) ...............................................16

*Justice v. Hosemann,*
    771 F.3d 285 (5th Cir. 2014) ...........................................................................11

*Kimel v. Fla. Bd. of Regents,*
    528 U.S. 62 (2000) ...........................................................................................27

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ...........................................................................18

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) ...........................................................................................15

*Lee v. Va. State Bd. of Elections,*
    843 F.3d 592 (4th Cir. 2016) ...........................................................................21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................... 16, 17, 18, 19

*Maryland v. King,*
    567 U.S. 1301 (2012) ...........................................................................................35

*Mays v. LaRose,*
    951 F.3d 775 (6th Cir. 2020) ...................................................................21, 22

*McCarthy ex rel. Travis v. Hawkins,*
    381 F.3d 407 (5th Cir. 2004) ...........................................................................13

*McDonald v. Bd. of Election Comm'rs of Chi.,*
    394 U.S. 802 (1969) .....................................................................21, 22, 23, 25

*Miller v. Hughs,*
    1:19-cv-1071 (W.D. Tex. Nov. 1, 2019) ...........................................................8

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) ...........................................................................12

*Moore v. Hosemann,*
    591 F.3d 741 (5th Cir. 2009) ...................................................................10, 11

*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014) ...........................................................................13

*NAACP v. City of Kyle,*
  626 F.3d 233 (5th Cir. 2010) ................................................................... 18

*Nashville Student Org. Comm. v. Hargett,*
  155 F. Supp. 3d 749 (M.D. Tenn. 2015) ................................................... 21

*Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.,*
  622 F. Supp. 2d 470 (S.D. Tex. 2009) ...................................................... 29

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ................................................................................ 35

*OCA-Greater Houston v. Texas,*
  867 F.3d 604, 613 (5th Cir. 2017) ............................................................ 16

*Olagues v. Russoniello,*
  770 F.2d 791 (9th Cir. 1985) .................................................................... 32

*Palmer v. Jackson,*
  617 F.2d 424 (5th Cir. 1980) ............................................................... 9, 10

*Parson v. Alcorn,*
  157 F. Supp. 3d 479 (E.D. Va.) ................................................................ 32

*Pennhurst State School and State Hospital v. Halderman,*
  465 U.S. 89 (1984) .................................................................................... 16

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
  734 F.3d 406 (5th Cir. 2013) .................................................................... 36

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ...................................................................................... 34

*Railroad Commission of Texas v. Pullman,*
  312 U.S. 496 (1941) .................................................................................... 9

*Rangra v. Brown,*
  566 F.3d 515 (5th Cir. 2009) .................................................................... 34

*Ray v. Texas,*
  2008 WL 3457021 (E.D. Tex. 2008) ........................................................ 22

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
  140 S. Ct. 1205 (2020) .............................................................................. 34

*Romero v. Coldwell,*
  455 F.2d 1163 (5th Cir. 1972) .................................................................. 10

*Russell v. Harris County,*
  2020 WL 1866835 (S.D. Tex. Apr. 14, 2020) .......................................... 10

*Salmon v. Lamb,*
  616 S.W.2d 296 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ.) ........ 3

*Sessions v. Morales-Santana,*
  137 S. Ct. 1678 (2017) .............................................................................. 37

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) .................................................................................... 19

*Stansberry v. Holmes,*
  613 F.2d 1285 (5th Cir. 1980) .................................................................. 29

*Stanton v. Stanton,*
  421 U.S. 7 (1975) ...................................................................................... 37

*Storer v. Brown,*
  415 U.S. 724 (1974) .................................................................................... 1

*Stringer v. Hughs,*
  5:16-cv-257 (W.D. Tex. Dec. 20, 2019) ..................................................... 8

*TDP v. Debeauvoir*, No. D-1-GN-20-001610 (201st Dist. Ct., Travis Cty., Tex.)
(dkt'd Apr. 17, 2020, 4:09 PM) ...................................................................................6
*Tex. Democratic Party v. Abbott*, 5:20-cv-438 (W.D. Tex. Apr. 7, 2020)...............................8
*Tex. Democratic Party v. DeBeauvior*, D-1-GN-20-001610 (Tex. Dist. [Travis] Mar. 20, 2019) ...............8
*Tex. Democratic Party v. Hughs*, 5:20-cv-8 (W.D. Tex. Jan. 6, 2020) ...............................8
*Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, No. 03-20-00025-CV,
2020 WL 1966314 (Tex. App.—Austin Apr. 24, 2020, no pet. h.) (per curiam) ...............7
*Tex. Indigenous Council v. Simpkins*,
No. 5:11-cv-315, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014)...........................................17
*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
667 F.3d 570 (5th Cir. 2012) ............................................................................... 11, 12
*Texas League of United Latin American Citizens, et al. v. Whitley, et al.*,
Case No. 5:19-cv-00074-FB, Doc. 131 (W.D. Tex. Mar. 27, 2019) ...............................34
*Thornhill v. Alabama*,
310 U.S. 88 (1940) ............................................................................................33
*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ..................................................................................... 20, 25
*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014). .....................................................................25
*United States v. 4*,
385 F.2d 734 (5th Cir. 1967) ................................................................................32
*United States v. Texas*,
445 F. Supp. 1245 (S.D. Tex. 1978) .......................................................................21
*United States v. Williams*,
553 U.S. 285 (2008) ..........................................................................................33
*Va. Office for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) (citation omitted) ...................................................................13
*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ...............................................................................34
*Vielma v. Eureka Co.*,
218 F.3d 458 (5th Cir. 2000) ...............................................................................11
*Voting for Am. v. Steen*,
732 F.3d 382 (5th Cir. 2013) .......................................................................... 11, 12
*Walgren v. Bd. of Selectmen of Town of Amherst*,
519 F.2d 1364 (1st Cir. 1975) ..............................................................................21
*Washington v. Davis*,
426 U.S. 229 (1976) ..........................................................................................28
*Willingham v. Cnty. of Albany*,
No. 04-369, 2005 WL 1660114 (N.D.N.Y. July 12, 2005) ...........................................32
*Women's Med. Ctr. of Nw. Hous. v. Bell*,
248 F.3d 411(5th Cir. 2001) ................................................................................12
*Zapata v. Smith*,
437 F.2d 1024 (5th Cir. 1971) ..............................................................................16
*Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017)....................................................................32

**Statutes**

52 U.S.C. § 10307(b) ........................................................................................31
52 U.S.C. § 10308(d) ........................................................................................31
Tex. Elec. Code § 221.003 ...............................................................................16
Tex. Elec. Code § 31.003 .................................................................................14
Tex. Elec. Code § 82.001-.004 ...................................................................passim
TEX. ELEC. CODE § 83.005 ..............................................................................15
Tex. Elec. Code § 84.0041 ...............................................................................33
Tex. Gov't Code § 418.001 ................................................................................3

**Other Authorities**

Tex. Gov. Proclamation (Mar. 16, 2020 7:30 p.m.) ..........................................3
Tex. Gov. Proclamation (Mar. 18, 2020 10:00 a.m.) .........................................3
Tex. Gov. Proclamation (Mar. 20, 2020 6:35 p.m.) ..........................................3
Texas Civil Practice and Remedies Code sections 51.014(a)(4) and (8) ...............6

**Constitutional Provisions**

U.S. Const. amend. XXVI, § 1 .........................................................................22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Texas Democratic Party, Gilbert Hinojosa, | § | |
| Chair of the Texas Democratic Party, | § | |
| Joseph Daniel Cascino, Shanda Marie | § | |
| Sansing, and Brenda Li Garcia, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 5:20-CV-00438-FB |
| | § | |
| Greg Abbott, Governor of Texas; Ruth | § | |
| Hughs, Texas Secretary of State, Dana | § | |
| Debeauvoir, Travis County Clerk, and | § | |
| Jacquelyn F. Callanen, Bexar County | § | |
| Elections Administrator, | § | |
| *Defendants.* | § | |

## STATE DEFENDANTS' RESPONSE TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

> Common sense, as well as constitutional law, compels the conclusion that government
> must play an active role in structuring elections; "as a practical matter, there must be a
> substantial regulation of elections if they are to be fair and honest and if some sort of
> order, rather than chaos, is to accompany the democratic processes."

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

On April 17, 2020, a Travis County trial court ordered that any Texas voter "without

established immunity [to COVID-19] meet[s] the plain language definition of disability" in the Texas

Election Code, and thus, is eligible to apply for a mail-in ballot in the upcoming 2020 elections. The

State of Texas immediately appealed that order, which conflicts with the Election Code's plain text,

and—more urgently—threatens to destabilize the State's carefully crafted framework governing the

conduct of elections. The resolution of the state court litigation will invariably alter these closely related

federal proceedings. For that reason, the *Pullman* abstention doctrine applies, and this Court should

decline to hear Plaintiffs' claims at this juncture.

