IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY, GILBERTO | § | |
| HINOJOSA, Chair of the Texas Democratic | § | |
| Party, JOSEPH DANIEL CASCINO, | § | |
| SHANDA MARIE SANSING, and | § | |
| BRENDA LI GARCIA | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 5:20-cv-00438 |
| | § | |
| GREG ABBOTT, Governor of Texas; RUTH | § | |
| HUGHS, Texas Secretary of State, DANA | § | |
| DEBEAUVOIR, Travis County Clerk, and | § | |
| JACQUELYN F. CALLANEN, Bexar County | § | |
| Elections Administrator | § | |
| | § | |
|     *Defendants*. | § | |

**BRIEF OF THE REPUBLICAN PARTY OF TEXAS AS *AMICUS CURIE*
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTEREST OF *AMICUS CURIAE***

*Amicus Curiae,*[1] the Republican Party of Texas ("RPT"), is a political party recognized by

the Texas Election Code. We believe that elections are fair when the process by which elections

are conducted is consistent and predictable. We support elections free from the flames of fear and

---

[1] *Amicus Curiae* and its counsel state that none of the parties to this case, including the intervening parties, nor their counsel authored this brief in whole or in part, nor made any monetary contribution for the preparation or submission of this brief.

uncertainty fanned by the Texas Democratic Party and liberal activists, whose true goal is to create a voting environment where checks and balances are few, and voter fraud can thrive. Our focus is to ensure that elections are conducted safely and consistently with the letter and spirit of the laws of Texas. Challenges to duly enacted election procedures, such as those brought by Plaintiffs in the present case, can only damage the integrity and legitimacy of the election results. After all, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The Republican Party of Texas thus has a significant interest in this important case.

## INTRODUCTION

This Court should deny Plaintiffs' claims that seek to have this Court prohibit the State of Texas from enforcing duly enacted state election laws that prevent voter fraud and preserve voter confidence in the integrity of elections. Specifically, Plaintiffs challenge section 82.002 of the Texas Election Code and seek to prohibit the State of Texas from enforcing the requirements necessary to receive a mail ballot for the runoff election on July 14, 2020 ("Challenged Provision").

The Court should not enjoin the Challenged Provision because the State of Texas has valid interests in preventing voter fraud and in protecting voter confidence in the integrity of its elections, and the U.S. Constitution specifically delegates to state legislatures responsibility for determining the "Times, Places and Manner" of federal elections. U.S. Const. art I, § 4, cl. 1; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194-197 (2008). Further, enjoining the Challenged Provision so close in time before an election would wreak havoc among election administrators,

who would have scant time and possibly very few resources to implement new procedures. *See Purcell v. Gonzalez*, 849 U.S. 1, 4-6 (2006).

It is important during these uncertain times that the fundamental pillars of our form of government, such as separation of powers and honest elections, remain intact. While *Amicus Curiae* recognize that adjustments have been made for upcoming elections, Plaintiffs' requested injunction is not the proper way to protect the integrity of the electoral process. Judicial intervention and inappropriate and burdensome injunctions will only lead to confusion and chaos in upcoming elections when steadiness and adherence to proper procedures are needed now more than ever.

Finally, as this Court noted, because the runoff election is set for July 14, 2020, the timing of Plaintiffs' request will likely render any requested relief moot.  A stay and appeal of this Court's ruling, if necessary, would likely go beyond the mail ballot request deadline, rendering moot any relief.

**ARGUMENT**

**I.     THE COURT SHOULD DENY PLAINITIFFS' MOTION FOR PRELIMINARY INJUNCTION BECAUSE THEY HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS AND IT IS CONTRARY TO THE PUBLIC INTEREST.**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movement, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (alteration in original) (citation omitted). Among other things, a movant requesting a preliminary injunction must prove the likelihood of success on the merits of their underlying claims and that granting their requested injunction is in

the public interest. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018). Here, Plaintiffs are not only unlikely to succeed on the merits of their underlying claims, but are also requesting an injunction that is contrary to the public interest.

### A.   The State of Texas has a Valid Interest in Preventing Voter Fraud and in Protecting Voter Confidence in the Integrity of Elections.

When analyzing an alleged burden on the right to vote from a challenged law, the well-established *Anderson/Burdick* framework applies. *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Under *Anderson/Burdick*, "election laws generally are not subject to strict scrutiny, even though voting rights are fundamental under the Constitution." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 605 (4th Cir. 2016); *see also Burdick*, 504 U.S. at 433. In reviewing a reasonable, nondiscriminatory restriction on voting rights, such as the Challenged Provision here, the restriction is justified by a state's "important regulatory interests." *Lee*, 843 F.3d at 606 (quoting *Burdick*, 504 U.S. at 434). Further, as voting by absentee ballot is not a fundamental right, challenges to absentee voting laws are not subject to a strict scrutiny analysis. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969).

Courts across the country, including the United States Supreme Court, have routinely recognized that a state has important regulatory interests in preventing voter fraud and in protecting voter confidence in the integrity of elections. *See e.g.*, *Crawford*, 553 U.S. at 194-197; *Lee*, 843 F.3d at 606-607; *Hoffman v. Maryland*, 928 F.2d 646, 649 (4th Cir. 1991); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130-32 (7th Cir. 2004). Here, just as in the above cited cases, the Challenged Provision is easily justified by those interests. For "[v]oting fraud is a serious problem

in U.S. elections generally … and it is facilitated by absentee voting." *Griffin*, 385 F.3d at 1130-31.

