```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
                       CORPUS CHRISTI DIVISION




MARC VEASEY, ET AL.,          )    CASE NO: 2:13-CV-00193
                              )
          Plaintiffs,         )              CIVIL
                              )
    vs.                       )      Corpus Christi, Texas
                              )
RICK PERRY, ET AL.,           )    Wednesday, September 3, 2014
                              )      (7:59 a.m. to 12:11 p.m.)
          Defendants.         )      (1:10 p.m. to  5:49 p.m.)


                       BENCH TRIAL - DAY 2

            BEFORE THE HONORABLE NELVA GONZALES RAMOS,
                   UNITED STATES DISTRICT JUDGE



Appearances:            See Next Page

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Adrian Perez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

EXHIBIT C

<u>APPEARANCES FOR:</u>

| | |
|---|---|
| Plaintiffs: | CHAD W. DUNN, ESQ.<br>KEMBEL SCOTT BRAZIL, ESQ.<br>Brazil and Dunn<br>4201 Cypress Creek Parkway, Suite 530<br>Houston, TX 77068<br><br>ARMAND DERFNER, ESQ.<br>P.O. Box 600<br>Charleston, SC 29402<br><br>J. GERALD HEBERT, ESQ.<br>Attorney at Law<br>191 Somervelle Street #405<br>Alexandria, VA 22304<br><br>NEIL G. BARON, ESQ.<br>914 FM 517 Rd. W, Suite 242<br>Dickinson, TX 77539<br><br>LUIS ROBERTO VERA, JR., ESQ.<br>111 Soledad, Suite 1325<br>San Antonio, TX 78205<br><br>EMMA P. SIMSON, ESQ.<br>Campaign Legal Center<br>215 E. Street NE<br>Washington, DC 20002 |
| **Mexican American Legislative Caucus, et al.:** | EZRA D. ROSENBERG, ESQ.<br>Dechert, LLP<br>902 Carnegie Center, Suite 500<br>Princeton, NJ 08540-6531<br><br>MARK A. POSNER, ESQ.<br>AMY L. RUDD, ESQ.<br>LINDSEY COHAN, ESQ.<br>JENNIFER CLARK, ESQ.<br>Lawyers' Committee for Civil Rights<br>1401 New York Ave. NW, Suite 400<br>Washington, DC 20005 |

<pre>
APPEARANCES FOR:          (CONTINUED)


United States            RICHARD DELLHEIM, ESQ.
of America:              ELIZABETH S. WESTFALL, ESQ.
                         ANNA BALDWIN, ESQ.
                         PAMELA CARLIN, ESQ.
                         AVNER SHAPIRO, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530

                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006

Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209

                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751

                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

Texas League of Young    RYAN HAYGOOD, ESQ.
Voters Education Fund:   NATASHA KORGAONKAR, ESQ.
                         NAACP Legal Def. and Educational Fund
                         40 Rector St., 5th Floor
                         New York, NY 10006

Also present:            Imani Clark

                         DANIELLE CONLEY, ESQ.
                         KELLY DUNBAR, ESQ.
                         Wilmer Cutler Pickering, et al.
