IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY, GILBERTO HINOJOSA, Chair of the Texas Democratic Party, JOSEPH DANIEL CASCINO, SHANDA MARIE SANSING, and BRENDA LI GARCIA<br>　　　*Plaintiffs,* | § § § § § § § | |
| v. | § § | Case No. 5-20:cv-00438-FB |
| GREG ABBOTT, Governor of Texas; RUTH HUGHS, Texas Secretary of State, DANA DEBEAUVOIR, Travis County Clerk, and JACQUELYN F. CALLANEN, Bexar County Elections Administrator<br>　　　*Defendants*. | § § § § § § | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PRELIMINARY INJUNCTION PROCEEDINGS

### PROPOSED FINDINGS OF FACT

**I.    COVID-19 is an Immediate Danger to all Texans**

1.      COVID-19 infection is caused by the SARS-CoV-2 virus and is spread by passing through mucous membranes.  Ex. 21 at p. 2.

2.      Coronavirus is spread through droplet transmission. These droplets are produced through coughing, sneezing, and talking. Ex. 21 at p. 3. Ex. 22 p. 14. Ex. 22 at p. 16-17.

3.      The virus can be spread when an infected person transmits these droplets to a surface like a polling machine screen.  Ex. 21 at p. 3. Ex. 22 p. 72-73.

4.      It is highly likely that COVID-19 will remain a threat to the public both in July and through November.  Ex.  6 at p.  3.  Even if virus transmission and prevalence do decline

over the summer months, it remains likely that they will resurge in the fall and winter. Ex. 28 at p. 7.

5.      Reported illnesses have ranged from mild symptoms to severe illness and death. The most common symptoms include fever, dry cough, and shortness of breath.   Ex. 21 at p. 2-3. Other identified symptoms include muscle aches, headaches, chest pain, diarrhea, coughing up blood, sputum production, runny nose, nausea, vomiting, sore throat, confusion, loss of senses of taste and smell, and anorexia. Due to the respiratory impacts of the disease, individuals may need to be put on oxygen, and in severe cases, patients may need to be intubated and put on a ventilator. Ex. 28 at p. 3.

6.      Anyone can be infected with the novel coronavirus.  Ex.  21 at p.  3-4. Ex. 22 at p. 21.

7.      Certain groups, such as those over 60 years of age and those with certain underlying medical conditions, are at higher risk of serious illness and death should they be infected.   Ex. 21 at p. 3

8.      People of every age are at risk of serious illness and possible death. Ex. 28 at p. 3.

9.       The Latino community is particularly vulnerable to infection, hospitalization, and death resulting from COVID-19, due to a combination of high prevalence of underlying medical conditions and socioeconomic conditions that make contracting the disease more likely. Ex. 28 at p. 4.

10.      Any place where people gather and cannot maintain physical distancing, such as a polling place, represents a heightened danger for transmission of COVID-19 disease.  Ex. 21 at p. 3. Ex. 22 p. 14.

11.     Crowding and exposure to a range of surfaces at the polls make polling places likely transmission sites for the virus.  Ex 21. at p. 2-3. Ex. 22 p. 14.

12.     Polling places will likely remain transmission sites for the virus, even if election officials use all reasonable preventive measures.  Ex. 22 at p. 72. Ex. 22 at p. 64-70.

13.     Requiring voters to remain in close proximity to other voters and election workers for lengthy periods of time, particularly at polling locations with long lines and extended wait times would place them at risk of contracting or spreading COVID-19. Ex. 28 at p. 8.

14.     This would be particularly true for those who are at a greater risk of complications and death from COVID-19, including the elderly, immunocompromised, and people with underlying health conditions, including many members of the Latino community. E. 28 at p. 8.

15.     However, data to date in Texas demonstrate higher than expected infection rates in younger persons.  Ex. 45; Ex. 22 at p. 42-44.

16.     Some infected persons do not appear to have any symptoms although they may still be able to infect others.   Ex. 21 at p. 3; Ex. 23 at p. 5     .

17.     Meanwhile, other people with no pre-existing conditions are dying of stroke without ever displaying the typical COVID-19 symptoms.  Ex. 28.

18.     COVID-19 has become one of the leading causes of death in the United States. Ex. 48 at p. 1-2.

19.     As of May 13, 2020, Texas has 41,048 reported cases of COVID-19.[1]  Ex. 44 at p.1.

---

[1]TEXAS DEPARTMENT OF STATE HEALTH SERVICES,
https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc
8b83 (last visited April 25, 2020).

20.    As of April 25, 2020, the highest number of reported cases of COVID-19 in Texas are among 50 to 59-year-olds and 40 to 49-year-olds, with     2,568 reported cases and 2,620 reported cases, respectively.  Ex. 45 at  p. 1.

21.    20 to 29-year-olds represent 2,183 cases, while those aged 65 to 74 make up 1,292 reported cases in Texas.  As of May 13, the State has seen 1,133 deaths from the virus. Ex. 44 at p. 1.  Ex. 45 at  p. 1.

22.    Herd Immunity occurs when a high percentage of people in a community become immune to an infectious disease. This can happen through natural infection or through vaccination. In most cases, 80- 95% of the population needs to be immune for herd immunity to take place.  Ex. 21 at p. 5.

23.    "Herd Immunity" will not reduce the risk of COVID-19 during the 2020 elections.  Ex. 21 at p. 6-7 .

24.    An FDA-approved vaccine will be available for at least 12-18 months. Therefore, a vaccine will not reduce the risk of COVID-19 during the 2020 elections.  Ex. 21 at p. 4-5

**II.  Voting by Mail Is Safe with No Risk of COVID-19 Transmission**

25.    There is no evidence the virus can be spread by paper, including mail.  Ex. 21 at p. 7.

26.    Voting by mail would prevent virus transmission between voters standing in line, signing in, and casting votes, as well as between voters and election workers.  Ex. 21 at p. 7. . Ex. 22 at p. 72-73. Ex. 22 at p. 183. Ex. 22 at p. 201.

27.    Voting by mail would eliminate viral transmission through contamination of environmental surfaces like voting machines.  Ex. 21 at p. 7. Ex. 22 p. 72. Ex. 22 at p. 252-253.

28.     Due to the pandemic, voting by mail is much safer for the public than voting in person.  Ex. 6 at p. 3. Ex. 22 at p. 182. Ex. 22 at p. 192-193. Ex. 22 at p. 234. Ex. 22 at p. 237.

**Background of Voting by Mail in Texas**

29.     Texas law allows voting by mail for registered voters who meet one of the qualifications stated in the Election Code.  *See* Tex. Elec. Code Ch. 82.

30.     A voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail.  Tex. Elec. Code §§ 82.001-4.  Ex. 1 at p. 2. Ex. 22 at p. 214. Ex. 22 at p. 243-244. Ex. 22 at p. 250.

