IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY, GILBERTO | § | |
| HINOJOSA, Chair of the Texas Democratic | § | |
| Party, JOSEPH DANIEL CASCINO, SHANDA | § | |
| MARIE SANSING, and | § | |
| BRENDA LI GARCIA | § | |
| _Plaintiffs,_ | § | |
| | § | |
| v. | § | Case No. 5-20:cv-00438-FB |
| | § | |
| GREG ABBOTT, Governor of Texas; RUTH | § | |
| HUGHS, Texas Secretary of State, DANA | § | |
| DEBEAUVOIR, Travis County Clerk, and | § | |
| JACQUELYN F. CALLANEN, Bexar County | § | |
| Elections Administrator | § | |
| _Defendants._ | § | |

**PLAINTIFFS' REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

## I.    Introduction

In the midst of a global pandemic that has infected more than 1.3 million Americans and resulted in more than 84,000 deaths, Plaintiffs seek this preliminary injunction to preserve their basic constitutional rights and those of other Texans.   It is not Plaintiffs' lawsuit that would "destabilize[]" Texas's "carefully crafted framework governing the conduct of election" (Response at 1) – it is COVID-19, which poses a risk of death to all those, regardless of age, who come into contact with it, and Defendants' inexplicable decision to ignore a valid State court order and place its citizens health and safety at unnecessary risk.

Defendants assertions that they have been "assiduously monitoring COVID-19 for months," and "Texas voters will be able to safely cast an in-person ballot," Response at 2, are unsupported by the evidence.   May 13, there were 1,473 new reported cases in the State, the second highest daily

toll ever and the highest in more than a month.[1]  Despite rising rates of infection, Defendants have

not explained, nor provided any evidence as to how they will actually keep polling places safe and

why they believe the pandemic will not continue through July and into November.  Nor have they

explained how the state's laws could be adequately adjusted to this yet unfounded plan given that

the state constitution explicitly prohibits the Governor from suspecting Acts of the Legislature.[2]

Defendants can only state to the Court that sometime soon they will explain how they believe they

will be able to safely protect the millions of Texans they intend to force to risk infection to exercise

their right to vote.  Response at 3.  But, the election process is running now and has for weeks and

anyway, the voting rights of citizens are not dependent on the hope without a plan benevolence of

the state's executive branch.

 Texas has neither explained nor provided any evidence as to how it will stop the COVID-19

pandemic and protect people who are forced not merely to vote at a polling place, but also travel to

and from it.  It is Defendants, not Plaintiffs, who are engaged in speculation and conjecture when

they declare in conclusory fashion that voting in-person in July and November will be safe for all

Texans.  The evidence, and recent experience, show that it cannot be done.

 Moreover, Defendants seek to have it both ways.  On the one hand, Defendants contend

that they are under siege from Plaintiffs' supposed "coordinated campaign" of litigation against the

Texas Election Code, of which this lawsuit is purportedly the "latest salvo."  Response at 8.  On the

other, Plaintiffs have engaged in delaying tactics and have not "moved urgently . . . to litigate their

claims."  *Id.*  Neither is true.  Plaintiffs have vigorously litigated their claims in this Court and others

---

[1] https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html
[2] Tex. Const. Art. 1, Sec. 28.

in order to protect and preserve their constitutional rights and those of other Texans. It is Defendants who have flouted the judicial process.

Plaintiffs moved with great haste to vindicate their right to vote. <u>Only one day</u> after the Texas Commissioner of the Department of State Health Services declared a state of public health disaster and Defendant Abbott closed schools, bars, and restaurants, Plaintiffs filed suit in Texas state court seeking a temporary injunction, permanent injunction, and declaratory judgment holding that Section 82.002 allows any eligible voter, regardless of age and physical condition, to vote by mail they should practice social distancing. *Texas Democratic Party, et al. v. DeBeauvoir, et al.*, No. D-1-GN-20-001610 (201st Dist. Ct., Travis Cnty., Tex. filed March 20, 2020). On April 15, the state court ruled in Plaintiffs' favor and granted the temporary injunction. *Id.*

It was Defendant Paxton, not Plaintiffs, who precipitated this lawsuit by releasing a letter which directly contradicted the decision of the Texas state court, described the court's decision as "unlawful," and threatened criminal prosecution against third parties who relied on a valid court order. It is Defendants who pursued this incorrect, dangerous, and unconstitutional interpretation of the Texas Election Code in defiance of the valid ruling of a Texas state court. It is Defendants' disregard for the judicial system and the health and safety of Texans, not Plaintiffs' efforts to ensure that they will be able to exercise the right to vote, that has spurred this litigation.

As explained in the Motion (*see generally, id.*), the Court should issue a preliminary injunction in this case. Plaintiffs are likely to succeed on the merits of their claims. Defendants' conduct violates Plaintiffs' right to vote under the Twenty-Sixth Amendment and the Equal Protection Clause. Moreover, the statute in question is unconstitutionally vague (particularly given Defendant Paxton's threat of criminal prosecution for those who chose to abide by the valid state court order),

Defendants have engaged in voter intimidation in violation of 52 U.S.C. § 10307(b), and Defendants have denied Plaintiffs' free speech rights in violation of the First Amendment. Plaintiffs are therefore likely to succeed on the merits of their claims, and, as explained below, the other elements for a preliminary injunction to issue are satisfied in this case. Finally, Defendants' standing, sovereign immunity, and improper defendant arguments all lack merit.

II.   **Plaintiffs Are Likely to Succeed on the Merits of their Claims**

    A.   Plaintiffs Are Likely to Prevail on the Merits of their Twenty-Sixth Amendment Claim

The State's argument that Texas Election Code § 82.003 does not violate the Twenty-Sixth Amendment is meritless. The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. The statute in question does just that, abridging Plaintiffs' right to vote based on their age.

        a.   *Strict Scrutiny Applies to the 26th Amendment Claims, and Defendants' Conduct Does Not Satisfy that Standard*

As explained in the Motion, strict scrutiny should apply to Plaintiffs' Twenty-Sixth Amendment Claim. *Id.* at 15. A three judge federal court in Texas considered a 26th Amendment claim, it surveyed numerous other federal and state supreme court opinions that determined that the state must advance a compelling state interest to enforce a law that granted voters differing benefits based on their age. *See Symm v. United States*, 439 U.S. 1105 (1979). The decision was summarily affirmed by the Supreme Court. *See United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978). "[S]ummary affirmances obviously are of precedential value," *Edelman v. Jordan*, 415 U.S. 651, 671 (1974). In the absences of a fully developed Supreme Court opinion, *Symm* should settle the case at bar for this Court. Strict scrutiny applies.

