IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

MAY **1 9** 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | |
|---|---|
| TEXAS DEMOCRATIC PARTY, | ) |
| GILBERTO HINOJOSA, Chair of the | ) |
| Texas Democratic Party, JOSEPH DANIEL | ) |
| CASCINO, SHANDA MARIE SANSING, | ) |
| and BRENDA LI GARCIA, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| V. | )    CIVIL ACTION NO. SA-20-CA-438-FB |
| | ) |
| GREG ABBOTT, Governor of Texas, | ) |
| KEN PAXTON, Texas Attorney General, | ) |
| RUTH HUGHS, Texas Secretary of | ) |
| State, DANA DEBEAUVOIR, Travis | ) |
| County Clerk, and JACQUELYN F. | ) |
| CALLANEN, Bexar County Elections | ) |
| Administrator, | ) |
| | ) |
|     Defendants. | ) |

## ORDER REGARDING PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

    **We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness . . . .**

THE DECLARATION OF INDEPENDENCE para.2 (U.S. 1776).

    Two hundred forty-four years on, Americans now seek Life without fear of pandemic, Liberty to choose their leaders in an environment free of disease and the pursuit of Happiness without undue restrictions.

    **We the People of the United States, in Order to form a more perfect Union . . . .**

U.S. CONST. pmbl.

Of the 3,929,214 original Americans, "We the People" as the new sovereign with the power to prevent a new despot belonged in the hands of only 235,753 white males who owned property.[1]

Over time the franchise grew to include all white males,[2] African-American men,[3] and women.[4]  Without that evolving expansion, "We the People" are mere words on 200 year old parchment.

There are some among us who would, if they could, nullify those aspirational ideas to return to the not so halcyon and not so thrilling days of yesteryear of the Divine Right of Kings,[5] trading our birthright as a sovereign people for a modern mess of governing pottage in the hands of a few and forfeiting the vision of America as a shining city upon a hill.[6]

### PROCEDURAL BACKGROUND

Now before the Court is plaintiffs' assertion that current public health circumstances require an expansion of how votes are cast to prevent the spread of COVID-19.  Plaintiffs would have the Court interpret "disability" to include lack of immunity from COVID-19 and fear of infection at polling places.  Plaintiffs seek a preliminary injunction to enlarge the use of voting by mail in lieu of close quarters in-person voting.

Texas law allows voting by mail for absentees (those who will be away from home for all of early voting and on election day), voters age sixty-five or older, and those with a "disability" which prevents them from voting in person. Tex. Elec. Code §§ 81.001-.004.

On April 17, 2020, a Travis County state court judge determined that any Texas voter without established immunity to COVID-19 meets the plain language definition of disability in the Texas Election Code, and thus, is eligible to apply for a mail in ballot in the upcoming July 2020 run off

2

elections.   Attorney General Paxton has appealed the ruling.   He also threatened election administrators and voters with criminal prosecution if they followed the state court order.

Plaintiffs filed this federal suit on April 7, 2020. They allege the failure to allow voters under the age of sixty-five to vote by mail during the pandemic violates their federal constitutional rights. On April 29, 2020, plaintiffs filed a motion for preliminary injunction seeking to enjoin defendants from denying mail-in ballots to otherwise eligible voters under the age of sixty-five and to enjoin defendants from threatening to initiate criminal prosecutions to those seeking or providing mail-in ballots.

On May 13, 2020, the state defendants filed a petition for writ of mandamus with the Texas Supreme Court seek a determination that election administrators have a duty to reject applications for mail in ballots which claim disability under the Texas Election Code based solely on the generalized risk of contracting a virus.   The state court order has been stayed pending further proceedings in the state appellate courts, and no ruling has issued either on the appeal or the petition for writ of mandamus.

Plaintiffs' motion for preliminary injunction is ripe for review by this Court.  The state defendants filed a response in opposition to the motion, Bexar County Elections Administrator Jacquelyn F. Callanen filed a response, plaintiffs filed a reply, and amici curiae briefs were filed by several organizations.

In order to secure a preliminary injunction, plaintiffs must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied

outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Plaintiffs contend they have met their burden of proof because defendants' interpretation of the disability provision allowing vote by mail—which would exclude those who seek to avoid possible exposure to the coronavirus from the disability authorization—subjects voters under the age of sixty-five to unconstitutional burdens not levied on voters age sixty-five or older.

The state defendants respond that the resolution of the state court litigation will invariably alter this closely-related federal proceeding. They therefore argue that the abstention doctrine applies and this Court should decline to hear plaintiffs' claims at this juncture. The state defendants further contend that plaintiffs lack standing and have not met their burden to show they are entitled to a preliminary injunction.

Plaintiffs reply that they have standing to bring suit and that abstention is not warranted because resolution by the state courts will not render this case moot or materially alter the constitutional questions presented. Plaintiffs also reurge their arguments that they have met their burden to show substantial likelihood of success on the merits of their claims under the First, Fourteenth and Twenty-Sixth Amendments of the United States Constitution; irreparable injury to plaintiffs outweighs the threatened harm to defendants if the injunction is denied; and granting the injunction will not disserve the public interest. For a more expansive view of the parties' positions, please see Appendix B.

4

## DISCUSSION

For those who have recently awakened from a Rip Van Winkle sleep, the entire world is mostly without immunity and fearfully disabled. Moreover, Governor Abbott, the State of Texas, and the federal government have issued guidance concerning prevention of the spread of the virus which speaks in terms of social distancing.[7] Plaintiffs say in-person voting makes social distancing difficult if not impossible.

In order to implement in-person voting, poll workers, many of whom are in an at-risk category, are also exposed to the COVID-19 virus.[8] The Court has concerns for the health safety of those individuals as well.

Other states have recognized the dangers of in-person voting and have implemented vote by mail procedures,[9] a process recently used by the President of the United States.[10]

The confusion concerning vote by mail eligibility is exemplified in plaintiffs' Exhibit 35, campaign material for a Republican candidate endorsed by Attorney General Paxton, who urges voters to use mail ballots based on COVID-19 concerns authorized by Secretary of State guidance, but subsequently advises that a voter must have the virus based on Attorney General Paxton's advice letter dated April 14, 2020. *See* docket no. 10, Exhibit 2 (explaining Attorney General Paxton's conclusion that based on the plain language of the relevant statutory text "fear of contracting COVID-19 does not constitute a disability under the Texas Election Code for purposes of receiving a ballot by mail."). Confusion also reigns because plaintiffs have not received requested guidance nor can the Court find any guidance from the Secretary of State. The lack of clarity is evidenced in Exhibit 35:

5





+1 (844) 505-3072 ›



Hi this is Alex w/Kathaleen Wall for Congress. Due to Covid19, the campaign is mailing you absentee ballot applications, so you will have the option to safely vote! If you haven't received your app or need help, contact the campaign or find more info at kathaleenwall.com. Have you filled out & mailed back your app yet?



AG Paxton, Voting by Mail Based on Disability Reserved for Texans With Actual Illness or Medical Problem Rendering

Equally vague and confusing are Attorney General Paxton's prior opinions. *Compare* Op. Tex. Att'y Gen No. KP-0009 (2015) (determining that no special definition of "disability" is required to use mail in ballot) *and contrast* Op. Tex. Att'y Gen. No. KP-0149 (2017) (determining that sexual deviant under age sixty-five meets definition of disabled under Texas Election Code §§ 82.001-.004) *with* Attorney General Paxton's advice letter of April 14, 2020 (determining that fear of contracting COVID-19 does not meet the definition of "disability" to use mail in ballot). Such contradictory opinions are at best duplicitous and at worst hypocritical.

Defendants raise the specter of widespread voter fraud if mail ballots are employed but cite little or no evidence of such in states already doing so. Texas truth is to the contrary. Between 2005 to 2018, there were 73 prosecutions out of millions of votes cast.[11] The Court finds the Grim Reaper's scepter of pandemic disease and death is far more serious than an unsupported fear of voter fraud in this *sui generis* experience. Indeed, if vote by mail fraud is real, logic dictates that all voting should be in person. Nor do defendants explain, and the Court cannot divine, why older voters should be valued more than our fellow citizens of younger age. U.S. CONST. amend. XIV § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."); Tex. Elec. Code § 82.003 ("A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day.").

In a previous case, the evidence has shown that there is no widespread voter fraud.[12] The Court has great confidence in the ability of election administrators and law enforcement to prevent or prosecute, with evidence and probable cause, the infinitesimal events of voter fraud, none of which are likely to affect election outcomes.

Attorney General Paxton has publicly expressed a willingness to pursue criminal charges against these election administrators and law enforcement officials.  The state defendants point out that, in 2019, this Court dismissed a claim against Attorney General Paxton based on statements that he made in a press release, noting that the plaintiffs there could not sustain a claim based on "an alleged intimidating press release." *Texas League of United Latin Am. Citizens v. Whitley,* Case No. 5:19-CA-00074-FB, docket no. 131 (W.D. Tex. Mar. 27, 2019) (Biery, J.).  The Court finds that threatening legal voters and election administrators with criminal prosecution is not the same as issuing a political press release directed at alleged illegal voters.  *See* docket no. 10, Exhibit 2 (Attorney General Paxton's advisory letter threatening voting administrators with criminal prosecution if they "advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19" and threatening voters with criminal prosecution if they cause a ballot to be obtained under "false pretense" of "disability" based fear of COVID-19); *see also Whitley*, docket no. 61-3.

The Twenty-Sixth Amendment of the United States Constitution provides:

> The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

The Texas Election Code allows citizens over sixty-five without a disability to vote by mail.[13]  Thus, the Texas vote by mail statute provides for the health safety of mail ballots for those 65 years of age and older but not those 64 years, 364 days and younger.  The Court finds no rational basis for such distinction and concludes the statute also violates the clear text of the Twenty-Sixth Amendment under a strict scrutiny analysis.[14]

The Texas Election Code defines "disability" as a "physical condition that prevents the voter from appearing at the polling place on election day without a likelihood . . . of injuring the voter's

health.[15]  Disability is also defined as "a physical or mental condition that limits a person's movements, senses, or activities."[16]  Clearly, fear and anxiety currently gripping the United States has limited citizens' physical movements, affected their mental senses and constricted activities, socially and economically.  A new study shows COVID-19's psychological toll: distress among Americans has tripled during the pandemic compared to 2018.  *Jean M. Twenge and Thomas E. Joiner, Mental Distress Among U.S. Adults During the COVID-19 Pandemic* (May 15, 2020) (downloaded from https://mfr.osf.io/render?url–https://osf.io/download/5eb43025a2.pfd (last visited May 18, 2020).[17]  The evidence also shows voters are right to be fearful and anxious about the risk of transmission to their physical condition.  Texas saw the largest single-day jump in coronavirus cases since the pandemic began this past Saturday.[18]  The Court finds such fear and anxiety is inextricably intertwined with voters' physical health.  Such apprehension will limit citizens' rights to cast their votes in person.[19]  The Court also finds that lack of immunity from COVID-19 is indeed a physical condition.

One's right to vote should not be elusively based on the whims of nature.  Citizens should have the option to choose voting by letter carrier versus voting with disease carriers.  "We the People" get just about the government and political leaders we deserve, but deserve to have a safe and unfettered vote to say what we get.[20]  The governed merit more than a Tillichian leap of faith in leaders elected by a small minority of the population as it was in 1789.[21]

> For want of a nail the shoe was lost.
> For want of a shoe the horse was lost.
> For want of a horse the rider was lost.
> For want of a rider the message was lost.
> For want of a message the battle was lost.
> For want of a battle the kingdom was lost.
> And all for the want of a horseshoe nail.[22]

8

For want of a vote, our democracy and the Republic would be lost and government of the people, by the people and for the people shall perish from the earth.

Accordingly, for the reasons stated herein, the findings made herein, the additional background in Appendix B and the Findings of Fact and Conclusions of Law in Appendix C, all attached hereto and made a part hereof, the preliminary injunction is GRANTED as follows:

Though Republican voters are not parties to this case, the Court finds it would discriminate against Republicans not to afford them the same health safety precautions of voting by mail. Accordingly, the Court *sua sponte* concludes this Order shall extend to allow Republican voters to vote by mail as well should they claim disability because of lack of immunity from or fear of contracting COVID-19.

Based on the state defendants' assertion of the abstention doctrine and lack of standing, plaintiffs' response thereto and for the reasons stated in the expanded findings in Appendix C, the Court concludes the abstention doctrine is not applicable and plaintiffs have standing to bring this suit.

The Court finds plaintiffs have met their burden to show a likelihood of success on the merits, a substantial threat of irreparable injury if the injunction is not issued, the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and that granting the injunction will not disserve the public interest.