Plaintiffs' motion for preliminary injunction also exhibits fatal jurisdictional and substantive defects. None of the State Defendants—Greg Abbott, Governor of Texas, Ken Paxton, Texas Attorney General, or Ruth Hughs, Texas Secretary of State—enforce the provisions of the Election Code at issue. Sovereign immunity therefore bars Plaintiffs' claims for injunctive relief against those officials on the basis of those provisions. For related reasons, Plaintiffs lack standing to sue State Defendants. And on the merits, Plaintiffs have not met their burden of showing that current or unknown future circumstances will prevent voters from safely exercising the franchise via in-person voting in July or November of this year. The known science of COVID-19 is constantly evolving, and with it, our understanding of how elected officials can continue to contain the spread of COVID-19 throughout the State—including, as relevant here, at polling places.

For these reasons and those below, State Defendants request that the Court abstain from ruling on Plaintiffs' claims until the conclusion of the pending state court litigation. Alternatively, Plaintiffs' motion for preliminary injunction should be denied because they have failed to make the showing required to obtain the extraordinary, and extraordinarily broad, injunctive relief they request.

BACKGROUND

**A.    Texas Voters Will Be Able to Safely Cast an In-Person Ballot.**

Our federal system places primary responsibility to protect the health and safety of Americans upon the States. And, in a different context, the Fifth Circuit recently cautioned that a federal court "should not impose[] its own judgment about how the COVID-19 pandemic should be handled . . . ." *In re Abbott*, 954 F.3d 772, 793 (5th Cir. 2020). Likewise, primary responsibility over the conduct of elections belongs to the States, and courts presume that States discharge these duties in good faith. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). To accomplish both these ends, the state officials charged with guiding Texas through this crisis have been assiduously monitoring COVID-19 for months and will continue to do so as long as the COVID-19 disaster continues.

On March 13, 2020, Governor Abbott exercised his statutory authority under the Texas Disaster Act, TEX. GOV'T CODE § 418.001, *et seq.*, and declared a state of disaster in all of Texas's 254 counties. Proclamation (Mar. 13, 2020 11:20 a.m.); *see Salmon v. Lamb*, 616 S.W.2d 296, 298 (Tex. Civ. App.—Houston [1st Dist.] 1981, no writ.) (discussing Governor's emergency authority in election context).

Since the disaster declaration, State officials have adopted multiple measures to protect, among numerous other things, the uniformity and integrity of elections during the ongoing effort to slow the spread of COVID-19. To date, the Governor has:

- Ordered the special election for Senate District 14 to be held on July 14, 2020, stating that holding the election on an earlier date "would prevent, hinder, or delay necessary action in coping with the declared disaster by placing the public's health at risk and threatening to worsen the ongoing public health crisis." Tex. Gov. Proclamation (Mar. 16, 2020 7:30 p.m.);

- Allowed political subdivisions to postpone elections scheduled for May 2, 2020 to November 3, 2020. Tex. Gov. Proclamation (Mar. 18, 2020 10:00 a.m.);

- Postponed the May 26, 2020 primary runoff to July 14, 2020. Tex. Gov. Proclamation (Mar. 20, 2020 6:35 p.m.); and

In consultation with the relevant state agencies, the Governor has also issued appropriate suspensions to allow the election cycle to proceed safely in light of COVID-19. Most recently, just yesterday, the Governor issued a proclamation expanding early voting for the July 14 election. *See* Exhibit A, Tex. Gov. Proclamation (May 11, 2020 5:30 p.m.). The proclamation provides that "early voting by personal appearance shall begin on Monday, June 29, 2020, and shall continue through the fourth day before election day, excluding any legal state or federal holidays." *Id.* at 3. The purpose of the expansion of early voting is to "to ensure that elections proceed efficiently and safely when Texans go to the polls to cast a vote in person during early voting or on election day" by providing election officials with sufficient time to "implement appropriate social distancing and safe hygiene practices." *Id.* at 2.

The Secretary of State has taken action, too, by issuing several advisories, including one providing guidance to local election officials on postponing elections scheduled for May 2, 2020.[1] The Secretary urged local officials to exercise their authority to postpone elections scheduled for May 2, 2020 pursuant to the Governor's March 18, 2020 proclamation, and as a result, most elections previously scheduled for this month were postponed until at least July. The Secretary of State's office also has alerted election officials to the Governor's May 11 proclamation and noted that counties have the "flexibility to offer voters extended early voting hours." Exhibit B, Mass Email re: Proclamation regarding early voting for July 14, 2020 Elections (May 11, 2020). The advisory explained further that the State of Texas is receiving $29.4 million in federal funds to "prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle." *Id.* Those funds will be sub-granted to Texas counties. *Id.* And, in very short order, the Secretary of State will provide "detailed recommendations for protecting the health and safety of voters and election workers at the polls" and work closely with election officials "to ensure that our elections are conducted with the utmost safety and security." *Id.*

**B.   Texas Law Allows Voters to Vote by Mail Only in Limited Circumstances.**

Most Texas voters vote in person, either during early voting or on election day. Voters may apply to vote by mail in only one of four instances—if they: (1) anticipate being absent from their county of residence; (2) have a disability that prevents them from appearing at the polling place; (3) are 65 or older; or (4) are confined in jail. TEX. ELEC. CODE § 82.001-.004. "Disability" for the purposes of the Election Code, is defined to allow a qualified voter to vote by mail if the "voter *has a* sickness or physical condition that prevents the voter from appearing at the polling place *on election day* without a likelihood of needing personal assistance or of injuring the voter's health." *Id.* § 82.002(a)

---

[1] Texas Secretary of State, *Election Advisory No. 2020-12 Actions for May 2, 2020 Uniform Election Date* (March 18, 2020), *available at* https://www.sos.state.tx.us/elections/laws/advisory2020-12.shtml.

(emphasis added). A disability need not be permanent to meet this definition so long as it exists on election day. For example, the Legislature expressly includes "expected or likely confinement for childbirth" in defining disability for purposes of ballot-by-mail eligibility. *Id.* § 82.002(b). This rule allowing sick or physically disabled voters to vote by mail has existed since 1935. Acts of 1935, 44th Leg., 2nd C.S., ch. 437, § 1, 1944 Tex. Gen. Laws 1700, 1700–01 (recodified 1985) (current version at Tex. Elec. Code §§ 82.001–.002).

**C.      The Texas Democratic Party and Others Sued in Travis County Trial Court.**

On March 23, 2020, the Texas Democratic Party (TDP) and two voters sued Travis County Clerk Dana Debeauvoir and the Secretary of State, seeking a declaration that the Election Code's definition of "disability" applies to all voters who "believe they should practice social distancing in order to hinder the known or unknown spread of a virus or disease." Doc. 10-3 at 7 (quoting state court petition). Plaintiffs voluntarily dismissed their state court case against the Secretary. *Id.* at 8 n.7. Because when filed, the lawsuit implicated the constitutionality of State law and threatened to create chaos and uncertainty across Texas's county-based election system (and indeed, has already done so), the State of Texas intervened by and through its Attorney General and participated in the preliminary injunction hearing.[2] *Id.* at 7.

At a hearing on April 15, the State argued that the plaintiffs lacked standing to pursue their claims, which were based on a theory of speculative harm common to every Texas voter, and that the claims were unripe and sought an advisory opinion. Doc. 10-1 at 153–55. The State noted that scientific knowledge and insight into COVID-19 is growing and that State officials had demonstrated that their response was appropriately evolving as circumstances warranted changes to the State's statutory election procedures. *Id.* at 155–56. Testimony from the plaintiffs' experts supported these

---

[2] After Texas's intervention, an additional voter and several entities aligned with the TDP intervened on the plaintiffs' side. Doc. 10-3 at 7–8. The state court plaintiff-intervenors are not parties to this case.

propositions. *Id.* at 91 (testimony of epidemiologist that it is "very fair" to say that "we are still learning about COVID-19"); *id.* at 94 (recognizing that Texas's public policy with respect to COVID-19 continues to develop). On the merits, the State argued that Section 82.002 of the Election Code does not permit voting by mail based on a fear of contracting a disease; instead, under the plain reading of the statutory text, a voter must have an illness or physical condition that in fact prevents them from voting in person without a likelihood of injury to that voter's health. *Id.* at 156–57.

The trial court did not rule from the bench on April 15. The court indicated that it intended to grant the plaintiffs' motion, but that the form of the order was still to be determined. Doc. 10-1 at 191, 193. Within thirty minutes of undersigned counsel's being notified of entry of the court's subsequent order on April 17, Texas filed its Notice of Appeal.[3] As stated in that notice, Texas was entitled to appeal under Texas Civil Practice and Remedies Code sections 51.014(a)(4) and (8), which allow for immediate expedited interlocutory appeal from an order granting a temporary injunction or denying a plea to the jurisdiction. Pursuant to Texas Civil Practice and Remedies Code Section 51.014(b), all further proceedings in the State trial court are stayed pending resolution of the appeal.