Texas' regulatory interest in preventing voter fraud is also supported by the fact that elections in Texas have been overturned on account of voter fraud. Recently, in *De La Paz v. Gutierrez*, a closely contested run-off election for a Justice of Peace seat in Kleberg County was overturned following a two-day hearing. No. 13-19-00377-CV, 2018 Tex. App. LEXIS 8687 (Tex. App.—Corpus Christi Oct. 25, 2018, no pet.) (mem. op.) (affirming judgment of the trail court). After a recount narrowed the vote differential to just six votes, seven of the sixteen votes contested by Guiterrez were thrown out by the trial court because they were cast by relatives of De La Paz who lived outside the Precinct 4 boundaries. *Id*. at *1-8. The trial court went on to state that "on the whole the evidence overwhelmingly established [De La Paz's] family and friends falsified their voter registration cards by claiming residence where they did not live . . . . Their individual and collective activities . . . so tainted this election that another is necessary." *Id*. at *8.

There are numerous other examples of elections being impacted by voter fraud in Texas. *See, e.g., O'Cana v. Salinas*, No. 13-18-00563-CV, 2019 Tex. App. LEXIS 2546 (Tex. App.—Corpus Christi Mar. 29, 2019, pet. denied) (noting, while overturning the trial court which voided a mayoral run-off election, that "[t]his case has uncovered clear and convincing evidence of election fraud, resulting in at least 31 illegal ballots being cast."); *Tiller v. Martinez,* 974 S.W.2d 769, 771-72 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) (affirming the trial court's overturning of an election because 28 of 108 mail-in ballots were improperly invalidated, which changed the outcome of the election); *Kelley v. Scott*, 733 S.W.2d 312, 314 (Tex. App.—El Paso

1987, writ dism'd w.o.j.) (overturning trail court and voiding an election because in an election decided by one vote, a single illegal absentee ballot was improperly counted); *Fuentes v. Howard*, 423 S.W.2d 420, 422, 427 (Tex. Civ. App.—El Paso 1967, writ dism'd w.o.j.) (reversing the trial court and holding that, while nine votes were illegally cast due to inappropriate assistance with absentee ballots, there were not a sufficient number of illegal ballots to change the outcome of the election).

Furthermore, individuals are routinely charged and convicted of voter fraud both in Texas and throughout the United States. *See, e.g.,* Tim Acosta, *Roberstown resident pleads guilty to voter fraud, barred from helping in future elections*, Caller Times (June 14, 2018, 5:38 p.m.), https://www.caller.com/story/news/local/2018/06/14/robstown-resident-pleads-guilty-voter-fraud-barred-elections/703726002/; Tasha Tsiaperas, *Bogus voter gets 180 days in Dallas jail for forging mail-in ballot*, The Dallas Morning News (June 20, 2018, 5:05 p.m.), https://www.dallasnews.com/news/courts/2018/06/20/bogus-voter-gets-180-days-in-dallas-jail-for-forging-mail-in-ballot/; Jennifer Emily, *Ellis County constable convicted of voter fraud*, The Dallas Morning News (June 16, 2017, 6:12 p.m.), https://www.dallasnews.com/news/courts/2017/06/16/ellis-county-constable-convicted-of-voter-fraud/ (convicted of six counts of voter fraud for improperly assisting with mail-in ballots); *see also, e.g., A Sampling of Recent Election Fraud Cases from Across the United States*, The Heritage Foundation, https://www.heritage.org/voterfraud (last accessed May 13, 2020).

Therefore, the Texas' interests in preventing voter fraud and in protecting voter confidence in the integrity of elections justifies the existence and enforcement of the Challenged Provision

under the *Anderson/Burdick* framework. Plaintiffs' underlying claims, therefore, are not likely to succeed and their request for a preliminary injunction should be denied.

### B.  A Similar Case from Wisconsin Is Persuasive as to How this Court Should Address Plaintiffs' Claims.

Last month, a group of plaintiffs filed suit in the United States District Court for the Western District of Wisconsin (the "Wisconsin Case") where, among other things, they challenged a law that required a witness signature on Wisconsin absentee ballots due to COVID-19 related concerns. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 57918, at *5 (W.D. Wis. Apr. 2, 2020). Despite acknowledging "the state's asserted interests in the witness requirement as a tool against voter fraud," the Wisconsin court enjoined the state's ability to enforce their absentee ballot witness requirement as enacted by the Wisconsin Legislature. *Id.* at *64, 75-76. With the Wisconsin elections fast approaching, upon review of the district court's order, the Seventh Circuit promptly stayed multiple provisions from the district court's order including the provisions that enjoined enforcement of the state's absentee ballot witness requirement. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538 (7th Cir. Apr. 3, 2020).

In staying the district court's injunction pertaining to the state's absentee ballot witness requirement, the Seventh Circuit found "that the district court did not give adequate consideration to the state's interests" in preventing voter fraud and in protecting voter confidence in the integrity of elections. *Id.* at 3. The court went on to state that "'[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy,' and '[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government.'" *Id.* (quoting

*Purcell*, 549 U.S. at 4). The Seventh Circuit stated that it was "concerned with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combatting voter fraud." *Id*. (emphasis added). Here, just as Wisconsin's interest in combatting voter fraud justified their absentee ballot witness requirement, so too are Texas' laws which determine under what circumstances an absentee ballot will issue justified by their substantial interest in combatting voter fraud and in protecting voter confidence in the integrity of elections.

In addition, following the Wisconsin election, at least two studies have been published as "pre-prints" to evaluate the election's impact on the spread of the virus. These two research studies show no effect. The first, titled "No Detectable Surge in SARS-CoV-2 Transmission due to the April 7, 2020 Wisconsin Election",[2] is attached hereto as Exhibit A. That study concluded, "[t]aken together, it appears that voting in Wisconsin on April 7 was a low-risk activity." *Id*. A second study examining Wisconsin found that the virus' rate of spread actually declined following the election, and declined in the three most populated counties in Wisconsin. That study entitled "Wisconsin April 2020 Election Not Associated with Increase in COVID-19 Infection Rates",[3] is attached hereto as Exhibit B. That study concluded, "[t]here was no increase in COVID-19 new case daily rates observed for Wisconsin or its three largest counties following the election on April 7, 2020, as compared to the US, during the post-incubation period." *Id*.