                         1875 Pennsylvania Avenue, NW
                         Washington, DC 20006
</pre>

| | |
|---|---|
| **APPEARANCES FOR:** | (CONTINUED) |
| Texas Association of Hispanic County Judges and County Commissioners: | ROLANDO L. RIOS, ESQ.<br>115 E. Travis<br>Suite 1654<br>San Antonio, TX 78205 |
| Also present: | ROGER GALVAN, County Commission<br>Calhoun County |
| State of Texas: | JOHN BARRET SCOTT, ESQ.<br>Deputy Attorney General<br>for Civil Litigation<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, TX 78711<br><br>JOHN REED CLAY, JR., ESQ.<br>LINDSEY E. WOLF, ESQ.<br>JENNIFER ROSCETTI, ESQ.<br>G. DAVID WHITLEY, ESQ.<br>STEPHEN L. TATUM, JR., ESQ.<br>STEPHEN R. KEISTER, ESQ.<br>Office of the Attorney General<br>P.O. Box 12548<br>MC001<br>Austin, TX 78711<br><br>ARTHUR D'ANDREA, ESQ.<br>Office of the Attorney General<br>209 W. 14th Street, 7th Floor<br>Austin, TX 78701<br><br>BEN A. DONNELL, ESQ.<br>Donnell Abernethy Kieschnick<br>555 N. Carancahua, Suite 400<br>Corpus Christi, TX 78401<br><br>WHITNEY DEASON, ESQ. |

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL HERRON | | | | |
|   BY MR. DERFNER | 8 | | 96 | |
|   BY MR. SCOTT | | 78/95 | | |
|   BY MS. BALDWIN | 93 | | | |
| EULALIO MENDEZ, JR. | | | | |
|   BY MS. VAN DALEN | 97 | | | |
|   BY MS. WOLF | | 110 | | |
| RAMONA BINGHAM | 112 | | | |
| (EXCERPTS OF VIDEO DEPO) | | | | |
| KRISTINA MARIE MORA | | | | |
|   BY MR. SHAPIRO | 113 | | | |
|   BY MR. SCOTT | | 134 | | |
| YAIR GHITZA | | | | |
|   BY MS. BALDWIN | 146 | | 189 | |
|   BY MR. SCOTT | | 167 | | 190 |
| RANDALL BUCK WOOD | | | | |
|   BY MR. DUNN | 192 | | 240 | |
|   BY MR. CLAY | | 213 | | |
| BLAKE GREEN | | | | |
|   BY MS. KORGAONKAR | 247 | | | |
|   BY MR. TATUM | | 260 | | |
| DAWN WHITE | | | | |
|   BY MS. RUDD | 268 | | | |

### INDEX (CONTINUED)

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GORDON BENJAMIN | | | | |
|   BY MR. BARON | 288 | | | |
|   BY MS. ROSCETTI | | 296 | | |
| PHYLLIS WASHINGTON | | | | |
| (EXCERPTS OF VIDEO DEPO) | 299 | | | |

1       **RANDALL BUCK WOOD, PLAINTIFFS' WITNESS, SWORN**

2              **MR. CLAY:**  Thank you, sir.

3                          **DIRECT EXAMINATION**

4    **BY MR. DUNN:**

5    Q    Please tell us your name.

6    A    Randall Buck Wood.

7    Q    Do you go by Buck?

8    A    I -- it's my second name.  Yes and that's what everybody

9    knows me by.

10   Q    All right, Mr. Wood.  As you know, my name is Chad Dunn.

11   I represent one of the Plaintiffs in this lawsuit.  I retained

12   you as an expert; is that true?

13   A    That's correct.

14   Q    All right.  You have in front of you the report that you

15   issued in this case; is that correct?

16   A    Yes.

17            **MR. DUNN:**  And for the Court's benefit, that's

18   Plaintiffs' Exhibit 776.

19   Q    Included in the exhibit is your CV; is that true?

20   A    It was.  Let's see if it's -- yes.

21   Q    Okay.  And I assume your representations in your CV about

22   your education, training and experience are accurate?

23   A    Yes.  I -- I'm not sure.  It seems to me that during the

24   deposition, they -- it was brought to my attention that I was

25   listed as the Executive Director of the Texas Chapter of Common

1  Cause at one time and I'm not seeing that right now but I don't
2  think there was a designation of the Executive Director.  I was
3  the chief cook and bottle washer but -- so --
4  Q    Okay.
5  A    Other than that, yes, it's -- yeah, correct.
6  Q    All right.  So let's just back up.  Tell us where you were
7  born and where you grew up and went to school and that sort of
8  thing.
9  A    I was born in Athens, Texas July 7th, 1944.  I grew up in
10 a little town called Edom, Texas which is about 20 miles from
11 Athens.  I attended a common school district, Edom Common
12 School District through the eighth grade and then I went to Van
13 High School.  All that's in Van Zandt County.
14      I then went to Tyler Junior College for two years.  I
15 transferred to the University of Texas and got an undergraduate
16 degree in history and then went to law school -- well, actually
17 I did some of it at the same time.  I went to law school and
18 graduated in '68.
19 Q    And which law school was that?
20 A    University of Texas.
21 Q    After attending law school, were you admitted to the Bar?
22 A    Yes.
23 Q    And when was that?
24 A    September of '68.
25 Q    Have you practiced law in Texas since then?

Wood - Direct / By Mr. Dunn                            194

1  A    Yes.
2  Q    Okay.  Give us a sense of what kind of law you practiced
3  over your 40-plus years.