31.     Voters apply to vote by mail with a mail ballot application which they send to the early voting clerk.  Tex. Elec. Code §§ 84.001.

32.     The early voting clerk is responsible for conducting early voting and must "review each application for a ballot to be voted by mail."  Tex. Elec. Code § 86.001(a).

33.     An early voting ballot application must include the applicant's name and the address at which the applicant is registered to vote and an indication of the grounds for eligibility for voting by mail.  Tex. Elec. Code § 84.002.

34.     The applicant for a mail ballot must certify that "the information given in this application is true, and I understand that giving false information in this application is a crime." Tex. Elec. Code § 84.011.

35.     It is a crime to "knowingly provide false information on an application for ballot by mail."  Tex. Elec. Code § 84.0041.

36.     If the clerk determines the applicant is entitled to vote by mail, the clerk shall provide the voter a ballot by mail.  Tex. Elec. Code § 86.001.

37.     If the voter is not entitled to vote by mail, the clerk shall reject the application and give notice to the applicant.  *Id*.

38.     A rejected applicant is not entitled to vote by mail.  *Id*.

39.     July 2 is the deadline for an early voting clerk to receive an application to vote by mail for the upcoming July 14, 2020 Democratic Party Run-Off.  *See* Tex. Elec. Code § 84.007(c).  Ex. 13 at p. 11.

40.     Mail ballots are expected to start being sent to voters in response to their requests on May 30, 2020.  Ex. 13 at p. 9.

41.     Thousands of vote-by-mail applications are being sent to early voting clerks across Texas.  Ex. 46 at p. 4-5.

**Election Officials Need Clarity to Prepare for Imminent Elections**

42.     Governor Abbott has set both the date of the special election for Senate District 14 in Bastrop and Travis Counties and the Democratic Primary Run-Off election in all 254 Counties on July 14, 2020.  Ex. 7 at p. 1.  During both the primary and the November General Election state election law requires all ballot information be complete by 74 days before the election. Ex. 7 at p. 1. During that time, clerks must do all of the following:

- proof ballot submissions, order races appropriately, merge with many jurisdictions appearing on the ballot;
- work with ballot companies to lay out for printing multiple ballot styles;
- program ballot scanners, controllers, and related technology;
- prepare ballot carriers for vote by mail applications and returned ballots for the use of signature verification committees and ballot boards;
- hire election workers for polling locations, early voting locations, and central counting;
- train all workers;
- determine polling locations for election day and early voting, negotiate contracts with locations;
- manage payroll issues of dozens to thousands of temporary workers; and,

- manage delivering and picking up equipment while keeping it secure and free from tampering before, during and after the polling locations open and close. Ex. 7 at p. 1-2.

43.     Prior to the commencement of the instant litigation, election administrators sought guidance from the Secretary of State regarding the threat of COVID-19 and the ability of voters to obtain mail-ballots. Ex. 24 at p. 7.  The Secretary did not provide such definitive guidance.

44.     On April 6, 2020, the Secretary of State issued Election Advisory 2020-14, which left the interpretation of the disability statute up to local election officials. This advisory remains the only guidance from the Secretary of State to election officials pending the resolution of Defendants' appeal of that litigation. It does not provide guidance to election officials if their interpretation is correct or if counties should have a uniform interpretation of the statute. Ex. 1 at p. 2-4.

45.     The State of Texas' Fourteenth Court of Appeals has ordered that the appeal in in the state court case will be submitted by June 12, 2020, 32 days prior to the primary runoff election date and 20 days prior to the vote-by-mail application deadline for that election. Ex. 38 at p. 2.

46.     On May 15, 2020, the State of Texas filed a Petition for Writ of Mandamus in the Texas Supreme Court against only some of the counties in Texas and the Petition seeks to collaterally attack the state district court injunction order while not including Plaintiffs as real parties in interest.  Ex 42.

**Sequence of Events Since the Outbreak in Texas**

47.     On March 13, 2020, Defendant Abbott declared that COVID-19 poses an imminent threat of disaster. Ex.  2 at p.  2 .

48.     On March 19, 2020, Dr. John W. Hellerstedt, Commissioner of the Department of State Health Services, declared a state of public health disaster.  The disaster declaration provided that people not gather in groups larger than 10 members and limit social contact with others by social distancing or staying six feet apart. Ex. 4 at p. 1.

49.     On March 19, 2020, Defendant Abbott closed schools temporarily.  He also closed bars and restaurants, food courts, gyms and massage parlors.  Ex.  3 at p.  3.

50.     On April 27, 2020, Defendant Abbott issued a new order that purports to open the state's business affairs, in "phases." Ex. 43 at p. 1.  He has indicated that case testing will be monitored and that if and when cases begin to increase, the opening will be slowed and/or reversed.

51.     Dr. Deborah Leah Birx, the Coronavirus Response Coordinator for the White House Coronavirus Task Force, has stated that "social distancing will be with us through the summer to really ensure that we protect one another as we move through these phases."  Ex. 47 at p. 12.

52.     An advisory issued by the Secretary of State's Office instructed counties to begin preparing for larger than normal volumes of vote by mail while also giving guidance to local officials to seek court orders, as appropriate, to adjust election procedures.  Ex. 24 at p. 9    .

53.     In order to seek clarity of the requirements of state law, some of these Plaintiffs sought declaratory and injunctive relief in Texas district court in Travis County.  *Democratic Party, et al. v. DeBeauvoir*, et al., No. D-1-GN-20-001610 (201st Dist. Ct., Travis Cty., Tex. filed March 20, 2020).

54.     Texas intervened and asserted a Plea to the Jurisdiction based on standing, ripeness, and sovereign immunity.  Ex. 33 at p. 2.

8

55.     Texas argued in its Plea to the Jurisdiction that vote by mail administration is a county-level decision.  Ex. 33 at p. 3.

56.     On April 15, the state court heard the plaintiffs' temporary injunction motion and Texas' plea to the jurisdiction. The state court verbally announced the denial of the plea to the jurisdiction and the granting of the temporary injunction.

57.     In response to the oral order, Defendant Paxton made public a letter he had sent to the Chair of the House Committee on Elections of the Texas House of Representatives.  Ex. 55 at p. 1-5.

58.     In the letter, Defendant Paxton gave a non-official, advisory opinion regarding whether the risk of transmission of COVID-19 would entitle Texas voters to cast a mail-in ballot. He stated: "We conclude that, based on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Election Code for purposes of receiving a ballot by mail."  Ex. 55 at p. 3.

59.     In a statement accompanying the publication of the letter, General Paxton said: "I am disappointed that the district court ignored the plain text of the Texas Election Code to allow perfectly healthy voters to take advantage of special protections made available to Texans with actual illness or disabilities. This unlawful expansion of mail-in voting will only serve to undermine the security and integrity of our elections and to facilitate fraud. Mail ballots based on disability are specifically reserved for those who are legitimately ill and cannot vote in-person without needing assistance or jeopardizing their health. Fear of contracting COVID-19 does not amount to a sickness or physical condition as required by state law."  Ex. 55 at p. 1.