Defendants contend that if *Anderson-Burdick* standard applies to 26th Amendment claims such as the one Plaintiffs bring here, the challenged statute should be evaluated under rational basis review.  Response at 20-21.  As explained in the Motion, however, the *Anderson-Burdick* analysis requires strict scrutiny where, as here, the burden on the right in question is severe.  *Id.* at 27 (citing *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (finding that the Twenty-Sixth Amendment provides an "added protection to that already offered by the Fourteenth Amendment")).  Defendants suggest that the burden on Plaintiffs' right to vote is not severe in this case because "young people and elderly people alike have the same avenues for in-person voting available to them" (Response at 21).  But this is not the case under current circumstances, which have the practical effect of closing off the avenue of in-person to persons practicing social distancing as a result of COVID-19. As such, while those 65 and older are able to vote by mail, young people practicing government requested, if not mandated, social distancing will be denied the right to vote. This burden is severe, and thus even if the Twenty-Sixth Amendment rolls into the Fourteenth and the *Anderson-Burdick* test applies, the burden must be "narrowly drawn to serve a compelling government interest."  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Defendants do not seriously contend in the Response that such narrow tailoring is present in this case.  Section 82.003 is *prima facie* discriminatory towards younger votes as the law on its face creates two classes of voters.  In doing so, it abridges and otherwise severely burdens the right to vote for voters under the age of 65.[3]  Despite Defendants' assertions to the contrary (Response at 22), the unrebutted evidence demonstrates that many voters under 65 will be denied mail ballots solely due

---

[3] Moreover, as explained in the Motion and unrefuted in the Response, laws that patently discriminate on their face, such as this one, are subject to strict scrutiny.  S*ee Lynch v. Donnelly,* 465 U.S. 668, 687 n. 13 (1984) (holding that laws, statutes, or practices that are "patently discriminatory on its face" will receive strict scrutiny); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

to their age, and will therefore be forced to choose between voting in-person and risking their life or forgoing their right to vote.  Section 82.003 unconstitutionally discriminates against younger voters by providing an alternative means for older voters to cast a ballot, but denying younger voters those same alternatives. In other words, it denies younger voters the means to cast a ballot safely during a pandemic, solely on the account of their age, and thus effectively denies their exercise of their fundamental right to vote in these as-applied circumstances.  This is impermissible under the Twenty-Sixth Amendment.[4]

If the Court declines to engage in strict scrutiny, it should employ the *Arlington Heights* framework and reject the state's argument to the contrary.  *See* Motion at 16-18.  Defendants assert that the *Arlington Heights* framework is inapplicable, but then concede neither the Supreme Court nor the Fifth Circuit have adopted a standard for review of Twenty-Sixth Amendment claims. Response at 21.  The better course is that if this court declines to adopt the *Anderson-Burdick* analysis, it should follow the well-reasoned decision in *One Wis. Inst., Inc. v. Thomsen*, 198 F.Supp.3d 896 (W.D. Wis. 2016), which held that because the Twenty-Sixth Amendment's text is "patterned on the Fifteenth Amendment . . . *Arlington Heights* provides the appropriate framework." *Id.* at 926.  And, as explained in the Motion (*id.* at 17-20), the four elements of the *Arlington Heights* framework[5] are satisfied in this case.

      b.  *Alternatively, Defendants' Conduct Does Not Satisfies Rational Basis Review*

---

[4] Even if the Court found that the burden on Plaintiffs was "moderate" and not "severe," under the *Anderson-Burdick* standard Defendants, for the reasons explained herein, would still not have shown that their asserted interests outweigh the public's interest in ensuring Texans are able to vote safely.

[5] The *Arlington Heights* framework is well-settled law, evaluating: (1) the impact of the official action and whether it bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequences of events leading up to the decision challenged in the case, including departures from normal procedures in making decisions and substantive departure; and (4) contemporary statements made by the governmental body who created the official action. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

Even if this court were to apply the standard of review advocated (incorrectly) by the Defendants, Defendants' reasons for barring voters under the age 65 who are practicing social distancing due to COVID-19 concerns do not reflect any legitimate government purpose.

Even under rational basis review, courts "insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). This is particularly true where the classification at issue touches upon both the fundamental right to vote and involves a suspect class, as it does here. *See supra*, Section II.B.

Indeed, "[a] law will not survive rational basis unless it is 'narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serve[s].'" *De Leon v. Perry*, 975 F. Supp. 2d 632, 652 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) (quoting *Romer*, 517 U.S. at 620). In *De Leon*, the court struck down a Texas constitutional provision barring the recognition of an out-of-state same sex marriage in Texas. *Id*. at *639. Proceeding under a rational review standard, the court determined that while at least some of the state's asserted governmental interests were undoubtedly legitimate, the state law failed to bear a rational relationship to those governmental ends. *Id*. at *653. In so finding, the Court noted that an unsupported and "overbroad generalization[s]" that cannot be a basis for upholding discriminatory legislation. *Id*. at 665.

Similarly, in this case, Defendants' asserted governmental interest, in preserving the health and well-being of those 65 and over, is undoubtedly legitimate. They assert that their interpretation of the statute survives rational basis review because "[e]ven outside the context of COVID-19, individuals aged 65 and over (as a group) face unique challenges in attending the polls," and that during the COVID-19 pandemic, "individuals aged 65 and over face a greater risk of developing

complications from COVID-19 than those under 65."  Response at 23.[6]  But Defendants' interpretation of the statute in question and their efforts to enforce that interpretation bear no rational relationship to that end.  Forcing millions of Texans (including 64 and 63 year olds) to travel to polling places and violate social distancing protocols to vote in-person, and then travel back to their homes (where many may live with Texans 65 or older) or places of business (where many may work with Texans 65 and older) does nothing to protect the health of that vulnerable population.  To the contrary, by enforcing their narrow interpretation of the statute, Defendants will directly undermine the very interest they assert.