IT IS ORDERED that during the pendency of pandemic circumstances:

(1) Any eligible Texas voter who seeks to vote by mail in order to avoid transmission of COVID-19 can apply for, receive, and cast an absentee ballot in upcoming elections during the pendency of pandemic circumstances;

9

(2) Defendants Dana Debeauvoir and Jacquelyn Callanen and all their respective officers, agents, servants, employees, attorneys, and persons acting in concert of participation with them may not deny a mail in ballot to any Texas voter solely on the basis that the voter does not otherwise meet the eligibility criteria outlined in Texas Election Code §§ 82.001–82.004;

(3) Defendants Dana Debeauvoir and Jacquelyn Callanen their agents, servants, employees, representatives, and all person or entities of any type whatsoever acting in concert with them or acting on their behalf are enjoined from refusing to accept and tabulate any mail ballots received from voters solely on the basis that the voter does not otherwise meet the eligibility criteria outlined in Texas Election Code §§ 82.001–82.004;

(4) Defendant Secretary of State Hughs is ordered pursuant to the power granted her under state law to ensure uniformity of election administration throughout the state, to use her lawful means to ensure this Order has statewide, uniform effect;

(5) All defendants and all their respective officers, agents, servants, employees, attorneys, and persons acting in concert of participation are enjoined from issuing any guidance, pronouncements, threats of criminal prosecution or orders, or otherwise taking any actions inconsistent with this Order. This Order does not prevent defendants and their agents and employees from prosecuting cases of voter fraud where evidence and probable cause exist;

(6) Each of the defendants, acting through the appropriate state or local agency, shall publish a copy of this Court's Order on the appropriate agency website and that the state defendants shall circulate a copy of this Court's Order to the election official(s) in every Texas County; and

(7) No cash bond shall be required of plaintiffs.

10

IT IS FURTHER ORDERED that this Order shall remain in full force and effect until a Judgment is issued in this matter or until such time as the pandemic circumstances giving rise to this Order subside.

IT IS FINALLY ORDERED that defendants may petition this Court, upon giving notice and opportunity to be heard to plaintiffs, that the Order should be dissolved for any reason, including that the state courts have resolved issues of a matter of state law that render this injunction unnecessary or because the pandemic circumstances giving rise to it have subsided.

It is so ORDERED.

SIGNED this 19th day of May, 2020.

_____

FRED BIERY
UNITED STATES DISTRICT JUDGE

APPENDIX A
Endnotes

1.  At the time of the first presidential election in 1789, there were 3,929,214 million Americans. Https://www.census.gov/history/through_the_decades/fast_facts/1790_fastfacts.html (last visited April 13, 2020). Only white, male property owners– 6% of the population—were eligible to vote. Https://www.archives.gov/exhibits/charters/charters_of_freedom_13.html (last visited April 13, 2020).

2.  The 1828 presidential election was the first in which non-property-holding white males could vote in the vast majority of states.  North Carolina was the last state to end the practice in 1856. Stanley Engerman & Kenneth Sokoloff, *The Evolution of Suffrage Institutions in the New World* 16, 35 (February 2005), http://www.economics.yale.edu/UploadedPDF/sokoloff-050406.pdf (last visited April 13, 2020).

3.  U.S. CONST. amend. XV.  Though in practice their votes were suppressed by poll taxes, violence and intimidation.  Https://www.history.com.topics/early-20th-century-us/jim-crow-laws (last visited April 14, 2020); *see also* 42 U.S.C. § 1973 (The Voting Rights Act of 1965); 42 U.S.C. § 2000d, et seq. (The Civil Rights Act of 1964).

4.  U.S. CONST. amend. XIX.

5.  "The Divine Right of Kings" is the doctrine that kings have absolute power because they were placed on their thrones by God and therefore rebellion against the monarch is always a sin. Https://www.oxfordreference.com/view/101093.oi/authority.20110810104754564 (last visited April 27, 2020).

6.  On January 11, 1989, President Ronald Reagan referred to America as a "shining city" upon a hill during his farewell speech to the nation:

> I've spoken of the shining city all my political life, but I don't know if I ever quite communicated what I saw when I said it. But in my mind it was a tall, proud city built on rocks stronger than oceans, wind-swept, God-blessed, and teeming with people of all kinds living in harmony and peace; a city with free ports that hummed with commerce and creativity. And if there had to be city walls, the walls had doors and the doors were open to anyone with the will and the heart to get here. That's how I saw it, and see it still.

Https://www.reaganlibrary.archives.gov (last visited May 10, 2020).  "A city upon a hill" is a phrase derived from Jesus's Sermon on the Mount:

> You are the light of the world. A city set on a hill cannot be hidden. Nor do people light a lamp and put it under a basket, but on a stand, and it gives light to all in the

house. In the same way, let your light shine before others, so that they may see
your good works and give glory to your Father who is in heaven.

*Matthew* 5:14-16. This scripture was cited at the end of Puritan John Winthrop's lecture, "A
Model of Christian Clarity," delivered on March 21, 1630, at Holyrood Church in Southampton,
England, before the first group of Massachusetts Bay colonists embarked on the ship Arbella to
settle Boston. He said:

For we must consider that we shall be as a city upon a hill. The eyes of all people
are upon us. So that if we shall deal falsely with our God in this work we have
undertaken, and so cause Him to withdraw His present help from us, we shall be
made a story and a by-word through the world.

JOHN WINTHROP, THE JOURNAL OF JOHN WINTHROP 1630-1649 1 n.1 (Harvard University Press
1996) (1630).

7.  Https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-to-expand-openings-
of-certain-businesses-and-activities.gov (last visited May 10, 2020);
https://dshs.texas.gov/coronavirus/default.aspx (last visited May 10, 2020);
https://cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited
May 10, 2020); https://whitehouse.gov/openingamerica.gov (last visited May 10, 2020).

8.  Https://www.pewresearch.org (explaining that "[a]mid COVID-19 risk to seniors, a majority
of poll workers are . . . age 61 or older") (last visited May 5, 2020).

9.  All active voters in Georgia were mailed absentee ballot request forms after the Republican
governor and Democratic Party agreed to move the run off elections due to COVID-19.
Https://www.ajc/news/state-regional-govt-politics/gerogia-mail-absentee-ballot-requests.html
(last visited April 27, 2020). Currently, registered voters automatically receive a ballot by mail
in five states: Oregon, Washington, Utah, Colorado and Hawaii. Seven states have switched to
allow all voters to vote by mail with extended deadlines during the pandemic: Alaska,
Wyoming, Ohio, Kansas, Delaware, Hawaii and Rhode Island. Other states, such as Florida and
Arizona, are encouraging voting by mail. In Pennsylvania, the governor entered an order
allowing voters concerned about the coronavirus to request an absentee ballot. Three other states
have expanded the option to vote by mail due to COVID-19: Indiana, New Jersey and Maryland.
Https://nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html (last visited May
10, 2020).

10.  Https://www.sun-sentinel.com/news/politics/fl-ne-donald-trump-palm-beach-county-
voter.html (last visited May 11, 2020).

11.  Robert Brischetto, Ph.D., a former executive director of the San Antonio-based Southwest
Voter Research Institute, who was writing for the San Antonio Express News, found that over a

thirteen year period from 2005 to 2018, there were 73 persons identified as adjudicated in election fraud cases in Texas. He noted:

> Almost half of the cases involved the improper use of absentee ballots, where voter fraud occurs most often. The rules for handling, transporting and mailing absentee ballots are very specific and very elaborate in Texas. While there were a couple of cases of forging and filling out absentee ballots for others, most were violations involving possessing, collecting, transporting and assisting in the submission of absentee ballots. Many of those violations might have been avoided with more training of election officers and education of voters on the handling and mailing of absentee ballots.

Robert Brischetto, *Texas' Desperate Search for Fraudulent Voters,* SAN ANTONIO EXPRESS NEWS, Mar. 19, 2019, https://www.mysanantonio.com/opinion/commentary/article/Texas-desperate-search-for-fraudulent-voters-13674630.php (last visited Apr. 27, 2020).

12. From *Texas League of United Latin Am. Citizens v. Whitley*:

> The evidence has shown in a hearing before this Court that there is no widespread voter fraud. **The challenge is how to ferret the infinitesimal needles out of the haystack of 15 million Texas voters.** The Secretary of State through his dedicated employees, beginning in February 2018, made a good faith effort to transition from a passive process of finding ineligible voters through the jury selection system in each county to a proactive process using tens of thousands of Department of Public Safety driver license records matched with voter registration records. Notwithstanding good intentions, the road to a solution was inherently paved with flawed results, meaning perfectly legal naturalized Americans were burdened with what the Court finds to be ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us.

Civil Action No. SA-19-CA-74-FB, (docket no. 61 at page 1) (bold emphasis added).

13. Tex. Elec. Code §§ 81.001-.004.

14. The rational basis standard is implemented pursuant to *Anderson v. Celebrezze,* 420 U.S. 780 (1983), and *Burdick v. Takushi,* 504 U.S. 428 (1992). Alternatively, defendants' interpretation of the statute does not meet the heightened standard set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252 (1977), or the strict scrutiny standard set forth in *Lynch v. Donnelly,* 465 U.S. 668, 687 n.13 (1984), as applied in *United States v. Texas,* 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom., Symm v. United States,* 439 U.S. 1105 (1979).

14

15. Tex. Elec. Code § 81.002(a).

16. Https://www.oxforddictionary.com/us/definition.disability.com (last visited May 11, 2020).

17. This new study suggests that the COVID-19 pandemic will substantially change daily life in ways which will have a negative impact on mental health. Researchers at San Diego State University and Florida State University compared a nationally representative online sample of 2,032 American adults in late April 2020, to 19,330 American adults who participated in the April 2018 National Health Interview Survey, to measure mental distress. Although the study has not yet undergone peer review and formal publication, its preliminary data showed that American adults in April 2020 were 8 times more likely to fit criteria for serious mental illness (27.7% v. 3.4%) and 3 times more likely to fit criteria for moderate or serious mental illness (70.4% v. 22.0%) compared to the 2018 sample.

18. Texas reported 1,801 new coronavirus cases on Saturday, May 16, 2020, https://www.dshs.texas.gov (dashboard) (last visited May 16, 2020), reportedly marking the States' largest single-day jump since the start of the COVID-19 pandemic. Https://www.houstonchronicle.com/news/article/massive-jump-in-COVID-19-cases.html (last visited May 18, 2020).

19. *See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* (5th ed. 2013) (explaining that mental health disorder is condition which affects thinking, feeling, behavior, or mood and which deeply impacts daily functioning).

20. *Dutmer v. City of San Antonio,* 937 F. Supp. 587, 589, 595 (W.D. Tex. 1996) (Biery, J.) ("If history judges the [San Antonio] term limits movement an idea whose time should not have come, the evolutionary experiment called democracy includes the right to make mistakes and, ultimately, delivers just about the kind of government voters deserve. . . . Those who believe the [term limits] Ordinance a malignancy on the body politic may have to await the appearance of symptoms to attempt persuasion of a majority to perform corrective surgery at the ballot box.").

21. PAUL TILLICH, DYNAMICS OF FAITH (Harper Collins Publishers Inc. 1957).

22. Benjamin Franklin included a version of this proverb in *Poor Richard's Almanac* when the American colonies were at odds with the English Parliament. Benjamin Franklin, *Poor Richard's Almanac* 275 (1758) (G.P. Putman's Sons eds. 1889). During World War II, this verse was framed and hung on the wall of the Anglo-American Supply Headquarters in London. Https://www.citidel.edu.com (last visited May 1, 2020).

APPENDIX B
OVERVIEW

The Texas Election Code §§ 82.001-.004 restricts access to voting by mail through explicit age-based eligibility criteria. Voters age sixty-five and older can vote by mail without an excuse while voters under the age of sixty-five can do so only if they fit within very limited exceptions. Plaintiffs allege in this lawsuit that the age restriction is unconstitutional and that the State cannot justify with an adequate basis its decision to grant voters age sixty-five and older additional voting rights than those under age sixty-five.

However, in the motion for preliminary injunction, plaintiffs seek only preliminary relief on their as-applied challenge. Plaintiffs argue they are entitled to a preliminary injunction because the vote by mail provisions, as interpreted by Texas Attorney General Paxton, violate the Twenty-Sixth Amendment in the circumstances of the pandemic now facing the state and the country. Plaintiffs assert that, during the pandemic, Attorney General Paxton's strict interpretation of the disability exemption for vote by mail to exclude those who wish to avoid possible exposure to the coronavirus subjects voters under the age of sixty-five to unconstitutional burdens not levied on voters age sixty-five or older.

Meanwhile, plaintiffs contend the State gives voters no benchmark of which pre-existing medical conditions allow them to vote with the disability exception and no standard exists for how election officials would enforce the line the State wishes to draw. Plaintiffs assert that the failure of the State to provide a safe vote by mail option for voters under age sixty-five under these pandemic circumstances—while providing that safe option widely to those sixty-five and older—abridges the right to vote on account of age and violates the Twenty-Sixth Amendment and

16

the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs also contend that Attorney General Paxton violated their rights to free speech. In response to a state court order finding that state law permits every eligible voter to vote by mail amid the COVID-19 pandemic, Attorney General Paxton publicly stated that third parties who advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19 could subject those third parties to criminal sanctions. Plaintiffs assert that Attorney General Paxton's letter is presently harming their right to vote, and indeed threatens political speech with criminal prosecution, in violation of the First Amendment. Plaintiffs further argue that Attorney General Paxton's conduct violates their right to be free from voter intimidation as guaranteed by the Voting Rights Act. Finally, plaintiffs seek injunctive relief based on their claim that Attorney General Paxton's interpretation of the Texas Election Code renders the statute unconstitutionally vague because it is not clear which voters qualify to vote by mail under its provisions.

The state defendants respond that plaintiffs have not met their preliminary injunction burden, which is to show a substantial likelihood of success on the merits on each claim, sufficient harm to plaintiffs and undue harm to defendants, and that it serves the public interest to grant the injunction. They submit that it is safe for all voters to vote in person in the midst of this pandemic. The state defendants also argue that abstention is warranted in this case because there are ongoing state court proceedings. They further contend that they are entitled to sovereign immunity and plaintiffs lack standing because the state defendants do not enforce the Texas Election Code.