## D.     Texas's Appeal Superseded the State Trial Court's Temporary Injunction.

Under the Texas Rules of Appellate Procedure, the trial court's temporary injunction was stayed upon the State's appeal. In their motion for preliminary injunction in this Court, Plaintiffs mistakenly contend that the "only legitimate course of action for the Attorney General to void a Texas court order is to allow the trial court to issue its order, appeal the order for a stay, and then proceed expeditiously on appeal to make the best case for the order to be overturned." Doc. 10 at 19. From that misunderstanding of Texas civil procedure, Plaintiffs accuse the Attorney General of spurning the Travis County trial court and dismantling the rule of law in Texas. Doc. 10 at 1–2. But it is

---

[3] *See* Notice of Interlocutory Appeal, *TDP v. Debeauvoir*, No. D-1-GN-20-001610 (201st Dist. Ct., Travis Cty., Tex.) (dkt'd Apr. 17, 2020, 4:09 PM).

Plaintiffs' position that flouts the rule of law in the State. Indeed, the State's right under Texas law to supersede and automatically suspend the effect of certain trial court judgments is well-established. As the Texas Supreme Court has long recognized

> "The State has a valid statutory right to a supersedeas without filing a bond upon perfecting its appeal by giving proper notice. Unless a contrary intention is made known to the Court, *the State's notice of appeal operates as a supersedeas.*" *Ammex* plainly recognized the State's right to supersedeas upon filing a notice of appeal, and that power, also reflected today in T[EX.] R[.] A[PP.] P[.] 25.1(h), is undisputed.

*In re State Bd. for Educator Certification*, 452 S.W.3d 802, 805 (Tex. 2014) (quoting *Ammex Warehouse Co. v. Archer*, 381 S.W.2d 478, 482, 485 (Tex. 1964) (emphasis added)). If this was ambiguous before, or if it was unclear whether the State's right to supersede applies to temporary injunctions, Texas' Third Court of Appeals—where the state court appeal originated—reiterated this rule just last month. *Tex. Educ. Agency v. Hous. Indep. Sch. Dist.*, No. 03-20-00025-CV, 2020 WL 1966314, at *2 (Tex. App.—Austin Apr. 24, 2020, no pet. h.) (per curiam). The court held that although an appellee may seek an order to preserve its rights pending the State's appeal,[4] the State has an automatic right to supersede upon filing a notice of appeal. *Id.* at *6 (stating that a "trial court has no discretion" to issue an order preventing that right).

Thus, when the State filed its appeal, the trial court's injunction was suspended, as were any obligations that it purported to impose upon the State. On May 6, 2020, the State court plaintiffs filed an emergency motion to undo that suspension and reinstate enforcement of the order. Plaintiffs' motion is pending in Texas's Fourteenth Court of Appeals, which received the case upon a transfer order from the Texas Supreme Court.[5] The Fourteenth Court of Appeals has ordered expedited briefing on both the emergency motion and the parties' merits briefing, and the State's brief on the

---

[4] The State has reserved the right to seek additional review in *Texas Education Agency* as Texas law limits an appellate court's ability to order such relief to circumstances not presented in that (or Plaintiffs' state court) case.

[5] The appeal of the Travis County court order is now No. 14-20-00258-cv (Tex. App.—Houston [14th], dkt'd May 6, 2020). The Fourteenth Court of Appeals ordered a response to Plaintiffs' motion by noon on May 11, 2020, which the State filed promptly.

merits has been filed (a week before even the Fourteenth Court's expedited deadline). Under the Fourteenth Court's revised briefing schedule, the case will be submitted no later than June 12, 2020.

## E.   The Texas Democratic Party Brought This Duplicative Lawsuit.

In the past six months, the TDP has led a coordinated campaign against half a dozen of Texas's election regulations, some dating back decades and originally enacted by members of the TDP itself.[6] This lawsuit is the latest salvo. Hedging against an unfavorable outcome in State court, Plaintiffs TDP, its Chair Gilberto Hinojosa, and three voters filed this action on April 7, 2020. *See* Doc. 1. Their amended complaint offers a variety of legal theories, but it seeks relief indistinguishable from what the TDP sought—and preliminarily obtained—in State district court. *E.g.*, Doc. 10-5 (Plaintiffs' proposed order purporting to allow any voter to vote by mail because of COVID-19). Plaintiffs did not, however, move urgently to serve the State Defendants or to litigate their claims in this Court. Instead, they waited until well after the State court ruled in their favor (and nearly two weeks after the Texas filed its notice of appeal) to pursue injunctive relief here.

Now, unhappy with the rules of procedure in the State court system they chose to utilize first, Plaintiffs claim crisis. They focus on the State's articulation of the plain text of the Election Code— namely, that fear of contracting COVID-19 does not, without more, constitute a disability. Plaintiffs argue that this "interpretation" (1) violates the Twenty-Sixth Amendment as-applied, (2) discriminates on the basis of race in violation of the Equal Protection Clause as-applied, and (3) is void for vagueness. Doc. 10 at 15, 30, 22–25. Perhaps Plaintiffs' most creative claim is that the Texas Attorney General acted improperly in responding to an inquiry from a legislator, Representative Stephanie

---

[6] *See Gilby v. Hughs*, 1:19-cv-1063 (W.D. Tex. Oct. 30, 2019) (challenging HB 1888, which eliminated the use of certain temporary polling locations for early voting in Texas); *Miller v. Hughs*, 1:19-cv-1071 (W.D. Tex. Nov. 1, 2019) (challenging a ballot order statute enacted by Democratic officeholders); *Stringer v. Hughs*, 5:16-cv-257 (W.D. Tex. Dec. 20, 2019) (challenging voter registration laws); *Tex. Democratic Party v. Hughs*, 5:20-cv-8 (W.D. Tex. Jan. 6, 2020) (challenging statutory requirement that voter registration applications be in writing and signed by applicant); *Bruni v. Hughs*, 5:20-cv-35 (S.D. Tex. Mar. 5, 2020) (challenging repeal of straight ticket voting); *Tex. Democratic Party v. Abbott*, 5:20-cv-438 (W.D. Tex. Apr. 7, 2020); *Tex. Democratic Party v. DeBeauvior*, D-1-GN-20-001610 (Tex. Dist. [Travis] Mar. 20, 2019).

Klick, Chair of the Texas House of Representatives Committee on Elections, who asked General Paxton for his interpretation of Election Code Section 82.002(a). Doc. 10-2 at 2. Plaintiffs seek to enjoin General Paxton from exercising his right to comment on these matters of deep public concern to the State of Texas.

**ABSTENTION**

Though Plaintiffs' current claims sound in federal law, they cannot be resolved without answering the question posed in state court: whether fear of contracting COVID-19 constitutes a "disability" under the Texas Election Code. That question is squarely presented in the state court litigation and will likely be taken up by Texas's civil court of last resort in short order. In light of uncertainty about a predicate question of state law, this Court should abstain under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941). "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980).

Plaintiffs have done all they can to manufacture uncertainty about eligibility to vote by mail under Texas law. Broader eligibility to vote by mail would put Plaintiffs' claims "in a different posture," if not moot them entirely. *Id.* That is because if the plaintiffs in prevail in state court, all Texas voters could be eligible to vote by mail. In turn, Plaintiffs' as-applied constitutional claims here, which are based on the alleged disparities between voters who can vote by mail and voters who cannot in the unique context of COVID-19, will be moot. Plaintiffs all but concede this point. *See* Doc. 10 at 33.

At most, Plaintiffs would be left with facial constitutional challenges, which Plaintiffs expressly declined to bring in their motion for preliminary injunction. *See id.* at 14 n.8. But the fact that some claims might remain in the aftermath of the state courts' interpretation of state law does not counsel against abstention: Even if the State court litigation "would not 'avoid in whole or in part the necessity

for federal constitutional adjudication,' it might 'at least materially change the nature of the problem.'" *Jackson*, 617 F.2d at 431 (quoting *Harrison v. NAACP*, 360 U.S. 167, 177 (1959)); *see also Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (noting abstention standard that the state court proceedings "substantially modify the federal constitutional question"); *Brooks v. Walker Cty. Hosp. Dist.*, 688 F.2d 334, 338 (5th Cir. 1982) (abstaining because "clarification of" state law "may have a considerable impact on the posture and ultimate resolution of . . . federal issues").