---

[2] Available at https://www.medrxiv.org/content/10.1101/2020.04.24.20078345v1.full.pdf
[3] Available at https://www.medrxiv.org/content/10.1101/2020.04.23.20074575v1.full.pdf

*Amicus Curiae* agree with the Seventh Circuit when it wisely stated that "[i]t is best to leave these decisions and any more particular prescriptions to the Commission, as it is better positioned to know what additional alternative suggestions are able to accommodate the many intersecting interests in play in the present circumstances." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, at 4 (7th Cir. Apr. 3, 2020). "[S]triking [] the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which [] judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Griffin*, 385 F.3d at 1131. It is inappropriate "for a federal district court to act as the state's chief health official by taking [] step[s] for them." *Democratic Nat'l Comm.*, No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 57918, at *52.

### C. The Supreme Court's *Purcell* Doctrine Counsels Against Granting the Plaintiffs' Injunction.

The United States Supreme Court has repeatedly held that judicial intrusion into elections must take account of "considerations specific to election cases." *Purcell*, 549 U.S. at 4. These considerations include the fact that "[c]ourt orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5. "As an election draws closer, that risk will increase." *Id*. at 5. Courts must therefore weigh such factors as the harms associated with judicial action or inaction, the proximity of the upcoming election, the "possibility that the nonprevailing parties would want to seek" further review, and the risk of "conflicting orders" from such review. *Id*. at 4-5.

Just as Plaintiffs have done here, plaintiffs across the Country have filed suits claiming that due to COVID-19, federal courts should interfere with election procedures—particularly as it pertains to absentee ballots. In deciding these cases, many federal courts decided to follow the logic of *Purcell* and stay out of elections and denied requests for temporary or emergency injunctive relief. *See, e.g.*, Order Den. Temp. Restraining Order, *Williams v. DeSantis*; 1:20-cv-00067-RH-GRJ (Mar. 17, 2020), ECF No. 12; Order Den. Renewed Mot. for Temp. Restraining Order & In Part Mot. for Prelim. Inj., *Williams v. DeSantis*, 1:20-cv-00067-RH-GRJ (Mar. 18, 2020), ECF No. 18; Order Den. Mot. for Temp. Restraining Order and Prelim. Inj., *Mays v. Thurston*, 4:20-cv-00341-JM (Mar. 30, 2020), ECF No. 11; Order Den. Mot. for Temp. Restraining Order and Prelim. Inj., *League of Women Voters of Ohio v. LaRose*, 2:20-cv-01638-MHW-EPD (Apr. 3, 2020), ECF No. 57.

Recently, on April 6, 2020, in the Wisconsin Case discussed *supra* Section I.B, the United States Supreme Court stayed a district court order that permitted absentee ballots to be cast after the election deadline.[4] *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 589 U.S. __, 2020 U.S. LEXIS 2195, at *1-2 (Apr. 6, 2020) (per curiam). The Supreme Court admonished the district court for "changing the election rules so close to the election date," noting that such action "contravened" Supreme Court precedent, which "has repeatedly emphasized that

---

[4] The Seventh Circuit had declined to stay this portion of the district court's order as they had done with the absentee ballot witness requirement provision discussed above. With this stay from the U.S. Supreme Court, the majority of the provisions from the Wisconsin district court's order have now been stayed. Additionally, just days after the U.S. Supreme Court stayed the order in the Wisconsin Case, after discussing the unique circumstances in which we find ourselves with COVID-19, a different Wisconsin U.S. District Court declined to adjust election procedures, citing the recent U.S. Supreme Court stay and *Purcell* as controlling. *Taylor v. Milwaukee Election Comm'n*, No. 20-cv-545-pp, 2020 U.S. Dist. LEXIS 60496 (E.D. Wis. Apr. 6, 2020).

lower federal courts should ordinarily not alter the election rules on the eve of the election." *Id*. at *2-3 (citing *Purcell*, 549 U.S. 1). Here, with the June election, and the printing and mailing-out of ballots, just weeks away, and with the all-but-certain upcoming appeals of this Court's decision, any action from this Court granting the requested relief is contrary to the public interest because it would likely result in "voter confusion and consequent incentive" not to vote. *Purcell*, 549 U.S. at 4-5. Therefore, given the United States Supreme Court's decisions in *Purcell* and its progeny, including the recent decision regarding the judicial interference in the Wisconsin Case in the upcoming election and the Seventh Circuit's reversal of the district court, this Court should not grant the requested relief for the upcoming Texas elections. Plaintiffs' request for a preliminary injunction should be denied.

## CONCLUSION

For the foregoing reasons, *Amicus Curiae* respectfully requests this Court deny the Plaintiffs' Motion for Preliminary Injunction.

This the 13th day of May, 2020.                    Respectfully submitted,

                                                     REPUBLICAN PARTY OF TEXAS


                                                     By: */s/ Dallin B. Holt*
                                                     Dallin B. Holt
Wade Emmert*                                         Texas State Bar No. 24099466
General Counsel                                      Holtzman Vogel Josefiak Torchinsky PLLC
Republican Party of Texas                            34 N. Hill Dr., Suite 100
Texas State Bar No. 00793688                         Warrenton, VA 20186
Emmert Law Firm, PC                                  Telephone: (540) 341-8808
100 Crescent Court, Suite 700

Dallas, TX 76013                          Facsimile: (540) 341-8809
Telephone: (469) 607-4502                 dholt@hvjt.law
Facsimile: (469) 436-6378
wade@emmertlaw.com
*Counsel admitted but currently on inactive status.
Readmission fee submitted.

ATTORNEYS FOR *AMICUS CURIAE*

Exhibit A

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

## No Detectable Surge in SARS-CoV-2 Transmission due to the April 7, 2020 Wisconsin Election

Kathy Leung, Ph.D. and Joseph T. Wu, Ph.D., WHO Collaborating Centre for Infectious Disease Epidemiology and Control, School of Public Health, Li Ka Shing Faculty of Medicine, The University of Hong Kong, Hong Kong Special Administration Region, China

Kuang Xu, Ph.D., and Lawrence M. Wein, Ph.D. (corresponding author), Graduate School of Business, Stanford University, Stanford, CA

**Abstract:** We analyze confirmed cases and new hospitalizations in Wisconsin in the weeks surrounding the April 7, 2020 election, and find no evidence of a surge in SARS-CoV-2 transmission.