4  A    Oh, first of all, I spent some time as a lawyer in -- for
5  the State of Texas.  I was the Director of Elections for the
6  Secretary of State for some 3-something years.  I then lobbied
7  for Common Cause for two years and that involved a lot of
8  election stuff like campaign finance and things of that nature.
9  I then became the General Counsel of the Comptroller of Public
10 Accounts in '75 when Bob Bullock took office and I was then
11 promoted to the Chief Deputy Comptroller which was the Number
12 Two person in the Comptroller's office and I left in April or
13 May of '77 and went into private practice with a firm we
14 created and exists today.
15 Q    So you've practiced law as a private attorney since about
16 1977?
17 A    Yes.
18 Q    Is one of the areas of law that you focused on is election
19 law?
20 A    Yes.
21 Q    Give us a sense of the type of matters you handle in the
22 area of election law.
23 A    I don't know what type of matter I haven't handled.  Since
24 I had been Director of Elections and been involved in elections
25 all of life -- my family was a very political family -- we

1  immediately started -- our little firm started getting clients
2  that had election problems, election contests, recounts,
3  investigations, qualifications to run for office and everything
4  and even though it didn't provide a steady stream of income, we
5  did a lot of it and I still do.
6  Q    Is it fair to say that most of the reported state
7  appellate decisions on election law in the last 30 years have
8  your name or another lawyer at your firm's name on it?
9  A    You know, I don't know the percentage but it'd be pretty
10 high.
11 Q    All right.  You've handled a number of matters at the
12 Texas Supreme Court?
13 A    I'm usually in the Texas Supreme Court every other year or
14 every year.
15 Q    On election-related matters?
16 A    Yes.
17 Q    Okay.  So let's just talk a little bit about election
18 contests.  What exactly is an "election contest" under state
19 law?
20 A    An "election contest" is a legislatively delegated lawsuit
21 that's delegated to the judiciary.  We had to pass a
22 Constitutional amendment to have election contest.  It's tried
23 almost identically to any other civil lawsuit.  There are some
24 restrictions in the election code which override certain Rules
25 of Civil Procedure and things but other than that, it's tried

1  just like an ordinary lawsuit except it can't be tried to a
2  jury.
3  Q    And in an election contest, is occasionally one of the
4  issues whether there's somebody or some group of persons have
5  lawfully voted?
6  A    Whether they were qualified to vote or voted unlawfully,
7  yes, that is true in almost every election contest.
8  Q    And, in fact, what is the ultimate legal issue the judge
9  is asked to decide in an election contest?
10 A    They've got basically three options.  They can uphold the
11 result of the election as stated -- as it's canvassed.  They
12 can declare the other person -- the challenger who didn't win
13 in the primary, they can declare that person the victor or they
14 call a new election if they can't determine the outcome.
15 Q    And what effect does discovery of illegal voting have on
16 the outcome in an election contest?
17 A    Well, I wouldn't say this is true in every case but almost
18 every case, somebody won and somebody lost by a very small
19 margin, you know.  Now, that sometimes can be a pretty good
20 size but, you know, a statewide race, let's say.  Or it can be
21 a few votes.  So whether people that voted in that election
22 were legally entitled to vote in that election and how they
23 voted is an issue in 99 percent of election contests.
24 Q    Is it fair to say that you've handled scores of election
25 contests?

1   A    At one time, I had tried election contests in 50 counties.
2   The reason I know that I was hanging pictures on my wall of the
3   courthouses until my (indiscernible) managers told me that
4   wasn't going to work anymore.  But I'm sure I've tried election
5   matters.  Some of them would be qualifications for office and
6   things like that in a hundred counties.
7   Q    Are there many lawyers in Texas that handle election-
8   related work on a regular basis?
9   A    Not on a regular basis.  That's pretty unusual.  Some
10  people will have had maybe one or two matters.  If you're
11  talking about election contests, now there's -- like I said,
12  there's other variations on the theme, recounts and all things
13  like that.  There used to be a number of lawyers and many of
14  them in Austin -- a number of them in Austin but they've
15  retired or are deceased.  There are a few other lawyers that I
16  know that have done election contests, a few.  There's some in
17  south Texas that do some and the reason I know is they're
18  usually on the other side of the election contest from me but
19  not many.