60.     This statement and the actions of the State contributed to the uncertainty that voters and early voting clerks face in administering upcoming elections.

61.     The letter also threatened political speech by Texas Democratic Party ("TDP" or "the Party") and other political actors in the state. Ex. 55 at p. 5.

62.     The letter stated: "To the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Ex. 55 at p. 5.

63.     The public statements and actions of the Defendant Paxton create a reasonable fear by voters  that they will be prosecuted. Ex. 8 at p. 7.

64.     On May 1, 2020 after counties were following judge Sulak's order, Defendant Paxton issued another Guidance Letter which again purported to threaten Texans with criminal prosecution for following Judge Sulak's order.  Ex. 34.

65.     Given the public statements and actions by Defendant Paxton, a voter would reasonably fear that he or she would face criminal sanction if he or she checks the disability box on a mail ballot application because of the need to avoid the potential contraction of the virus. Ex. 8 at p. 7

66.     Given the public statements and action by Defendant Paxton, third party political actors such as TDP have a reasonable fear of criminal sanction for assisting voters to apply for mail in ballots in order to avoid exposure to COVID-19. Ex. 55 at p. 5.

**Texas Is a Large, Diverse State Whose Voters Need Protection**

67.     Texas is a large state, with a diverse pool of voters.  As of July 1, 2019, there are 28,995,881 Texans.  Ex. 29..  People over the age of 65 are 12.6% of the population, or about 3,653,481 people.  *Id.* Children below the age of 18 are 25.8% of the population, or 7,480,937

people.  *Id.*  Texans between age of 18 and 65 are 61.6% of the population, or 17,861,463 people.  *Id.*  On January 23, 2020, the Secretary of State announced that Texas had set a new state record of registered voters with 16,106,984 registered voters.  *Id.*

68.     Texas is a racially diverse state.  U.S. Census data show that Non-Hispanic Whites make up 41.5% of the population *Id.*  62.9% of Texans who are 65 years of age or older are Anglos.  The average age of all Texas Anglos is 41.5 years old. Anglos are only 41.8% of Texans 18 to 65 years of age.

69.     Among the voting-eligible population, only an estimated 11 percent of Latino voters in Texas are 65 years of age or older.[2] Conversely, an estimated 21.7 percent of white voters are 65 years of age or older—nearly twice as many as Latinos.[3]

70.     Texas Latinos are uniquely vulnerable to infection, hospitalization, and death as a result of COVID-19 due to higher rates of underlying medical risk factors and other socioeconomic conditions that contribute to poorer health outcomes, such as lower rates of health insurance. Ex. 28

71.     Elections in Texas are racially polarized in all or nearly all levels of state elections.  Ex. 31.  The Anglo majority statewide votes as a bloc against the minority preferred candidates.  *Id.*  Minority voters vote as a bloc for their preferred candidates.  *Id.*  Anglos vote in sufficiently large numbers and in concert to defeat the minority-preferred candidates most of the time.  *Id.*  Texas campaigns have been typified by racial appeals and minority-preferred candidates are rarely, if ever, successful.  *Id.*

---

[2] https://www.pewresearch.org/hispanic/fact-sheet/latinos-in-the-2016-election-texas/
[3] *Id.*

72.     Socio-economic disparities exist in Texas that undermine the ability of the minority community to influence state officials, state elections and state policy. *Id.* Elected officials are not responsive to the needs of the minority community. *Id.* Texas has long history of disfranchisement and racial discrimination. *Id.*

**Plaintiffs**

**a.     Texas Democratic Party**

73. The TDP is a political party formed under the Texas Election Code.

74.     The TDP is the canvassing authority for many of the imminent run-off elections to be held on July 14, 2020.

75.     The election of July 14 is, in part, to determine runoff elections and therefore award the Democratic Party Nominations to those who prevail.  Ex. 24 at p. 13           .

76.     TDP is the political home to millions of Texas voters and thousands of Texas' elected officials.

77.     The TDP expends resources to try to help its eligible voters vote by mail.  Ex 7. 24 and 29.

78.     TDP is injured by the uncertainty of the laws associated with voting by mail because of the expenditure of financial resources used to help its members vote by mail, and the potential disfranchisement of its members.  Ex 7. 24 and 29.

79.     TDP is harmed by the state forcing it to award its nominations in an un-democratic process.  Ex 7. 24 and 29.

**b.     Gilberto Hinojosa**

80.     Gilberto Hinojosa is the elected Chair of the TDP.   He is one of the administrators of the upcoming run-off elections for the Texas Democratic Party. Ex. 24 at p. 4

He is the head of the canvassing authority for the July run-off elections and is the leader of the Party by and through his statutory and rule-based powers.

81.     Chair Hinojosa is also a registered voter in Texas.

82.     Chair Hinojosa is injured by the Defendants, because of the uncertainty of Texas law    s regarding qualifications to vote by mail.

**c.     Joseph Daniel Cascino**

83.     Joseph Daniel Cascino is a Travis County voter who voted in Democratic primary election on March 3, 2020.  Ex. 10 at p. 1    .

84.     He intends to vote by mail in the upcoming run-off and general elections.  Ex. 10 at p. 1-2    .

85.     He is not 65 years of age or older.  Ex. 10 at p. 1    .

86.     He intends to be in Travis County during the early vote period and Election Day. Ex. 10 at p. 1    .

87.     He has not been deemed physically disabled by any authority.  Ex. 10 at p. 1    .

88.     He wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.  Ex. 10 at p. 2    .

**d.     Shanda Marie Sansing**

89.     Shanda Marie Sansing is a Travis County voter who voted in Democratic primary election on March 3, 2020.  Ex. 9 at p. 1    .

90.     She intends to vote by mail in the upcoming run-off and general elections.  Ex. 9 at p. 1-2    .

91.     She is not 65 years of age or older.  Ex. 9 at p. 1    .

92.     She intends to be in Travis County during the early vote period and Election Day. Ex. 9 at p. 1   .

93.     She has not been deemed physically disabled by any authority.  Ex. 9 at p. 1   .

94.     She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.  Ex. 9 at p. 2   .

**e.      Brenda Li Garcia**

95.     Brenda Li Garcia is a Bexar County voter who has voted in Democratic primary, run-off, and general elections in the past.  Ex. 30

96.     She intends to vote by mail in the upcoming run-off and general elections.  Ex. 30.

97.     She is not 65 years of age or older.  Ex. 30.

98.     She intends to be in Bexar County during the early vote period and Election Day. Ex. 30.

99.     She has not been deemed physically disabled by any authority.  Ex. 30.

100.    She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places.  Ex. 30.

101.    **Defendants**

**a.      The Honorable Gregg Abbott**

119.    The Honorable Gregg Abbott is the Governor of Texas and a defendant in this case.

120.    He is the chief executive officer in this State.  Tex. Const. Art. IV § 1.

**b.      The Honorable Ruth Hughs**

14

121.    The Honorable Ruth Hughs is the Secretary of State of Texas and its chief election officer.  Tex. Elec. Code § 31.001.