Seeking to bolster their argument that conduct is rationally related to a legitimate government interest, Defendants point to the elections that occurred in Wisconsin in April of 2020 as evidence that voters that do not have access to a mail ballot during the pandemic are not burdened.  According to Defendants, the elections in Wisconsin "demonstrate[] that elections can be held in-person without an increased risk of transmission of COVID-19."  Response at 27.  This assertion is false.  More than 50 people who voted in person or worked the polls during that Wisconsin election have tested positive for COVID-19.[7]  And while the statistical methods of the study the state perches on are suspect, even were the study's finding scientifically supported, it says nothing about whether voting in-person caused more infections that otherwise would have occurred over the same time.  All the paper really can conclude, if it was rigorous, is that in Wisconsin there was not a spike of cases after the election.

---

[6] This argument is not only callous in its disregard of the health of Texans under 65; it also appears to be ungrounded in facts. Data from the State of Texas shows that the highest number of reported cases of COVID-19 are among Texans aged 40-49, 50-59, and 30-39. Those aged 20-29 comprise more than double the reported cases of COVID-19 than those aged 65-69 or 70-74.  Motion at 16; *see also* https://dshs.texas.gov/coronavirus/TexasCOVID19CaseCountData.xlsx.
[7] https://www.pbs.org/newshour/health/52-people-who-worked-or-voted-in-wisconsin-election-have-covid-19

B.  <u>Plaintiffs Are Likely to Prevail on their Equal Protection Claims</u>

       *a.  Defendants' Conduct Violates the Equal Protection Clause on the Basis of Age*

In their Response, Defendants misstate the standard of review for discrimination on the basis of age in the voting rights context, and in any event misapply the standard they purport to apply in these circumstances.  Defendants ignore the well-established principle that the right to vote is a "fundamental right," *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966). Discriminatory classifications that impinge on the fundamental right to vote are subject to heightened scrutiny. *See Jones v. DeSantis*, 950 F.3d 795, 817 ("where a law draws a suspect classification or burdens fundamental rights, we look beyond the benign glance of rational basis and demand a tighter fit between the classification and the government's interests."). In *Jones*, the Eleventh Circuit held that even where states otherwise have a "green light" to deny access to the ballot to all voters, that does not mean that a state has free rein to discriminate between different classes of voters solely on the basis of wealth.  *Id.* **at** 822.  Similarly, although the state may be free in the abstract to decline to provide absentee ballots to voters, once it chooses to provide such an alternative means of voting, it cannot draw classifications based solely on age.  *See Id.*[8]

    Defendants instead rely on *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62 (2000), an employment law case that has nothing to do with voting rights (or any other fundamental right) to suggest that rational basis review applies.  The cases cited by the court in *Kimel* as supporting the

---

[8] Defendants' reliance on *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969), cited in the Response at 22 is misplaced. First, *McDonald* was decided before the Twenty-Sixth Amendment was ratified, calling into question its persuasiveness with respect to classifications based on age. Indeed, the Court's holding that the classifications were rational because they were not "drawn on the basis of wealth or race," *id*. at 807, confirms that a classification that are specifically prohibited under the Constitution, like those based on age under the 26th Amendment, demand heightened scrutiny. Second, the Plaintiffs in *McDonald* failed to present evidence that pretrial detainees were effectively prohibited from exercising the right to vote, *id*. at 810, and the Court later acknowledged that had such evidence been presented, as it is here, the case may have come out the other way.  *See Goosby v. Osser*, 409 U.S. 512, 522 (1973).

proposition that age discrimination need meet only rational basis review (which included a statute requiring state police officers to retire at age 50, a statute requiring Foreign Service officers to retire at age 60, and a statute that required judges to retire at age 70) only serve to demonstrate *Kimel*'s inapplicability in this case concerning the fundamental right to vote.

Even under the inapplicable standard Defendants advance, however, they have still failed to establish that they have a rational basis for their (incorrect) interpretation of the statute.  Defendants assert that the rational basis, pre-COVID-19, for permitting only voters 65 and over to vote by mail is the "everyday barriers to movement, outings, and activity" that they face to a greater degree than young people.  Response at 23.  Is it really the state's position that the Governor recently issued stay at home orders because of "everyday barriers?"  The COVID-19 pandemic is not an everyday barrier.

In fact, Defendants' only argument for why enforcement is rational is that "individuals 65 and over face a greater risk of developing complications from COVID-19 than those under 65." Response 23.  But the state offers no evidence for such and anyway, it has not proven that age 65 voters are at a greater risk than age 64, 55 or 50.  The fact is, individuals under 65 still face an unacceptable risk of complications and death from COVID-19.  And, as discussed above, denying vote by mail to those that live, work, and otherwise interact with and are likely to therefore expose those 65 and older undermines any assertion that enforcement of the state's narrow interpretation of the vote by mail statute is rational.

Given that Defendants cannot meet even the rational basis standard, they certainly cannot meet the test set forth in *Anderson-Burdick*.  In *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), on which Defendants rely, the Court found a voter identification law survived *Anderson-Burdick* scrutiny because "[o]rdinary and widespread burdens, such as those requiring 'nominal

effort' of everyone, are not severe." *Id.* at 197; *see also* Response (quoting *Crawford*'s "ordinary and widespread burden" language.  Quite simply, there is nothing "ordinary" about the burden that voting during the global COVID-19 pandemic would impose, and risking one's life (and the lives of anyone with whom one lives, particularly those aged 65 and older) is not a "nominal effort." Moreover, despite Defendants' assertion, Plaintiffs are not asking this Court to "rewrite state election codes," Response at 24 (quoting *Crawford*, 553 U.S. at 197), but rather to enjoin Defendants from imposing on Texas citizens the undue burden of subjecting themselves and their family members to the risk of sickness and death in order to vote during these historic times.