Plaintiffs reply that they have met their preliminary injunction burden. They further argue that this Court should not abstain because they have cognizable federal constitutional claims which will not be addressed in the state court proceedings and the failure to remedy them would cause

17

irreparable harm. Plaintiffs further contend the state defendants cannot claim sovereign immunity

because of their connections to the enforcement of the Texas Election Code. Finally, plaintiffs

maintain they meet the requirements for Article III standing because each has suffered and will

continue to suffer legally cognizable injuries because of defendants' actions.

BACKGROUND

Given the current pandemic conditions and their effects on election procedure, on March 27,

2020, some of the plaintiffs in this case filed an original petition and application for temporary

injunction in a Texas state court to determine the application of state law. Plaintiffs argued § 82.002

of the Texas Election Code allows voters to elect to cast their ballots by mail under the

circumstances of this pandemic. Section 82.002 of the Texas Election Code provides:

> Sec. 82.002. DISABILITY. (a) A qualified voter is eligible for early voting by mail
> if the voter has a sickness or physical condition that prevents the voter from
> appearing at the polling place on election day without a likelihood of needing
> personal assistance or of injuring the voter's health.

Tex. Elec. Code § 82.002. Section 82.003 of the Election Code states that "[a] qualified voter is

eligible for early voting by mail if the voter is 65 years of age or older on election day." TEX. ELEC.

CODE § 82.003. Plaintiffs contended that participating in social distancing to prevent the spread of

COVID-19 is "a sickness or physical condition that prevents the voter from appearing at the polling

place on election day without a likelihood of needing personal assistance or of injuring the voter's

health." They therefore requested a declaration that Texas Election Code § 82.002 "allows any

eligible voter, regardless of age and physical condition, to request, receive and have counted, a mail-

in ballot, if they believe they should practice social distancing in order to hinder the known or

unknown spread of the virus or disease." Plaintiffs also sought a temporary injunction requesting

18

that the Texas Secretary of State and the Travis County Clerk "be enjoined to accept and tabulate any mail-in ballots received from voters in an upcoming election who believe that they should practice social distancing in order to hinder the known or unknown spread of a virus or disease."

Shortly after the state court case was filed, the Texas Democratic Party and three voters brought this federal suit on April 7, 2020. The complaint states that, "[i]n the event the state courts find that vote by mail is permitted for all voters over the age of eighteen who are social distancing," plaintiffs ask this Court to "ensure compliance with federal law by providing a remedy." Plaintiffs allege this case should proceed so that the Court can timely determine "the constitutional rights of these plaintiffs and be in a position to do so in the event the state court rulings serve to harm these federal rights and/or the state court proceedings are delayed thus preventing timely state resolution of the state law issue." Their complaint asserts claims of age, race and language-minority discrimination, as well as violations of the right to free speech under the First Amendment, vagueness in violation of the Fourteenth Amendment, and intimidation in violation of the Voting Rights Act.

A hearing was held in the state court case on plaintiffs' motion for a temporary injunction on April 15, 2020. Medical experts testified that they expect pandemic conditions to persist throughout the summer months and into the fall. Texas law allows voting by mail for absentees (those who will be away from home for all of early voting and on election day), voters age sixty-five or older, and those with a disability that prevents them from voting in person. As noted, plaintiffs argued that social distancing is a "disability" for purposes of voting by mail. The response presented by Assistant Attorneys General in that case was that the courts have no jurisdiction, pandemic conditions might change by July and Governor Abbott might provide direction to protect voters and

19

the public.

Even as the hearing was concluding, Texas Attorney General Ken Paxton released an advisory letter to the chair of the House Elections Committee, threatening prosecution of any voter who voted by mail without a narrowly defined "physical condition" constituting a "disability." He threatened "criminal sanctions" as well for any election official advising such a vote. In the letter, Attorney General Paxton gave a non-official, advisory opinion regarding whether or not the risk of transmission of COVID-19 would entitle Texas voters to cast a mail-in ballot. The letter states: "We conclude that, based on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Election Code for purposes of receiving a ballot by mail."

On April 17, 2020, two days after the hearing, Travis County District Judge Tim Sulak ruled that in the context of the COVID-19 pandemic, all Texas voters who are not immune from the virus are eligible to apply for mail ballots under the "disability" provision of state election law. The temporary injunction order, which is imposed through July 27, states that "it is reasonable to conclude that voting in person while the virus is still in general circulation presents a likelihood of injuring the voter's health and therefore any voters without established immunity meet the plain language definition of disability thereby entitling them to a mailed ballot under Tex. Elec. Code section 82.002."

> In response to the state court order, Attorney General Paxton stated:
> I am disappointed that the district court ignored the plain text of the Texas Election Code to allow perfectly healthy voters to take advantage of special protections made available to Texans with actual illness or disabilities. This unlawful expansion of mail-in voting will only serve to undermine the security and integrity of our elections and to facilitate fraud. Mail ballots based on disability are specifically reserved for those who are legitimately ill and cannot vote in-person without needing assistance

20

or jeopardizing their health.  Fear of contracting COVID-19 does not amount to a sickness or physical condition as required by state law.

That same day, Texas Attorney General Ken Paxton filed notice a notice of appeal with the Third Court of Appeals.  The Third Court of Appeals transferred the case to the Fourteenth Court of Appeals which ruled that the state court injunction shall remain in full force and effect pending the conclusion of the appeal.  During this same time period, Attorney General Paxton filed a petition for writ of mandamus asking the Texas Supreme Court to determine that election administrators have "a duty to reject applications for mail-in ballots that claim 'disability' under Texas Election Code section 82.002(a) based solely on the generalized risk of contracting a virus." The appellate case and petition for writ of mandamus remain pending for disposition in the state courts.

On April 29, 2020, plaintiffs filed a motion for a preliminary injunction with this Court seeking to expedite the process, stating that "[t]he Rule of Law has broken down in the State of Texas, and it has become clear that the federal courts will have to ensure basic constitutional protections for the U.S. Citizens within."  Plaintiffs contend that, in the days since the state court ruling, counties around the state have begun to comply; many counties have posted notice on their websites that they are accepting vote by mail applications in compliance with Judge Sulak's ruling; and city and school district elections going forward in early May are accepting vote by mail applications in compliance with Judge Sulak's ruling. Plaintiffs argue that "[a]fter waiting well more than a week watching the state election apparatus turn to comply with the state court order and after watching tens of thousands of Texans submit vote by mail applications, defendants appear willing to allow the circumstances where the State's judicial branch has so far reached one view of the law

21

while, at least part of, the executive branch of state government threatens prosecution for complying

with the Court order." Therefore, plaintiffs contend:

> Texas citizens can no longer have confidence that the executive branch of the State
> will comply with the Rule of Law. Now, even if the State is never successful in
> overturning the state court order, the Attorney General has shown he will not comply
> with orders of his state's judiciary. Furthermore, Texans will continue to reasonably
> fear that the executive branch will not comply with state court rulings and/or that they
> could be subjected to criminal prosecution for attempting to vote by mail. Under
> these circumstances, the State is no longer functioning to protect the federal rights
> of U.S. citizens, and even if it were to begin to do so, voters can have no confidence
> their rights will be preserved. Moreover, the behavior of the executive branch of
> Texas government threatens to upset the State's election apparatus which is largely
> complying with the state court order and where the State is successful in strong
> arming local officials to defy the state court order, election procedures throughout the
> State will be administered non-uniformly.

Accordingly, plaintiffs seek an injunction order blocking state officials from denying a mail-in ballot

to any Texas voter who applies for a mail-in ballot because of the risk of transmission of COVID-19,

and enjoining defendants, including Attorney General Paxton, from issuing threats or seeking

criminal prosecution of voters and others advising voters on mail ballot eligibility based on the risk

of transmission of COVID-19.

The state defendants respond that the state court temporary injunction order conflicts with

the Texas Election Code's plain text and "threatens to destabilize the State's carefully crafted

framework governing the conduct of elections." They argue the resolution of the state court

litigation will invariably alter this closely related federal proceeding. For this reason, the state

defendants contend the *Pullman* abstention doctrine applies and this Court should decline to hear

plaintiffs' claims at this juncture. The state defendants also argue:

> Plaintiffs' motion for preliminary injunction also exhibits fatal jurisdictional and
> substantive defects. None of the state defendants–Greg Abbott, Governor of Texas,
> Ken Paxton, Texas Attorney General, or Ruth Hughs, Texas Secretary of

22

State–enforce the provisions of the Election Code at issue. Sovereign immunity therefore bars plaintiffs' claims for injunctive relief against those officials on the basis of those provisions. For related reasons, plaintiffs lack standing to sue the state defendants. And on the merits, plaintiffs have not met their burden of showing that current or unknown future circumstances will prevent voters from safely exercising the franchise via in-person voting in July or November of this year. The known science of COVID-19 is constantly evolving, and with it, our understanding of how elected officials can continue to contain the spread of COVID-19 throughout the State–including, as relevant here, at polling places.

Accordingly, the state defendants request that the Court abstain from ruling on plaintiffs' claims until the conclusion of the pending state court litigation. Alternatively, they argue plaintiffs' motion for preliminary injunction should be denied because plaintiffs have failed to make the required showing to obtain the extraordinary injunctive relief they request.

## VOTING BY MAIL IN TEXAS

Texas law allows voting by mail for registered voters who meet one of the qualifications stated in the Election Code. *See* Tex. Elec. Code § 82.001, *et seq.* A voter is qualified to vote by mail if he or she (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him or her from appearing at the polling place; (3) is sixty-five or older; or (4) is confined in jail. Tex. Elec. Code §§ 82.001-004. Voters apply to vote by mail with a mail ballot application sent to the early voting clerk. The early voting clerk is responsible for conducting early voting and must "review each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a). An early voting ballot application must include the applicant's name, the address at which the applicant is registered to vote, and an indication of the grounds for eligibility for voting by mail. Tex. Elec. Code § 84.002. Mail ballot applicants must certify that "the information given in this application is true, and I understand that giving false information in this

23

application is a crime." Tex. Elec. Code § 84.011. Section 84.0041 makes it a crime to "knowingly provide false information on an application for ballot by mail." Tex. Elec. Code § 84.0041.

If the voting clerk determines the applicant is entitled to vote by mail, the voting clerk shall provide the voter a ballot by mail. Tex. Elec. Code § 86.001. If the applicant is not eligible to vote by mail, the voting clerk shall reject the application and give notice to the applicant. *Id.* A rejected applicant is not entitled to vote by mail. *Id.* July 2, 2020, is the deadline for an early voting clerk to receive an application to vote by mail for the upcoming July 14, 2020, Democratic Party run-off election. Tex. Elec. Code § 84.007(c). In their motion for preliminary injunction, plaintiffs state that "[m]ail ballots are expected to start being sent to voters, in response to their request on May 24, 2020," and that "thousands of vote by mail applications are pouring in now."

Plaintiffs maintain that in the last month many Texas counties, including some of the most populous, have been following the state district court's order interpreting state law in a way that allows all eligible voters, regardless of age and without immunity to COVD-19, to vote by mail, and its injunction enforcing that order. They allege many mail ballots have already been submitted under this order.

When voters submit absentee ballots, they are asked to check a box to indicate which eligibility criteria they meet but not asked to provide more detailed reasoning. Plaintiffs maintain the record shows—and defendants have not suggested otherwise—that it would be impossible to disaggregate the absentee ballots that were submitted pursuant to risk of contracting coronavirus during the past several weeks from other qualifying absentee ballots. Meanwhile, plaintiffs have not yet submitted their applications for a mail ballot to participate in the Democratic primary runoff

election because they fear prosecution and they fear the state courts will ultimately determine that if they vote a mail ballot, their vote will not be counted.

The State is taking steps to impose measures that would make in person voting safer during these pandemic elections. Plaintiffs argue that, even with these measures implemented at the local level, the State still has no way to ensure the non-transmission of the virus at crowded in-person polling locations. Recent history has shown that medical professionals in even the most carefully monitored medical environments have fallen ill and died from virus infections. Plaintiffs state that, although the State's efforts toward encouraging increased in-person voting protections are at least a step in the right direction, they also inevitably will slow the election process and limit the rate at which voters can be processed. At the same time, plaintiffs contend the process will be slowed from another direction because fewer election workers will be present.

Plaintiffs point out that the evidence additionally shows that many election workers did not report as scheduled on election day during the March primary elections because of the possibility of contracting the virus. Further, the recent evidence from the Wisconsin election shows that people did in fact contract the virus during in person voting, and this occurred in a state that does not require an excuse to vote by mail. The State responds with some studies that conclude that the rate of virus infection was not meaningfully changed by voting activity in Wisconsin. Presumably, there are a number of factors that drive virus infection rates and determining one cause from others is a challenging task indeed, particularly given our present state of knowledge about coronavirus spread. Regardless of the rate of growth in Wisconsin after the election, defendants do not deny that some individuals have been found to have contracted coronavirus due to their exposure at polling locations.