COVID-19 has generated new issues for courts. Just weeks ago, a federal court recognized the need for abstention in these extraordinary circumstances. Rather than decide federal constitutional questions, Judge Rosenthal abstained because "relevant state law is uncertain and will impact any argument in this court." *Russell v. Harris Cnty.*, 2020 WL 1866835, at *13 (S.D. Tex. Apr. 14, 2020). "[D]elicate considerations of federalism and separation of powers support abstention in this complex, rapidly evolving situation." *Id.* The same reasoning applies here. Texas officials need space to enact policies that are responsive to and take full consideration of the evolving COVID-19 situation. Moreover, elected officials are better-equipped than courts to grasp the range of public health and social issues at play and craft appropriate policies to address them. And this is precisely their role in our representative democracy. For these reasons, this case presents an almost textbook illustration of the *Pullman* abstention doctrine. *See Harris Cnty. Comm'r Court v. Moore*, 420 U.S. 77, 84 (1975) ("Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law.").

Recognizing that their own litigation strategy dictates that this Court abstain from hearing this case under *Pullman*, Plaintiffs preemptively argue that abstention is inappropriate because this is a voting-rights case. Doc. 10 at 33. On the contrary, binding precedent "confirm[s] that traditional abstention principles apply to civil rights cases." *Romero v. Coldwell*, 455 F.2d 1163, 1167 (5th Cir. 1972) (abstaining in a one-man, one-vote case). Thus, it is no surprise the Fifth Circuit frequently abstains

in cases challenging election laws. *See, e.g., Justice v. Hosemann*, 771 F.3d 285, 301 n.14 (5th Cir. 2014); *Moore*, 591 F.3d at 745–46; *see also Harris v. Samuels*, 440 F.2d 748, 752–53 (5th Cir. 1971).

And although Plaintiffs assert that state court proceedings are not moving quickly enough, Doc. 10 at 33, Plaintiffs are the masters of their litigation decisions. At the temporary injunction hearing before the state court, counsel for Plaintiffs expressly disclaimed any argument that Section 82.002(a) is unconstitutional on any of the theories they pursue here. Doc. 10-1 at 38. It is beyond peradventure that state courts can resolve these types of constitutional questions, *see, e.g., Dillard Dep't Stores v. Owens*, 951 S.W.3d 915, 919 (Tex. App.—Corpus Christi 1997, no writ), and that federal courts can interpret state law, *e.g., Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000). Plaintiffs chose to split their claims; that litigation decision does not support ignoring longstanding abstention doctrines that federal courts have applied for decades. Instead, Plaintiffs' claims should be dismissed without prejudice until the state court proceedings conclude. *See Moore*, 420 U.S. at 88 (explaining that because the Texas Supreme Court has ruled that "it cannot grant declaratory relief under state law if a federal court retains jurisdiction over the federal claim," "we direct the District Court to dismiss the complaint").

## PRELIMINARY INJUNCTION STANDARD

Should the Court determine that *Pullman* abstention does not apply and that a ruling should issue, the Court should deny Plaintiffs' motion. To obtain a preliminary injunction, the applicants must show "(1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Voting for Am. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)).

The Fifth Circuit "has repeatedly cautioned that a preliminary injunction is an *extraordinary*

remedy which should not be granted unless the party seeking it has *clearly* carried the burden of persuasion on *all four* requirements." *Steen*, 732 F.3d at 386 (quoting *Lakey*, 667 F.3d at 574 (quotation marks omitted)) (emphasis added). If the movant fails to establish any one of the four elements, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). Even if a movant satisfies all four factors, the decision whether to grant a preliminary injunction lies within the district court's discretion and is to be treated as an exception rather than the rule. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

ARGUMENT

## A. Plaintiffs Cannot Overcome Sovereign Immunity and Lack Standing.

Plaintiffs are unlikely to prevail on their claims against State Defendants under the Fourteenth and Twenty-Sixth Amendments because those defendants do not enforce Texas Election Code Section 82.002 or 82.003, and are immune from suit. For related reasons, Plaintiffs lack standing to bring these claims against the State Defendants.

### i. Sovereign immunity

As an initial matter, it is unclear what actions Plaintiffs seek to enjoin, and against whom they request that injunction to apply. As best the State Defendants can discern, Plaintiffs seek to enjoin enforcement of Election Code chapter 82 in a manner that would prohibit universal mail-in voting. Their proposed order asks the Court to order that "Defendants may not deny a mail in ballot to any Texas voter that applies for a mail-in ballot because of the risk of transmission of COVID-19." Doc. 10-5. That would necessarily mean enjoining State Defendants from giving effect to the plain meaning of Election Code Sections 82.002 and 82.003. But because none of the State Defendants enforce those sections, this claim is barred by immunity.

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy*

*ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Thus, Plaintiffs' claims fail unless they fit that exception. *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

As a consequence, *Ex parte Young* applies only when the defendant enforces the challenged statute. The "the general duty to see that the laws of the state are implemented" held by a statewide official (such as the Governor, Attorney General, or Secretary of State) is insufficient. *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quotation marks omitted). Instead, the named defendant must have "particular duty to enforce the statute in question *and* a demonstrated willingness to exercise that duty." *Id.* (emphasis added; quotation marks omitted). As the Fifth Circuit has recently emphasized, even when a government official "*has* the authority to enforce" a challenged statute, a plaintiff still must show the official "is likely to do [so] here." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). That is, without evidence that the named defendant is likely to enforce the law against these plaintiffs, the government official "lacks the requisite connection to the enforcement of" the challenged law. *Id.* (quotations omitted).

None of the State Defendants in this case has the "requisite connection" to bring him or her within *Ex parte Young*'s ambit. *First*, the Governor does not enforce the Texas Election Code, and, more specifically, does not administer Texas elections. The Governor's authority as the State's chief executive does not make him a proper defendant. *See, e.g.*, *Morris*, 739 F.3d at 746 (dismissal of Governor Perry from case because the statute at issue did not "specially task Governor Perry with its enforcement, or suggest that he will play any role at all in its enforcement."); *Inclusive Cmtys. Project v. Abbott*, 2018 WL 2415034, at *6 (N.D. Tex. May 29, 2018) (holding that group lacked standing to sue

Governor Abbott where challenged laws "do not provide Governor Abbott with the authority or 'definite responsibilities' to enforce the Statute").

*Second*, General Paxton also does not have authority to administer Texas elections. *Cf. City of Austin*, 943 F.3d at 1002 ("[T]his circuit's caselaw requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law."). General Paxton has concurrent jurisdiction with local prosecutors to prosecute election fraud. But Plaintiffs have made no allegations that General Paxton has either brought criminal enforcement proceedings for potential violations of the Election Code relating to COVID-19, or threatened to bring such criminal proceedings against them. At most, they point to a letter in which General Paxton noted (in response to a question that he received) that "to the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity *could* subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Doc. 10-2 at 6 (emphasis added). But General Paxton cautioned that "whether specific activity constitutes an offense under these provisions will depend upon the facts and circumstances of each individual case." *Id.* Those caveats are critical; they reflect that General Paxton is not threatening criminal enforcement against any particular actor. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (noting to establish standing in a pre-enforcement context, the threat of enforcement against a particular plaintiff must not be "chimerical").

*Third*, although the Election Code charges the Secretary of State with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code," TEX. ELEC. CODE § 31.003, it does not provide her the power to actually enforce the Election Code or to coerce local officials. Instead, it authorizes the Secretary to "assist and advise all election authorities with regard to the application, operation, and interpretation of this code." *Id.* § 31.004(a). Thus, the Secretary "maintain[s] an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b). The

Secretary's other, limited enforcement powers would not allow her to coerce a local official in a case like this. *E.g.*, *id.* § 31.005. Because she neither enforces the mail-in-ballot rules herself nor controls local officials' enforcement, the Secretary lacks the requisite connection to the challenged law for purposes of *Ex parte Young*.

Instead, early-voting clerks are responsible for conducting early voting and must "review each application for a ballot to be voted by mail." *Id.* § 86.001 (a). For most state- and county-wide elections, the county clerk or elections administrator is the early-voting clerk, while "[t]he city secretary is the early voting clerk for an election ordered by an authority of a city." *Id.* § 83.005. Each early-voting clerk is responsible for determining whether an application to vote by mail complies with all requirements, providing notice and cure instructions to a voter who submits a noncompliant application, and "provid[ing] an official ballot envelope and carrier envelope with each ballot provided to a voter" who properly completes an application. *Id.* §§ 86.001(a), .008, .009, .002(a). Thus, the counties and political subdivisions, not State officials, are responsible for administering early voting in Texas.

But even if the State Defendants could control local officials' enforcement of the early voting laws, a federal court could not order them to exercise such power. The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." 209 U.S. at 159. It does not authorize mandatory injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) ("Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property."). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity."

*Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971) (Frankfurter, J., dissenting); *see also Jacobson v. Fla. Sec'y of State*, -- F.3d --, 2020 WL 2049076, at *13 (11th Cir. Apr. 29, 2020) (explaining that "an injunction ordering the Secretary to promulgate a rule . . . . would have raised serious federalism concerns" and that "it is doubtful that a federal court would have authority to order it"). Because that is true here, Plaintiffs cannot overcome State Defendants' immunity.[7]

### ii.     Standing

Plaintiffs also cannot establish standing to sue State Defendants. Acceptance or rejection of an application to vote by mail falls to local, rather than State, officials. *See supra*, Part A(i). Thus, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; rather, they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted). And the impact of the statutory scheme on a plaintiff is irrelevant for standing purposes; what matters is whether the named defendants enforce that scheme. *See Okpalobi*, 244 F.3d at 426 (majority op.) (dismissing claims for lack of standing and explaining that courts should not "confuse[] *the statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*"); *Paxton*, 943 F.3d at 1002 (finding that it was "unlikely that the [plaintiff] had standing" to sue a state official who did not have the power to enforce the challenged statute). Thus, Plaintiffs' purported injuries are not redressable, and Plaintiffs' claims fail for that reason, too.[8]

Moreover, Plaintiffs have failed to establish any cognizable injury and are essentially seeking an impermissible advisory opinion. "Because a preliminary injunction may only be awarded upon a

---

[7] To the extent that the Plaintiffs' claims would require this Court to order state officials to comply with state (as opposed or in addition to) federal law, it is also barred by the principles announced in *Pennhurst State School and State Hospital v. Halderman*, 465 U.S. 89 (1984).

[8] *OCA-Greater Houston v. Texas* does not help Plaintiffs because it found standing only for "facial" claims and only when there is "no private right of action." 867 F.3d 604, 613 (5th Cir. 2017). Here, Plaintiffs bring as-applied claims, and there is a relevant private right of action. Losing candidates can bring election contests to challenge the application of the statute. *See* TEX. ELEC. CODE § 221.003.

clear showing that the plaintiff is entitled to such relief, the plaintiffs must make a clear showing that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (internal quotation marks omitted). Of course, this requires "evidence in the record of an injury-in-fact." *Id.* at 355. Here, Plaintiffs have not submitted *any* evidence of standing, not even declarations from the plaintiffs themselves. That alone is reason enough to deny the motion for a preliminary injunction.

Allegations in Plaintiffs' complaint cannot suffice at the preliminary-injunction stage. Even if Plaintiffs' allegations sufficed at the pleading stage, they are not enough at this stage. *See Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). But in any event, even if Plaintiffs had submitted evidence proving their allegations to be true, that still would not be enough. Plaintiffs have not plausibly alleged a cognizable injury in fact.

This includes the TDP and its Chair, Gilberto Hinojosa. TDP lacks associational standing because it has not identified any injured members. First, TDP has not established that it even has members within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). TDP has not alleged that its purported members "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). Nor they do not allege that those individuals "participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). The allegation that some of the individual Plaintiffs voted in a Democratic primary election is insufficient. *See* Doc. 9 ¶¶ 71–73. The individual Plaintiffs do not even allege that they consider themselves members of TDP.

Second, even if the individual Plaintiffs were members of TDP, they lack standing for the reasons explained above and below. Without injured members, TDP cannot have associational standing. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

TDP also does not have organizational standing. An organization lacks organizational standing unless it satisfies the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *E.g., NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61). In an appropriate case, an organization can establish an injury in fact by showing that the challenged law conflicts with the organization's mission and "perceptibly impair[s]" its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

If an organization avoids the impairment of its activities by spending additional resources to combat the effects of the challenged law, then the "drain on the organization's resources" may constitute an injury in fact. *Id.*; *see City of Kyle*, 626 F.3d at 238. But a diversion of resources is not a cognizable injury in fact unless the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010);*see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("[A]ny resources [the organizational plaintiff] used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." (quotation omitted)). That is because a plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

TDP's claims fail on both theories. It has not established that Sections 82.002–.003 cause them any cognizable injury-in-fact. Plaintiffs claim they are "injured by the uncertainty of the laws associated with voting by mail[.]" Doc. 10 at 6–7. By TDP's own admission, the injury is uncertain and therefore

speculative, and the Party and its leaders therefore lack standing. *See Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)) (to have standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision').

Plaintiff Hinojosa also lacks standing. Insofar as he sues in his official capacity as the chairman of TDP, he lacks standing for the same reason TDP does. Insofar as he sues in his individual capacity, he lacks standing for the same reasons the other individual Plaintiffs do. None of the individual Plaintiffs has alleged that he or she is currently ineligible to vote by mail. *See* Doc. 9 ¶¶ 70–73. Perhaps they would be eligible to vote by mail, for example, because they expect to be traveling or because they have a qualifying disability. Their complaint does not say and therefore fails to establish standing. Instead, the complaint demonstrates that Plaintiffs seek an advisory opinion based on contingent or speculative circumstances. *See Halder v. Standard Oil Co.*, 642 F.2d 107, 110 (5th Cir. 1981) (noting that a court may not issue "an opinion advising what the law would be upon a hypothetical state of facts.").

There are other standing problems. No Plaintiff has standing to pursue a race discrimination claim. The three named Plaintiffs have not even pleaded membership in a protected racial group, let alone how they are being discriminated against on account thereof. *See* Doc. 10 at 7. Accordingly, they lack standing to sue for racial discrimination that they do not even plausibly allege or describe. And, as explained above, TDP claims only that it "is injured by the uncertainty of the laws associated with voting by mail." Doc. 10 at 6. TDP does not claim an injury for violations of the Constitution on the basis of race. Because no Plaintiff has standing to pursue a claim for unlawful racial discrimination, Plaintiffs cannot obtain a preliminary injunction on that claim (or any other for which they have not established standing).

**B.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Twenty-Sixth Amendment or Equal Protection Claims.**

On the merits, Plaintiffs claim that State Defendants have violated the Fourteenth and Twenty-Sixth Amendments by failing to implement a mail ballot system that applies to all registered

voters universally, especially those who fear exposure to COVID-19. More specifically, Plaintiffs claim that (1) the definition of a "disability" under Section 82.002 of the Election Code creates an unconstitutional burden on the fundamental right to vote; (2) Section 82.003, which allows voters 65 years of age or older to apply to vote by mail, creates impermissible voter classifications based on age;[9] and (3) those classifications are also racially discriminatory. Doc. 10, Part II(A), (E). But Plaintiffs cannot make out any constitutional violation. And the relief they seek is an unjustified wholesale abrogation of the Texas Legislature's complex statutory framework regulating the State's elections. This statutory framework survives constitutional scrutiny, even in (and perhaps, especially in) these challenging times.

### i.     The legal standard

In recent decades, the Supreme Court has evaluated First and Fourteenth Amendment challenges to state election laws under the "*Anderson-Burdick*" framework. *See Burdick*, 504 U.S. 428; *Anderson v. Celebrezze*, 420 U.S. 780 (1983). Under this standard, courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id.* "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citations omitted).

---

[9] Texas is not the only state that expands voting by mail for older voters. Seven others—Indiana, Kentucky, Louisiana, Mississippi, South Carolina, Tennessee, and West Virginia—do too. *See* Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, National Conference of State Legislatures, *available at* https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

Plaintiffs do not dispute that *Anderson-Burdick* applies to their Equal Protection claims, Doc. 10 at 27–28, but they contend that strict scrutiny applies to their Twenty-Sixth Amendment claim. The only authority they identify, *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), does not support that proposition for three reasons. *First*, in that case, the district court described itself as applying "close constitutional scrutiny" to a restriction on the right to vote. *Id. at* 1246. But the case pre-dates the modern *Anderson-Burdick* standard. *Second*, it dealt with a burden on the right to register to vote, *id.* at 1248, which—as noted *infra*—is subject to more robust protection than an asserted right to vote in a given way, such as a mail-in ballot. *See, e.g.*, *McDonald*, 394 U.S. at 807–09; *Mays v. LaRose*, 951 F.3d 775, 783, n.4 (6th Cir. 2020); *Burdick*, 504 U.S. at 433. *Third*, *United States v. Texas* dealt with the singling-out of the student community for special treatment and the imposition of nearly insurmountable voter-registration requirements. 445 F. Supp. at 1246. By contrast, here young people and elderly people alike have the same avenues for in-person voting available to them.

In the alternative, Plaintiffs contend that the Court should evaluate their Twenty-Sixth Amendment claim through the *Arlington Heights* factors. Doc. 10 at 28. But thus far, neither the Fifth Circuit nor the Supreme Court has established a standard for Twenty-Sixth Amendment claims, and neither of the Courts of Appeal to have considered such claims have applied the *Arlington Heights* factors. *See Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016); *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1366–67 (1st Cir. 1975). To the contrary, courts, including the First Circuit, have either applied or suggested they would apply the *Anderson-Burdick* balancing approach. *Cf. Walgren*, 519 F.3d at 1367 (suggesting a "rigorous standard of review" might apply to a Twenty-Sixth Amendment claim "if a significant burden were . . . intentionally imposed"); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 754 (M.D. Tenn. 2015) ("the court finds that, similarly, the Tennessee Voter ID Law is not an abridgment of the right to vote, let alone a denial of it, for purposes

of a Twenty-Sixth Amendment claim.") (citing *Crawford v. Marion Cnty Election Bd.*, 553 U.S. 181 (2008) (applying *Anderson-Burdick*)).