The April 7, 2020 Wisconsin election produced a large natural experiment to help understand the transmission risks of the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). Up to 300,000 people voted in person [1-2] and waiting times in Milwaukee averaged 1.5-2 hr [3]. Poll workers had surgical masks and latex gloves, hand sanitizer was made available to voters, isopropyl alcohol wipes were used to clean voting equipment, and painting tape and signs were used to facilitate social distancing [2].

Wisconsin tracks cases confirmed by testing (Fig. 1A) and throughout April 2020 have restricted testing to frontline workers and those hospitalized with serious illness [4]. We used a deconvolution-based method to reconstruct the SARS-CoV-2 epidemic curve by dates of infections rather than dates of reporting by health authorities, and then used two different methods [5]-[6] to estimate the instantaneous reproduction number $R_t$, which is the average number of secondary cases generated by one primary case with the time of infection on day $t$, from March 25 (the start of the safer-at-home order) through April 18 (see the Supplementary Appendix).

As seen in Fig. 1B, there is no detectable spike in $R_t$ on April 7. The number of SARS-CoV-2 tests performed in Wisconsin has been relatively stable throughout April [7] (Fig. 1C), suggesting that reduced testing capacity in the days after April 7, which could have censored some of the April 7 infections, did not occur. Moreover, new SARS-CoV-2 hospitalizations in Wisconsin have steadily declined throughout April (Fig. 1D), from a high of 101 on April 3 to a low of 14 on April 18 [7], suggesting that daily new hospitalizations are much less than testing capacity.

The lengths of the incubation period and the reporting delay imply that April 7 infections would not be reported until April 17 on average, with most cases being reported during April 11-22. Taken together, there is no evidence to date that there was a surge of infections due to the April 7, 2020 election in Wisconsin, which has a relatively low level of SARS-CoV-2 transmission in the US.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

Finally, the Wisconsin Department of Health Services announced on April 22 that 19 people who either voted in person or worked at the polls on April 7 have tested positive for SARS-CoV-2, although several of these people also experienced non-voting exposures [8]. This fact is not inconsistent with our population-level analysis, because 19 cases is small relative to the total number of confirmed cases in Wisconsin. To put this information into perspective, if we assume that the SARS-CoV-2 fatality rate among symptomatic patients who were physically capable of voting in person on April 7 (e.g., not including nursing home residents) is 1% (using the fatality rate of known cases for people aged <60 [9]), then we would expect 0.19 deaths out of 300,000 people, which is the fatality risk of driving an automobile approximately 50 miles [10]. However, in addition to the individual risk of voting on April 7, there is the community risk: how many downstream cases will these 19 original cases generate? According to Fig. 1B, the reproduction number in Wisconsin has been hovering near the value of one for all of April. If this value was much larger than one (as it was in, say, January) then these 19 cases would cause a lot of downstream damage, and if this value was clearly smaller than one then they would cause minimal damage. But a value near one, coupled with the small number of cases, means that it is very difficult to reliably predict the amount of downstream damage.

Taken together, it appears that voting in Wisconsin on April 7 was a low-risk activity.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .



**Figure 1. SARS-CoV-2 Dynamics Surrounding the April 7, 2020 Election in Wisconsin.** Panel A shows the number of daily confirmed SARS-CoV2 cases in Wisconsin from March 15 to April 19. Panel B shows the estimated instantaneous reproduction number $R_t$ (along with 95% confidence intervals) each day from March 25 (the start of the safer-at-home-order in Wisconsin) to April 18 using two different methods. Panel C shows the number of SARS-CoV-2 tests performed each day from March 15 to April 18. Panel D shows the number of new SARS-CoV-2 hospitalizations in Wisconsin on each day from March 30 to April 18. In generating the curve in Panel C, a possible mis-entry in the original data set [4] led to the cumulative test count on March 29 being smaller than the day prior; in response, we replaced the March 29 cumulative case count by the average value between March 28 and 30.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

1. 2020 spring election and presidential preference vote ballot status as of April 17, 2020. Accessed at https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/Ballot%20Data%20as%20of%20April%2017%202020.pdf

2. Wisconsin Election Commission. Summary of April 7, 2020 election. Accessed at https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf

3. Spicuzza M. 'A very sad situation for voters': Milwaukeeans brave wait times as long as 2 ½ hours, top election official says. Milwaukee Journal Sentinel, April 7, 2020.

4. Wisconsin Department of Health Services. Coronavirus Disease 2019 (COVID-19) Situation Report. Publication P-02624, March 25, 2020.

5. Wallinga J, Teunis P. Different epidemic curves for severe acute respiratory syndrome reveal similar impacts of control measures. Am J Epidemiology 2004;160:509-516.

6. Cori A, Ferguson NM, Fraser C, Cauchemez S. A new framework and software to estimate time-varying reproduction numbers during epidemics. Am J Epidemiol. 2013;178:1505-12.

7. Wisconsin COVID-19 Historical Cases by State Boundary as of April 19. Accessed at https://data.dhsgis.wi.gov/datasets/wisconsin-covid-19-historical-cases-state-boundary

8. Stracqualursi V, Phillip A. 19 coronavirus cases connected to Wisconsin primary election, state health official says. cnn.com, April 22, 2020. Accessed at https://www.cnn.com/2020/04/22/politics/wisconsin-april-7-election-coronavirus-cases/index.html

9. Verity R, Dorigatti I, Winskill P et al. Estimates of the severity of coronavirus disease 2019: a model-based analysis. Lancet 2020;395:published online on March 30, 2020.