20  Q    Is it fair to say that as far as you know, there's no
21  other attorney in the state that's handled as many of these
22  matters as you have?
23  A    I'm not sure that's the case.
24  Q    Okay.  Now, occasionally in election-related disputes,
25  does somebody raise the allegation that there was fraudulent

Wood - Direct / By Mr. Dunn                    198

1  voting or illegal voting?
2  A    Well, we've got to be -- I don't like to use the word
3  "illegal" voting.  Most people who vote who are not eligible to
4  vote are not doing it intentionally.  They don't know that
5  they're not eligible to vote.  They may have moved outside of a
6  state representative's district or something and still thought
7  they could vote for that candidate and they go ahead and vote.
8  I'd say intentional voter fraud in person is very rare.  And I
9  just don't like to use that term "illegal voter" because most
10 of them that we find that are not eligible to vote really
11 didn't commit any crime.
12 Q    Now, when you talk about intentional voter fraud in person
13 being rare, are you referring to voter impersonation?
14 A    Well, what I was really referring there is in some
15 instances -- and I have been involved in a number of election
16 contests, the election officials themselves were involved in
17 it.  So it was at the polling place -- that the election
18 officials at the polling place were actually involved in that
19 fraud.
20       If you're talking about impersonation of a voter --
21 in other words, a voter trying to vote impersonating another
22 voter, I've never seen one.
23 Q    Has it been raised though in cases you've handled?
24 A    No.
25 Q    Has somebody alleged at least colloquially or in a press

1  release that there's illegal impersonation and then you get
2  involved in the election contest and it turns out there were
3  none?
4  A    Um, I know of one where that happens but I was not
5  personally involved in it.  Impersonation just -- it just
6  doesn't happen.  I mean, I know it could -- can happen and,
7  therefore, it probably has happened.  I've been told by lawyers
8  that they've heard of it.  It just -- it doesn't happen and it
9  doesn't happen for a very simple reason.  It almost can't
10 happen, not without being detected.
11 Q    And why is it your opinion it can't happen without being
12 detected?
13 A    Well, I can see that if someone went to some trouble --
14 I'm talking about an individual here -- and they found out that
15 -- they just decided they'd go vote under somebody else's name.
16 Let's just say they just decided to do that.  Well, they're
17 almost certainly going to get caught.  First, you'd have to
18 pick your voter out that you're going to impersonate and then
19 you would have to hope that that person hadn't already voted
20 either by mail or in person in early voting and then you would
21 have to hope that that person didn't come in and try to vote
22 later because you're going to get caught.
23          And as I said, I have been told that it's happened on
24 a very small number of people from the state because they got
25 caught.  It's just almost impossible to do.  On anything other

Wood - Direct / By Mr. Dunn                              200

1  than a -- kind of a nutty situation where somebody just thinks
2  they'll go down and vote for their neighbor or something, it
3  doesn't happen.
4  Q    When a would-be voter impersonator goes into the polls, do
5  they have to be concerned if the election worker might
6  recognize them or might know the person they're trying to
7  impersonate?
8  A    Sure.  I will say this -- and this is because of my years
9  of experience.  The people that are the election officials at
10 the polling place, they generally have been doing that for
11 quite a while and they know people in that area.  It's not --
12 it's not as -- like it used to be because now we have early
13 voting in person and sometimes you can go to any polling place.
14 You can go to polling places all over but yes, you would have
15 to be concerned they wouldn't know who you were or who the
16 voter was and these are all felonies and they're multiple
17 felonies.
18 Q    And a would-be voter impersonator, do they also have to --
19 prior to SB14, wouldn't they also have to have some
20 identification or some documentation that links them to the
21 person they wanted to vote for?
22 A    Yes.  We -- I was on the -- Lieutenant Governor Hobby
23 appointed me to the Advisory Commission to revise the election
24 code back in '83 through '85 and we looked at the entire code
25 obviously but since I was mainly put on there because of

1  election issues and conduct of elections, I looked at all the
2  laws.  We changed some of the laws, quite a few, in fact.  I
3  don't think I've totally answered your question.