122.    Secretary Hughes has injured the plaintiffs by creating a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State.

**c.     The Honorable Ken Paxton**

123.    The Honorable Ken Paxton is the Attorney General of Texas and its chief legal officer.  Tex. Const. Art. IV § 22.

124.    The Attorney General of Texas may investigate and assist local jurisdictions in prosecuting election-related crimes.  Tex. Elec. Code §§ 273.001 (d); 273.002.

125.    Recently, General Paxton has issued a letter threatening "third parties [who] advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code."  Ex. 55 at p. 5.

126.    General Paxton has created a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State.

127.    General Paxton's letter also threatens U.S. citizens for exercising their Right to Vote.  Ex. 55 at p. 5.  *See also*, Ex. 34.

**d.     The Honorable Dana De Beauvoir**

153.    The Honorable Dana DeBeauvoir is the Travis County Clerk.  Ex. 15 at p. 1.

154.    She is the early voting clerk for the upcoming run-off and general elections.

155.    Clerk DeBeauvoir has been ordered by a Texas district court to issue voters like the plaintiffs a mail ballot.  Ex. 49 at p. 5-6.

**e.**    **Ms. Jacquelyn Callanen**

156.    Ms. Jacquelyn Callanen is the elections administrator for Bexar County.

157.    She is the administrator of the run-off and general elections in Bexar County.

158.    She is the early voting clerk that will grant or deny mail ballots to applicants in the coming elections.

**PROPOSED CONCLUSIONS OF LAW**

**I.      All Plaintiffs Have Standing**

1.      This Court concludes that Plaintiffs have standing in this case because they all

face an imminent risk of harm, the harm they face is fairly traceable to Defendants' conduct, and

that harm is redressable by this Court.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61

(1992).

2.      Plaintiff Texas Democratic Party faces an imminent risk of harm as a result of the

Defendants' interpretation of the Texas Elec Code. § 82.001-4. and Defendants' refusal to follow

the Texas state court order permitting voters to access absentee ballots due to fear of COVID-19.

The Texas Democratic Party will be conducting their own run-off elections to determine who the

organization chooses as their standard bearer.  Ex. 24 at p. 14: 10-24.    The Texas Democratic

Party has an interest in ensuring that their election is conducted in a manner that would not

disenfranchise voters nor put voters at risk of death and is harmed because under the Attorney

General's interpretation of the statute and inability to follow the Texas state court law, the

party's ability to run their primary is diminished.  Ex. 24 at p. 15. An organization may establish

injury-in-fact if the "defendant's conduct significantly and 'perceptibly impaired' the

organization's ability to provide its 'activities—with the consequent drain on the organization's

resources.'"  *NAACP v. City of Kyle*, 626 F.3d. 233, 238 (5th Cir. 2010) (quoting *Havens Realty

Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  The Texas Democratic Party's purpose is to

promote Democratic candidates and facilitate elections for the party, promote voter participation

among its members and the public more broadly (Ex. 29), and the interest the Party seeks to

protect through this litigation are therefore germane to its purpose.  This harm is plainly traceable

to the Defendants who are refusing to follow the state court order and threatening voters who

request or use an absentee ballot due to COVID-19 with prosecution.  Accordingly, the Texas Democratic Party has standing to sue Defendants.  *See Lujan,* 504 U.S. at 560-61.

3.      The Texas Democratic Party also has standing to challenge the actions at issue both on behalf of its members and its own behalf.  An organization may establish injury-in-fact if the "defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle*, 626 F.3d. 233, 238 (5th Cir. 2010) (*quoting Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  The Texas Democratic Party's purpose is to promote Democratic candidates and facilitate elections for the party, promote voter participation among its members and the public more broadly (Ex. 29), and the interest the Party seeks to protect through this litigation are therefore germane to its purpose.

4.      Plaintiff Gilberto Hinojosa faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4, and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic.  Hinojosa is a registered Democrat, is planning to vote in the July 14th, 2020 runoff election, and is the elected Chair of the Texas Democratic Party.  Hinojosa is one of the administrators of the Texas Democratic Party run-off elections. Ex. 24 at p. 4.  He is the head of the canvassing authority and is the leader of the Party by and through his statutory and rule-based powers.  Texas Election Code § 163.003-004. Hinojosa is injured by the Defendants because the uncertainty of Texas law's regarding qualifications to vote by mail and the Attorney General's threat of prosecution of those who access vote by mail ballots, even those permitted through the Texas state court order.  Ex. 49 at p. 4-6. Ex. 55 at p. 1-5. Ex. 34 at p. 1-3. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use

absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm.  Accordingly, Gilberto Hinojosa has standing to sue Defendants.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

5.      Plaintiff Joseph Daniel Cascino faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Cascino is a registered Democrat and Travis County voter who intends to vote by mail in the July 2020 run-off election and general election due to the risk of transmission by COVID-19.  Ex. 10 at p. 1-2    .  Cascino is not 65 years of age, intends to be in Travis County during the early voting period and Election Day, and has not been deemed physically disabled by any authority. Ex. 10 at p. 1    .  Cascino is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise him. He is further injured by the threat of unjust prosecution by Attorney General Paxton. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Joseph Daniel Cacino has standing to sue Defendants.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

6.      Plaintiff Shanda Marie Sansing faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Sansing is a registered voter in Travis County and has voted in Democratic primary,

run-off elections, and general elections in the past.  Ex. 9 at p. 1.  She intends to vote by mail in the upcoming run-off elections and general elections. Ex. 9 at p. 1-2. She is not 65 years of age, intends to be in Travis County during the early vote period and Election Day, and has not been deemed disabled by any authority.  Ex. 9 at p. 1.  Sansing wishes to vote by mail due to the risk of transmission of COVID-19 at in-person polling places.  Ex. 9 at p. 2.  She is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise her.  She is further injured by the threat of unjust prosecution by Attorney General Paxton. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm.  Accordingly, Shanda Marie Sansing has standing to sue Defendants. *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

7.      Plaintiff Brenda Li Garcia faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic.  Ex. 30.  Garcia is a Bexar County voter.  *Id.*  She has voted in the Democratic primary, run-off elections, and general elections in the past and intends to vote by mail in the upcoming run-off and general elections.  *Id.*  She is not 65 years of age or older.  *Id.*  She intends to be in Bexar County during the early voting period and Election Day.  *Id.*   She wishes to vote by mail because of the risk of transmission and contraction of COVID-19 at in-person polling places.  *Id.*   She is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise her. She is further injured by the threat of unjust prosecution by Attorney General Paxton.  The evidence before this

Court demonstrates that counties view the orders of the Attorney General as mandatory *Id.* , and thus, an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Brenda Li Garcia has standing to sue Defendants. *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

8.     The claims asserted in this case do not require individualized proof as to every affected voter and cases that involve injunctive relief such as that sought here do not normally require individual participation. *See Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

9.     The Texas Democratic Party has organizational standing to sue on its own behalf because Defendants' illegal acts not permitting voters to access mail ballots under the Texas state court order and under Texas Election Code and Attorney General Paxton's threats to prosecute voters, impair the Texas Democratic Party's ability to engage in its projects by forcing the organization to divert resources to counteract those illegal actions, such as by educating voters on their ability to access absentee ballots. Ex. 7, 24 and 29.  Resource diversion is a concrete injury traceable to the Defendants' conduct and redress can be provided by granting this injunction. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). And the Fifth Circuit has affirmed that "an organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle, Tex*., 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp*., 455 U.S. at 379).

10.     Further, all individual Plaintiffs have made clear in their declarations that they not only do intend to vote in the upcoming elections, but they intend to do so through absentee ballots and will be disenfranchised due to fear of COVID-19 if unable to access mail ballots or prosecuted for accessing these ballots.  Ex. 9 at p. 1-2.  Ex. 10 at p. 1-2 and Ex. 30.  The evidence before this court satisfies any requirement that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue."  *See Gill v. Whitford*, 138 S. Ct. 1916,1929 (2018).

11.     Plaintiffs also satisfy the causation requirement of standing.  *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (citations omitted) ("Because State Defendants significantly contributed to the Plaintiffs' alleged injuries, Plaintiffs have satisfied the requirement of traceability.").  Defendants' actions would significantly contribute, if not wholly cause, Plaintiffs' alleged injuries, *i.e.*, their inability to exercise their constitutional right to vote.

II.     **A Preliminary Injunction Should Issue against Defendants while the Case Proceeds.**

12.     This Court concludes that Plaintiffs should be granted a preliminary injunction pursuant to its as-applied claims relating to: (1) the 26th Amendment of the U.S. Constitution; (2) vagueness in violation of the "Due Process" clause of the 5th and 14th Amendments; (3) voter intimidation in violation of 52 U.S.C. § 10307(b); and (4) the First Amendment of the U.S. Constitution.

13.     Plaintiffs should be granted a preliminary injunction, because they have satisfied the four requirements for such an injunction to issue: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction

is granted, and (4) that the grant of an injunction will not disserve the public interest.  *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

### a.   Plaintiffs Are Likely to Succeed on the Merits of their Claims

### i.   Plaintiffs Are Likely to Succeed on their 26th Amendment Claim

14.     The Twenty-Sixth Amendment states, "[t]he right of citizens of the United State, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on the account of age" (U.S. Const. amend. XXIV, § 1), and forbids the abridgement or denial of the right to vote of young voters by singling them out for disparate treatment.  *See Ownby v. Dies,* 337 F. Supp. 38, 39 (E.D. Tex. 1971).

15.     Courts presented with claims arising under the Twenty-Sixth Amendment must apply strict scrutiny.  *See U.S. v. State of Tex.*, 445 F. Supp. 1245,126 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States,* 439 U.S. 1105 (1979) (determining that a Texas registrar had violated the Twenty-Six Amendment by imposing burdens on students wishing to register to vote and providing that "before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny"); *see also Lynch v. Donnelly,* 465 U.S. 668, 687 n. 13 (1984) (holding that laws, statutes, or practices that are "patently discriminatory on its face" will receive strict scrutiny.); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (finding that the Twenty-Sixth Amendment provides an "added protection to that already offered by the Fourteenth Amendment").  Under strict scrutiny, the burden is on the State to justify that its policy, statute, or decision is narrowly tailored to serve a compelling state interest.  *See League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 475 (2006).

16.     Texas statute creates two classes of voters, those under the age of 65 who cannot access a mail ballot under this law and those over the age of 65 who can access mail ballots. Tex. Elec. Code § 82.003 states that "a qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day."  Those aged 65 and older are permitted to access mail ballots under this law on the account of their age alone, and those younger than 65 face a burden of not being able to access mail ballots on account of their age alone.

17.     Plaintiffs complain that younger voters bear a disproportionate burden because the age restrictions of Tex. Elec. Code § 82.003, that Tex. Elec. Code § 82.003 is a government classification based on age and discriminates against voters under the age of 65 based on age, and that Tex. Elec. Code § 82.003 is *prima facie* discriminatory under all circumstances.

18.     However, in the Preliminary Injunction proceeding, Plaintiffs only seek relief, as applied during the pandemic.

19.     The Court concludes, that during the COVID-19 pandemic, younger voters bear a disproportionate burden because the age restrictions of Tex. Elec. Code § 82.003, that Tex. Elec. Code § 82.003 is a government classification based on age and discriminates against voters under the age of 65 based on age, and that Tex. Elec. Code § 82.003 violates the 26th Amendment, as applied, during the COVID-19 pandemic.

20.     COVID-19 has become one of the leading causes of death in the United States. Data to date in Texas demonstrates higher than expected infection rates in younger persons. General Paxton has threatened to prosecute voters under the age of 65 who use mail ballots under the disability exemption as provided by the state court ruling.  Ex. 8 at p. 7    .  Thus, younger voters who are just as at risk to contract COVID-19 are forced to choose between risking their health by voting in-person or facing criminal prosecution by Defendant Paxton.

24

21.     As a result of Defendants' actions, the right of people below the age of 65 to vote is uniquely threatened and burdened solely based on their age.  Thus, this Court concludes that Tex. Elec. Code § 82.003 classification of voters by age is discriminatory, as applied, because it erects an obstacle to the franchise for younger voters.

22.     Defendants have attempted to meet their burden of showing that their actions here satisfy strict scrutiny, and they failed to do so.  They presented no evidence that demonstrates a compelling governmental interest and instead provided confusing and conflicting reasoning behind why the state would bar younger voters from accessing mail ballots during a global, deadly pandemic.  The State's interest is particularly attenuated in this case, given that the data show that Texas aged under 65 comprise a majority of the COVID-19 cases reported.  Ex. 45 at p. 1.

23.     In fact, the State's given reasoning would increase the harm to the public health and safety of not only those Texans who are under the age of 65 and who would be unable to vote by mail, but also the safety of any Texans (even those over 65) who interact with individuals who voted in person because they were unable to vote by mail and who were exposed to the COVID-19 virus.

24.     Put simply, there is no compelling interest in imposing arbitrary obstacles on voters on account of their age in these circumstances, and thus Defendants' conduct thus fails to meet strict scrutiny.

25.     This Court concludes that Plaintiffs have established that they are likely to succeed on their as applied Twenty-Sixth Amendment claim.

26.     Alternatively, even if strict scrutiny does not applψ Defendants' conduct is unconstitutional as it intentionally discriminates against voters on the basis of age.

27.     Where they have not applied strict scrutiny, federal courts have evaluated claims under the Twenty-Sixth Amendment using the *Arlington Heights* framework.  *See e.g. One Wis. Inst., Inc. v. Thomsen*, 198 F.Supp.3d 896, 926 (W.D. Wis. 2016) (finding that the Twenty-Sixth Amendment's text is "patterned on the Fifteenth Amendment . . . suggest[ing] that Arlington Heights provides the appropriate framework.").

28.     Under the *Arlington Heights* test, the court infers discriminatory intent through (1) the impact of the official action and whether it bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequences of events leading up to the decision challenged in the case, including departures from normal procedures in making decisions and substantive departure; and (4) contemporary statements made by the governmental body who created the official action.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

29.     Defendants' decision to interpret the law in a discriminatory fashion and threaten criminal prosecution against those who advance a different determination is discriminatory particularly to voters under the age of 65.  That decision bears more heavily on voters under 65 especially during the COVID-19 pandemic, because if they are unable to access mail ballots, they will be forced to risk their lives, the lives of their loved ones, and the lives of the public at-large in order to vote.  The refusal to extend access to mail ballots to younger voters affirmatively disenfranchises thousands of Texas voters simply on the account of age.  Voters age 65 and older will not face the same burden on the right to vote because they are able to access mail ballots and vote from the safety of their home, away from potential COVID-19 carriers and spreaders.  Voters under the age of 65 bear the burden of this application of the law more heavily than voters aged 65 and older because they will not be able to vote from the safety

of their homes.  Thus, the impact of the official action bears more heavily on younger voters than another group—older voters.

30.     The background of Defendants' decision also leads this Court to conclude there was discriminatory intent.  Initially, a district court granted voters in Texas relief to vote absentee due to COVID-19 by a Texas state court judge.  Ex. 49, p. 4-6.     Despite this state court order, Attorney General Paxton issued an advisory, non-official opinion threatening to prosecute people and groups who complied with the state court ruling.  Ex. 55.  Defendant Paxton called the state court ruling an "unlawful expansion of mail-in voting."  General Paxton further opined that to help or advise a voter to seek a mail-in ballot pursuant to this provision of the Election Code was a crime.  Defendant Paxton's decision to threaten criminal sanctions is strong evidence of invidious discrimination.

31.     Further, Defendants' actions regarding the state court proceedings are a departure from the legal norm and policy procedure.  The Attorney General rarely, if ever, "opine[s] through the formal opinion process on questions ... that are the subject of pending litigation."   In a highly unusual manner, Defendant Paxton circumvented the State's judicial process by announcing that he would criminally prosecute voters in defiance of the emerging court order.  These significant departures from normalcy were all in service of preventing legal, registered voters from casting ballots without exposing themselves to a deadly virus.

32.     Thus, *Arlington Heights* factors have been satisfied as to Defendants' conduct, and Plaintiffs have established that they are likely to succeed on their claim that Tex. Elec. Code § 82.003 impermissibly discriminates on the basis of age, as applied, in violation of the Twenty-Sixth Amendment.

### ii.   The Plaintiffs Will Succeed on Their Denial of Free Speech Claim

33.    This Court concludes that Plaintiffs are likely to prevail to prevail on their denial of free speech claim.

34.    Voters enjoy a "Right to Vote" as a form of political speech.  Political speech, including the right to vote, is strongly protected as a "core First Amendment activity."  *League of Women Voters of Fl. v. Detzner,* 863 F. Supp.2d at 1158.

35.    When determining whether there has been a violation of this right, the court inquires as to (1) what sort of speech is at issue, and (2) how severe of a burden has been placed upon the speech.  *Burdick v. Takushi,* 504 U.S. 428, 433 (1992).  Strict scrutiny is applied if the law "places a severe burden on fully protected speech and associational freedoms."  *Lincoln Club of Orange County v. City of Irvine*, 292 F.3d 934, 938 (9th Cir. 2002).  "[V]oting is of the most fundamental significance under our constitutional structure," meaning the speech at issue is fully protected First Amendment activity.  *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

36.    Political speech is at issue here.  If not for Defendants' conduct, Plaintiff TDP (and other campaigns and political groups) would be engaging in communications with voters concerning who is eligible to and how to vote by mail. Defendant Paxton has outwardly threatened to prosecute these communications.  Ex. 55 at p. 3.  Defendant Paxton has also threatened to criminally prosecute voters who do not meet his construction of the statutory conditions to vote absentee who attempt to vote by mail.

37.    Meanwhile, at least one candidate for the Republican Nomination for a seat in Congress has issued mailers encouraging all voters, regardless of Age, to vote by mail and her statements allege that she did so with advice from Defendant Paxton.  Ex. 35.  There is no

evidence this Republican candidate is being criminally investigated or prosecuted or the county where much of the district at issue in the campaign is located, has been targeted by Defendant Paxton's letters and Texas Supreme Court Petition.

38.     These circumstances leave the Democratic Party and its candidates unsure whether only Democrats will be prosecuted.

39.     These circumstances, the evidence shows, hinders the free exchange of political speech.

40.     The burden on this speech is severe.  Under Defendant Paxton's interpretation of state law, voters face the choice between casting their ballot and paying the  price of criminal prosecution. Especially given the visibility of the fallout from the Wisconsin primary election, voters are deeply fearful about.

41.     Defendants' conduct does not meet strict scrutiny, and thus Plaintiffs have established that they are likely to succeed on their claim that their right to freedom of political speech was denied. Indeed, Defendants' conduct cannot stand under any potential First Amendment standard.

42.     Even were the state courts to clarify the disability provision in favor of voters under the age of 65, in a timely fashion, which seems unlikely, the threats of prosecution, now widely disseminated, would not be completely cured.

### iii.  The Plaintiffs Will Succeed on Their Void for Vagueness Claim

43.     This Court concludes that Plaintiffs are likely to succeed on their void for vagueness claim.

44.     A statute violates the Fourteenth Amendment on the basis of vagueness if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).  When a statute infringes upon basic First Amendment freedoms, "a more stringent vagueness test should apply." *Id.* at 246.

45.    Criminal enactments are subject to a stricter vagueness standard because "the consequences of imprecision are . . . severe." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498–499 (1982).  Voters can face criminal prosecution under Tex. Elec. Code § 84.0041, and thus a stricter vagueness standard applies to it.  The law must be specific enough to give reasonable and fair notice in order to warn people to avoid conduct with criminal consequences. *Smith v. Goguen,* 415 U.S. 566, 574 (1974).  A statute must also establish minimal guidelines to govern enforcement. *Id.* at 574.

46.    Tex. Elec. Code § 82.001–4 concerns the right to vote, which is a form of political speech protected under the First Amendment.  Thus, a more stringent vagueness test applies here as the statute infringes upon basic First Amendment freedoms and voters are threatened with criminal prosecution.

47.    Tex. Elec. Code § 82.001–4 provides that a voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail.  Tex. Elec. Code §§ 82.001–4.  Tex. Elec. Code § 82.002(a) states "a qualified voter is eligible for early voting by mail if the voter has a sickness of physical condition that prevents the voters from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." *Id*.  A Texas state court judge

has stated that § 82.002(a) definition includes persons who are social distancing because of COVID-19.

48.     Defendant Paxton has issued varying and contradictory interpretations of Tex. Elec. Code § 82.001–4.  Prior to the pandemic, Defendant Paxton advised that there was no specific definition of disability required to be met in order to qualify to use an absentee ballot. Op. Tex. Att'y Gen. No. KP- 0009 (2015).  Defendant Paxton has also previously opined that a court-ruled sexual deviant under the age of 65 meets the definition of "disabled" under this statute.  Op. Tex. Att'y Gen. No. KP- 0149 (2017).

49.     Defendant Paxton's recent interpretations of Tex. Elec. Code § 82.001–4 renders the statute vague as it is unclear which voters qualify to vote using a mail ballot under the law. The statute itself does not  clearly define the phrase "physical condition that prevents the voters from appearing at the polling place on election day."  Tex. Elec. Code § 82.001–4The multiple constructions of Tex. Elec. Code § 82.001–4 by Defendant Paxton and the state court fail to provide people of ordinary intelligence a reasonable opportunity to understand if they are unqualified to access a mail ballot, and authorize and encourage arbitrary and discriminatory enforcement.

50.     Every day that goes by, Texans are being subjected to criminal prosecuting threat if they are under age 65 and seek to vote by mail before the July 2 deadline.

51.     The statute does not establish minimal guidelines to govern enforcement by Defendants or other state actors.  Defendant Paxton has threatened to prosecute elected officials and voters who access mail ballots as provided by the state court because of the COVID-19 pandemic.  He issued a letter stating that "[t]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those

third parties to criminal sanctions imposed by Election Code section 84.0041." Defendant

Paxton's repeated assertions of prosecution of voters and threatening of election officials who

seek to comply with a state court order is evidence of a lack of guidelines.

52.     Voters have received conflicting instructions on their ability to access mail

ballots; one from the Texas judiciary that orders voters who fear COVID-19 to qualify for a mail

ballot and instructions from Defendant Paxton which threatens voters who follow the Texas

court order with prosecution.

53.     Due Process has been violated as the interpretation by Defendant Paxton and the

Election Code itself provide no definitive standard of conduct and instead provides Defendants

with unfettered freedom to act on nothing but their own preference and beliefs.

54.     Tex. Elec. Code § 82.001–4 is unconstitutionally vague in violation of the

Fourteenth Amendment Due Process Clause.

55.     Plaintiffs have established that they are likely to succeed on their claim that the

State's interpretation of the law and the law itself are unconstitutionally vague in violation of the

Due Process Clause.

### iv.   The Plaintiffs Will Succeed on Their Voter Intimidation Claim

56.     This Court concludes that Plaintiffs are likely to succeed on their voter

intimidation claim.

57.     Title 42 U.S.C. § 1985, part of the Civil Rights Act of 1871, "creates a private

civil remedy for three prohibited forms of conspiracy to interfere with civil rights under that

section."  *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 149 (5th Cir. 2010).

58.     Plaintiff must prove the following elements for a claim under § 1985(3): (1) a

conspiracy of two or more persons; (2) for the purpose of depriving, directly or indirectly, a

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprives her of a right or privilege of a United States citizen. See *Hilliard v. Ferguson*, 30 F.3d 649, 652– 53 (5th Cir. 1994).

59.     The right to vote in federal elections is a right of national citizenship protected from conspiratorial interference by the provision of 42 USC § 1985(3) pertaining to conspiracies to deprive persons of rights or privileges. *See* 42 USC § 1985(3) (preventing persons from conspiring to "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner"); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975), *certiorari denied* 424 U.S. 958.

60.     Voters are legally entitled access to the franchise, and the right to vote is a fundamental right.  *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964). This right entitles voters to access to the franchise free from unreasonable obstacles. *See Common Cause Ga. v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005); *see also Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014).

61.     Defendants have worked in concert with others in threatening criminal prosecution, an act in furtherance of this conspiracy to deprive access to the franchise from legal, rightful voters.  This has injured Plaintiffs, and this injury has been caused by state officials acting in concert with others to prevent legal voters from casting a ballot free from fear of risk of transmission of a deadly illness or criminal retribution.

62.     Defendant Paxton issued an advisory opinion just as a state court was ruling that Texas voters are entitled to a mail-in ballot because of the risk of transmission of COVID-19. Ex. 55 at p.1.     In this advisory opinion, Defendant Paxton wrote: "[T]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such

activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Ex. 55 at p. 5. He also claimed that expanding mail ballot eligibility to all Texans "will only serve to undermine the security and integrity of our elections." Defendant Paxton's statements operate to discourage voters from seeking mail-in ballots because of their fear of criminal sanction or victimization by fraud, and have the intention and the effect of depriving legally eligible voters' access to the franchise.

63.     Plaintiffs are likely to succeed on the merits of their claim that Defendant Paxton's official actions amount to voter intimidation in violation of Title 42 USC § 1985(3).

### v.  The Defendants Violated the Equal Protection Clause of the 14th Amendment

64.     The Defendants, who are state actors and/or acting under color or law as administrators of elections, have violated the Equal Protection Clause of the Fourteen Amendment by creating an unconstitutional burden on the fundamental right to vote for those under the age of 65.

65.     The Defendants, who are state actors and/or acting under color or law as administrators of elections, have also violated the Equal Protection Clause of the Fourteen Amendment by creating an unconstitutional, racially discriminatory burden on the fundamental right to vote.

66.     The Equal Protection Clause "is essentially a mandate that all persons similarly situated must be treated alike." *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). When a "challenged government action classifies or distinguishes between two or more relevant groups," courts must conduct an equal protection inquiry to determine the validity of the classifications. *Quth v. Strauss*, 11 F.3d 488, 491 (5th Cir. 1993).

67.     First, Defendants have unconstitutionally burdened Plaintiffs' right to vote as set forth under the *Anderson-Burdick* analysis.

68.     Because voting is a fundamental right (*Harper v. Virginia State Bd. Of Elections*, 383 U.S. 663, 667 (1966)), state election laws or enactments that place a burden on the right to vote are evaluated under the *Anderson-Burdick* analysis.  Under that analysis, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by the rule." *Burdick v. Takushi*, 504 U.S. at 434.  If the burden on the right to vote is severe, a court will apply strict scrutiny. The classification created by the state must promote a compelling governmental interest and be narrowly tailored to achieve this interest if it is to survive strict scrutiny. *Plyer v. Doe*, 457 U.S. 202, 216-17 (1982).

69.     Under strict scrutiny, Defendants are unable to supply any legitimate or reasonable interest to justify such a restriction.  Defendants' proffered interests in denying millions of Texans a mail-in ballot amidst a pandemic are that (1) mail-in ballots are a special protection for the aged or disabled and (2) mail ballots enable election fraud. Both reasons, even taken at face-value, fail to outweigh the burden voters will face in exercising their right to vote before the threat of COVID-19 can be realistically be contained. Anyway, Defendants fail to explain why, under their advanced interests, that older voters are so highly valued above those of younger voters that the rampant fraud Defendants claim mail-in voting provides is justified.

70.     Further, the statutory interpretation espoused by Defendants is not narrowly tailored enough to serve the proffered interests.  Tex. Elec. Code § 82.001, *et seq.*, extends the "special protection" of a vote by mail-in ballot to not just the aged or disabled but also to voters

confined in jail, voters who have been civilly committed for sexual violence, and voters who are confined for childbirth.

71.     Second, mail-in ballots have built-in protections to ensure their security, including many criminal penalties for their misuse—protections that Defendant Paxton has publicly expressed a willingness to pursue.  Tex. Elec. Code § 86.001, *et seq.*  "Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State's announced interests and the statute enacted." *Veasey v. Abbott*, 830 F.3d 216, 262 (5th Cir. 2016) (citing *St. Joseph Abbey v. Castille*, 712 F.3d 215, 225–26 (5th Cir. 2013)).

72.     Even if this court finds that this statute should receive only rational basis review, as is appropriate where the burden is found to be more minimal, Defendants cannot proffer any rational state interest to justify their statutory interpretation.  There is no rational state interest in forcing the majority of its voters to visit polls in-person during a novel global pandemic, thus jeopardizing their health (and the health of all those they subsequently interact with).  There is certainly no rational interest in fencing out voters under the age of 65 because it would introduce rampant fraud, while allowing older voters to utilize mail ballots and allowing the alleged rampant fraud therewith.  Nor do Defendants have a rational state interest in fencing out from the franchise a sector of the population because of the way they may vote. "'The exercise of rights so vital to the maintenance of democratic institutions' . . . cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents." *U.S. v. State of Tex.*, 445 F. Supp. 1245, 1260 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105, 99 S. Ct. 1006, 59 L. Ed. 2d 66 (1979).  Furthermore, the state has no interest in

allowing a situation where the Attorney General can sow confusion, un-even election administration and threaten criminal prosecutions on these circumstances.

73.     Thus, this Court concludes that Defendants, who are state actors and/or acting under color or law as administrators of elections, have violated the Equal Protection Clause of the Fourteen Amendment by creating an unconstitutional burden on the fundamental right to vote for those under the age of 65.

74.     In addition, this Court concludes that Defendants, who are state actors and/or acting under color or law as administrators of elections, have also violated the Equal Protection Clause of the Fourteen Amendment by creating an unconstitutional, racially discriminatory burden on the fundamental right to vote.

75.     The Fourteenth Amendment to the U.S. Constitution prohibits states from treating U.S. citizens differently based on their race.

### b.  Without Preliminary Relief, Plaintiffs Are Suffering Irreparable Harm

76.     This Court concludes Plaintiffs are suffering irreparable harm in the absence of injunctive relief.

77.     Voting is a constitutional right for those that are eligible, and the violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction.  *See Deerfield Med. Ctr. V. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981) (citing, e.g. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); DeLeon v. Perry, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sum nom. DeLeon v. Abbot, 791 F3d 619* (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."); *see also Mitchell v.*

*Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

78.     In addition, forcing voters to unnecessarily risk their lives in order to practice their constitutional rights while allowing other voters a preferred status so that they do not have to face this same burden, is also irreparable injury.

79.     Leaving the elections conditions as they are is itself a harm.  TDP and these individual voters are held up, every day by the conflicting state court order and Paxton's guidance.  If the Plaintiff voters apply for ballots by mail, right now, as they would otherwise be entitled to do, they subject themselves to criminal investigation.  If they wait, they may miss the deadline, risk their application or ballot do no travel in the mail timely or otherwise gets held up with a last minute rush of vote by mail applications.  Meanwhile, TDP is unable to counsel and advise its members as to who can vote in its primary runoff and how.

      **c.   The Continued Injury if the Injunction is Denied Outweighs Any Harm that Will Result if the Injunction is Granted**

80.     This Court concludes that     any harm to Defendants is outweighed by the continued injury to Plaintiffs if an injunction does not issue.

81.     As explained above, the injury Plaintiffs are suffering in the absence of an injunction, is severe.

82.     No harm occurs when the State permits all registered, legal voters the right to vote by utilizing the existing, safe method that the State already allows for voters over the age of 65.

**III.   Preliminary Relief Will Serve the Public Interest**

83.     This Court concludes that the injunctive relief that Plaintiffs seek will not disserve the public interest, and, to the contrary, will serve the public interest because it will protect

prevent violation of individuals' constitutional rights and will prevent additional cases of a deadly infectious disease that has already taken the lives of over a thousand Texans.

84.     It is "always" in the public interest to prevent violations of individuals' constitutional rights, *Deerfield Med. Ctr.*, 661 F.2d at 338-39, and it is in the public interest not to prevent the State from violating the requirements of federal law.  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *c.f. Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (stating that protecting the right to vote is of particular public importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

85.     Moreover, it is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally: "[a]ll statutes tending to limit the citizen in his exercise of this right should be liberally construed in [the voter's] favor." *Owens v. State ex rel. Jennett*, 64 Tex. 500, 502 (1885).  The public policy the state's executive branch attempts to advance in this case does not appear clearly in any state legislative enactment.

86.     Thus, an injunction against Defendants will serve the public interest.

Respectfully submitted,

TEXAS DEMOCRATIC PARTY

By: _____ /s/ Chad W. Dunn _____
Chad W. Dunn
General Counsel
State Bar No. 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

K. Scott Brazil
State Bar No. 02934050

Brazil & Dunn, LLP
13231 Champion Forest Drive, Suite 406
Houston, Texas 77069
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
scott@brazilanddunn.com

Dicky Grigg
State Bar No. 08487500
Law Office of Dicky Grigg, P.C.
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: 512-474-6061
Facsimile: 512-582-8560
dicky@grigg-law.com

Martin Golando
The Law Office of Martin Golando, PLLC
SBN #: 24059153
N. Saint Mary's, Ste. 700
San Antonio, Texas 78205
(210) 892-8543
martin.golando@gmail.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been sent via

the Court's electronic filing system to all counsel of record on May 14, 2020.

/s/ Chad W. Dunn
Chad W. Dunn