Defendants' other arguments as to why their enforcement of the statute (as they have interpreted it) survives *Anderon-Burdick* scrutiny lack merit.  They argue in conclusory fashion that a deluge of mail-in ballots would limit their efforts to prevent voter fraud (Response at 25) but provide no evidence to support that contention.  The court in *Veasey v. Abbot*, 830 F.3d 216 (2016) which Defendants themselves cite, warned against invoking "preventing voter fraud as a talisman" against constitutional objections to state statutes concerning voting.  *Id.* at 248 n.39.  In addition, Defendants also argue that their interpretation of Section 82.003 places no burden on Plaintiffs' right to vote, because it merely "provides another avenue to cast a ballot for members of a community more likely to face special challenges voting in person."  Response at 25.  But Defendants' argument is little more than semantics–they have provided voters 65 and over a way to avoid contracting COVID-19 while exercising their fundamental right to vote, and denied that option to similarly situated voters under 65.

    b.  *Defendants' Conduct Violates the Equal Protections Clause on the Basis of Race*

In their Response, Defendants mischaracterize Plaintiffs' claim as a "disparate impact" claim. *Id.* at 28. As explained in Plaintiffs' Motion, as-applied by Defendants, Texas's mail-ballot eligibility law serves to create classifications that are discriminatory. *Id.* at 30. *Washington v. Davis*, 426 U.S. 229 (1976), which Defendants cite in their Response, is inapposite. *Id.* at 28. In that case, the Supreme Court found that facially neutral laws do not present an equal protection violation based on disparate impact alone. *Washington*, 426 U.S. at 242. The Supreme Court went on to note, however, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* The statute at issue here is not facially neutral – it discriminates specifically on the basis of age. In Texas, the population of those under the age of 65 is disproportionately made of members of racial minorities. Motion at 13. Thus, most mail ballots are provided to Texas's seniors who are 65 years of age or older, and Texas' population of voters older than 65 is overwhelmingly Anglo.

    C.  <u>Plaintiffs Are Likely to Prevail on their Void for Vagueness and Voter Intimidation Claims</u>

        *a.  Plaintiffs Are Likely to Prevail on their Void for Vagueness Claim*

Notwithstanding Defendants' assertions in the Response, Plaintiffs are likely to succeed on the claim that Section 82.002(a) is unconstitutionally vague under the 14th Amendment.

As an initial matter, Defendants argue that void-for-vagueness challenges in the civil context are disfavored, and cite *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192 (5th Cir. 2000), which involved a challenge under the Fair Housing Amendment Act to a local zoning decision. Response at 29 (citing *id.* at 195). As Defendants note, the court in *Groome Resources* noted that the "void-for-vagueness doctrine has been primarily employed to strike down criminal laws." *Id.* at 217. What Defendants ignore, however, is that they themselves are the ones who have invoked criminal

liability in this case through Defendant Paxton's statement.  As Judge Sparks in this District has explained, courts in the void-for-vagueness context have "expressed greater tolerance of enactments with civil rather than criminal penalties because <u>the consequences of imprecision are qualitatively less severe</u>." *Inst. for Creation Research Graduate Sch. v. Texas Higher Educ. Coordinating Bd.*, No. A-09-CA-382-SS, 2010 WL 2522529, at *18 (W.D. Tex. June 18, 2010) (noting that the statute in question in that case was "a civil regulation," that "[n]oncompliance with its standards results not in criminal penalties, but merely in the denial of a certificate of authority to offer a degree," and "[t]hus, a more lenient standard for vagueness applies to the rule") (emphasis added).  Defendants here should not be able to raise the specter of criminal liability to intimidate Plaintiffs and third parties, and then contend before this Court that the civil nature of the statute means the Court should engage in a less fulsome analysis of the statute's vagueness.

In addition, Defendants fail to respond to Plaintiffs' argument in the Motion that when a vague statute infringes upon basic First Amendment freedoms, "a more stringent vagueness test should apply.'" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (finding that "government may regulate in the area of First Amendment freedoms only with narrow specificity," that "the State may not hinge liability on a phrase so ambiguous in nature," that "it most certainly may not do so when devastating consequences attach to potential violations," and striking down the state statute in question).

Nor do Defendants even analyze whether the law encourages or authorizes arbitrary enforcement because it is clear from Defendant Paxton's actions during the state court proceedings and these proceedings that the statute does just that.  Defendant Paxton has threatened certain election officials while not addressing others on vote by mail.  Due process is violated when a statute

subjects one to criminal liability and provides no standard of conduct or a standard so indefinite that it provides law enforcement officers freedom to react on nothing more than their own beliefs and preferences. *Smith v. Goguen*, 415 U.S. 566, 578 (1974). The vagueness of the statute allows Defendant Paxton, as he has stated, to choose to prosecute some voters on nothing more than what his opinions are regarding a disability or injury. There are no guidelines by the State to determine when a voter has a qualifying injury. The law must be specific enough to give reasonable and fair notice in order to warn people to avoid conduct with criminal consequences. *Smith*, 415 U.S. at 574. In the absence of any such guidelines or specificity, the statute must be void for vagueness.

b.  Plaintiffs Are Likely to Prevail on their Voter Intimidation Claim

Defendants assert that Plaintiffs' Motion "drips with disdain" (Response at 30) regarding Defendant Paxton's decision to release his letter defying the lawful order of a Texas state court and threatening third parties who would seek to exercise their fundamental right to vote under that order. It is Defendants who are acting with disdain in this case, directing that disdain towards the judicial system and Texas voters.

Defendants also contend that Defendant Paxton did not act with the intent to deprive anyone of their vote, but instead was simply "explain[ing]" that, in effect, failure to follow his interpretation of the statute "could implicate the Code's criminal provisions." Response at 31. It strains credulity, however, to accept that Defendant Paxton's decision, as the State's chief law enforcement officer, to invoke criminal liability in a letter, the stated purpose of which was guidance as to whether a voter "may claim a disability entitling the voter to receive a ballot by mail," was not intended as a threat.

As explained in the Motion (*id.* at 26), Plaintiff must prove the following elements for a claim under § 1985(3): (1) a conspiracy of two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprives her of a right or privilege of a United States citizen.  *See Hilliard v. Ferguson*, 30 F.3d 649, 652– 53 (5th Cir. 1994); *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987).  Plaintiffs have satisfied all of these elements.

Defendant Paxton worked with employees and other signatures to issue an advisory opinion for the purpose of depriving persons and classes of voters the right to vote.  Statements made by Defendant Paxton include: "to the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041" and that expanding mail ballot eligibility to all Texans "will only serve to undermine the security and integrity of our elections." These statements operate to confuse and discourage voters from seeking mail ballots under the Texas state court order due to prosecution. Indeed, Defendant Paxton has openly attempted to prosecute voters in a plethora of cases before this court unjustly.  It goes without saying that using his position as Attorney General to openly threaten voters with possible prosecution is an act in furtherance of this conspiracy to deprive access to the franchise from legal, rightful voters. Plaintiffs are likely to succeed on the merits of their claim that Defendant Paxton's official actions amount to voter intimidation in violation of Title 42 USC § 1985(3).

Second, defendants assert that Defendant Paxton's individual right to free speech would be violated if he were enjoined from threatening voters with prosecution for attempting to vote by mail.

Response at 33.  However, when "speech is brigaded with action . . . [t]hey are indeed inseparable." *Brandenburg v. Ohio*, 395 U.S. 444, 456 (1969).  Here, Defendant Paxton's overt act is his intimidation of voters.  Voter intimidation, encompassing anyone who "intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose," is prohibited by the Voting Rights Act. 18 U.S.C. § 594.  In the Fifth Circuit, elected officials' speech is "analogous to that afforded citizens in general," *Rangra v. Brown*, 566 F.3d 515, 517 (5th Cir. 2009), and there is no private citizen or elected official exemption for voter intimidation. See 18 U.S.C. § 594.

    D.  <u>Plaintiffs Are Likely to Prevail on their First Amendment Claims</u>

Defendants suggest that Plaintiffs' free speech rights are not violated, because they are free to continue to advocate that voters to apply for and cast absentee ballots under the state court's order—activity Defendants argue is illegal—despite Defendants' threats that they will be prosecuted for doing so. Indeed, there would be no reason for Defendants' speech if it was not intended to have just such an effect. And, the case Defendants rely on for the proposition that Plaintiffs' right to free speech is not abridged by these threats is inapposite. "[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality." *See United States v. Williams*, 553 U.S. 285, 298-99 (2008).  In *Williams*, the case defendants cite, the Court held that mere "abstract advocacy" of illegal activity, as opposed to "offers to provide or requests to" engage in illegal activity, "falls well within constitutional bounds." *Id.* at 299.  In addition, the imminence requirement for criminal speech to fall outside First Amendment protection is well-settled; "mere advocacy" or "assembly with others merely to advocate the described type of action" is wholly protected by the First Amendment.  *Brandenburg*, 395 U.S. at 449.

16

III.    <u>The Public Interest in this Case Is Best Served by Protecting the Rights of the Public rather
than the Opinions of State Actors</u>

The public interest in this case would best be served by protecting the constitutional rights
of Texas voters, rather than the policy whims of one State executive branch official.  An "injunction[]
protecting First Amendment freedoms," such as the one sought by Plaintiffs, is "always in the public
interest."  *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *see also
Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (affirming the district court's
finding that "the public interest would be undermined if the unconstitutional actions of the
[defendant] were allowed to stand" and that "the public interest is enhanced" where an injunction
requires "comport[ment] with basic protections of due process to which all citizens are entitled").

The cases Defendants rely on in their Response are not to the contrary.  In *Maryland v. King*,
567 U.S. 1301 (2012), the irreparable harm that would have resulted from an injunction preventing
the state from collecting DNA samples from individuals charged with (but not convicted of) certain
crimes would have been the deprivation of "a valuable tool for investigating unsolved crimes and
thereby helping to remove violent offenders from the general population."  *Id.* at 1301.  The Court
went on to that "[c]rimes for which DNA evidence is implicated tend to be serious, and serious
crimes cause <u>serious injuries</u>," and an injunction should not issue because failing to "<u>prevent these
injuries constitutes irreparable harm</u>."  *Id.* (emphasis added).  Thus, the Supreme Court's decision
makes clear that it is public health and safety, not blind enforcement of edicts from state executive
branch actors, that represents the public interest.  In *Abbott v. Perez*, 138 S. Ct. 2305 (2018), in which
the plaintiffs challenged the state's redistricting decisions, the Supreme Court noted that State
"needed usable plans for its rapidly approaching primaries" and characterized the injunction sought
by the plaintiffs as "for all intents and purposes . . .  barring the State from conducting this year's

17

elections pursuant to a statute enacted by the Legislature." *Id.* at 2323.  By contrast, in this case, Plaintiffs do not seek to enjoin the State from conducting their election or to invalidate its vote-by-mail regime, but instead to prevent the state from unconstitutionally denying Texas voters access to either.  And in *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406 (5th Cir. 2013), the substantial interests at issue was not simply enforcement of the law, but rather "regulating the medical profession," and noted that the regulations in question were "designed to foster the health" of Texas women.  *Id.* at 411.

If the public interest at issue is, as Defendants suggest, citizens' "confidence in the evenhanded application of the State's election laws in these precarious times" (Response at 36) and Defendants oppose allowing everyone at risk of COVID-19 infection (rather than only those 65 and over) to vote by mail, then granting Plaintiffs' injunction would further that public interest.

### IV.   An Injunction Should Issue Now, at this Point in the Election Cycle, before the Defendants Cause Any Further Irreparable Harm

The Court should issue an injunction now, with more than two months before the run-off election and five months before the general election, before Defendants' conduct can cause any further irreparable harm.  Ironically, it is Defendants who argue both that there is sufficient time for the State to come up with remedial measures to allow voters to safely vote (Response at 2-3 (arguing that voters "will be able to safely case an in-person ballot," despite admitting that the Defendant Hughs has yet to provide guidelines which will help achieve such a safe election)), and that it is "too late" for a federal court to issue an injunction protecting Texas voters (Response at 35).  Yesterday, in a filing to the Texas Supreme Court, the state argued that the current circumstances were urgent.  The fact is that counties throughout the state have been following the state court injunction order for weeks, it is the state who now wishes to upset the election process.

Defendants suggest that the injunction Plaintiffs seek "threaten[s] to create chaos and uncertainty" in Texas's election system as mail-in ballot applications are being returned, and Defendants argue that they are interested in preserving the "uniformity" of elections during the COVID-19 crisis.  Response at 3, 5.  But it is the currently existing chaos, caused by Defendant Paxton avoidance of the orders of the state judiciary, that prompted Plaintiffs to seek this injunction.  If Defendants complaint is one of a lack of certainty, then the Plaintiffs' proposed injunction provides the remedy.

Moreover, Defendants cannot complain now that there is no sufficient time for this Court to issue an injunction, given that it is Defendants themselves who have ignored a Texas state court's ruling requiring the very same relief.  To allow Defendants to manufacture a basis to deny an injunction based on temporal impossibility would undermine the authority of both the Texas state court which has already enjoined the Defendants and this Court.

The cases Defendants cite are not to the contrary and, in fact, support Plaintiffs.  In *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020), the Supreme Court issued its ruling <u>on the day before the election</u>.  *Id.* at 1207.  In any event, it is the State in this case who is trying to upset the election process that has been followed in counties around the state since Judge Sulak's order.  Plaintiffs filed this case the day after the *Republican Nat'l Comm.* opinion was issued, but just a few days later, Plaintiffs obtained relief under state law in state court.  When Defendant Paxton attempted to upset this state court order and sent a memo threatening election officials, voters and political advocacy groups, Plaintiffs here immediately moved for Preliminary Injunction.  To follow its arguments to conclusion, Defendants would never find an appropriate time when Plaintiffs could

vindicate their federal right; which, of course is the point.  The State executive officials hope to govern unencumbered by any orders of the state or federal judiciary.

V.     **Plaintiffs' Proposed Injunction Is Tailored to the Specific Harm, and the Reason for its Breadth (if Any) Can Be Traced to the Wide Reach of Defendants' Conduct**

As an initial matter, the injunction Plaintiffs seek does not suffer from overbreadth. Contrary to Defendants' contention (Response at 36), the Fifth Circuit has frequently upheld enforcement of injunctions which impact non-plaintiffs outside of the class action context. *See, e.g.: Villas at Parkside Partners v. City of Farmers Branch, Texas*, 726 F.3d 524, 539 (5th Cir. 2013) (enjoining a city housing ordinance where plaintiffs did not sue as a class); *United States v. McLeod,* 385 F.2d 734, 746-47 (5th Cir. 1967) (precluding enforcement of local law in order to protect the civil rights of "citizens generally); *United States v. Wood*, 295 F.2d 772, 781 (5th Cir. 1961) (creating a cause of action for the government to assert the voting rights of all African-American citizens registered to vote).[9]  Indeed, in *Veasey*, the voter ID case, the Fifth Circuit *en banc* adopted relief for individual voter Plaintiffs that applied state-wide. 830 F..3d at 272.

Defendants also complain in their response that because equal treatment could supposedly be achieved by withdrawing the right to vote by mail from every registered Texas voter, this Court cannot issue an injunction requiring Texas to offer vote by mail ballots to all Texas voters. Response at 36-37.  As an initial matter, this argument rings hollow given Texas's repeatedly

---

[9] The case on which Defendants rely in making this argument, *In Re: Abbott,* does not stand for the broad proposition that district courts lack the authority to issue injunctions like the one sought in this case.  In *In re Abbott*, the appellate court merely found in that specific case that "The district court lacked authority to enjoin enforcement of [the challenged statute] as to anyone other than the named plaintiffs," *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis added), and did not, as Defendants suggest, announce a general rule that "a district court lacks the authority" to do so under any circumstances (Response at 36 (emphasis added)).

expressed interest in protecting the health of its voters 65 and older (although apparently not the health of its voters younger than 65).

Moreover, as the Court in *Sessions v. Morales-Santana* (cited by Defendants) noted, "[o]rdinarily . . . 'extension,' rather than nullification, is the proper course." 137 S. Ct. 1678,1699 (2017).  The Court in *Morales-Santana* noted that a court "can" withdraw benefits from the favored class (not that it must), held that" [t]he choice between these outcomes is governed by the legislature's intent," and cited a number of cases in which the Court struck discriminatory exceptions denying benefits to discrete groups, <u>which meant benefits previously denied were extended</u>."  *Id*. at 1699 (emphasis added).  Whatever the meaning of the disability exception in Tex. Elec. Code Section 82.002, it cannot be true that the Legislature explicitly decided that Texans must vote in person during pandemic circumstances.  In this case, the legislature's intent in creating the statute is clear: to expand the right to vote.  This Court need look no further than to the State's own Response, in which Defendants contend that the "State's decision to allow older Texans to vote by mail without <u>extending that privilege</u> to everyone is a rational way to facilitate exercise of the franchise for Texans who are more likely to face everyday barriers to movement, outings, and activity than younger people."  *Id*. at 23 (emphasis added).  According to Defendants themselves then, the Legislature intended the statute to expand, not limit, the franchise in Texas, and thus the Court has clear guidance to extend, rather than nullify, the right to vote by mail.

VI.   **This Court Should Not Abstain Where, as Here, Plaintiffs Have Cognizable Federal Constitutional Claims and Failure to Remedy Them Would Cause Irreparable Harm**

Abstention in this case is improper as the state law determination will not moot nor present in a different posture the federal constitutional questions raised by Plaintiffs. Plaintiffs allege clear violations of their federal constitutional rights under the Equal Protection Clause and Twenty-Sixth

Amendment that stand regardless of resolution of the state law question, which only bears on one of Plaintiffs claims. Unlike the Defendants' contention, resolution of this issue, however, is neither "dispositive of the case" before this Court, nor would its resolution "materially alter the constitutional questions presented" by Plaintiffs' claims. *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000). Regardless of whether the challenged provision of Texas Election Code is resolved in Texas state court, and there is no indication that such clarification will come soon.  Furthermore, the evidence questions whether the state's executive branch would follow such a ruling anyhow, it did not the trial court's injunction.  Meanwhile, Texas voters are waking every day to make the choice to request a mail ballot and have it rejected (and be criminally prosecuted) or wait further and potentially request the ballot too late or do so with an avalanche of others that overloads the electoral system.  the orderly administration of the election requires resolution now.  The state has had ample opportunity to resolve the state law legal issues and has not done so; indeed executive branch officials have thwarted such timely resolution.  The question of whether the current circumstances violate the U.S. constitution remains and must be answered by this Court.

Abstention is also improper because the July run-off election is weeks away. There is no guarantee that the state court proceedings will have resolved the issue before this election, leaving Plaintiff's federal constitutional rights in limbo and violated.  "The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers."  *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). In fact, the stay of a federal decision is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959) (quoted in *Colorado River Water Conservation District v. United*

*States*, 424 U.S. 800, 813 (1976)). "[A]bstention is the exception rather than the rule." *Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. 1981).

Defendants inaptly argue that the Plaintiffs have "manufactured uncertainty about eligible to vote by mail," yet the Defendants, especially Defendant Paxton's communication with the public and election officials through non-binding statements regarding vote by mail are the reason that there is uncertainty about voting by mail.  Response at 9.  The state's own petition to the Texas Supreme Court filed yesterday all but acknowledges that the vast majority of the voters in the state live in counties which are following Judge Sulak's ruling.  Defendants are the ones who want to disrupt the status quo, and short of that, cloud the election machinery with threats of criminal prosecution. Defendant's argument in favor of this court granting abstention precariously sits on a mountain of "mights" about the possibilities stemming from a state court proceeding, none of which directly influence the federal constitutional claims. Plaintiffs allege prima facie discrimination on the basis of age in violation of the U.S. constitution, a claim that only this court can resolve. Abstention is inappropriate in this case, for the same reason that it is "particularly inappropriate" in voting cases.  *See Siegel*, 234 F.3d at 1174.  Constitutional "deprivations may not be justified by some remote administrative benefit to the State." *Harman*, 380 U.S. at 542.  As such, abstention is improper.

**VII.**    <u>The State Defendants Cannot Claim Sovereign Immunity</u>

In their Response, Defendants argue that the State Defendants (*i.e.*, Defendants Abbott, Paxton, and Hughs) have sovereign immunity because they do not enforce the Texas Election Code, and thus the *Ex Parte Young* Doctrine does not apply.  Response at 12-17.  This argument is meritless.

*Ex Parte Young* provides an exception to sovereign immunity when the defendant enforces the challenged statute "by virtue of his office." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). Ex Parte Young requires two analyses: first, a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," and second, consideration of whether the official in question "has a 'sufficient connection [to] the enforcement' of the challenged act." *Id.*  The Complaint in this case alleges numerous violations of federal law and seeks prospective relief (*see generally,* Compl.), and, as explained below, all of the State Defendants have a sufficient connection to the enforcement of the Texas Election Code.

As to Defendant Hughs, the Fifth Circuit has already determined, in another case, that "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" *OCA-Greater Houston v. Texas*, 867 F. 3d 604, 613 (5th Cir. 2017).  In *OCA-Greater Houston*, the court found that because the Secretary of State is Texas's Chief Election Officer and is required to "obtain and maintain uniformity in the application, operation, and interpretation of" the Texas Election Code, Tex. Elec. Code § 31.003, the Secretary was positioned to redress the plaintiffs' injuries caused by a generally applicable election law.  *Id.*;  *see also United States v. Texas*, 422 F. Supp. 917, 921 (S.D. Tex. 1976) (rejecting motion to dismiss in case regarding Texas election law by Texas Secretary of

State due to Secretary's position as chief elections officer and duty to maintain uniformity in application, operation, and interpretation of election laws).

The other State Defendants also have no immunity under the *Ex Parte Young* doctrine, as they both enforce or control the Texas Election Code. Indeed, in cases in front of the federal courts of Texas, "the State [has] concede[d] that the attorney general has the duty to enforce and uphold the laws of Texas." *City of Austin v. Abbott*, 385 F. Supp. 3d 537, 545 (W.D. Tex. 2019). Further, Defendant Paxton's threat of prosecution and likelihood that he will bring an enforcement proceeding against local election administrators and voters' bears "some connection" to enforce Texas Election Code and qualifies as a proper defendant. And because both Defendant Abbott undoubtedly "would be important to any remedial process this Court may order," he is a proper defendant as well. *See Terrebonne Par. NAACP v. Jindal*, 154 F. Supp. 3d 354, 362 (M.D. La. 2015) (finding that the governor and attorney general were proper defendants because "[b]ased on their powers and duties, [they] . . . will be instrumental in devising and enforcing a remedy that this Court may potentially order").

Defendants construe the *Ex Parte Young* doctrine much too narrowly, as evidenced by the their argument (rejected in this Circuit) that not even the Secretary of State is properly sued for challenges to the Texas Election Code. As the Fifth Circuit has made clear, *Ex Parte Young* merely requires "some scintilla of 'enforcement' by the relevant state official with respect to the challenged law." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). Here, Defendant Hughs holds clearly defined responsibilities relating to Tex. Elec. Code § 82.001-4's implementation. *See* Tex. Elec. Code § 31.003 ("The secretary of state shall obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code"). Further,

Defendants Hughs and Paxton both have instructed local election officials regarding COVID-19 and mail ballots as a way to control local election administrators.  Motion at 8.  As to Defendant Abbott, it is Defendants themselves who in their Response detailed the numerous measures that the Defendant Abbott has taken in enforcing the Election Code.  *See* Response at 3 (noting that, "[t]o date, the <u>Governor has</u>" changed the date of special election, allowed political subdivisions to postpone elections, postponed the May 26 primary runoff, and issuing proclamations relating to early voting) (emphasis added).  In light of those admissions, Defendants' claim that "the Governor does not enforce the Texas Election Code, and, more specifically, does not administer Texas elections" bears little credibility.

Finally, Defendants seek to limit *Ex Parte Young*'s applicability to situations involving prohibitory injunctions, and not those involving "mandatory injunctions directing 'affirmative action.'"  Response at 15.  But no such distinction exists in the law.  Rather, under *Ex Parte Young*, a federal court . . . may enjoin state officials to conform their future conduct to the requirements of federal law," *McCarthy ex rel. Travis v. Hawkins,* 381 F.3d 407, 412 (5th Cir. 2004), because "[a]n injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer."  *Ex Parte Young*, 209 U.S. at 159.  In this case, Plaintiffs' proposed injunction is exactly that.  *See* Dkt. 10-5 at 2 (Plaintiffs' Proposed Order) (enjoining Defendants from denying a mail in ballot to any Texas voter that applies for a mail-in ballot because of the risk of transmission of COVID-19 and from issuing threats to or seeking criminal prosecution of voters and others advising voters on mail ballot eligibility based on the risk of transmission of COVID-19). Defendants have no legal right to either deny those ballots or issue such threats, and thus the *Ex Parte Young* exception applies in this case.

**VIII.** **Plaintiffs All Have Article III Standing to Pursue their Claims**

All Plaintiffs easily meet the requirements for Article III standing, as each has suffered and will continue to suffer legally cognizable injuries because of Defendants' actions.  To establish Article III standing, a plaintiff must show (1) an "injury in fact" that is concrete, particularized, and actual or imminent; (2) that the injury is "fairly traceable" to the challenged conduct of the defendant; and (3) that it is likely that the injury can be redressed by a favorable decision.  *Lujan,* 504 U.S. at 560-61.  Because Plaintiffs seek injunctive relief, only one party need have Article III standing for the case to proceed.  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019).  Defendants' interpretation of the Texas Election Code and refusal to follow the state court order, as evidenced by the threats of prosecution by Defendant Paxton, directly injure Plaintiffs Gilberto Hinojosa, Joseph Daniel Cascino, Shanda Marie Sansing, and Brenda Li Garcia.

Moreover, contrary to Defendants' assertions, Plaintiff Texas Democratic Party ("TDP") presents a classic example of both organizational and associational standing.  The Supreme Court has long recognized that a direct organizational injury is cognizable in two ways: (1) a diversion of organizational resources to identify or counteract the allegedly unlawful action, or (2) frustration of the organization's mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  And the Fifth Circuit has affirmed that "an organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'"  *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp.*, 455 U.S. at 379).

27

First, it is TDP's election the Governor has moved to July and that the state purports to regulate.  TDP will decide in this runoff election who among the candidates can run with the Democratic Party imprimatur in November.  The State purports to dictate who can meaningfully participate in the Democratic Party's nominating process.  And, if successful, it is the opinion of TDP that results from a survival of the fittest election that Texas hopes to impose, are democratically suspect.  If the state can constitutionally dictate who and how people can participate in TDP's nominating process, it must be true that TDP has standing to question the constitutionality of those regulations in federal court.

Also, the Complaint alleges, and Plaintiffs have supported with evidence, concrete and particularized facts for the TDP that demonstrate the impairment of their mission and consequent diversion-of-resources from other specific organizational priorities to counteract the burdens placed on the TDP due to the State's interpretation of the Section 82.002(a).  Additionally, the State's interpretation will directly harm the TDP by frustrating their mission of turning out voters and ensuring fair and equitable elections.  The harm will force this plaintiff to divert resources away from existing projects and towards effort to ensure that voters are not disenfranchised by choosing their health, the health of others, and their safety and their right to vote by the State's interpretation of the Texas Election Code.  These harms are plainly traceable to the Defendants who are refusing to follow the state court order and threatening voters who request or use an absentee ballot due to COVID-19 with prosecution.

TDP also has representative or associational standing, which allows an organization to bring suit when: "(1) the association's members [or constituency] would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the

purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members."  *TDP v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).   TDP meets this test on behalf of both voters who intend to support Democratic candidates for offices across Texas in the 2020 general election, and also on behalf of the candidates TDP has endorsed and support.  Indeed, the Fifth Circuit has specifically held in *Benkiser* that TDP has standing in these kinds of cases.

Defendants inexplicably contend that the TDP has failed to identify any injured members (Response at 17), despite the fact that one of the individual Plaintiffs, Gilberto Hinojosa, is the chairman (and member) of the TDP, as are the other individual Plaintiffs.  *See, e.g.*, Compl., ¶ 54. In any event, there is no requirement that a plaintiff must name the individuals on whose behalf they assert associational standing.  *See Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on lack of associational standing.").

IX.   <u>Conclusion</u>

For the reasons stated herein and in the Motion, this Court should issue a preliminary injunction against Defendants in this case.

Respectfully submitted,

TEXAS DEMOCRATIC PARTY

By: <u>/s/ Chad W. Dunn</u>
Chad W. Dunn
General Counsel
State Bar No. 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111

Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn, LLP
13231 Champion Forest Drive, Suite 406
Houston, Texas 77069
Telephone: (281) 580-6310
Facsimile: (281) 580-6362
scott@brazilanddunn.com

Dicky Grigg
State Bar No. 08487500
Law Office of Dicky Grigg, P.C.
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: 512-474-6061
Facsimile: 512-582-8560
dicky@grigg-law.com

Martin Golando
The Law Office of Martin Golando, PLLC
SBN #: 24059153
N. Saint Mary's, Ste. 700
San Antonio, Texas 78205
(210) 892-8543
martin.golando@gmail.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been sent via

the Court's electronic filing system to all counsel of record on May 14, 2020.

/s/ Chad W. Dunn
Chad W. Dunn