<u>PRELIMINARY INJUNCTION STANDARD OF REVIEW</u>

In order to secure a preliminary injunction, plaintiffs must establish the following four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). None of these elements, however, is controlling. *Florida Med. Ass'n v. United States Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *Id.*

<u>THE ARGUMENTS OF THE PARTIES</u>

Plaintiffs contend they have established a substantial likelihood of success on the merits of their as-applied claims relating to: (1) age discrimination in violation of the Twenty-Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment; (2) vagueness in the Texas Election Code's definition of "disability" in violation of the Due Process Clause of the Fourteenth Amendment; (3) voter intimidation in violation of 52 U.S.C. § 10307(b); and (4) the denial of free speech in violation of the First Amendment of the United States Constitution. Plaintiffs further argue they will suffer irreparable injury if the injunction is not granted, their substantial injury  outweighs the threatened harm to defendants, and granting the preliminary injunction will not disserve the public interest. The state defendants disagree plaintiffs have met their burden. The state defendants also contend that plaintiffs lack standing and that the Court should abstain from hearing plaintiffs' arguments because of the pending state court proceedings.

Likelihood of Success on the Merits

Plaintiffs' Age Discrimination Claims Under the Twenty-Sixth and Fourteenth Amendments

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. CONST. amend. XXVI, § 1. The Equal Protection Clause of the Fourteenth Amendment "is essentially a mandate that all persons similarly situated must be treated alike." *Rolf v. City of San Antonio,* 77 F.3d 823, 828 (5th Cir. 1996) (internal quotation omitted). Plaintiffs argue that § 82.002(a) of the Texas Election Code abridges their right to vote based on their age in violation of the Twenty-Sixth Amendment and discriminates against them based on age in violation of the Fourteenth Amendment. Specifically, plaintiffs argue that when in-person voting becomes physically dangerous, age-based restrictions on mail ballot eligibility become constitutionally unsound. With regard to the applicable standard of review, plaintiffs argue strict scrutiny applies. *Symm v. United States,* 439 U.S. 1105 (1979); *see also United States v. Texas,* 445 F. Supp. 1245 (S.D. Tex. 1978). They contend Texas is unable to present a compelling state interest in "imposing arbitrary obstacles on voters on account of age when Texas election law does not clearly demand this result during this pandemic." If the Court declines to engage in strict scrutiny, plaintiffs argue it should apply the *Arlington Heights* framework which evaluates: (1) the impact of the official action and whether it bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision challenged in the case, including departures from normal procedures in making decisions and substantive departures; and (4) contemporary statements made by the governmental body which created the official action. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252 (1977).

Plaintiffs contend Attorney General Paxton's interpretation of the law related to mail ballot eligibility in Texas is: (1) discriminatory to every voter under the age of sixty-five and untenable given the COVID-19 pandemic, and (2) the official decision by the Attorney General to threaten to enforce that law in the most disenfranchising and severe manner possible, through criminal sanction, is strong evidence of invidious discrimination.

The state defendants respond that § 82.003 does not "deny or abridge" plaintiffs' right to vote and therefore the challenged statute should be evaluated under the elevated *Anderson-Burdick* rational basis standard of review. *See Burdick v. Takushi,* 504 U.S. 428 (1992); *Anderson v. Celebrezze,* 420 U.S. 780 (1983). Under this rational basis review, as long as the distinctions made in the challenged law bear a rational relationship to a legitimate governmental end, the law must be upheld. *McDonald v. Board of Election Comm'rs,* 394 U.S. 802, 809 (1969). The state defendants maintain that the decision to limit voting by mail to older Texans is rational because individuals aged sixty-five and over are more susceptible to COVID-19, and it is related to legitimate governmental interests including the prevention of voter fraud. Accordingly, the state defendants argue that plaintiffs have not shown a likelihood that they will prevail on their Twenty-Sixth and Fourteenth Amendment claims.

<u>Plaintiffs' Claim Under the First Amendment</u>

Plaintiffs argue their right to vote has been violated by Attorney General Paxton's threats of criminal prosecution. Because the speech at issue is fully protected First Amendment activity, and the burden on this speech is heavy, plaintiffs contend the Court should apply the strict scrutiny standard of review. Citing the reasons stated in support of their age discrimination claim, plaintiffs contend they are likely to succeed on their free speech claim.

The state defendants respond that Texas Attorney General Paxton has not threatened plaintiffs' right to free speech. They argue plaintiffs' accusation misapprehends the Attorney General's responsibilities to enforce state statutes and the letter he sent in fulfillment of those responsibilities. The state defendants also argue that "an injunction prohibiting Attorney General Paxton from threatening voters or voter groups with criminal or civil sanction for voting by mail or communicating with or assisting voters in the process of vote by mail" would violate his rights to comment on matters of public concern. The state defendants therefore contend that plaintiffs have not shown a likelihood of success on their First Amendment claim.

Plaintiffs' Void for Vagueness Claim

Plaintiffs note that the Texas Democratic Party and some of the plaintiffs in the instance case maintained in the state court proceeding that state law allows all voters, regardless of age, to vote by mail because they have a "disability" based on the risk of transmission of COVID-19. They also noted that, although the state court agreed with plaintiffs, Attorney General Paxton holds a different interpretation. Plaintiffs argue that these factual conditions result in an environment where the "public cannot reasonably determine what state law allows." They therefore argue that Attorney General Paxton's interpretation renders the Texas Election Code unconstitutionally vague in violation of the Fourteenth Amendment because it is not clear which voters qualify to vote by mail under its provisions. *See Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972); *see also Johnson v. United States,* 135 S. Ct. 2551, 2556-58 (2015); *Kolender v. Lawson,* 461 U.S. 352, 357-58 (1983); *Papachristou v. Jacksonville,* 405 U.S. 156, 162 (1972).

The state defendants respond that plaintiffs' void-for-vagueness claim fails because this doctrine has been primarily applied to strike down criminal laws and Attorney General Paxton's

interpretation of the statute does not render it to be "so vague and indefinite as really to be no rule at all." *Groome Resources, Ltd. v. Parish of Jefferson,* 234 F.3d 192, 217 (5th Cir. 2000). They also contend Attorney General Paxton's interpretation of the statute does not result in a constitutional violation because he was merely giving his opinion about the statute's construction. *See Ford Motor Co. v. Texas Dept' of Transp.,* 264 F.3d 493, 509 (5th Cir. 2001); *Stansberry v. Holmes,* 613 F.2d 1285, 1289 (5th Cir. 1980). The state defendants therefore conclude that plaintiffs have not shown a likelihood of success on the merits of their vagueness argument.

<u>Voter Intimidation</u>

Plaintiffs argue Attorney General Paxton has made the extraordinary choice to upend the rule of law, disturb the state judiciary from fulfilling its mission, and to outwardly intimidate rightful voters and the third parties who assist voters in elections. He stated: "[T]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." This advisory opinion was made just as a state court ruled that Texas voters are entitled to a mail-in ballot because of the risk of transmission of COVID-19. Hours later, Attorney General Paxton stated that expanding mail ballot eligibility to all Texans "will only serve to undermine the security and integrity of our elections." Plaintiffs contend that these statements operate to discourage voters from seeking mail-in ballots because of their fear of criminal sanction or victimization by fraud in violation of 52 U.S.C. § 10307.

The state defendants respond that Attorney General Paxton did not intimidate plaintiffs or any other voters. They argue the communication merely states the law regarding the giving of false information in connection with a request for a ballot by mail. Accordingly, the state defendants

maintain that plaintiffs have not shown that their voter intimidation claim is likely to succeed on the merits.

Irreparable Injury and Harm

Plaintiffs argue they are irreparably injured if an injunction is not granted and their harm outweighs any harm to the defendants.  They note that voting is a constitutional right for those that are eligible, and contend that the violation of constitutional rights for even a minimal period of time constitutes an irreparable injury which justifies granting their motion for preliminary injunction. *See Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976)).  In addition, plaintiffs contend that forcing voters to unnecessarily risk their lives in order to practice their constitutional rights while allowing other voters a preferred status so they do not have to face this same burden, is also irreparable injury. They assert: (1) there is no harm to the State allowing registered, legal voters the right to vote in the safest way possible, (2) the State has no interest in forcing voters to choose between their well being and their votes, and (3) the State has no interest in allowing a situation where "the Attorney General can sow confusion, un-even election administration and threaten criminal prosecution" under these circumstances.

The state defendants respond that injunctive relief at this point in the election cycle is improper.  They note that the Supreme Court "has repeatedly emphasized that lower courts should ordinarily not alter the election rules on the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* 140 S. Ct. 1205, 1207 (2020).  The state defendants also argue that plaintiffs cannot establish an irreparable injury because "they have not proven that they will be deprived of the safe exercise of the franchise in the State's upcoming elections."

31

Public Interest Considerations

Plaintiffs contend "the public is best served by both preserving the public health of Texans and by fervent and competitive races for public office." They argue it is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally, and there is no justification nor public interest in denying the ballot to eligible voters. Furthermore, plaintiffs argue it is always in the public interest to prevent violations of individuals' constitutional rights, and to prevent the State from violating the requirements of federal law. Plaintiffs also contend that protecting the right to vote is of particular public importance because it is "preservative of all rights." *See Dunn v. Blumstein,* 405 U.S. 330, 336 (1972). Accordingly, plaintiffs contend they have met all the requirements for a preliminary injunction.

The state defendants respond that an injunction would undermine the public interest. They argue "the equitable factors of the injunctive relief analysis tilt heavily against the issuance of an injunction, especially the overbearing one Plaintiffs ask the Court to adopt." The state defendants assert that the State has a weighty interest in the equal, fair, and consistent enforcement of its laws. *Maryland v. King,* 567 U.S. 1301, 1303 (2012). They further maintain that the inability of Texas to enforce its duly enacted laws clearly inflicts irreparable harm on the State. *See Abbott v. Perez,* 138 S. Ct. 2305, 2324 n.17 (2018). The state defendants assert that interest is especially potent in the middle of a global health crisis and that "if citizens lose confidence in the evenhanded application of the State's election laws in these precarious times, the foundations of our system of representative government will weaken." Accordingly, they contend plaintiffs' motion for preliminary injunction should be denied.

32

<u>Standing to Bring Suit</u>

The state defendants argue plaintiffs are unlikely to prevail on their claims against them under the Fourteenth and Twenty-Sixth Amendments because they do not enforce Texas Election Code § 82.002 or § 82.003, and are immune from suit. For related reasons, the state defendants also argue plaintiffs lack standing to bring their claims against the state defendants.

Plaintiffs respond that the state defendants' immunity argument is meritless. Specifically, plaintiffs maintain that all of the state defendants have a sufficient connection to the enforcement of the Texas Election Code. They contend that in light of the admissions in this case, including threats of criminal prosecution, this argument bears little credibility. Plaintiffs also argue that each meets the requirements for Article III standing because each has suffered and will continue to suffer legally cognizable injuries because of defendants' actions. Accordingly, plaintiffs contend this Court should proceed to hear their motion for preliminary injunction.

<u>Abstention</u>

The state defendants contend that, though plaintiffs' current claims sound in federal law, they cannot be resolved without answering the question posed in state court: whether fear of contracting COVID-19 constitutes a "disability" under the Texas Election Code. They contend that question is squarely presented in the state court litigation and will soon be considered by the Texas Supreme Court. In light of uncertainty about a predicate question of state law, the state defendants argue that this Court should abstain under *Railroad Commission of Texas v. Pullman,* 312 U.S. 496 (1941). "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law, and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson,*

617 F.2d 424, 428 (5th Cir. 1980). With regard to the second factor, the state defendants contend resolution by the state court will render this case moot or materially alter the constitutional claims presented.

Plaintiffs respond that "the abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt,* 377 U.S. 360, 375 (1964). Plaintiffs also argue that abstention in this case is improper because the state law determination will not moot nor present in a different posture the federal constitutional questions raised by plaintiffs. Plaintiffs further contend that, "regardless of whether the challenged provision of Texas Election Code is resolved in Texas state court, and there is no indication that such clarification will come soon," Texas voters are "waking every day to make the choice to request a mail ballot and have it rejected (and be criminally prosecuted) or wait further and potentially request the ballot too late or do so with an avalanche of others that overloads the electoral system." Plaintiffs maintain that the orderly administration of the election requires resolution now because: (1) the question of whether the current circumstances violate the United States Constitution remains and must be answered by this Court; (2) the July run-off election is weeks away; and (3) there "is no guarantee that the state court proceedings will have resolved the issue before this election leaving plaintiff's federal constitutional rights in limbo." Accordingly, plaintiffs argue this Court should not abstain from ruling on their motion for preliminary injunction.

APPENDIX C

FINDINGS OF FACT AND CONCLUSIONS OF LAW

FINDINGS OF FACT

I. COVID-19 is an Immediate Danger to all Texans

1. COVID-19 infection is caused by the SARS-CoV-2 virus and is spread by passing through mucous membranes. Ex. 21 at p. 2.

2. Coronavirus is spread through droplet transmission. These droplets are produced through coughing, sneezing, and talking. Ex. 21 at p. 3. Ex. 22 p. 14. Ex. 22 at p. 16-17.

3. The virus can be spread when an infected person transmits these droplets to a surface like a polling machine screen. Ex. 21 at p. 3. Ex. 22 p. 72-73.

4. It is highly likely that COVID-19 will remain a threat to the public both in July and through November. Ex. 6 at p. 3. Even if virus transmission and prevalence do decline over the summer months, it remains likely that they will resurge in the fall and winter. Ex. 28 at p. 7.

5. Reported illnesses have ranged from mild symptoms to severe illness and death. The most common symptoms include fever, dry cough, and shortness of breath. Ex. 21 at p. 2-3. Other identified symptoms include muscle aches, headaches, chest pain, diarrhea, coughing up blood, sputum production, runny nose, nausea, vomiting, sore throat, confusion, loss of senses of taste and smell, and anorexia. Due to the respiratory impacts of the disease, individuals may need to be put on oxygen, and in severe cases, patients may need to be intubated and put on a ventilator. Ex. 28 at p. 3.

6. Anyone can be infected with the novel coronavirus. Ex. 21 at p. 3-4. Ex. 22 at p. 21.

7. Certain groups, such as those over 60 years of age and those with certain underlying

35

medical conditions, are at higher risk of serious illness and death should they be infected. Ex. 21 at p. 3.

8. People of every age are at risk of serious illness and possible death. Ex. 28 at p. 3.

9. The Latino community is particularly vulnerable to infection, hospitalization, and death resulting from COVID-19, due to a combination of high prevalence of underlying medical conditions and socioeconomic conditions that make contracting the disease more likely. Ex. 28 at p. 4.

10. Any place where people gather and cannot maintain physical distancing, such as a polling place, represents a heightened danger for transmission of COVID-19 disease. Ex. 21 at p. 3. Ex. 22 p. 14.

11. Crowding and exposure to a range of surfaces at the polls make polling places likely transmission sites for the virus. Ex 21. at p. 2-3. Ex. 22 p. 14.

12. Polling places will likely remain transmission sites for the virus, even if election officials use all reasonable preventive measures. Ex. 22 at p. 72. Ex. 22 at p. 64-70.

13. Requiring voters to remain in close proximity to other voters and election workers for lengthy periods of time, particularly at polling locations with long lines and extended wait times would place them at risk of contracting or spreading COVID-19. Ex. 28 at p. 8.

14. This would be particularly true for those who are at a greater risk of complications and death from COVID-19, including the elderly, immunocompromised, and people with underlying health conditions, including many members of the Latino community. E. 28 at p. 8.

15. However, data to date in Texas demonstrate higher than expected infection rates in younger persons. Ex. 45. Ex. 22 at p. 42-44.

16. Some infected persons do not appear to have any symptoms although they may still be able to infect others. Ex. 21 at p. 3. Ex. 23 at p. 5.

17. Meanwhile, other people with no pre-existing conditions are dying of stroke without ever displaying the typical COVID-19 symptoms. Ex. 28.

18. COVID-19 has become one of the leading causes of death in the United States. Ex. 48 at p. 1-2.

19. As of May 13, 2020, Texas has 41,048 reported cases of COVID-19.1 Ex. 44 at p.1.

20. As of April 25, 2020, the highest number of reported cases of COVID-19 in Texas are among 50 to 59-year-olds and 40 to 49-year-olds, with 2,568 reported cases and 2,620 reported cases, respectively. Ex. 45 at p. 1.

21. 20 to 29-year-olds represent 2,183 cases, while those aged 65 to 74 make up 1,292 reported cases in Texas. As of May 13, the State has seen 1,133 deaths from the virus. Ex. 44 at p. 1. Ex. 45 at p. 1.

22. Herd Immunity occurs when a high percentage of people in a community become immune to an infectious disease. This can happen through natural infection or through vaccination. In most cases, 80- 95% of the population needs to be immune for herd immunity to take place. Ex. 21 at p. 5.

23. "Herd Immunity" will not reduce the risk of COVID-19 during the 2020 elections. Ex. 21 at p. 6-7.

24. An FDA-approved vaccine will be available for at least 12-18 months. Therefore, a vaccine will not reduce the risk of COVID-19 during the 2020 elections. Ex. 21 at p. 4-5.

II. Voting by Mail Is Safe with No Risk of COVID-19 Transmission

25. There is no evidence the virus can be spread by paper, including mail. Ex. 21 at p. 7.

26. Voting by mail would prevent virus transmission between voters standing in line, signing in, and casting votes, as well as between voters and election workers. Ex. 21 at p. 7. Ex. 22 at p. 72-73. Ex. 22 at p. 183. Ex. 22 at p. 201.

27. Voting by mail would eliminate viral transmission through contamination of environmental surfaces like voting machines. Ex. 21 at p. 7. Ex. 22 p. 72. Ex. 22 at p. 252-253.

28. Due to the pandemic, voting by mail is much safer for the public than voting in person. Ex. 6 at p. 3. Ex. 22 at p. 182. Ex. 22 at p. 192-193. Ex. 22 at p. 234. Ex. 22 at p. 237.

Background of Voting by Mail in Texas

29. Texas law allows voting by mail for registered voters who meet one of the qualifications stated in the Election Code. See Tex. Elec. Code Ch. 82.

30. A voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail. Tex. Elec. Code §§ 82.001-4. Ex. 1 at p. 2. Ex. 22 at p. 214. Ex. 22 at p. 243-244. Ex. 22 at p. 250.

31. Voters apply to vote by mail with a mail ballot application which they send to the early voting clerk. Tex. Elec. Code §§ 84.001.

32. The early voting clerk is responsible for conducting early voting and must "review each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a).

33. An early voting ballot application must include the applicant's name and the address at which the applicant is registered to vote and an indication of the grounds for eligibility for voting

38

by mail. Tex. Elec. Code § 84.002.

34. The applicant for a mail ballot must certify that "the information given in this application is true, and I understand that giving false information in this application is a crime." Tex. Elec. Code § 84.011.

35. It is a crime to "knowingly provide false information on an application for ballot by mail." Tex. Elec. Code § 84.0041.

36. If the clerk determines the applicant is entitled to vote by mail, the clerk shall provide the voter a ballot by mail. Tex. Elec. Code § 86.001.

37. If the voter is not entitled to vote by mail, the clerk shall reject the application and give notice to the applicant. *Id.*

38. A rejected applicant is not entitled to vote by mail. *Id.*

39. July 2 is the deadline for an early voting clerk to receive an application to vote by mail for the upcoming July 14, 2020 Democratic Party Run-Off. See Tex. Elec. Code § 84.007(c). Ex. 13 at p. 11.

40. Mail ballots are expected to start being sent to voters in response to their requests on May 30, 2020. Ex. 13 at p. 9.

41. Thousands of vote-by-mail applications are being sent to early voting clerks across Texas. Ex. 46 at p. 4-5.

Election Officials Need Clarity to Prepare for Imminent Elections

42. Governor Abbott has set both the date of the special election for Senate District 14 in Bastrop and Travis Counties and the Democratic Primary Run-Off election in all 254 Counties on July 14, 2020. Ex. 7 at p. 1. During both the primary and the November General Election state

election law requires all ballot information be complete by 74 days before the election. Ex. 7 at p.

1. During that time, clerks must do all of the following:

* proof ballot submissions, order races appropriately, merge with many jurisdictions appearing on the ballot;
* work with ballot companies to lay out for printing multiple ballot styles;
* program ballot scanners, controllers, and related technology;
* prepare ballot carriers for vote by mail applications and returned ballots for the use of signature verification committees and ballot boards;
* hire election workers for polling locations, early voting locations, and central counting;
* train all workers;
* determine polling locations for election day and early voting, negotiate contracts with locations;
* manage payroll issues of dozens to thousands of temporary workers; and,
* manage delivering and picking up equipment while keeping it secure and free from tampering before, during and after the polling locations open and close. Ex. 7 at p. 1-2.

43.   Prior to the commencement of the instant litigation, election administrators sought guidance from the Secretary of State regarding the threat of COVID-19 and the ability of voters to obtain mail-ballots. Ex. 24 at p. 7. The Secretary did not provide such definitive guidance.

44. On April 6, 2020, the Secretary of State issued Election Advisory 2020-14, which left the interpretation of the disability statute up to local election officials. This advisory remains the only guidance from the Secretary of State to election officials pending the resolution of Defendants' appeal of that litigation. It does not provide guidance to election officials if their interpretation is correct or if counties should have a uniform interpretation of the statute. Ex. 1 at p. 2-4.

45. The State of Texas' Fourteenth Court of Appeals has ordered that the appeal in in the state court case will be submitted by June 12, 2020, 32 days prior to the primary runoff election date and 20 days prior to the vote-by-mail application deadline for that election. Ex. 38 at p. 2.

46. On May 13, 2020, the State of Texas filed a Petition for Writ of Mandamus in the Texas Supreme Court against only some of the counties in Texas and the Petition seeks to collaterally attack the state district court injunction order while not including Plaintiffs as real parties in interest. Ex 42. Sequence of Events Since the Outbreak in Texas. On May 15, 2020, the Justices again blocked mail-in voting requests for people worried about contracting COVID-19, overturning the appellate court order from earlier in the week. The Texas Supreme court did not provide an explanation for issuing the stay.

47. On March 13, 2020, Defendant Abbott declared that COVID-19 poses an imminent threat of disaster. Ex. 2 at p. 2 .

48. On March 19, 2020, Dr. John W. Hellerstedt, Commissioner of the Department of State Health Services, declared a state of public health disaster. The disaster declaration provided that people not gather in groups larger than 10 members and limit social contact with others by social distancing or staying six feet apart. Ex. 4 at p. 1.

49. On March 19, 2020, Defendant Abbott closed schools temporarily. He also closed bars and restaurants, food courts, gyms and massage parlors. Ex. 3 at p. 3.

50. On April 27, 2020, Defendant Abbott issued a new order that purports to open the state's business affairs, in "phases." Ex. 43 at p. 1. He has indicated that case testing will be monitored and that if and when cases begin to increase, the opening will be slowed and/or reversed.

51. Dr. Deborah Leah Birx, the Coronavirus Response Coordinator for the White House Coronavirus Task Force, has stated that "social distancing will be with us through the summer to really ensure that we protect one another as we move through these phases." Ex. 47 at p. 12.

52. The Texas Secretary of State only gives guidance to local election administrators about

41

how the election laws apply.  An advisory issued by the Secretary of State's Office instructed counties to begin preparing for larger than normal volumes of vote by mail while also giving guidance to local officials to seek court orders, as appropriate, to adjust election procedures. Ex. 24 at p. 9 .

53. In order to seek clarity of the requirements of state law, some of these Plaintiffs sought declaratory and injunctive relief in Texas district court in Travis County. *Democratic Party v. DeBeauvoir,* et al., No. D-1-GN-20-001610 (201st Dist. Ct., Travis Cty., Tex. filed March 20, 2020).

54. Texas intervened and asserted a Plea to the Jurisdiction based on standing, ripeness, and sovereign immunity. Ex. 33 at p. 2.

55. Texas argued in its Plea to the Jurisdiction that vote by mail administration is a county-level decision. Ex. 33 at p. 3.

56. On April 15, the state court heard the plaintiffs' temporary injunction motion and Texas' plea to the jurisdiction. The state court verbally announced the denial of the plea to the jurisdiction and the granting of the temporary injunction.

57. In response to the oral order, Defendant Paxton made public a letter he had sent to the Chair of the House Committee on Elections of the Texas House of Representatives. Ex. 55 at p. 1-5.

58. In the letter, Defendant Paxton gave a non-official, advisory opinion regarding whether the risk of transmission of COVID-19 would entitle Texas voters to cast a mail-in ballot. He stated: "We conclude that, based on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Election Code for purposes of receiving a ballot by mail." Ex. 55 at p. 3.

59. In a statement accompanying the publication of the letter, General Paxton said: "I am

42

disappointed that the district court ignored the plain text of the Texas Election Code to allow perfectly healthy voters to take advantage of special protections made available to Texans with actual illness or disabilities. This unlawful expansion of mail-in voting will only serve to undermine the security and integrity of our elections and to facilitate fraud. Mail ballots based on disability are specifically reserved for those who are legitimately ill and cannot vote in-person without needing assistance or jeopardizing their health. Fear of contracting COVID-19 does not amount to a sickness or physical condition as required by state law." Ex. 55 at p. 1. Ex.35.

60. This statement and the actions of the State contributed to the uncertainty that voters and early voting clerks face in administering upcoming elections.

61. The letter also threatened political speech by Texas Democratic Party ("TDP" or "the Party") and other political actors in the state. Ex. 55 at p. 5.

62. The letter stated: "To the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Ex. 55 at p. 5.

63. The public statements and actions of the Defendant Paxton create a reasonable fear by voters that they will be prosecuted. Ex. 8 at p. 7.

64. On May 1, 2020 after counties were following Judge Sulak's order, Defendant Paxton issued another Guidance Letter which again purported to threaten Texans with criminal prosecution for following Judge Sulak's order. Ex. 34.

65. Given the public statements and actions by Defendant Paxton, a voter would reasonably fear that he or she would face criminal sanction if he or she checks the disability box on a mail ballot application because of the need to avoid the potential contraction of the virus. Ex. 8 at p. 7.

43

66. Given the public statements and action by Defendant Paxton, third party political actors such as TDP have a reasonable fear of criminal sanction for assisting voters to apply for mail in ballots in order to avoid exposure to COVID-19. Ex. 55 at p. 5.

Texas Is a Large, Diverse State Whose Voters Need Protection

67. Texas is a large state, with a diverse pool of voters. As of July 1, 2019, there are 28,995,881 Texans. Ex. 29.  People over the age of 65 are 12.6% of the population, or about 3,653,481 people. Id. Children below the age of 18 are 25.8% of the population, or 7,480,937 people. Id. Texans between age of 18 and 65 are 61.6% of the population, or 17,861,463 people. Id. On January 23, 2020, the Secretary of State announced that Texas had set a new state record of registered voters with 16,106,984 registered voters. Id.

Plaintiffs

a. Texas Democratic Party

68. The TDP is a political party formed under the Texas Election Code.

69. The TDP is the canvassing authority for many of the imminent run-off elections to be held on July 14, 2020.

70. The election of July 14 is, in part, to determine runoff elections and therefore award the Democratic Party Nominations to those who prevail. Ex. 24 at p. 13 .

71. TDP is the political home to millions of Texas voters and thousands of Texas' elected officials.

72. The TDP expends resources to try to help its eligible voters vote by mail. Ex 7. 24 and 29.

73. TDP is injured by the uncertainty of the laws associated with voting by mail because of the expenditure of financial resources used to help its members vote by mail, and the potential disfranchisement of its members. Ex 7. 24 and 29.

74. TDP is harmed by the state forcing it to award its nominations in an undemocratic process. Ex 7. 24 and 29.

b. Gilberto Hinojosa

75. Gilberto Hinojosa is the elected Chair of the TDP. He is one of the administrators of the upcoming run-off elections for the Texas Democratic Party. Ex. 24 at p. 4.  He is the head of the canvassing authority for the July run-off elections and is the leader of the Party by and through his statutory and rule-based powers.

76. Chair Hinojosa is also a registered voter in Texas.

77. Chair Hinojosa is injured by the Defendants, because of the uncertainty of Texas law s regarding qualifications to vote by mail.

c. Joseph Daniel Cascino

78. Joseph Daniel Cascino is a Travis County voter who voted in Democratic primary election on March 3, 2020. Ex. 10 at p. 1 .

79. He intends to vote by mail in the upcoming run-off and general elections. Ex. 10 at p. 1-2.

80. He is not 65 years of age or older. Ex. 10 at p. 1.

81. He intends to be in Travis County during the early vote period and Election Day.  Ex. 10 at p. 1 .

82. He has not been deemed physically disabled by any authority. Ex. 10 at p. 1.

83. He wishes to vote by mail because of the risk of transmission by COVID-19 at polling

places. Ex. 10 at p. 2 .

d. Shanda Marie Sansing

84. Shanda Marie Sansing is a Travis County voter who voted in Democratic primary election on March 3, 2020. Ex. 9 at p. 1.

85. She intends to vote by mail in the upcoming run-off and general elections. Ex. 9 at p. 1-2.

86. She is not 65 years of age or older. Ex. 9 at p. 1.

87. She intends to be in Travis County during the early vote period and Election Day. Ex. 9 at p. 1 .

88. She has not been deemed physically disabled by any authority. Ex. 9 at p. 1.

89. She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places. Ex. 9 at p. 2 .

e. Brenda Li Garcia

90. Brenda Li Garcia is a Bexar County voter who has voted in Democratic primary, run-off, and general elections in the past. Ex. 30.

91. She intends to vote by mail in the upcoming run-off and general elections. Ex. 30.

92. She is not 65 years of age or older. Ex. 30.

93. She intends to be in Bexar County during the early vote period and Election Day.  Ex. 30.

94. She has not been deemed physically disabled by any authority. Ex. 30.

95. She wishes to vote by mail because of the risk of transmission by COVID-19 at polling places. Ex. 30. ·

46

Defendants

a. The Honorable Gregg Abbott

96. The Honorable Gregg Abbott is the Governor of Texas and a defendant in this case.

97. He is the chief executive officer in this State. Tex. Const. Art. IV § 1.

b. The Honorable Ruth Hughs

98. The Honorable Ruth Hughs is the Secretary of State of Texas and its chief election officer. Tex. Elec. Code § 31.001.

99. Secretary Hughes has injured the plaintiffs by creating a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State.

c. The Honorable Ken Paxton

100. The Honorable Ken Paxton is the Attorney General of Texas and its chief legal officer. Tex. Const. Art. IV § 22.

101. The Attorney General of Texas may investigate and assist local jurisdictions in prosecuting election-related crimes. Tex. Elec. Code §§ 273.001 (d); 273.002.

102. Recently, General Paxton has issued a letter threatening "third parties [who] advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code." Ex. 55 at p. 5.

103. General Paxton has created a lack of clarity and probable lack of uniformity in application of the election laws relating to mail ballot eligibility throughout the State. Ex. 35.

104. General Paxton's letter also threatens U.S. citizens for exercising their right to vote. Ex. 55 at p. 5. See also, Ex. 34.

d. The Honorable Dana DeBeauvoir

105. The Honorable Dana DeBeauvoir is the Travis County Clerk. Ex. 15 at p. 1.

106. She is the early voting clerk for the upcoming run-off and general elections.

107. Clerk DeBeauvoir has been ordered by a Texas district court to issue voters like the plaintiffs a mail ballot. Ex. 49 at p. 5-6.

e. Ms. Jacquelyn Callanen

108. Ms. Jacquelyn Callanen is the elections administrator for Bexar County.

109. She is the administrator of the run-off and general elections in Bexar County.

110. She is the early voting clerk that will grant or deny mail ballots to applicants in the coming elections.

CONCLUSIONS OF LAW

I. All Plaintiffs Have Standing

1. This Court concludes that Plaintiffs have standing in this case because they all face an imminent risk of harm, the harm they face is fairly traceable to Defendants' conduct, and that harm is redressable by this Court. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

2. Plaintiff Texas Democratic Party faces an imminent risk of harm as a result of the Defendants' interpretation of the Texas Elec Code. § 82.001-4. and Defendants' refusal to follow the Texas state court order permitting voters to access absentee ballots due to fear of COVID-19. The Texas Democratic Party will be conducting their own run-off elections to determine who the organization chooses as their standard bearer. Ex. 24 at p. 14: 10-24. The Texas Democratic Party

has an interest in ensuring that their election is conducted in a manner that would not disenfranchise voters nor put voters at risk of death and is harmed because under the Attorney General's interpretation of the statute and inability to follow the Texas state court law, the party's ability to run their primary is diminished. Ex. 24 at p. 15. An organization may establish injury-in-fact if the "defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle,* 626 F.3d. 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). The Texas Democratic Party's purpose is to promote Democratic candidates and facilitate elections for the party, promote voter participation among its members and the public more broadly (Ex. 29), and the interest the Party seeks to protect through this litigation are therefore germane to its purpose. This harm is plainly traceable to the Defendants who are refusing to follow the state court order and threatening voters who request or use an absentee ballot due to COVID-19 with prosecution. Accordingly, the Texas Democratic Party has standing to sue Defendants. *See Lujan,* 504 U.S. at 560-61.

3. The Texas Democratic Party also has standing to challenge the actions at issue both on behalf of its members and its own behalf. An organization may establish injury-in-fact if the "defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle,* 626 F.3d. 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). The Texas Democratic Party's purpose is to promote Democratic candidates and facilitate elections for the party, promote voter participation among its members and the public more broadly (Ex. 29), and the interest the Party seeks to protect through this litigation are therefore germane to its purpose.

4. Plaintiff Gilberto Hinojosa faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4, and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Hinojosa is a registered Democrat, is planning to vote in the July 14th, 2020 runoff election, and is the elected Chair of the Texas Democratic Party. Hinojosa is one of the administrators of the Texas Democratic Party run-off elections. Ex. 24 at p. 4. He is the head of the canvassing authority and is the leader of the Party by and through his statutory and rule-based powers. Texas Election Code § 163.003-004. Hinojosa is injured by the Defendants because the uncertainty of Texas law's regarding qualifications to vote by mail and the Attorney General's threat of prosecution of those who access vote by mail ballots, even those permitted through the Texas state court order. Ex. 49 at p. 4-6. Ex. 55 at p. 1-5. Ex. 34 at p. 1-3. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Gilberto Hinojosa has standing to sue Defendants. *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

5. Plaintiff Joseph Daniel Cascino faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Cascino is a registered Democrat and Travis County voter who intends to vote by mail in the July 2020 run-off election and general election due to the risk of transmission by COVID-19. Ex. 10 at p. 1-2 . Cascino is not 65 years of age, intends to be in Travis County during the early voting period and Election Day, and has not been deemed physically disabled by any authority. Ex. 10 at p. 1 .

Cascino is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise him. He is further injured by the threat of unjust prosecution by Attorney General Paxton. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Joseph Daniel Cascino has standing to sue Defendants. *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

6. Plaintiff Shanda Marie Sansing faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Sansing is a registered voter in Travis County and has voted in Democratic primary, run-off elections, and general elections in the past. Ex. 9 at p. 1. She intends to vote by mail in the upcoming run-off elections and general elections. Ex. 9 at p. 1-2. She is not 65 years of age, intends to be in Travis County during the early vote period and Election Day, and has not been deemed disabled by any authority. Ex. 9 at p. 1. Sansing wishes to vote by mail due to the risk of transmission of COVID-19 at in-person polling places. Ex. 9 at p. 2. She is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise her. She is further injured by the threat of unjust prosecution by Attorney General Paxton. The evidence before this Court is that an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Shanda Marie Sansing has standing to sue Defendants. *See Lujan v.*

*Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

7. Plaintiff Brenda Li Garcia faces an imminent risk of harm as a result of the Defendants interpretation of the Texas Elec Code. § 82.001-4. and Defendant's refusal to follow the Texas state court order permitting voters to use absentee ballots due to the COVID-19 pandemic. Ex. 30. Garcia is a Bexar County voter. Id. She has voted in the Democratic primary, run-off elections, and general elections in the past and intends to vote by mail in the upcoming run-off and general elections. Id. She is not 65 years of age or older. Id. She intends to be in Bexar County during the early voting period and Election Day. Id. She wishes to vote by mail because of the risk of transmission and contraction of COVID-19 at in-person polling places. Id. She is injured by Defendants because Defendant's interpretation of the Texas Election Code and refusal to follow the state court order would disenfranchise her. She is further injured by the threat of unjust prosecution by Attorney General Paxton. The evidence before this Court demonstrates that counties view the orders of the Attorney General as mandatory, *id.*, and thus, an injunction issued by the Court requiring the Defendants to permit the use absentee ballots under the Texas law due to COVID-19 and enjoin the Attorney General from threatening prosecution of voters who use absentee ballots would redress the harm. Accordingly, Brenda Li Garcia has standing to sue Defendants. *See Lujan v. Defenders of Wildlife,* 504 U.S. 55, 560-61 (1992).

8. The claims asserted in this case do not require individualized proof as to every affected voter and cases that involve injunctive relief such as that sought here do not normally require individual participation. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

9. The Texas Democratic Party has organizational standing to sue on its own behalf because Defendants' illegal acts not permitting voters to access mail ballots under the Texas state court order and under Texas Election Code and Attorney General Paxton's threats to prosecute voters, impair the Texas Democratic Party's ability to engage in its projects by forcing the organization to divert resources to counteract those illegal actions, such as by educating voters on their ability to access absentee ballots. Ex. 7, 24 and 29. Resource diversion is a concrete injury traceable to the Defendants¡| conduct and redress can be provided by granting this injunction. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). And the Fifth Circuit has affirmed that "an organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities–with the consequent drain on the organization's resources.'" *NAACP v. City of Kyle, Tex.,* 626 F.3d 233, 238 (5th Cir. 2010) (quoting *Havens Realty Corp.,* 455 U.S. at 379).

10. Further, all individual Plaintiffs have made clear in their declarations that they not only do intend to vote in the upcoming elections, but they intend to do so through absentee ballots and will be disenfranchised due to fear of COVID-19 if unable to access mail ballots or prosecuted for accessing these ballots. Ex. 9 at p. 1-2. Ex. 10 at p. 1-2 and Ex. 30. The evidence before this court satisfies any requirement that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *See Gill v. Whitford,* 138 S. Ct. 1916,1929 (2018).

11. Plaintiffs also satisfy the causation requirement of standing. *K.P. v. LeBlanc,* 627 F.3d 115, 123 (5th Cir. 2010) (citations omitted) ("Because State Defendants significantly contributed to the Plaintiffs' alleged injuries, Plaintiffs have satisfied the requirement of traceability."). Defendants'

actions would significantly contribute, if not wholly cause, Plaintiffs' alleged injuries, i.e., their inability to exercise their constitutional right to vote.

II. A Preliminary Injunction Should Issue against Defendants while the Case Proceeds

12. This Court concludes that Plaintiffs should be granted a preliminary injunction pursuant to its as-applied claims relating to: (1) the 26th Amendment of the U.S. Constitution; (2) vagueness in violation of the "Due Process" clause of the 5th and 14th Amendments; (3) voter intimidation in violation of 52 U.S.C. § 10307(b); and (4) the First Amendment of the U.S. Constitution.

13. Plaintiffs should be granted a preliminary injunction, because they have satisfied the four requirements for such an injunction to issue: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir. 2009).

a. Plaintiffs Are Likely to Succeed on the Merits of their Claims

i. Plaintiffs Are Likely to Succeed on their 26th Amendment Claim

14. The Twenty-Sixth Amendment states, "[t]he right of citizens of the United State, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on the account of age" (U.S. Const. amend. XXIV, § 1), and forbids the abridgement or denial of the right to vote of young voters by singling them out for disparate treatment. *See Ownby v. Dies,* 337 F. Supp. 38, 39 (E.D. Tex. 1971).

15. Courts presented with claims arising under the Twenty-Sixth Amendment must apply strict scrutiny. *See United States v. Texas.,* 445 F. Supp. 1245,126 (S.D. Tex. 1978), *aff'd sub nom.*

*Symm v. United States,* 439 U.S. 1105 (1979) (determining that a Texas registrar had violated the Twenty-Six Amendment by imposing burdens on students wishing to register to vote and providing that "before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny"); *see also Lynch v. Donnelly,* 465 U.S. 668, 687 n. 13 (1984) (holding that laws, statutes, or practices that are "patently discriminatory on its face" will receive strict scrutiny.); *League of Women Voters of Fla., Inc. v. Detzner,* 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (finding that the Twenty-Sixth Amendment provides an "added protection to that already offered by the Fourteenth Amendment"). Under strict scrutiny, the burden is on the State to justify that its policy, statute, or decision is narrowly tailored to serve a compelling state interest. *See League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 475 (2006).

16. Texas statute creates two classes of voters, those under the age of 65 who cannot access a mail ballot under this law and those over the age of 65 who can access mail ballots. Texas. Election Code § 82.003 states that "a qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day." Those aged 65 and older are permitted to access mail ballots under this law on the account of their age alone, and those younger than 65 face a burden of not being able to access mail ballots on account of their age alone.

17. Plaintiffs complain that younger voters bear a disproportionate burden because the age restrictions of Tex. Elec. Code § 82.003, that Tex. Elec. Code § 82.003 is a government classification based on age and discriminates against voters under the age of 65 based on age, and that Tex. Elec. Code § 82.003 is prima facie discriminatory under all circumstances.

18. However, in the Preliminary Injunction proceeding, Plaintiffs only seek relief, as applied during the pandemic.

19. The Court concludes, that during the COVID-19 pandemic, younger voters bear a disproportionate burden because the age restrictions of Tex. Elec. Code § 82.003, that Tex. Elec. Code § 82.003 is a government classification based on age and discriminates against voters under the age of 65 based on age, and that Tex. Elec. Code § 82.003 violates the 26th Amendment, as applied, during the COVID-19 pandemic.

20. COVID-19 has become one of the leading causes of death in the United States. Data to date in Texas demonstrates higher than expected infection rates in younger persons. General Paxton has threatened to prosecute voters under the age of 65 who use mail ballots under the disability exemption as provided by the state court ruling. Ex. 8 at p. 7. Thus, younger voters who are just as at risk to contract COVID-19 are forced to choose between risking their health by voting in-person or facing criminal prosecution by Defendant Paxton.

21. As a result of Defendants¡| actions, the right of people below the age of 65 to vote is uniquely threatened and burdened solely based on their age. Thus, this Court concludes that Tex. Elec. Code § 82.003 classification of voters by age is discriminatory, as applied, because it erects an obstacle to the franchise for younger voters.

22. Defendants have attempted to meet their burden of showing that their actions here satisfy strict scrutiny, and they failed to do so. They presented no evidence that demonstrates a compelling governmental interest and instead provided confusing and conflicting reasoning behind why the state would bar younger voters from accessing mail ballots during a global, deadly pandemic. The State¡|s interest is particularly attenuated in this case, given that the data show that Texas aged under 65

56

comprise a majority of the COVID-19 cases reported. Ex. 45 at p. 1.

23. In fact, the State's given reasoning would increase the harm to the public health and safety of not only those Texans who are under the age of 65 and who would be unable to vote by mail, but also the safety of any Texans (even those over 65) who interact with individuals who voted in person because they were unable to vote by mail and who were exposed to the COVID-19 virus.

24. Put simply, there is no compelling interest in imposing arbitrary obstacles on voters on account of their age in these circumstances, and thus Defendants' conduct thus fails to meet strict scrutiny.

25. This Court concludes that Plaintiffs have established that they are likely to succeed on their as applied Twenty-Sixth Amendment claim.

26. Alternatively, even if strict scrutiny does not apply, defendants' conduct is unconstitutional as it intentionally discriminates against voters on the basis of age.

27. Where they have not applied strict scrutiny, federal courts have evaluated claims under the Twenty-Sixth Amendment using the *Arlington Heights* framework. *See e.g. One Wis. Inst., Inc. v. Thomsen,* 198 F.Supp.3d 896, 926 (W.D. Wis. 2016) (finding that the Twenty-Sixth Amendment's text is "patterned on the Fifteenth Amendment . . . suggest[ing] that *Arlington Heights* provides the appropriate framework.").

28. Under the *Arlington Heights* test, the Court infers discriminatory intent through (1) the impact of the official action and whether it bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequences of events leading up to the decision challenged in the case, including departures from normal procedures in making decisions and substantive departure; and (4) contemporary statements made by the governmental body who created

57

the official action. See *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252 (1977).

29. Defendants' decision to interpret the law in a discriminatory fashion and threaten criminal prosecution against those who advance a different determination is discriminatory particularly to voters under the age of 65. That decision bears more heavily on voters under 65 especially during the COVID-19 pandemic, because if they are unable to access mail ballots, they will be forced to risk their lives, the lives of their loved ones, and the lives of the public at-large in order to vote. The refusal to extend access to mail ballots to younger voters affirmatively disenfranchises thousands of Texas voters simply on the account of age. Voters age 65 and older will not face the same burden on the right to vote because they are able to access mail ballots and vote from the safety of their home, away from potential COVID-19 carriers and spreaders. Voters under the age of 65 bear the burden of this application of the law more heavily than voters aged 65 and older because they will not be able to vote from the safety of their homes. Thus, the impact of the official action bears more heavily on younger voters than another group–older voters.

30. The background of Defendants' decision also leads this Court to conclude there was discriminatory intent. Initially, a district court granted voters in Texas relief to vote absentee due to COVID-19 by a Texas state court judge. Ex. 49, p. 4-6. Despite this state court order, Attorney General Paxton issued an advisory, non-official opinion threatening to prosecute people and groups who complied with the state court ruling. Ex. 55. Defendant Paxton called the state court ruling an "unlawful expansion of mail-in voting." General Paxton further opined that to help or advise a voter to seek a mail-in ballot pursuant to this provision of the Election Code was a crime. Defendant Paxton's decision to threaten criminal sanctions is strong evidence of invidious discrimination.

31. Further, Defendants' actions regarding the state court proceedings are a departure from the legal norm and policy procedure. The Attorney General rarely, if ever, "opine[s] through the formal opinion process on questions ... that are the subject of pending litigation." In a highly unusual manner, Defendant Paxton circumvented the State's judicial process by announcing that he would criminally prosecute voters in defiance of the emerging court order. These significant departures from normalcy were all in service of preventing legal, registered voters from casting ballots without exposing themselves to a deadly virus.

32. Thus, *Arlington Heights* factors have been satisfied as to Defendants' conduct, and Plaintiffs have established that they are likely to succeed on their claim that Tex. Elec. Code § 82.003 impermissibly discriminates on the basis of age, as applied, in violation of the Twenty-Sixth Amendment. The Court also finds there is no rational basis for allowing voters 65 and over to mail-in their ballots while denying eligibility to voters less than 65.

<u>ii. The Plaintiffs Will Succeed on Their Denial of Free Speech Claim</u>

33. This Court concludes that Plaintiffs are likely to prevail to prevail on their denial of free speech claim.

34. Voters enjoy a "Right to Vote" as a form of political speech. Political speech, including the right to vote, is strongly protected as a "core First Amendment activity." *League of Women Voters v. Detzner,* 863 F. Supp.2d at 1158.

35. When determining whether there has been a violation of this right, the Court inquires as to (1) what sort of speech is at issue, and (2) how severe of a burden has been placed upon the speech. *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). Strict scrutiny is applied if the law "places a severe burden on fully protected speech and associational freedoms." *Lincoln Club v. City of*

*Irvine,* 292 F.3d 934, 938 (9th Cir. 2002). "[V]oting is of the most fundamental significance under our constitutional structure," meaning the speech at issue is fully protected First Amendment activity. *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979).

36. Political speech is at issue here. If not for Defendants' conduct, Plaintiff TDP (and other campaigns and political groups) would be engaging in communications with voters concerning who is eligible to and how to vote by mail. Defendant Paxton has outwardly threatened to prosecute these communications. Ex. 55 at p. 3. Defendant Paxton has also threatened to criminally prosecute voters who do not meet his construction of the statutory conditions to vote absentee who attempt to vote by mail.

37. Meanwhile, at least one candidate for the Republican Nomination for a seat in Congress has issued mailers encouraging all voters, regardless of Age, to vote by mail and her statements allege that she did so with advice from Defendant Paxton. Ex. 35. There is no evidence this Republican candidate is being criminally investigated or prosecuted or the county where much of the district at issue in the campaign is located, has been targeted by Defendant Paxton's letters and Texas Supreme Court Petition.

38. These circumstances leave the Democratic Party and its candidates unsure whether only Democrats will be prosecuted.

39. These circumstances, the evidence shows, hinders the free exchange of political speech.

40. The burden on this speech is severe. Under Defendant Paxton's interpretation of state law, voters face the choice between casting their ballot and paying the price of criminal prosecution. Especially given the visibility of the fallout from the Wisconsin primary election, voters are deeply fearful.

41. Defendants' conduct does not meet strict scrutiny, and thus Plaintiffs have established that they are likely to succeed on their claim that their right to freedom of political speech was denied. Indeed, Defendants' conduct cannot stand under any potential First Amendment standard.

42. Even were the state courts to clarify the disability provision in favor of voters under the age of 65, in a timely fashion, which seems unlikely, the threats of prosecution, now widely disseminated, would not be completely cured.

### iii. The Plaintiffs Will Succeed on Their Void for Vagueness Claim

43. This Court concludes that Plaintiffs are likely to succeed on their void for vagueness claim.

44. A statute violates the Fourteenth Amendment on the basis of vagueness if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972). When a statute infringes upon basic First Amendment freedoms, "a more stringent vagueness test should apply." Id. at 246.

45. Criminal enactments are subject to a stricter vagueness standard because "the consequences of imprecision are . . . severe." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 498–499 (1982). Voters can face criminal prosecution under Tex. Elec. Code § 84.0041, and thus a stricter vagueness standard applies to it. The law must be specific enough to give reasonable and fair notice in order to warn people to avoid conduct with criminal consequences. *Smith v. Goguen,* 415 U.S. 566, 574 (1974). A statute must also establish minimal guidelines to govern enforcement. Id. at 574.

46. Tex. Elec. Code § 82.001–4 concerns the right to vote, which is a form of political speech protected under the First Amendment. Thus, a more stringent vagueness test applies here as the statute infringes upon basic First Amendment freedoms and voters are threatened with criminal prosecution.

47. Tex. Elec. Code § 82.001–4 provides that a voter is qualified to vote by mail if he (1) anticipates being absent from his county of residence on election day; (2) has an illness or other physical condition that disables him from appearing at the polling place; (3) is 65 or older; or (4) is confined in jail. Tex. Elec. Code §§ 82.001–4. Tex. Elec. Code § 82.002(a) states "a qualified voter is eligible for early voting by mail if the voter has a sickness of physical condition that prevents the voters from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." Id. A Texas state court judge has stated that § 82.002(a) definition includes persons who are social distancing because of COVID-19.

48. Defendant Paxton has issued varying and contradictory interpretations of Tex. Elec. Code § 82.001–4. Prior to the pandemic, Defendant Paxton advised that there was no specific definition of disability required to be met in order to qualify to use an absentee ballot. Op. Tex. Att'y Gen. No. KP- 0009 (2015). Defendant Paxton has also previously opined that a court-ruled sexual deviant under the age of 65 meets the definition of "disabled" under this statute. Op. Tex. Att'y Gen. No. KP- 0149 (2017).

49. Defendant Paxton's recent interpretations of Tex. Elec. Code § 82.001–4 renders the statute vague as it is unclear which voters qualify to vote using a mail ballot under the law. The statute itself does not clearly define the phrase "physical condition that prevents the voters from appearing at the polling place on election day." Tex. Elec. Code § 82.001–4. The multiple

constructions of Tex. Elec. Code § 82.001–4 by Defendant Paxton and the state court fail to provide people of ordinary intelligence a reasonable opportunity to understand if they are unqualified to access a mail ballot, and authorize and encourage arbitrary and discriminatory enforcement.

50. Every day that goes by, Texans are being subjected to criminal prosecuting threat if they are under age 65 and seek to vote by mail before the July 2 deadline.

51. The statute does not establish minimal guidelines to govern enforcement by Defendants or other state actors. Defendant Paxton has threatened to prosecute elected officials and voters who access mail ballots as provided by the state court because of the COVID-19 pandemic. He issued a letter stating that "[t]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Defendant Paxton's repeated assertions of prosecution of voters and threatening of election officials who seek to comply with a state court order is evidence of a lack of guidelines.

52. Voters have received conflicting instructions on their ability to access mail ballots; one from the Texas judiciary that orders voters who fear COVID-19 to qualify for a mail ballot and instructions from Defendant Paxton which threatens voters who follow the Texas court order with prosecution.

53. Due Process has been violated as the interpretation by Defendant Paxton and the Election Code itself provide no definitive standard of conduct and instead provides Defendants with unfettered freedom to act on nothing but their own preference and beliefs.

54. Tex. Elec. Code § 82.001–4 is unconstitutionally vague in violation of the Fourteenth Amendment Due Process Clause.

55. Plaintiffs have established that they are likely to succeed on their claim that the State's interpretation of the law and the law itself are unconstitutionally vague in violation of the Due Process Clause.

### iv. The Plaintiffs Will Succeed on Their Voter Intimidation Claim

56. This Court concludes that Plaintiffs are likely to succeed on their voter intimidation claim.

57. Title 42 U.S.C. § 1985, part of the Civil Rights Act of 1871, "creates a private civil remedy for three prohibited forms of conspiracy to interfere with civil rights under that section." *Montoya v. FedEx Ground Package Sys., Inc.,* 614 F.3d 145, 149 (5th Cir. 2010).

58. Plaintiff must prove the following elements for a claim under § 1985(3): (1) a conspiracy of two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or deprives her of a right or privilege of a United States citizen. *See Hilliard v. Ferguson,* 30 F.3d 649, 652– 53 (5th Cir. 1994).

59. The right to vote in federal elections is a right of national citizenship protected from conspiratorial interference by the provision of 42 U.S.C. § 1985(3) pertaining to conspiracies to deprive persons of rights or privileges. See 42 U.S.C. § 1985(3) (preventing persons from conspiring to "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner"); *Means v. Wilson,* 522 F.2d 833 (8th Cir. 1975), *cert. denied,* 424 U.S. 958.

60. Voters are legally entitled access to the franchise, and the right to vote is a fundamental right. *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964). This right entitles voters to access to the franchise free from unreasonable obstacles. *See Common Cause Ga. v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005); *see also Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014).

61. Defendants have worked in concert with others in threatening criminal prosecution, an act in furtherance of this conspiracy to deprive access to the franchise from legal, rightful voters. This has injured Plaintiffs, and this injury has been caused by state officials acting in concert with others to prevent legal voters from casting a ballot free from fear of risk of transmission of a deadly illness or criminal retribution.

62. Defendant Paxton issued an advisory opinion just as a state court was ruling that Texas voters are entitled to a mail-in ballot because of the risk of transmission of COVID-19. Ex. 55 at p.1. In this advisory opinion, Defendant Paxton wrote: "[T]o the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity could subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Ex. 55 at p. 5. He also claimed that expanding mail ballot eligibility to all Texans "will only serve to undermine the security and integrity of our elections." Defendant Paxton's statements operate to discourage voters from seeking mail-in ballots because of their fear of criminal sanction or victimization by fraud, and have the intention and the effect of depriving legally eligible voters' access to the franchise.

63. Plaintiffs are likely to succeed on the merits of their claim that Defendant Paxton's official actions amount to voter intimidation in violation of Title 42 U.S.C. § 1985(3).

<u>v. The Defendants Violated the Equal Protection Clause of the 14th Amendment</u>

64. The Defendants, who are state actors and/or acting under color or law as administrators

of elections, have violated the Equal Protection Clause of the Fourteen Amendment by creating an

unconstitutional burden on the fundamental right to vote for those under the age of 65.

65. The Equal Protection Clause "is essentially a mandate that all persons similarly situated

must be treated alike." *Rolf v. City of San Antonio,* 77 F.3d 823, 828 (5th Cir. 1996).  When a

"challenged government action classifies or distinguishes between two or more relevant groups,"

courts must conduct an equal protection inquiry to determine the validity of the classifications. *Quth*

*v. Strauss,* 11 F.3d 488, 491 (5th Cir. 1993).

66. First, Defendants have unconstitutionally burdened Plaintiffs' right to vote as set forth

under the *Anderson-Burdick* analysis.

67. Because voting is a fundamental right (*Harper v. Virginia State Bd. of Elections,* 383

U.S. 663, 667 (1966)), state election laws or enactments that place a burden on the right to vote are

evaluated under the Anderson-Burdick analysis. Under that analysis, a court must weigh "the

character and magnitude of the asserted injury to the rights protected by the First and Fourteenth

Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the

State as justifications for the burden imposed by the rule." *Burdick v. Takushi,* 504 U.S. at 434. If

the burden on the right to vote is severe, a court will apply strict scrutiny.  The classification created

by the state must promote a compelling governmental interest and be narrowly tailored to achieve

this interest if it is to survive strict scrutiny. *Plyer v. Doe,* 457 U.S. 202, 216-17 (1982).

68. Under strict scrutiny, Defendants are unable to supply any legitimate or reasonable

interest to justify such a restriction. Defendants' proffered interests in denying millions of Texans

a mail-in ballot amidst a pandemic are that (1) mail-in ballots are a special protection for the aged or disabled and (2) mail ballots enable election fraud. Both reasons, even taken at face-value, fail to outweigh the burden voters will face in exercising their right to vote before the threat of COVID-19 can be realistically be contained. Moreover, Defendants fail to explain why, under their advanced interests, that older voters are so highly valued above those of younger voters that the rampant fraud Defendants claim mail-in voting provides is justified.

69. Further, the statutory interpretation espoused by Defendants is not narrowly tailored enough to serve the proffered interests. Texas Election Code § 82.001, *et seq.*, extends the "special protection" of a vote by mail-in ballot to not just the aged or disabled but also to voters confined in jail, voters who have been civilly committed for sexual violence, and voters who are confined for childbirth.

70. Second, mail-in ballots have built-in protections to ensure their security, including many criminal penalties for their misuse—protections that Defendant Paxton has publicly expressed a willingness to pursue. Tex. Elec. Code § 86.001, *et seq.* "Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State's announced interests and the statute enacted." *Veasey v. Abbott,* 830 F.3d 216, 262 (5th Cir. 2016) (citing *St. Joseph Abbey v. Castille,* 712 F.3d 215, 225–26 (5th Cir. 2013)).

71. Even if this Court finds that this statute should receive only rational basis review, as is appropriate where the burden is found to be more minimal, Defendants cannot proffer any rational state interest to justify their statutory interpretation. There is no rational state interest in forcing the majority of its voters to visit polls in-person during a novel global pandemic, thus jeopardizing their health (and the health of all those they subsequently interact with). There is certainly no rational

interest in fencing out voters under the age of 65 because it would introduce rampant fraud, while allowing older voters to utilize mail ballots and allowing the alleged rampant fraud therewith. Nor do Defendants have a rational state interest in fencing out from the franchise a sector of the population because of the way they may vote. "'The exercise of rights so vital to the maintenance of democratic institutions' . . . cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents." *United States v. Texas*, 445 F. Supp. 1245, 1260 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States,* 439 U.S. 1105 (1979). Furthermore, the State has no interest in allowing a situation where the Attorney General can sow confusion, uneven election administration and threaten criminal prosecutions on these circumstances.

72. Thus, this Court concludes that Defendants, who are state actors and/or acting under color or law as administrators of elections, have violated the Equal Protection Clause of the Fourteen Amendment by creating an unconstitutional burden on the fundamental right to vote for those under the age of 65.

### b. Without Preliminary Relief, Plaintiffs Are Suffering Irreparable Harm

73. This Court concludes Plaintiffs are suffering irreparable harm in the absence of injunctive relief.

74. Voting is a constitutional right for those that are eligible, and the violation of constitutional rights for even a minimal period of time constitutes irreparable injury justifying the grant of a preliminary injunction. *See Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B. Nov. 1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *DeLeon v. Perry,* 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sum nom. DeLeon v. Abbot,* 791 F3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes

68

irreparable harm as a matter of law."); see also *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir. 1984)

("When an alleged deprivation of a constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary.").

75. In addition, forcing voters to unnecessarily risk their lives in order to practice their

constitutional rights while allowing other voters a preferred status so that they do not have to face

this same burden, is also irreparable injury.

76. Leaving the elections conditions as they are is itself a harm. TDP and these individual

voters are held up, every day by the conflicting state court order and Attorney General's Paxton's

guidance. If the Plaintiff voters apply for ballots by mail, right now, as they would otherwise be

entitled to do, they subject themselves to criminal investigation. If they wait, they may miss the

deadline, risk their application or ballot do no travel in the mail timely or otherwise gets held up with

a last minute rush of vote by mail applications. Meanwhile, TDP is unable to counsel and advise its

members as to who can vote in its primary runoff and how.

c. The Continued Injury if the Injunction is Denied Outweighs Any Harm that Will Result
if the Injunction is Granted

77. This Court concludes that any harm to Defendants is outweighed by the continued injury

to Plaintiffs if an injunction does not issue.

78. As explained above, the injury Plaintiffs are suffering in the absence of an injunction, is

severe.

79. No harm occurs when the State permits all registered, legal voters the right to vote by

utilizing the existing, safe method that the State already allows for voters over the age of 65.  The

Court also concludes that the local election administrators will suffer no undue burden if vote-by-

mail is expanded.

## III. Preliminary Relief Will Serve the Public Interest

80. This Court concludes that the injunctive relief that Plaintiffs seek will not disserve the public interest, and, to the contrary, will serve the public interest because it will protect prevent violation of individuals' constitutional rights and will prevent additional cases of a deadly infectious disease that has already taken the lives of over a thousand Texans.

81. It is "always" in the public interest to prevent violations of individuals' constitutional rights, Deerfield Med. Ctr., 661 F.2d at 338-39, and it is in the public interest not to prevent the State from violating the requirements of federal law. *Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013); *c.f. Dunn v. Blumstein,* 405 U.S. 330, 336 (1972) (stating that protecting the right to vote is of particular public importance because it is "preservative of all rights.") (citing *Reynolds v. Sims,* 377 U.S. 533, 562 (1964)).

82. Moreover, it is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally: "[a]ll statutes tending to limit the citizen in his exercise of this right should be liberally construed in [the voter's] favor." *Owens v. State ex rel. Jennett,* 64 Tex. 500, 502 (1885). The public policy the State's executive branch attempts to advance in this case does not appear clearly in any state legislative enactment.

83. Thus, an injunction against Defendants will serve the public interest.

## IV.  Abstention is not Warranted

Abstention here is not warranted because resolution by the State court will not render this case moot nor materially alter the constitutional questions presented. Plaintiffs allege injury of their federal constitutional rights in addition to injuries arising from the ambiguity of state law. A Texas

state court has already interpreted the ambiguity of Texas' election code and many counties are complying. Yet, General Paxton's letter ruling is preventing meaningful political speech, confuses mail ballot applicants and leaves these voters having to risk criminal prosecution if they seek to protect their health by voting by mail. Meanwhile, vote by mail applications are being submitted daily and many counties, cities, and school districts are complying with Judge Sulak's ruling. Under these circumstances, abstaining from exercising federal court jurisdiction is not warranted.

Moreover, "[t]he abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt,* 377 U.S. 360, 375 (1964).  In fact, the stay of federal decision is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188 (1959) (quoted in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813 (1976)). As such, "abstention is the exception rather than the rule . . . ." *Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir. 1981).

*Pullman* abstention must be "narrow and tightly circumscribed" and is "to be exercised only in special or 'exceptional' circumstances." *Duke v. James,* 713 F.2d 1506, 1510 (11th Cir. 1983). Nonetheless, "voting rights cases are particularly inappropriate for abstention," *Siegel v. LePore,* 234 F.3d 1163, 1174 (11th Cir. 2000), because in voting rights cases plaintiffs allege "impairment of [their] fundamental civil rights" *Harman v. Forssenius,* 380 U.S. 528, 537 (1965).  Abstention is even more inappropriate where the inevitable delay it will cause could preclude resolution of the case before the upcoming elections. *Detzner,* 354 F. Supp. 3d at 1284 (citing *Harman,* 380 U.S. at 537).

71

In this case, time is of the essence—the runoff election is mere weeks away, and the 2020 general election comes not long after. There is no guarantee that state court proceedings will be completed in time and given the Attorney General's defiance of the state district court ruling, a final state court ruling would not fully vindicate Plaintiffs' federal constitutional rights.

Even if Defendants' reading of Tex. Elec. Code § 82.003 was plausible, it is not the sole, mandatory reading of the text, and the constitutional avoidance canon requires that it be rejected. "[W]hen one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." *Pine v. City of West Palm Beach,* 762 F.3d 1262, 1270 (11th Cir. 2014). Resolution of the state court matters is neither "dispositive of the case" before this Court nor would its resolution "materially alter the constitutional questions presented" by Plaintiffs' claims. *Siegel,* 234 F.3d at 1174.

Presuming the Texas Supreme Court upholds the lower court's reading of Tex. Elec. Code §§ 82.001–4, and even if the Executive branch of the Texas government complies with this reading, this does not properly counsel for abstention. To find otherwise is to depend upon a series of questionable "mights." *See Wollschlaeger v. Governor of Fla.,* 848 F.3d 1293, 1322 (11th Cir. 2017) (relying on *United States v. Stevens,* 559 U.S. 469, 480 (2010), for the proposition that courts should not decline to enforce constitutional rights in reliance on the "benevolence" of enforcing officials). Additionally, even if this series of "mights" come to pass, that would not change the constitutional questions presented in this case. Plaintiffs allege that Texas' election code is prima facie discriminatory in violation of the United States Constitution, which is a matter only this Court can resolve.

Abstention would take considerable time and meanwhile these Plaintiffs' constitutional speech, right to assemble as a political party and to vote, are all harmed.  Abstention is inappropriate in this case, for the same reason that it is "particularly inappropriate" in voting cases. *See Siegel,* 234 F.3d at 1174. Constitutional "deprivations may not be justified by some remote administrative benefit to the State." *Harman,* 380 U.S. at 542. Therefore, Plaintiffs' injuries are redressable by this Court and abstention is not appropriate.