The Court should apply rational basis review because this case implicates the ability to vote by mail, not the fundamental right to vote. But even if the stricter *Anderson-Burdick* standard applies, Plaintiffs' constitutional claims fail.

### ii.    Plaintiffs' Twenty-Sixth Amendment claim fails.

#### a.   Under rational-basis review, Plaintiffs cannot prevail.

The Twenty-Sixth Amendment provides that the "right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. CONST. amend. XXVI, § 1. Texas Election Code section 82.003 does not "deny or abridge" anyone's right to vote. It is therefore subject to rational-basis review, which it easily satisfies.

No one, least of all the State, disputes that "voting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (citations and quotation marks omitted). "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Id.* Consequently, "State action making it easier for some electors to vote—such as providing them an extended deadline to register for absentee ballots— doesn't make it harder to vote for electors that don't get the same benefit." *Mays v. LaRose*, 951 F.3d at 783 (6th Cir. 2020).

It is perhaps unsurprising, then, that "there is no constitutional right to an absentee ballot." *Id.* at 792 (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-09 (1969)). *See also, e.g., Ray v. Texas*, 2008 WL 3457021 (E.D. Tex. 2008) ("It is well-settled that voting by absentee ballot is not a fundamental right requiring strict scrutiny analysis.") (citing *McDonald*, 394 U.S. 802); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. at 209 (Scalia, J., concurring in the judgment) ("That the State

accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

In *McDonald*, the Supreme Court recognized the clear distinction between the right to register to vote and cast a ballot, and the ability to utilize a state's absentee-ballot machinery. 394 U.S. at 807 The Court explained that "absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise[.]" *Id.* That the jailed plaintiffs in *McDonald* were unable to vote by mail did not implicate the right to vote because it did not "preclude[ ] [the plaintiffs] from voting" via other methods. *Id.* at 808; *id.* at 807 ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. . . ."). Thus, laws allowing certain groups to vote by mail cannot fairly be said to *deny* the franchise to those groups not included, and any burden on the fundamental right to vote is minimal and therefore subject to rational basis review. *See id; see also, e.g.*, *Burdick*, 504 U.S. at 433.

Under rational basis review, so long as the distinctions made in the challenged law bear a rational relationship to a legitimate governmental end, the law must be upheld. *Id.* at 809. The Texas Election Code's distinction between those aged 65 and over and those under 65 for purposes of voting by mail is rational. Even outside the context of COVID-19, individuals aged 65 and over (as a group) face unique challenges in attending the polls. For example, many live in nursing homes and have limited mobility.[10] The State's decision to allow older Texans to vote by mail without extending that privilege to everyone is a rational way to facilitate exercise of the franchise for Texans who are more likely to face everyday barriers to movement, outings, and activity than younger people. The decision has proven particularly prescient here, given that individuals aged 65 and over face a greater risk of developing complications from COVID-19 than those under 65. Exhibit C, Declaration of Jeffrey

---

[10]    *See* Long Term Care, Texas Health and Human Services, *available at* https://hhs.texas.gov/services/aging/long-term-care (estimating that as many as 70 percent of people turning 65 can expect to use some form of long-term care during their lives).

Klausner, M.D., ¶¶ 24–28. For these reasons, Section 82.003 survives rational basis review.

       **b.   Plaintiffs' Twenty-Sixth Amendment claim also fails under** *Anderson-Burdick*.

Even if the stricter *Anderson-Burdick* standard applies, section 82.003 meets that standard. "To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* (quotations omitted). The Texas Legislature has not provided for universal mail-in balloting, and the Constitution allows the Legislature that choice.

As the Supreme Court has explained:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id.* at 196. Given Texas's interest in ensuring uniform, orderly elections that are carried out consistent with State law, commanding election officials across 254 counties to hastily cobble together a universal vote-by-mail system in time for this year's elections without the care and planning required risks widespread chaos. The Supreme Court has also stated that "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197.

Plaintiffs apparently believe it is irrational to allow mail-in voting for a limited class of people while also wanting to prevent election fraud. In fact, Texas's system limits the class of eligible mail-in

voters at a level that allows the State to monitor the process for fraudulent activity. If Texas suddenly and drastically expands the ability to vote by mail to every single adult citizen in the State, its ability to detect and prosecute election fraud will be greatly diminished by the deluge of mail ballots. Despite Plaintiffs' claims to the contrary, the approach that has been carefully and extensively considered in the Texas Legislature is a perfectly logical balancing of these interests.

As explained above, Section 82.003 in no way hampers Plaintiffs' fundamental right to vote. Rather, it provides another avenue to cast a ballot for members of a community more likely to face special challenges voting in person. Those challenges existed before the pandemic and are exacerbated by it now. Ex. C ¶ 25. Under *Anderson-Burdick*, therefore, Section 83.003 places no burden upon *Plaintiffs'* ability to cast a vote.

Sections 82.002(a) and 82.003 are important to the State for many other reasons, among which is that "the State . . . has a significant interest in enforcing its enacted laws." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 742 (S.D. Miss. 2014). Moreover, States must regulate elections uniformly "if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process[]."' *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. at 730). Because Plaintiffs face no burden under section 82.003, the State's important interests in maintaining the rule of law and ensuring the orderly administration of elections outweighs Plaintiffs' "claimed right" to vote by mail. *See Timmons*, 520 U.S. at 358; *McDonald*, 394 U.S. at 807–09.

That leaves Plaintiffs' final argument: that under-65 voters might contract COVID-19 while voting in person in July or November, and that those voters must be given the opportunity to vote by mail, or else face an unconstitutional burden on their exercise of the franchise. *See* Doc. 10 at 19–20. Although COVID-19 certainly presents new issues for officials to consider in managing and conducting elections, the record does not support Plaintiffs' assertion that voting in person in the age of COVID-19 is an unconstitutional burden on the right to vote.

To begin, Plaintiffs lack specific evidence that they will not be able to safely vote in person in the July or November elections. The science of COVID-19 treatment and prevention is rapidly developing, and policy decisions are evolving with it to ensure that voters can safely vote at the polls. Texas counties are taking significant steps to ensure that voting in-person is safe for their residents. For example, Collin County is instituting the following procedures at its polling places in July:

- Thoroughly training election workers on best practices for setting up polling locations for social distancing, including determining maximum capacity inside the voting areas;

- Providing a table-mounted Plexiglas protective shield at each voter check-in station. Poll workers will be stationed behind the protective shield as they are processing the voters;

- Providing protective masks for all election workers. A new mask will be provided for each day of Early Voting and on Election Day;

- Providing sanitizing wipes and hand sanitizer to each location in sufficient quantities as to accommodate voter turnout and equipment sanitation needs. Election workers will be trained on proper procedures for sanitizing the items touched by voters;

- Providing social distancing floor decals to polling places to ensure safety recommendations are practiced inside and outside the location;

- Offering cotton swabs to voters to use as disposable styli for marking their ballot selections on the touch screen ballot marking device;

- Placing additional election workers in polling places to assist with changes relating to implementation of the safety measures;

- Preparing for increased curbside voting traffic at polling places; and

- Conducting a thorough post-election analysis of the safety measures used in the July 14, 2020 Primary Runoff Election including seeking input from voters and election workers, and making any necessary adjustments to the safety measures in preparations for the November 3, 2020 General Election.

Exhibit D, Declaration of Bruce Sherbet ¶ 4. Other counties intend to introduce similar protective measures. *Id.* ¶ 6. These steps will significantly reduce the risk of transmission of COVID-19 at polling sites and make it safe for voters to be present at polling sites. Ex. C ¶ 42.

There are also several salient features of the COVID-19 pandemic in Texas that bear on Plaintiffs' claims. Fortunately, Texas has been less afflicted by COVID-19 than some other States, *id.*

¶ 29, and to the extent that there is an increase in COVID-19 infections in the future, the steps that Texas is taking to control the spread of infections, utilizing methods such as contact methods and tracing, will help limit community spread across the State. *See* DSHS, Contact Tracing, *available at* https://www.dshs.state.tx.us/coronavirus/tracing.aspx; *see also* Ex. C ¶ 36. Indeed, some Texas counties do not have a single reported case of COVID-19. *Id.* ¶ 31. And the voters most at risk of becoming seriously ill from COVID-19—those who are over 65 or who have underlying health conditions—are already eligible to vote by mail. *See* TEX. ELEC. CODE §§ 82.002–.03. Healthy young adults are unlikely to become ill from COVID-19. Ex. C ¶ 28. Viewed together, this evidence shows that Plaintiffs will not be unconstitutionally burdened if the challenged provisions of the Texas Election Code remain in effect for the July and November elections. Indeed, Dr. Jeffrey Klausner, a medical doctor and expert in epidemiology, opines that the upcoming elections can safely be conducted in the State of Texas. *Id.* ¶ 44. Experiences in at least one other state, Wisconsin, demonstrate that elections can be held in-person without an increased risk of transmission of COVID-19. *Id.* ¶ 43. Balanced against the State's interests in ensuring smooth and efficient elections, preventing voter confusion and disarray, ensuring the security of election results, and maintaining the rule of law, it becomes apparent that Plaintiffs are not entitled to preliminary injunctive relief.

For these reasons, Plaintiffs have not shown a substantial likelihood that they will prevail on their as-applied Twenty-Sixth Amendment claim.

### iii.    Plaintiffs' Equal Protection claims also fail.

#### a.  Age

For similar reasons, plaintiffs' age-based discrimination claims fail. The Supreme Court has squarely held that "States may discriminate on the basis of age without offending the Fourteenth Amendment" so long as "the age classification in question is rationally related to a legitimate state interest." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83–84 (2000) (quotation and brackets omitted). This

standard "does not require States to match age distinctions and the legitimate interests they serve with razorlike precision." *Id.* The Court may not overturn such "action unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." *Id.* For the reasons set forth at length above, Section 82.003 satisfies rational basis review, and also survives even stricter *Anderson-Burdick* scrutiny.

### b. Race

Plaintiffs' preliminary injunction motion offers no legal authorities in support of their claim of racial discrimination in violation of the Equal Protection Clause. Doc. 10 at 30. Instead, Plaintiffs attempt to bootstrap this claim onto their age-discrimination claim, alleging that "[m]ost mail ballots are provided to Texas's seniors who are 65 years of age or older," and that "Texas' population of voters older than 65 is overwhelmingly Anglo." *Id.* But they fail to show that any impact on a younger population is also an impact on its minority population—that is, that minority individuals under 65 are disfavored compared to similarly situated Anglos under 65. And even if they had made such a showing, a disparate impact alone is not enough to state an equal protection violation based upon race. *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another."). Plaintiffs offer no evidence of discrimination, let alone intentional discrimination, on the basis of race. They are not entitled to injunctive relief on their bare-bones assertion of racial discrimination.

### C. The Election Code's Definition of "Disability" is Not Unconstitutionally Vague.

The above sections address the bulk of Plaintiffs' motion for preliminary injunction. But Plaintiffs raise a smattering of other arguments. All of them lack merit. State Defendants turn to those claims next.

First, Plaintiffs' "void-for-vagueness" claim with respect to Section 82.002(a) is not, fairly construed, a void-for-vagueness claim at all. The Fifth Circuit has explained that the "void-for-vagueness doctrine has been primarily employed to strike down criminal laws," and that in the civil context, "the statute must be 'so vague and indefinite as really to be no rule at all." *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir.2000). But Plaintiffs do not claim that Section 82.002(a)'s definition of "disability" is "vague and indefinite"; indeed, they claim that a plain reading of the statute clearly supports their construction of the statute. Doc. 10 at 22.

Plaintiffs actually object to the Attorney General's letter responding to an inquiry about the statute's construction. But, as the Fifth Circuit has explained, a "statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001); *see also Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir. 1980) ("A provision need not . . . be cast in terms that are mathematically precise; it need only give fair warning of the conduct proscribed, in light of common understanding and practices."). That is because the void-for-vagueness doctrine "does not ordain the unconstitutionality of a statute that two lawyers may read differently, nor does it mean that persons subject to the law may bank against . . . inconsistent decisions." *Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.*, 622 F. Supp. 2d 470, 481 (S.D. Tex. 2009) (citation omitted). "[N]either absolute uniformity of interpretation, nor total absence of ambiguity is semantically or practically achievable, or, it necessarily follows [,] constitutionally required." *Id.* (citation omitted).

Moreover, Plaintiffs' "as-applied" void-for-vagueness claim should not—indeed, cannot—be resolved prior to the resolution of the State court proceedings. If the Texas Supreme Court ultimately agrees with the State, Plaintiffs will not have a void-for-vagueness claim because the State's highest court will have definitively interpreted the plain language of the Election Code. And if the Texas

Supreme Court agrees with Plaintiffs, that decision will govern, too. Either way, the *Pullman* abstention doctrine precludes the Court from unnecessarily interpreting Section 82.002(a) at this juncture.

## D.    Attorney General Paxton Did Not Intimidate Plaintiffs or Any Other Voters.

Resolution of the state litigation is also necessary to determine Plaintiffs' voter intimidation claim(s). Plaintiffs' motion for preliminary injunction drips with disdain that the Attorney General responded to Chair Klick's request for guidance on this important issue of state law, making an outlandish claim that the Attorney General engaged in an unlawful conspiracy to intimidate voters. Doc. 10 at 26 (citing 42 U.S.C. § 1985(3)).

The very case Plaintiffs rely upon, *Hilliard v. Ferguson*, 30 F.3d 649 (5th Cir. 1994), repudiates their claim under section 1985. To state a viable cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege:

> (1) a conspiracy involving two or more persons; (2) *for the purpose* of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3)an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Id.* at 652–53 (emphasis added). "In so doing, the plaintiff must show that the conspiracy was motivated by a class-based animus." *Id.* at 653. This claim fails for at least two reasons.

*First*, Plaintiffs have made no allegations, and offered no evidence, that the purported conspiracy "was motivated by a class-based animus," or even against what class General Paxton was allegedly discriminating. Moreover, General Paxton cannot engage in a "conspiracy" with his own "employees, including the signatory to the letter in question"—the only supposed conspirators Plaintiffs identify. *See* Doc. 10 at 26. "It is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Hilliard*, 30 F.3d at 653 (citation omitted). Thus, the letter that Plaintiffs cite as evidence of conspiracy, which was written by an employee of the Office of the

Attorney General, Doc. 10-2, is attributable to General Paxton. Under Section 1985, there can be no conspiracy between General Paxton and his agent. *See id.*

*Second*, Plaintiffs cannot establish that General Paxton has acted with the *intent* to deprive anyone of their vote. *See id.* When he explained that misapplication of the Election Code's "disability" provision could implicate the Code's criminal liability provisions, General Paxton's purpose was to respond to a legislative request for his opinion on the law and accomplish one of the primary functions of his office. The opinion merely states the law regarding the giving of false information in connection with a request for a ballot by mail and even concludes by stating "whether specific activity constitutes an offense under these provisions will depend upon the facts and circumstances of each individual case." Doc. 10-2 at 6. Plaintiffs' characterization of this opinion as voter intimidation is belied by the actual content of Attorney General Paxton's letter and press release, and cannot serve as the basis for a viable claim under Section 1985 or the Voting Rights Act.

*Third*, Plaintiffs do not even argue that the supposed conspiracy was motivated by racial animus. But the Fifth Circuit has held that "the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (quoting *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987)).

Plaintiffs also appear to allege a claim under section 11(b) of the Voting Rights Act, *see* Doc. 10 at 26, which provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). As an initial matter, Plaintiffs have not established that they have a private right of action under this provision. The Voting Rights Act explicitly authorizes the United States Attorney General to bring a civil action for injunctive relief to stop a practice prohibited by Section 11, but it says nothing about extending that enforcement authority to private parties. *See* 52 U.S.C. § 10308(d). Furthermore, the Supreme Court has established stringent standards for implied

causes of action, and Plaintiffs make no effort to satisfy them. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275 (2001); *see also, e.g.*, *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1856 (2017) ("If the statute does not itself so provide, a private cause of action will not be created through judicial mandate."). Thus, Plaintiffs are not permitted to bring a cause of action pursuant to Section 11.

Even if a cause of action exists under Section 11, Plaintiffs' claim would fail for many of the same reasons they have no claim under section 1985. "Limited precedent on Section 11(b) indicates that, in order to succeed on such a claim, a plaintiff must show both [1] an act of intimidation or attempt to intimidate, and [2] that the act was done with the specific intent to intimidate or attempt to intimidate." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985)); *see also United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967); *Am. Fed'n of St., Cnty. & Mun. Emps., Council 25 v. Land*, 583 F. Supp. 2d 840 (E.D. Mich. 2008). Section 11 "does not protect voters against inadvertent or technical violations of voting procedures but against conduct *intended* to 'intimidate, threaten, or coerce.'" *Willingham v. Cnty. of Albany*, No. 04-369, 2005 WL 1660114 at *7 (N.D.N.Y. July 12, 2005) (citation omitted).

Ultimately, Plaintiffs' allegations come nowhere close to meeting the standard required for either a section 1985 or a Voting Rights Act claim. The Attorney General is not attempting to stop people from voting. Rather, the Legislature has established eligibility criteria for mail-in voting, and the Attorney General has explained the contours of the law in response to an inquiry from an elected official. General Paxton's response to a legislator's request for clarification on a point of law does not meet either element of a voter-intimidation claim under Section 11(b). Under the first element, Plaintiff's allegation is an impermissibly broad construction of the word "intimidate"—accepting this premise would mean that any time a state's attorney general gives an opinion as to how election laws may be prosecuted, the attorney general has engaged in voter intimidation. *See McLeod*, 385 F.2d at 740. Such a construction would impermissibly impinge on one of the Office of the Attorney General's

core functions, which is to advise the public of its position on uncertain questions of public law.

Accordingly, the Court should decline to grant preliminary injunctive relief on Plaintiffs' voter intimidation claims.

**E.    Plaintiffs Will Not Prevail on Their First Amendment Claims.**

Finally, Plaintiffs also claim that Attorney General Paxton threatened their rights to free speech. Doc. 10 at 20–22. For the reasons discussed above, Plaintiffs' accusation misapprehends the Attorney General's responsibilities and the letter he sent in fulfillment of those responsibilities. But Plaintiffs' free speech claim should fail for two additional reasons.

*First*, the First Amendment does not protect Plaintiffs' asserted right to encourage otherwise healthy individuals to vote by mail. The First Amendment does not protect speech that promotes or incites illegal activity. *E.g.*, *United States v. Williams*, 553 U.S. 285, 298 (2008). Under Texas law, it is a crime for voters to submit knowingly false applications to vote by mail, or for third parties to encourage voters to do so. *See* TEX. ELEC. CODE § 84.0041; *see also id.* § 276.013. As such, unless the Texas Supreme Court agrees with the Plaintiffs' reading of section 82.002, Plaintiffs' First Amendment rights are not implicated by his letter. Though Attorney General Paxton is confident that the Supreme Court will not agree with their atextual interpretation, this is yet another reason for this Court to abstain.

*Second*, the relief Plaintiffs request—an injunction prohibiting Attorney General Paxton from "from threatening voters or voter groups with criminal or civil sanction for voting by mail or communicating with or assisting voters in the process of vote by mail," Doc. 10 at 34—would violate *his* rights to comment on matters of public concern. The freedom of speech safeguards "the right of individuals to speak as they think on matters vital to them." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). And it relies on "the process of education and discussion"—not injunctions against speech that litigants disfavor—to respond to political viewpoints regarded as false or unwise. *Id.* "Indeed, the

Supreme Court's decisions demonstrate that the First Amendment's protection of elected officials' speech is robust and no less strenuous than that afforded to the speech of citizens in general." *Rangra v. Brown*, 566 F.3d 515, 524 (5th Cir. 2009), *vacated on other grounds en banc*, 584 F.3d 206 (5th Cir. 2009).

Therefore, to the extent that Plaintiffs' claims are based on Attorney General Paxton's protected speech, they are meritless. In 2019, this Court dismissed a similar claim against General Paxton based on statements that he made in a press release, noting that the plaintiffs there could not sustain a claim based on "an alleged intimidating press release." *Texas League of United Latin American Citizens, et al. v. Whitley, et al.*, Case No. 5:19-cv-00074-FB, Doc. 131 (W.D. Tex. Mar. 27, 2019). Plaintiffs raise virtually the same claim here, and it should be dismissed for the same reasons.

### INJUNCTIVE RELIEF AT THIS POINT IN THE ELECTION CYCLE IS IMPROPER

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). For example, in *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), the Supreme Court relied on "considerations specific to election cases" to caution against federal court interference with impending state elections. It explained that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. To account for those risks, a federal court considering a request to enjoin state election laws before an impending election must consider potential conflicts with the timing of elections and appellate proceedings. *See id.* Similarly, the Fifth Circuit declined to grant immediate relief on a Voting Rights Act claim even though several months remained before the general election. *See Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) (instructing the district court in July 2016 to "take the requisite time to reevaluate the evidence" and fashion a remedy to apply after the November 2016 election).

In this case, the Court has already recognized that Plaintiffs are seeking injunctive relief too close to the July election. *See* Doc. 15 (noting "the practical time reality is that, even if plaintiffs were to prevail, a stay of this Court's ruling and the appeal thereof would likely go beyond the mail ballot request deadline"). Plaintiffs themselves admit that "[t]housands of vote by mail applications are pouring in now" and that "[m]ail ballots are expected to start being sent to voters in response to their request, on May 24, 2020." Doc. 10 at 6. Right now, local officials are processing vote-by-mail applications.

Plaintiffs have not acted diligently. They delayed serving Defendants and filing their motion for a preliminary injunction. With the process they seek to change already underway, it is too late for a federal court to issue injunctive relief.

## AN INJUNCTION WOULD UNDERMINE THE PUBLIC INTEREST

Even if Plaintiffs could demonstrate a substantial likelihood that they will prevail on the merits, they also must establish an irreparable injury, that the injunction will serve the public interest and that the threatened injury outweighs any damage that the injunction may cause the opposing party. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir.1989). As explained above, Plaintiffs cannot establish an irreparable injury because they have not proven that they will be deprived of the safe exercise of the franchise in the State's upcoming elections.

The equitable factors of the injunctive relief analysis tilt heavily against the issuance of an injunction, especially the overbearing one Plaintiffs ask the Court to adopt. The State has a weighty interest in the equal, fair, and consistent enforcement of its laws. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (citations omitted)). The "inability [for a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018);

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (recognizing that, when a duly enacted law cannot be enforced, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws").

That interest is especially potent in the middle of a global health crisis. If citizens lose confidence in the evenhanded application of the State's election laws in these precarious times, the foundations of our system of representative government will weaken. The path forward is clear: the State must maintain the consistency of its laws, but work within the bounds of the law, as prescribed by the Texas Legislature, to protect the health and safety of all Texans. Because that is exactly what the State has been doing, *see* Section (A), *supra*, the public interest favors the continuation of those efforts, not a sudden, irrevocable halt to them.

### PLAINTIFFS' PROPOSED INJUNCTION IS OVERBROAD

But even if some injunctive relief were proper, despite the arguments above, Plaintiffs' proposed injunction would be overbroad. Plaintiffs request an injunction protecting not only "the plaintiffs" but also "voters like the plaintiffs" and non-party "voters or voter groups." Doc. 10 at 34; *see also* Doc. 10-5 at 2. As the Fifth Circuit recently explained, when plaintiffs do "not sue as class representatives," a "district court lack[s] authority to enjoin enforcement of [the challenged law] as to anyone other than the named plaintiffs." *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). Here, Plaintiffs have not sued as class representatives. An injunction prohibiting enforcement of Texas law as to non-plaintiffs would be improper.

Moreover, and even as to Plaintiffs, no injunction based on a finding of discrimination can require the State to expand eligibility to vote by mail. If the "discrimination" of allowing only some voters to vote by mail must be remedied, it can be remedied by either expanding or contracting eligibility.

As the Supreme Court recently reiterated, "[w]hen the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017) (internal quotation marks omitted). And "[b]ecause the manner in which a State eliminates discrimination 'is an issue of state law,' upon finding state statutes constitutionally infirm, [the Supreme Court] ha[s] generally remanded to permit state courts to choose between extension and invalidation." *id.* at 1698 n.23 (quoting *Stanton v. Stanton*, 421 U.S. 7, 18 (1975)). That the plaintiffs have not sought invalidation "does not restrain the Court's judgment." *Morales-Santana*, 137 S. Ct. at 1701 n.29. Thus, rather than decide this policy issue for Texas, the court should "leave it to [the State] to select" how to remedy the purported problem with its law, *id.* at 1686.

If the Court insists on picking a remedy, *Morales-Santana* requires it to "strik[e] the discriminatory exception" and "extend[] the general rule." 137 S. Ct. at 1699. Here, the general rule requires in-person voting. It is the exceptions allowing limited groups of people to vote by mail that Plaintiffs consider discriminatory. This Court cannot extend that supposedly discriminatory exception in derogation of the general rule chosen by the Texas Legislature.

## CONCLUSION

The Court should abstain from ruling on Plaintiffs' motion for preliminary injunction and dismiss this suit without prejudice under the *Pullman* abstention doctrine. Alternatively, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/Michael R. Abrams*
MICHAEL R. ABRAMS
Texas Bar No. 24087072
ANNE MARIE MACKIN
Texas Bar No. 24078898
CORY A. SCANLON
Texas Bar No. 24104599
Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
michael.abrams@oag.texas.gov
anna.mackin@oag.texas.gov
cory.scanlon@oag.texas.gov

*Counsel for State Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 12, 2020 a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS
Assistant Attorney General