10. National Safety Board. Injury facts. Accessed on April 22, 2020 at https://injuryfacts.nsc.org/motor-vehicle/historical-fatality-trends/deaths-and-rates/

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345. this version posted April 29, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC-ND 4.0 International license .

## SUPPLEMENTARY APPENDIX

The instantaneous reproductive number $R_t$ was defined as the average number of secondary cases generated by one primary case with the time of infection on day $t$. If $R_t >$ 1 the epidemic is expanding at time $t$, whereas $R_t < 1$ indicates that the epidemic size is shrinking at time $t$.

Since the epidemic curve of Wisconsin is based on the dates of test confirmation, we use a deconvolution-based method to reconstruct the SARS-CoV-2 epidemic curve by dates of infection [1-2]. Let $f_{incubation}$ be the probability density function (pdf) of the incubation period, and $f_{onset-confirmation}$ be the pdf of the time between symptom onset and test confirmation. We assume $f_{incubation}$ and $f_{onset-confirmation}$ are independent such that the pdf of the time between infection and confirmation is

$$f_{infection-confirmation}(t) = \int_{0}^{t} f_{onset-confirmation}(t-u) f_{incubation}(u) du$$

We use $f_{infection-confirmation}$ to deconvolute the time series of the daily number of confirmed cases to reconstruct an epidemic curve of daily number of new infections. We assume the incubation period distribution is gamma with mean and SD of 5.2 and 2.3 days [3]. We assume that the distribution of the time between symptom onset and confirmation is gamma with mean and standard deviation (SD) of 4.3 and 3.2 days, based on 186 cases reported in Jan-Feb 2020 in Beijing [4]. With the epidemic curve by dates of infection in hand, we applied two different methods -- developed by Wallinga and Teunis [5] and by Cori et al. [6] -- to estimate $R_t$ using the R package EpiEstim. We assume the generation time distribution is approximately the same as the serial interval distribution, which was

medRxiv preprint doi: https://doi.org/10.1101/2020.04.24.20078345.this version posted April 29, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .

inferred to be gamma with mean 5.4 and SD 4.7 days from the dates of symptom onset of 56 infector-infectee pairs from mainland China [4].

1. Goldstein E, Dushoff J, Ma J et al. Reconstructing influenza incidence by deconvolution of daily mortality time series. PNAS 2009;106:21825-29.

2. Wu JT, Ho A, Ma ESK et al. Estimating infection attack rates and severity in real time during an influenza pandemic: analysis of serial cross-sectional serologic surveillance data. PLOS Medicine 2011;8,10:e1001103.

3. Li Q, Guan X, Wu P et al. Early transmission dynamics in Wuhan, China, of novel coronavirus-infected pneumonia. N Engl J Med 2020;382:1199-1207.

4. Leung K, Wu JT, Leung GM. First-wave COVID-19 transmissibility and severity in China outside Hubei after control measures, and second-wave scenario planning: a modelling impact assessment. Lancet 2020;395:published online April 8.

5. Wallinga J, Teunis P. Different epidemic curves for severe acute respiratory syndrome reveal similar impacts of control measures. Am J Epidemiology 2004;160:509-516.

6. Cori A, Ferguson NM, Fraser C, Cauchemez S. A new framework and software to estimate time-varying reproduction numbers during epidemics. Am J Epidemiol. 2013;178:1505-12.

Exhibit B

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575 this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

1

# Wisconsin April 2020 Election Not Associated with Increase in COVID-19 Infection Rates

Andrew C. Berry, D.O.[1]; Madhuri S. Mulekar, Ph.D[2]; Bruce B. Berry, M.D.[3]

1 Department of Medicine, Division of Gastroenterology, Larkin Community Hospitals, South Miami, FL, USA[##]

2 Department of Mathematics and Statistics, University of South Alabama, Mobile, AL, USA

3 Community Physicians, Froedtert & The Medical College of Wisconsin, Milwaukee, WI, USA[#]

April 23, 2020

**Abstract:**

**Background:** Wisconsin (WI) held a primary election in the midst of the COVID-19 pandemic. Live voting at polls was allowed despite concern over increasing the spread of COVID-19. In addition to 1.1 million absentee ballots cast, 453,222 persons voted live. The purpose of our study was to determine if an increase in COVID-19 activity was associated with the election.

**Methods:** Using the voting age population for the United States (US), WI, and its 3 largest counties, and daily new COVID-19 case reports from various COVID-19 web-based dashboards, daily new case rates were calculated. With election day April 7, the incubation period included April 12-21. The new case activity in the rest of the US was compared with the Wisconsin activity during the incubation period.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Results:** WI daily new case rates were lower than those of the rest of the US for the 10-day period before the election and remained lower during the post exposure incubation period. The ratio of Wisconsin new case rates to US new case rates was 0.34 WI: 1 US for the 10 days leading up to the election and declined to 0.28 WI: 1 US for the 10-day post-incubation period after the election. Similar analysis for Milwaukee county showed a pre-election ratio of 1.02 Milwaukee: 1 US and after the election the ratio was 0.63 Milwaukee: 1 US. Dane county had a pre-election ratio of 0.21 Dane: 1 US case, and it fell to 0.13 Dane: 1 US after the election. Waukesha county had a pre-election ratio of 0.27 Waukesha: 1 US case and that fell to 0.19 Waukesha: 1 US after the election.

**Conclusions:** There was no increase in COVID-19 new case daily rates observed for Wisconsin or its 3 largest counties following the election on April 7, 2020, as compared to the US, during the post-incubation interval period.

[#]Article Guarantor Contact: Bruce B. Berry, M.D. Community Physicians, Froedtert & The Medical College of Wisconsin, Milwaukee, WI, USA. Email: bbberry2018@gmail.com

[##]Corresponding Author and Media Contact: Andrew C Berry, D.O. Department of Medicine, Division of Gastroenterology, Larkin Community Hospitals. Email: ABerry5555@gmail.com

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

## Introduction:

Since the World Health Organization declared SARS-CoV-2 (COVID-19) a global pandemic on
March 11, 2020, drastic social distancing measures have been declared across the United
States[1] and in Wisconsin by Governor Evers Safer at Home Order [2]. Many businesses and social
activities have been closed and minimized, leading to unrest about individual freedoms. The
intricate balance between constitutional voting rights and public health took front seat on April 7,
2020, the scheduled primary election date for the state of Wisconsin. The presidential primary
election, a key state Supreme Court justice election, and numerous local office elections were on
the ballot for April 7.

A U.S. District judge rejected a request to postpone the election, but provided an extension for
absentee ballots. Later, the Supreme Court cancelled the extended period for absentee voting,[3]
and on April 7, the election occurred, a mixture of live and absentee mail in voting. Absentee
ballots needed to be postmarked by April 7 to count, causing a change in many voter's plans.

We aimed to see whether a subsequent rise in COVID-19 cases followed the controversial in-
person Wisconsin election on April 7, 2020. Not only may this impact local public health
actions, but could impact future election behaviors.

## Methods:

Websites for new COVID-19 daily cases were visited daily to obtain new case data for the
United States (US)[4], Wisconsin[5], Milwaukee county[6], Dane county[7], and Waukesha county[8].
Those counties represented the largest 3 contingents of voter age adults in Wisconsin and were

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575. this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

counties where COVID-19 was active during election time. The number of new cases reported by the websites daily were extracted, and the daily new case rates per 100,000 voting age (age 18 or older) adults were calculated in those populations. Census data[9] was used to obtain population data and age mix, then the number of voter age adults were calculated for the cohorts. The number of Wisconsin (WI) voters was subtracted from the US total, so the US data would represent all of the country excluding WI data. Daily new cases of COVID-19 infections extracted from the websites were then divided by the number of voter age adults in the cohorts to determine the daily new case rates. COVID-19 daily cases numbers from WI were removed to determine the number of new daily cases for US. The daily new COVID-19 cases were not adjusted for age (<3% under age 19)[5]. The study was exempt from IRB, it did not include protective health information and used data in the public domain exclusively.

The median incubation period of the virus is 5 days[10]. With the election on April 7, we used April 12 as the first date to start monitoring the number of new COVID-19 cases that may be related to the election. We then continued the analysis for the full 14-day period following exposure, mimicking a self-quarantine period, as <1% are shown to develop symptoms after 14 days[10]. Analysis of data from April 12-21 best represents the viral properties and course of action by the individual, from symptoms to testing to receiving results to being reported by the local health department.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Results:**

Wisconsin's April 7, 2020 election was completed and allowed live in-person voting, with

subsequent voting characteristics listed in Table 1, for the three largest voting counties, state of

Wisconsin, and US, which show considerably large number of live in-person voters.

Figure 1 displays the daily rate of new cases of COVID-19 by day of the pandemic, for

Wisconsin and the rest of the US, with curves visually mimicking each other. Figure 1 displays

election day occurring on day 28 (highlighted), and the incubation period occurred during days

33-42, five days post-election. Figure 2 provides a focused comparison between Wisconsin and

the US for the 5-14 days post-election period. It does not suggest any spike in post-election cases

in Wisconsin in relation to the rest of the US.

The average rate of new cases of COVID-19 was 10.77 per 100,000 voting age adults (all rates

are per 100,000 voting age adults) in the US for the 10 days leading up to the election on April 7,

2020, and 11.62 for the 10-day incubation period following the election (April 12-21) (Table 2,

Supplement A-B). Using the same time period, the average daily rate of new COVID-19 cases

for Wisconsin was 3.65 before the election, and 3.23 for the 10-day incubation period following

the election.

The US and WI rates themselves, are of course different as the circumstances in the US are

different than those in Wisconsin as it pertains to the course of pandemic, population mix,

population densities, and many other factors. So, a ratio was determined to see if the correlation

between the US and Wisconsin was consistent. Prior to the election, the Wisconsin daily rate of

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

new COVID-19 cases compared to that for the US rate was in a ratio of 0.34 WI:1 US (Table 2, Supplement A-B). The average daily new case rate after the election was 11.62 in the US compared to 3.23 in Wisconsin, with a ratio of 0.28 WI:1 US (Table 2, Supplement A-B). After the election the ratio of new daily case activity in Wisconsin compared to the rest of the US dropped from its pre-election level, suggesting the rate of development of new cases was decreasing following the election compared to what would have been expected if the relationship between Wisconsin and the rest of the US had continued at its pre-election ratio.

The daily rate of new cases of COVID-19 by day of the pandemic for each of the three Wisconsin counties with the most voting age residents—Milwaukee, Dane, and Waukesha—are shown in Figure 3, Figure 4, and Figure 5, respectively. The figures do not suggest any significant spike in cases in any one of these three counties as compared to the US during that time. Milwaukee county's average rate of daily new COVID-19 cases (10.97 ) was nearly the same as the US (10.77), but higher than the Wisconsin rate of 3.65 for the 10 days prior to the election (Table 2, Supplement A-B). Following the election, the Milwaukee county rate dropped to 7.28, while the US rate increased to 11.62. Prior to the election the ratio between Milwaukee county and the US was 1.02 Milwaukee: 1 US. After the election the ratio went down to 0.63 Milwaukee: 1 US, which is consistent with a drop in rate of new cases in Milwaukee county beyond what would have been expected should the relationship between Milwaukee county data and the rest of the US had continued at the pre-election ratios.

A reduction in post-election new case rates was found for Dane county as well. Dane county started with an average new case daily rate of 3.68 which was lower than the US average (10.77)

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575. this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

and it further dropped to 1.54 following the election. The ratio of new cases between Dane and the US was 0.21 Dane: 1 US before the election and 0.13 Dane: 1 US after the election (Table 2, Supplement A-B). Similarly, Waukesha county started with an average new daily case rate of 2.92 prior to the election and it dropped to 2.16 after the election. The ratio of new case rates between Waukesha county and the rest of the US was 0.27 Waukesha: 1 US prior to the election and 0.19 Waukesha: 1 US after the election (Table 2, Supplement A-B). Both Dane and Waukesha counties showed a drop in new cases rates beyond what would have been expected should the relationship between the counties' new case rates and the rest of the US had continued at the pre-election ratios.

**Discussion**

Our study did not find any significant increase in the rate of new COVID-19 cases following the April 7, 2020 election post-incubation period, for the state of Wisconsin or its three major voting counties, as compared to the US. Ethically, it is not possible to design a randomized study to investigate associations between an in-person voting event and the development of new COVID-19 symptoms. The next best option would be to study two groups of people, matched for all the known risks factors for contracting COVID-19 such as age, gender, race, diabetes, hypertension, occupation, sick contacts, etc—but this remains an arduous task that is impractical. Our study compared the rate of new COVID-19 cases following the Wisconsin election to the rest of the US. Thus, we took a practical approach and observed that the COVID-19 activity in Wisconsin seemed to parallel the activity in the rest of the United States (Figure 1, Figure 2). Prior studies have shown that most people who are going to show symptoms do so between 5-14 days following an exposure[9]. Thus, a 10-day period before the election was used to establish a ratio

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

reflecting the relationship between Wisconsin and US rates and then was compared with the ratio observed during the 10-day incubation period following the potential COVID-19 exposure during the in-person election.  A reduction in daily new case rates in Wisconsin was observed compared to what would have been expected if the rates in Wisconsin had followed the pre-election ratios. Our initial hypothesis of an increase in COVID-19 activity following the live election was not supported. There is no scientific reason why the election would cause a reduction in COVID-19 cases and there is nothing about voting that seems protective against COVID-19. The explanation may lie in characteristics and behaviors of those involved.

The concern that live voting in Wisconsin would cause a large spike in COVID-19 cases caused considerable turmoil in the days prior to election and an increase in absentee voting, that may have been a large factor in preventing an increase in COVID-19 activity. There were 1,551,711 absentee ballots cast, but there were 453,222 ballots[11] cast by voters who went to polls to vote and many stood in line for hours. With the heightened publicity around COVID-19 and the perceived risks associated with voting live, high-risk individuals may have self-selected themselves out of the live voting process. Protective measures at the polls may also have mitigated some of the risk associated with the increased social exposure. Maybe the characteristics of the live voters were more favorable to producing asymptomatic infections and many went undetected. A mixture of all those things likely contributed to the absence of an increase in daily new case daily rates following the election. In the three most populous Wisconsin counties, where 109,052 live ballots were cast, no significant increase in daily rates compared to the rest of the US (Figures 3-5) was observed. Similar to Wisconsin as a whole, those counties' daily new case rates fell faster compared to the rest of the US as well.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575; this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

Individual cases of COVID-19 infections most likely occurred as a result of additional exposure from live voting. Contact tracing is very difficult at this time with potential for exposure virtually everywhere in the community, linking an individual to live voting as their sole risk is not possible. Although a designed experiment is not possible to answer the questions raised, the next best option would be a retrospective study where two groups of people are matched for all the known risks factors for contracting COVID-19 such as age, gender, race, diabetes, hypertension and many others. In a future retrospective study, one could extract characteristics about those people who voted live and those voted absentee, and then compare the new COVID-19 case rates for those with comparable characteristics. Even if the two groups could be matched for many of the known risk factors associated with developing COVID-19, it will still not be easy to control for their other exposures, activities of daily living, other household members, and the risk factors and behaviors of other household members.

**Conclusions:**

No evidence was found to support an increase in COVID-19 new daily case rates for the state of Wisconsin, nor its major voting counties, compared to the rest of the US following live voting on April 7,2020. We must continue to utilize our knowledge about COVID-19 and social distancing measures to create the safest and most effective voting environment for all.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

**Funding**

No funding by any organization or political member for this project or to any member of the research team.

**Contributions**

ACB and BBB both conceptualized and designed the study. MSM conducted data analysis. ACB, BBB, MSM designed, prepared, and finalized the manuscript. BBB is the article guarantor.

**Competing Interest**

ACB, BBB, MSM have nothing to declare.

**References**

1. WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020. https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. 11 March 2020. Accessed March 20, 2020.

2. State of Wisconsin Department of Health Services. Emergency Order #12 Safer at Home Order. March 12,2020

3. URGENT -- Wisconsin Supreme Court Orders Election Day to Continue and U.S. Supreme Court Alters Ballot Receipt Deadline; Tallying and Reporting Results Still Prohibited Until April 13 - COVID-19. https://elections.wi.gov/node/6824. Accessed April 20 2020.

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

4. University of Virginia COVID19 Dashboard. Accessed at https://nssac.bii.virginia.edu/covid-19/dashboard. Last accessed April 22,2020

5. Wisconsin Department of Health Services. COVID-19. Available at https://www.dhs.wisconsin.gov/covid-19/index.htm. Accessed April 22,2020.

6. Milwaukee County COVID-19 Dashboard. Available at https://www.arcgis.com/apps/opsdashboard/index.html Accessed April 22.2020.

7. Public Health Madison and Dane county. COVID-19 Dashboard. Available at www.cityomadisonmaps.arcgis.com Accessed April 22,2020.

8. Waukesha county Public Health. COVID-19 Dashboard. Available at www.waukeshacounty.maps.arcgis.com Accessed April 22, 2020.

9. Census.gov 2019. Available at www.census.gov. Accessed April 22,2020.

10. Lauer SA, Grantz KH, Bi Q, et al. The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application. *Ann Intern Med*. 2020; [Epub ahead of print 10 March 2020].

11. Wisconsin Elections Commission. Spring election and presidential preference primary April 7, 2020. Available at www.elections.wi.gov. Accessed April 19, 2020

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

**Table 1:  Election Demographics for Wisconsin, Wisconsin Three Major Counties, and United States (US)**

|  | Wisconsin | Milwaukee County | Dane County | Waukesha County | US |
|---|---|---|---|---|---|
| Population | 5,822,434 | 945,726 | 456,695 | 404,198 | 328,239,523 |
| Voting Age Adults | 4,360,176 | 737,666 | 356,222 | 315,274 | 254,713,870 |
| Ballots Cast Total | 1,551,711 | 210,068 | 201,613 | 140,068 | |
| Absentee Ballots Cast | 1,098,489 | 168,882 | 155,195 | 118,620 | |
| Live Votes Cast | 453,222 | 41,186 | 46,418 | 21,448 | |
| % Absentee Voting | 70.8 | 80.4 | 77 | 84.7 | |

**Table 2: Pre and Post-Election Daily New Case Rates and Ratios Comparing United States (US), Wisconsin, and Wisconsin Three Major Counties**

| | Mean Daily Rate New Cases per 100,000 Voting Age Adults (with Ratios) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | US | WI | WI:US | Milwaukee | Milwaukee:US | Dane | Dane:US | Waukesha | Waukesha:US |
| PRE-Election 10-Day Period | 10.77 | 3.65 | 0.34 | 10.97 | 1.02 | 3.68 | 0.21 | 2.92 | 0.27 |
| POST-Election 10-Day Period | 11.62 | 3.23 | 0.28 | 7.28 | 0.63 | 1.54 | 0.13 | 2.16 | 0.19 |

(Days 5-14 Post Election)

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Figure 1:**



Highlight:  Election Day April 7, 2020

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Figure 2:**



medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Figure 3:**



medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint **(which was not certified by peer review)** is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

**Figure 4:**



medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint
(which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Figure 5:**



medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575 this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC 4.0 International license .

**Supplement Table A:  Complete Data of Pre and Post-Election Daily New Case Rates and Ratios Comparing United States (US) and Wisconsin**

| Date Pre/Post Election April 7 | US Daily New Cases | US Daily New Cases Sans WI | US Mean Daily New Case Rate | WI Daily New Cases | WI Mean Daily New Case Rate | WI:US Ratio New Case Rate |
|---|---|---|---|---|---|---|
| 29-Mar | 18403 | 18280 | | 123 | | |
| 30 | 21569 | 21460 | | 109 | | |
| 31 | 25130 | 25000 | | 130 | | |
| 1-Apr | 26962 | 26763 | | 199 | | |
| 2 | 28874 | 28694 | | 180 | | |
| 3 | 32856 | 32670 | | 186 | | |
| 4 | 33761 | 33565 | | 196 | | |
| 5 | 25693 | 25538 | | 155 | | |
| 6 | 30507 | 30334 | | 173 | | |
| 7 | 31481 | 31343 | | 138 | | |
| MEAN | 27524 | | 10.77 | 159 | 3.65 | 0.34 |
| | | | | | | |
| 12-Apr | 27834 | 27706 | | 128 | | |
| 13 | 26240 | 26153 | | 87 | | |
| 14 | 26867 | 26740 | | 127 | | |
| 15 | 30059 | 29893 | | 166 | | |
| 16 | 32557 | 32403 | | 154 | | |
| 17 | 35534 | 35364 | | 170 | | |
| 18 | 28615 | 28461 | | 154 | | |
| 19 | 30012 | 29865 | | 147 | | |
| 20 | 28891 | 28738 | | 153 | | |
| 21 | 26388 | 26267 | | 121 | | |
| MEAN | 29300 | 29599 | 11.62 | 141 | 3.23 | 0.28 |

WI: Wisconsin

medRxiv preprint doi: https://doi.org/10.1101/2020.04.23.20074575.this version posted April 28, 2020. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity.
It is made available under a CC-BY-NC 4.0 International license .

**Supplement Table B:  Complete Data of Pre and Post-Election Daily New Case Rates and Ratios Comparing United States (US) and Three Major Wisconsin Counties**

| Date Pre/Post Election April 7 | MKE Daily New Cases | MKE Mean Daily New Case Rate | MKE:US Ratio New Case Rate | DANE Daily New Cases | DANE Mean Daily New Case Rate | DANE:US Ratio New Case Rate | WAUK Daily New Cases | WAUK Mean Daily New Case Rate | WAUK:US Ratio New Case Rate |
|---|---|---|---|---|---|---|---|---|---|
| 29-Mar | 50 | | | 11 | | | 12 | | |
| 30 | 72 | | | 9 | | | 7 | | |
| 31 | 95 | | | 22 | | | 7 | | |
| 1-Apr | 84 | | | 18 | | | 13 | | |
| 2 | 80 | | | 6 | | | 9 | | |
| 3 | 93 | | | 14 | | | 16 | | |
| 4 | 101 | | | 17 | | | 6 | | |
| 5 | 92 | | | 11 | | | 6 | | |
| 6 | 42 | | | 12 | | | 8 | | |
| 7 | 100 | | | 11 | | | 8 | | |
| MEAN | 80.9 | 10.97 | 1.02 | 13.1 | 3.68 | 0.21 | 9.2 | 2.92 | 0.27 |
| | | | | | | | | | |
| 12 | 49 | | | 7 | | | 9 | | |
| 13 | 58 | | | 3 | | | 6 | | |
| 14 | 67 | | | 6 | | | 12 | | |
| 15 | 72 | | | 2 | | | 10 | | |
| 16 | 35 | | | 2 | | | 9 | | |
| 17 | 86 | | | 7 | | | 8 | | |
| 18 | 37 | | | 2 | | | 6 | | |
| 19 | 28 | | | 4 | | | 1 | | |
| 20 | 50 | | | 17 | | | 2 | | |
| 21 | 55 | | | 5 | | | 5 | | |
| MEAN | 53.7 | 7.28 | 0.63 | 5.5 | 1.54 | 0.13 | 6.8 | 2.16 | 0.19 |

MKE: Milwaukee
WAUK: Waukesha