4  Q    Well, the question was, prior to SB14, if somebody wanted
5  to --
6  A    Oh, yes, I got it.
7  Q    -- commit voter impersonation, wouldn't they need some
8  article from --
9  A    They would.  We built into the law prior to the voter ID
10 laws, everybody calls it -- we built in an identification
11 provision and it could be satisfied a number of different ways
12 but you would had to have something indicating that you were
13 that person.
14 Q    And that could be a voter registration card under the old
15 law; is that right?
16 A    Yes.
17 Q    That could be a utility bill under the old law?
18 A    Yes.
19 Q    Driver --
20 A    Well, obviously that utility bill would have to show the
21 address that's -- that the election officials would have had on
22 the voter rolls.
23 Q    And you -- of course, you could use your driver's license
24 under the old law?
25 A    Sure.

1  Q    Okay.  On the other articles that were listed, are they
2  typically things you'd have to get out of -- let's call it a
3  victim's mail in order to impersonate them?
4  A    I'm not sure what you mean.
5  Q    Well, like a utility bill or a telephone bill.
6  A    Oh, well, you either have to get it out of their mail or
7  -- I don't know how you would do it but I guess you could rob
8  mailboxes.
9  Q    Okay.  Which -- would that also be a crime?
10 A    Yes, of course.
11 Q    All right.  Now, is there voter fraud occurring by mail?
12 A    Yes, very definitely.
13 Q    I mean, would you characterize it as a problem, the amount
14 of voter fraud by mail?
15 A    It is a serious problem.
16 Q    Explain the problem to us, please.
17 A    Well, it didn't used to be such of a problem because prior
18 to our passing legislation that let anybody over the age of 65
19 vote by mail, you had to have some doctor's excuse or something
20 in effect saying that you are unable to attend the polls.  Now,
21 that was pretty easy to get if you were elderly and you
22 normally had a doctor and they would sign one for you but what
23 really happened was when they went to, in effect, no excuses
24 over 65 mail-in voting, the -- there's nobody supervising you
25 when you have that ballot if you're the voter.  You may -- the

1  voter may never even see the ballot.
2           We have actually had evidence in election contests
3  where the people that were living the fraud knew what day the
4  ballot was being mailed out and actually went and got it out of
5  the mailbox before the person -- the voter ever even saw it.
6  And the usual system is they go to nursing homes.  They go to
7  -- and I say "they."  I'm talking people that commit this kind
8  of fraud and they're organized.
9           They go to people's houses that -- sometimes they
10 cultivate these people year-round.  I've had cases where they
11 had like a hundred or a hundred and fifty people that they knew
12 that were old that were infirm and they'd go by and see them in
13 the off-season.  They were friends and then, of course, they
14 would get them a ballot and they would generally vote the
15 ballot for them.
16 Q    You --
17 A    That's common.
18 Q    You mentioned that there's organized efforts on mail-in
19 voter fraud.  Is it easier in mail-in voter fraud to harvest or
20 turn in a number of fraudulent votes?
21 A    It's very easy.
22 Q    Is it more difficult to in person commit voter fraud to
23 the degree enough to change an election outcome?
24 A    I've never seen one and the reason being, unless the
25 election official at the polling place is in on the fraud, it's

1  just -- almost doesn't happen.
2  Q    And you were asked in your deposition by Mr. Clay a number
3  of questions in this case.  You recall that?
4  A    Yes.
5  Q    One of the answers that you gave -- you thought you had
6  seen recently -- well, strike that.  One of the answers you
7  gave is that there are often allegations that noncitizens have
8  successfully voted.  Do you remember that conversation?
9  A    Yes.
10 Q    Is it your experience that noncitizens are voting in
11 Texas?
12 A    I don't know why it is but a -- in south Texas and east
13 Texas, there are a lot of election contests, a lot of election
14 disputes and contests.  The -- it always comes up that somebody
15 says somebody's dead that voted.  I've heard that from my
16 clients and I've heard it from the other side and everything
17 and in my 42 years of doing this -- or 44 years, I've never
18 found one, not one.
19 Q    Is that the same for noncitizens?
20 A    I found a noncitizen a few years back for the first time
21 and that is -- that is always something that people -- oh, I
22 know so-and-so and they're not a citizen or I know so-and-so
23 and he's dead or that person's dead.  When you get through with
24 it, I had never found it until just by accident and it was a
25 vote by mail.

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    September 4, 2014

TONI HUDSON, TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC