IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Texas Democratic Party, Gilbert Hinojosa, | § | |
| Chair of the Texas Democratic Party, | § | |
| Joseph Daniel Cascino, Shanda Marie | § | |
| Sansing, and Brenda Li Garcia, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 5:20-CV-00438-FB |
| | § | |
| Greg Abbott, Governor of Texas, | § | |
| Ken Paxton, Attorney General of Texas, | § | |
| Ruth Hughs, Texas Secretary of State, | § | |
| Dana Debeauvoir, Travis County Clerk, and | § | |
| Jacquelyn F. Callanen, Bexar County | § | |
| Elections Administrator, | § | |
| *Defendants.* | § | |

## DEFENDANT KEN PAXTON'S MOTION TO DISMISS

Defendant Ken Paxton, in his official capacity as Attorney General of Texas, respectfully seeks the dismissal of all claims asserted against him in this cause. *See* Plaintiffs' First Amended Complaint (Doc. 9).[1] For the reasons discussed below, the *Pullman* abstention doctrine calls for this Court to delay a ruling in this case pending the resolution of related state court litigation; the political question doctrine precludes the Court from resolving Plaintiffs' claims; sovereign immunity bars Plaintiffs' claims for injunctive relief; Plaintiffs lack standing; and Plaintiffs' claims fail on the merits.

### BACKGROUND

#### A.    Texas law allows voters to vote by mail only in limited circumstances.

Most Texas voters vote in person, either during early voting or on election day. Voters may apply to vote by mail in only one of four instances—if they: (1) anticipate being absent from their

---

[1] As to the other State Defendants, the Secretary of State filed a motion to dismiss on May 21, 2020. *See* Doc. 107. It does not appear that Plaintiffs ever requested the issuance of summons for Governor Abbott. *See* Docs. 2–4, 6–8, 12–13 (reflecting Plaintiffs' requests for issuance of summons as to other defendants but not Governor Abbott).

county of residence; (2) have a disability that prevents them from appearing at the polling place; (3) are 65 or older; or (4) are confined in jail. TEX. ELEC. CODE §§ 82.001-.004. "Disability" for the purposes of the Election Code is defined to allow a qualified voter to vote by mail if the "voter has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." *Id.* § 82.002(a).

**B.      The Texas Democratic Party brought suit in state court.**

On March 23, 2020, the Texas Democratic Party (TDP) and two voters sued Travis County Clerk Dana Debeauvoir and the Texas Secretary of State in state court, seeking a declaration that the definition of "disability" in Section 82.002(a) of the Texas Election Code applies to all voters who "believe they should practice social distancing in order to hinder the known or unknown spread of a virus or disease." Doc. 10-3 at 7 (quoting state court petition). The state court plaintiffs voluntarily dismissed their state court case against the Secretary, *id.* at 8 n.7, and the State of Texas subsequently intervened in the case for particular, specified purposes.[2]

On April 17, 2020, after an evidentiary hearing, the Travis County district court ordered that any Texas voter "without established immunity [to COVID-19] meet[s] the plain language definition of disability" in the Texas Election Code, and thus, is eligible to apply for a mail-in ballot in the upcoming 2020 elections. Doc. 10 at 5. That order was immediately appealed, superseded, and thus stayed. TEX. R. APP. P. 29.1(b). Texas's Fourteenth Court of Appeals issued a new order, pursuant to Texas Rule of Appellate Procedure 29.3, which temporarily allowed the Travis County district court's order defining "disability" under Section 82.002(a) of the Texas Election Code to take effect on May 14, 2020. *See* Doc. 86. But on May 15, 2020, the Texas Supreme Court granted the State's emergency

---

[2] Texas law takes a broader, more flexible view of intervention than the Federal Rules of Civil Procedure do. *See State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015) (describing the "expansive" intervention standard in Texas). As a result, Texas's limited intervention did not render it a defendant in the Travis County action.

motion for temporary relief and issued a stay of the Fourteenth Court of Appeals order pursuant to Texas Rule of Appellate Procedure 29.3.

In response to the "public confusion" caused by the Travis County lawsuit, the Attorney General provided guidance to county election officials on May 1, 2020. Doc 75-1. "Based on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Texas Election Code," he explained. *Id.* at 1. And the Attorney General further noted that the stayed state-court injunction "does not change or suspend these requirements." *Id.* at 2–3; *see also* Doc. 10-2 (letter to the Honorable Stephanie Klick, Chair, Committee on Elections, setting forth the contours of Section 82.002(a) of the Texas Election Code).

Relatedly, *In re State of Texas*, No. 20-0394—in which the State has sought mandamus relief against five counties involving their compliance with the Texas Election Code—was argued in the Texas Supreme Court on May 20, 2020, with a decision expected to follow shortly. The case squarely addresses the interpretation of Section 82.002(a) of the Texas Election Code. *See* Doc. 50-1.

## C.   Plaintiffs brought overlapping claims in this court.

Hedging against an unfavorable outcome in state court, Plaintiffs TDP, its Chair Gilberto Hinojosa, and three voters filed this action on April 7, 2020. *See* Doc. 1. Plaintiffs contend that the State of Texas's "Election Conditions" (a term Plaintiffs do not define) violate the Voting Rights Act, the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments, and are void for vagueness. Doc. 9 ¶¶ 79–110.

Attorney General Paxton defended against Plaintiffs' motion for preliminary injunction (Doc. 10) at the hearing on May 15, 2020, and now seeks the dismissal of Plaintiffs' claims in their entirety.[3]

---

[3] Attorney General Paxton re-urges and incorporates by reference as if fully set forth herein all arguments made in response to Plaintiffs' motion for preliminary injunction. Moreover, to the extent the arguments herein have been rejected by the Court, Attorney General Paxton respectfully requests reconsideration of those arguments in light of the

## ABSTENTION

Though Plaintiffs' suit sounds in federal law, it cannot be resolved without reference to the question posed in state court: whether fear of contracting COVID-19 constitutes a "disability" under the Texas Election Code. That question is pending before Texas's civil court of last resort, which will address it in short order. In light of uncertainty about a predicate question of state law, this Court should abstain under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941). "The *Pullman* case establishes two prerequisites for *Pullman* abstention: (1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980).

If the Texas Supreme Court permits broader eligibility to vote by mail, its ruling would put Plaintiffs' claims "in a different posture," if not moot them entirely. *Id.* That is because if the state court plaintiffs prevail, all Texas voters could be eligible to vote by mail. In turn, Plaintiffs' constitutional claims here, which are based on the alleged disparities between voters who can vote by mail and voters who cannot in the unique context of COVID-19, will be moot. Even if some claims might remain in the aftermath of the state courts' interpretation of state law, that does not counsel against abstention: Even if the State court litigation "would not 'avoid in whole or in part the necessity for federal constitutional adjudication,' it might 'at least materially change the nature of the problem.'" *Jackson*, 617 F.2d at 431 (quoting *Harrison v. NAACP*, 360 U.S. 167, 177 (1959)); *see also Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (noting abstention standard that the state court proceedings "substantially modify the federal constitutional question").

Texas officials are charged with enacting policies that are responsive to and take full consideration of the evolving COVID-19 situation. Moreover, elected officials are better-equipped

---

poster of this motion to dismiss and the allegations in Plaintiffs' amended complaint. *Cf. Holoway v. Triola*, 172 F.3d 866, 866 (5th Cir. 1999) ("A district court may reconsider and reverse a previous interlocutory order at its discretion.").

than courts to grasp the range of public health and social issues at play and craft appropriate policies to address them. And this is precisely their role in our representative democracy. For these reasons, this case presents an almost textbook illustration of the *Pullman* abstention doctrine. *See Harris Cnty. Comm'r Court v. Moore*, 420 U.S. 77, 84 (1975). Accordingly, Plaintiffs' claims should be dismissed without prejudice until the state court proceedings conclude. *See id.* at 88.

## MOTION TO DISMISS STANDARD

Attorney General Paxton seeks dismissal of the claims against him for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). And the party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "[A] court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009).

In a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312–13 (5th Cir. 2002) (internal quotation marks and citation omitted). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and brackets omitted).

## POLITICAL QUESTION DOCTRINE

This case should be dismissed, first and foremost, because it presents political questions about the adequacy of the State's response to COVID-19. Sometimes "the judicial department has no

business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quotation omitted). Such claims present nonjusticiable "political questions" because they are "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.* "Among the political question cases the Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

*Rucho* held that whether an electoral map reflects unconstitutional partisan gerrymandering is a political question, for three reasons. First, "the Framers' decision to entrust districting to political entities" precluded "hold[ing] that legislators cannot take partisan interests into account." *Id.* at 2497. Thus, the relevant question is when political gerrymandering "has gone too far," not whether it is permissible at all. *Id.* (quotation omitted). Second, courts cannot "even begin to answer" whether gerrymandering "has gone too far" unless they know the "fair" baseline from which to measure departures. *Id.* at 2500–01. Third, in the redistricting context, "fairness" is subject to differing interpretations, and "[t]here are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 2500. Similar concerns are at play in this case, which turns (at its core) on whether it is fair to ask voters to abide by Texas's normal voting rules during this election cycle.

Indeed, the night before the preliminary injunction hearing, the Northern District of Georgia dismissed a similar challenge to a state's allegedly inadequate response to managing its elections in light of COVID-19. *See Coal. for Good Governance v. Raffensperger*, 2020 WL 2509092 (N.D. Ga. May 14, 2020).[4] In that case, the plaintiffs sought a wide range of relief related to in-person and absentee ballots. *Id.* at *1. The court dismissed the plaintiffs' claims under the political question doctrine. As

---

[4] The Plaintiffs since sought reconsideration of the court's decision, which was denied on May 26, 2020. *See Coal. for Good Governance v. Raffensperger*, No. 1:20-cv-1677-TCB, Doc. 56 (N.D. Ga. May 26, 2020).

the court explained, the "Framers of the Constitution did not envision a primary role for the courts in managing elections, but instead reserved election management to the legislatures." *Id.* at \*3. In the absence of "pellucid proof provided by plaintiffs that a political question is not at issue, courts should not substitute their own judgments for state election codes." *Id.* And whether the executive branches had done enough in the context of COVID-19 was a "classic political question involving policy choices." *Id.* The court noted that "there are no discernable and manageable standards to decide issues such as how early is too early to hold the election or how many safety measures are enough." *Id.* And "ordering Defendants to adopt Plaintiffs' laundry list of so-called 'Pandemic Voting Safety Measures' would require the Court to micromanage the State's election process." *Id.* at \*4.

This reasoning applies with equal vigor here. Plaintiffs contend that in-person elections cannot be held safely unless any Texan who wishes may vote by mail. Doc. 9 ¶¶ 3–9. In making those claims, Plaintiffs essentially ask this Court to determine whether the State's response to COVID-19 in the context of elections has been adequate. There is no discernable measure or standard of "how many safety measures are enough," and the Court cannot begin to answer that question without substituting its judgment for the judgment of the actors charged with making those decisions. For these reasons, the political question doctrine applies, and it renders Plaintiffs' claims non-justiciable.

### SOVEREIGN IMMUNITY

As best as can be discerned from their live pleading, Plaintiffs challenge the "Election Conditions" that are a result of the COVID-19 pandemic, because they seek to enjoin the Defendants from "giving any effect to the requirements of these Election Conditions, including enjoining Defendants from conducting any elections utilizing these Election Conditions." Doc. 9 ¶ 113. These allegations suggest that Plaintiffs seek to enjoin enforcement of some provisions of the Texas Election Code, or, at a minimum, modify how they are enforced. But because the Attorney General does not administer Texas elections, immunity bars Plaintiffs' claims against him.

"[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Thus, Plaintiffs' claims fail unless they fit that exception. *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

As a consequence, *Ex parte Young* applies only when the defendant enforces the challenged statute. The "the general duty to see that the laws of the state are implemented" held by a statewide official (such as the Governor, Attorney General, or Secretary of State) is insufficient. *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). Instead, the named defendant must have a "particular duty to enforce the statute in question *and* a demonstrated willingness to exercise that duty." *Id.* (emphasis added; quotation marks omitted). As the Fifth Circuit recently emphasized, even when a government official "*has* the authority to enforce" a challenged statute, a plaintiff still must show the official "is likely to do [so] here." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). That is, without evidence that the named defendant is likely to enforce the law against these plaintiffs, the government official "lacks the requisite connection to the enforcement of" the challenged law. *Id.* (quotations omitted).

General Paxton does not have authority to administer Texas elections. *Cf. id.* ("[T]his circuit's caselaw requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law."). General Paxton has concurrent jurisdiction with local prosecutors to prosecute election fraud. But Plaintiffs have made no allegations that General Paxton has either brought criminal enforcement proceedings for potential violations of the Election Code relating to COVID-19, or

threatened to bring such criminal proceedings against them. Instead, they point to a letter in which General Paxton noted (in response to a question from a legislator) that "to the extent third parties advise voters to apply for a mail-in ballot based solely on fear of contracting COVID-19, such activity *could* subject those third parties to criminal sanctions imposed by Election Code section 84.0041." Doc. 10-2 at 6 (emphasis added). But General Paxton cautioned that "whether specific activity constitutes an offense under these provisions will depend upon the facts and circumstances of each individual case." *Id.* Those caveats are critical; they make plain that General Paxton is not threatening criminal enforcement against any particular actor. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (noting to establish standing in a pre-enforcement context, the threat of enforcement against a particular plaintiff must not be "chimerical").

But even if Attorney General Paxton could control local officials' enforcement of the early voting laws, a federal court could not order him to exercise such power. The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." 209 U.S. at 159. It does not authorize mandatory injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) ("Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property."). Because that would be the case here, Plaintiffs cannot overcome Attorney General Paxton's immunity.[5]

---

[5] To the extent that the Plaintiffs' claims would require this Court to order state officials to comply with state (as opposed or in addition to) federal law, it is also barred by the principles explained in *Pennhurst State School and State Hospital v. Halderman*, 465 U.S. 89 (1984). *See, e.g., Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) ("TDCJ also is likely to succeed on appeal insofar as the district court enjoined the State to follow its own laws and procedures.").

**STANDING**

For several reasons, Plaintiffs lack standing. First, Plaintiffs have failed to establish any cognizable injury and are essentially seeking an impermissible advisory opinion. They imply that voters will be exposed to or contract COVID-19 at a polling site if they are required to vote in person, but those assertions are inherently speculative and ignore the measures that State and local officials might take (and indeed, have already taken) to ensure the safety of in-person voting. Plaintiffs' allegations are therefore insufficient to confer standing. *See, e.g.*, *Galveston Open Gov't Project v. U.S. Dep't of Hous. & Urban Dev.*, 17 F. Supp. 3d 599, 606 (S.D. Tex. 2014) ("Unless and until someone who is going to be directly affected by the rebuilt public housing believes they are suffering an injury attributable to unlawful conduct, there is no 'case' or 'controversy' to resolve."). Moreover, no Plaintiff has standing to pursue a race discrimination claim. Indeed, in their amended complaint, the three named Plaintiffs have not even pleaded membership in a protected racial group, let alone how they are being discriminated against on account thereof. Accordingly, Plaintiffs lack standing to sue for racial discrimination that they do not even plausibly allege or describe.

Plaintiffs do not establish any basis upon which this Court might conclude that TDP or its Chair has standing. TDP lacks associational standing because it has not identified any injured members. Indeed, TDP has not even established that it even has members within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership"). And even if it had, TDP has not alleged that its purported members "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). Nor they do not allege that those individuals "participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental*

*Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). The allegation that some of the individual Plaintiffs voted in a Democratic primary election is insufficient. *See* Doc. 9 ¶¶ 71–73.

Second, even if the individual Plaintiffs were members of TDP, they lack standing for the reasons explained above and below. Without injured members, TDP cannot have associational standing.[6] *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).

TDP similarly lacks organizational standing. An organization lacks organizational standing unless it satisfies the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *E.g., NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61). In an appropriate case, an organization can establish an injury in fact by showing that the challenged law conflicts with the organization's mission and "perceptibly impair[s]" its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

If an organization avoids the impairment of its activities by spending additional resources to combat the effects of the challenged law, then the "drain on the organization's resources" may constitute an injury in fact. *Id.*; *see City of Kyle*, 626 F.3d at 238. But a diversion of resources is not a cognizable injury in fact unless the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("[A]ny resources [the organizational plaintiff] used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." (quotation omitted)). That is because a plaintiff "cannot manufacture standing by choosing to make

---

[6] *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), does not help Plaintiffs. That case found associational standing based on an identified candidate who "step[ped] into the shoes of" the TDP "after the primary election" and pursued a claim that a candidate from other party was improperly included on the ballot, thereby harming her prospects of winning an election. *Id.* at 588. Standing is claim specific, and *Benkiser* does not stand for the proposition that a party always has standing to challenge election rules.

expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

TDP's claims fail on both theories. It has not established what "Election Conditions" in Texas they are actually challenging, let alone how those "Election Conditions" cause TDP any cognizable injury-in-fact. In TDP's motion for preliminary injunction, Plaintiffs claim they are "injured by the uncertainty of the laws associated with voting by mail[.]" Doc. 10 at 6–7. By TDP's own admission, the injury is uncertain and therefore speculative, and the Party and its leaders therefore lack standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)) (to have standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision').

Plaintiffs also cannot establish standing to sue Attorney General Paxton. As discussed above, acceptance or rejection of an application to vote by mail falls to local, rather than state, officials. Thus, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; rather, they are "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation and alterations omitted). And the impact of the statutory scheme on a plaintiff is irrelevant for standing purposes; what matters is whether the named defendants enforce that scheme. *See Okpalobi*, 244 F.3d 405, 426 (5th Cir. 2001) (majority op.) (dismissing claims for lack of standing and explaining that courts should not "confuse[] *the statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*"); *Paxton*, 943 F.3d at 1002 (finding that it was "unlikely that the [plaintiff] had standing" to sue a state official who did not have the power to enforce the challenged statute).

Moreover, the Attorney General did not cause any of the circumstances arising from the COVID-19 pandemic. In other words, he did not cause the "Election Conditions" that form the basis

of Plaintiffs' claims. He is thus not a proper defendant, because Plaintiffs challenge events wholly outside his control. *Cf. Raffensberger*, 2020 WL 2509092, at *3 n.4.

RULE 12(B)(6) DISMISSAL MOTION

**A.      Plaintiffs have not pleaded a viable race discrimination claim.**

On the merits, Plaintiffs claim that "Election Conditions" in the State of Texas discriminate on the basis of race and language minority in violation of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. Doc. 9 ¶¶ 79–85. These bare-bones allegations do not put any defendant on notice of the basis for the claims against them. For example, there is no explanation of how the Attorney General is discriminating on the basis of race (or even which protected groups are allegedly being discriminated against). The complaint contains only legal conclusions devoid of sufficient factual support. *See Evans v. City of Meridian Miss.*, 630 F. App'x 312, 315 (5th Cir. 2015) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements' are not sufficient to survive a motion to dismiss" (citation omitted)). Because they do not meet their burden of alleging plausible claims for relief, those claims should be dismissed.

**B.      Plaintiffs have not pleaded viable claims under the First and Fourteenth Amendments.**

Plaintiffs further claim that the State has unconstitutionally burdened their right to vote, and also thereby violated their free speech rights. *See* Doc. 9 ¶¶ 86–94. In recent decades, the Supreme Court has evaluated First and Fourteenth Amendment challenges to state election laws under the *Anderson/Burdick* framework. *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 420 U.S. 780 (1983). Under this standard, courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). State rules that impose a severe

burden on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id.* "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citations omitted).

For the same reasons Plaintiffs' race discrimination claims fail, so too do their First and Fourteenth Amendment claims. Plaintiffs fail to identify the burden on their right to vote, or grapple with how the State's efforts to ensure voter safety at the polls will reduce the risk of COVID-19 transmission at polling sites throughout Texas. And, as the federal district court in Georgia noted, Plaintiffs' claims are fundamentally different than the typical election-related suit in that "this is not a case in which the state applied its own policy, adopted a rule, or enacted a statute that burdened the right to vote." *See Raffensberger*, 2020 WL 2509092, at *3 n.4. Even if the Plaintiffs described any burden on *their* right to vote (they do not), it was not created by the government. *See id.*

In any event, States must regulate elections uniformly "if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process[]." *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Thus, the State's important interests in maintaining the rule of law, preventing fraud, and ensuring the orderly administration of elections suffices to establish the constitutionality of Texas's election laws, especially in the face of Plaintiffs' bare-bones and unspecific allegations of violations of the First and Fourteenth Amendments.

Accordingly, Plaintiffs' First and Fourteenth Amendment claims fail to state claims for relief.

**C.     Plaintiffs' Twenty-Sixth Amendment claim fails.**

The Twenty-Sixth Amendment provides that the "right of citizens of the United States, who are eighteen years of age or older, to vote shall be not denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. Texas Election Code section 82.003, which allows voters who are 65 or older to vote early by mail, does not "deny or abridge" anyone's

right to vote. It is therefore subject to rational-basis review, which it easily satisfies.

No one, least of all the State, disputes that "voting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (citations and quotation marks omitted). "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Id.* Consequently, "State action making it easier for some electors to vote—such as providing them an extended deadline to register for absentee ballots— doesn't make it harder to vote for electors that don't get the same benefit." *Mays v. LaRose*, 951 F.3d at 783 (6th Cir. 2020).

It is perhaps unsurprising, then, that "there is no constitutional right to an absentee ballot." *Id.* at 792 (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-09 (1969)). *See also, e.g.*, *Ray v. Texas*, 2008 WL 3457021 (E.D. Tex. 2008) ("It is well-settled that voting by absentee ballot is not a fundamental right requiring strict scrutiny analysis.") (citing *McDonald*, 394 U.S. 802); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. at 209 (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

In *McDonald*, the Supreme Court recognized the clear distinction between the right to register to vote and cast a ballot, and the ability to utilize a state's absentee-ballot machinery. 394 U.S. at 807 The Court explained that "absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise[.]" *Id.* That the jailed plaintiffs in *McDonald* were unable to vote by mail did not implicate the right to vote because it did not "preclude[ ] [the plaintiffs] from voting" via other methods. *Id.* at 808; *id.* at 807 ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. . . ."). Thus, laws allowing certain groups to vote by mail cannot fairly be said to *deny* the franchise to those groups not included, and any burden on the fundamental right to vote is minimal

and therefore subject to rational basis review. *See id; see also, e.g.*, *Burdick*, 504 U.S. at 433.

Under rational basis review, so long as the distinctions made in the challenged law bear a rational relationship to a legitimate governmental end, the law must be upheld. *Id.* at 809. The Texas Election Code's distinction between those aged 65 and over and those under 65 for purposes of voting by mail is rational. Even outside the context of COVID-19, individuals aged 65 and over (as a group) face unique challenges in attending the polls. For example, many live in nursing homes and have limited mobility.[7] The State's decision to allow older Texans to vote by mail without extending that privilege to everyone is a rational way to facilitate exercise of the franchise for Texans who are more likely to face everyday barriers to movement, outings, and activity.

Even if the stricter *Anderson/Burdick* standard applies, Section 82.003 satisfies it. "To deem ordinary and widespread burdens severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of the States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Crawford*, 553 U.S. at 197. "The Constitution does not require that result, for it is beyond question that the States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* (quotations omitted). The Texas Legislature has not provided for universal mail-in balloting, and the Constitution allows the Legislature that choice.

As the Supreme Court has explained:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

---

[7] *See* Long Term Care, Texas Health and Human Services, *available at* https://hhs.texas.gov/services/aging/long-term-care (estimating that as many as 70 percent of people turning 65 can expect to use some form of long-term care during their lives).

*Id.* at 196. Given Texas's interest in ensuring uniform, orderly elections that are carried out consistent with State law, commanding election officials across 254 counties to hastily cobble together a universal vote-by-mail system in time for this year's elections without the care and planning required risks widespread chaos. The Supreme Court has also stated that "[w]hile [the interest in the integrity and legitimacy of representative government] is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197.

Plaintiffs apparently believe it is irrational to allow mail-in voting for a limited group of people while also wanting to prevent election fraud. In fact, Texas's system limits the group of eligible mail-in voters at a level that allows the State to monitor the process for fraudulent activity. If Texas suddenly and drastically expands the ability to vote by mail to every single adult citizen in the State, its ability to detect and prosecute election fraud will be greatly diminished by the deluge of mail ballots. Despite Plaintiffs' claims to the contrary, the approach that has been carefully and extensively considered in the Texas Legislature is a perfectly logical balancing of these interests.

As explained above, Section 82.003 in no way hampers Plaintiffs' fundamental right to vote. Rather, it provides another avenue to cast a ballot for members of a community more likely to face special challenges voting in person. Under *Anderson/Burdick*, therefore, Section 83.003 places no burden upon *Plaintiffs'* ability to cast a vote.

For these reasons, Plaintiffs' Twenty-Sixth Amendment claim fails as a matter of law.

**D.      The Texas Election Code is not unconstitutionally vague.**

Plaintiffs' "void-for-vagueness" claim does not put Attorney General Paxton on notice of which specific provision of the Texas Election Code is unconstitutionally vague, nor attempt to meet the very high threshold to make such a claim. The Fifth Circuit has explained that the "void-for-vagueness doctrine has been primarily employed to strike down criminal laws," and that in the civil

context, "the statute must be 'so vague and indefinite as really to be no rule at all.'" *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir.2000).

As the Fifth Circuit has noted, a "statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001); *see also Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir. 1980) ("A provision need not . . . be cast in terms that are mathematically precise; it need only give fair warning of the conduct proscribed, in light of common understanding and practices."). That is because the void-for-vagueness doctrine "does not ordain the unconstitutionality of a statute that two lawyers may read differently, nor does it mean that persons subject to the law may bank against . . . inconsistent decisions." *Nautilus Ins. Co. v. Int'l House of Pancakes, Inc.*, 622 F. Supp. 2d 470, 481 (S.D. Tex. 2009) (citation omitted).

Plaintiffs allege that "[t]he Texas Election Code surrounding mail ballot eligibility are poorly defined, enforced, and understood." Doc. ¶ 96. This conclusory allegation (which does not even specify which provisions of the Election Code are at issue) does not meet Plaintiffs' pleading burden. *See* FED. R. CIV. P. 8(a). Plaintiffs do not expand on this threadbare allegation or explain how any particular provision of the Election Code is unconstitutionally vague. Accordingly, Plaintiffs have failed to state a valid "void-for-vagueness" claim.

Moreover, Plaintiffs' "as-applied" void-for-vagueness claim should not—indeed, cannot—be resolved prior to the resolution of the State court proceedings, which should ultimately provide clarity on the proper construction of Section 82.002(a). The *Pullman* abstention doctrine therefore applies with exceptional force to this claim in particular.

## E.    Plaintiffs do not plausibly allege that Attorney General Paxton has intimidated voters.

Finally, Plaintiffs' allegations regarding voter intimidation also fail as a matter of law. *See* Doc. 9 ¶¶ 104–110. Plaintiffs contend that Attorney General Paxton has engaged in a conspiracy "for the

purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Id.* ¶ 107.

To state a viable cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege:

> (1) a conspiracy involving two or more persons; (2) *for the purpose* of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3)an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994) (emphasis added). "In so doing, the plaintiff must show that the conspiracy was motivated by a class-based animus." *Id.* at 653.

This claim fails for at least two reasons. *First*, Plaintiffs have made no allegations, and offered no evidence, that the purported conspiracy "was motivated by a class-based animus," let alone against what class General Paxton was allegedly discriminating. Moreover, General Paxton cannot engage in a "conspiracy" with his own "employees, including the signatory to the letter in question"—the only supposed conspirators Plaintiffs have identified with any specificity elsewhere in their briefing. *See* Doc. 10 at 26. "It is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Hilliard*, 30 F.3d at 653 (citation omitted). Thus, the letter that Plaintiffs cite as evidence of conspiracy, which was written by an employee of the Office of the Attorney General, Doc. 10-2, is attributable to General Paxton. Under Section 1985, there can be no conspiracy between General Paxton and any agent. *See id.* Although Plaintiffs do assert that the "defendant state actors are part of a conspiracy," Doc. 9 ¶ 106, Plaintiffs do not allege any facts at all demonstrating how the State Defendants have conspired with each other. Accordingly, that allegation alone cannot sustain Plaintiffs' Section 1985 claim. *See Evans*, 630 F. App'x at 315.

*Second*, Plaintiffs cannot establish that Attorney General Paxton has acted with the *intent* to deprive anyone of their vote. *See id.* When he explained that misapplication of the Election Code's "disability" provision could implicate the Code's criminal liability provisions, Attorney General

Paxton's purpose was to alleviate widespread public confusion. He simply stated the law regarding the giving of false information in connection with a request for a ballot by mail and even concluded by noting that "whether specific activity constitutes an offense under these provisions will depend upon the facts and circumstances of each individual case." Doc. 10-2 at 6; Doc. 75-1 at 2. Plaintiffs' characterization of this opinion as voter intimidation is belied by the actual content of Attorney General Paxton's letter, and cannot serve as the basis for a viable claim under Section 1985.

*Third*, Plaintiffs do not even argue that the supposed conspiracy was motivated by racial animus. But the Fifth Circuit has held that "the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (quoting *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 (5th Cir. 1987)).

Ultimately, Plaintiffs' allegations come nowhere close to meeting the standard required for a section 1985 claim. The Attorney General is not attempting to stop people from voting. Rather, the Legislature has established eligibility criteria for mail-in voting, and the Attorney General has explained the contours of the law in response to an inquiry from an elected official and widespread confusion about the accurate status of the law. Plaintiffs' allegation is an impermissibly broad construction of the word "intimidate"—accepting this premise would mean that any time a state's attorney general speaks about how election laws might apply, the attorney general has engaged in voter intimidation. *See McLeod*, 385 F.2d at 740. Such a construction would impermissibly impinge on the Office of the Attorney General's ability to advise the public of its position on uncertain questions of public law.[8]

Accordingly, the Court should dismiss Plaintiffs' voter intimidation claim against General Paxton.

---

[8] Moreover, even if Plaintiffs had pleaded a violation of 52 U.S.C. § 10307(b) (they did not), such a claim fails on its merits. *Accord United States v. Brown*, 494 F. Supp. 2d 440, 474 (S.D. Miss. 2007) (Where county election administrator issued a press release listing 174 white voters who "might be challenged under the authority of Miss. Code Ann. § 23-15-575 if they attempted to vote in the Democratic primary," holding that "the court does not view the publication as the kind of threat or intimidation that was envisioned or covered by [52 U.S.C. § 10307](b)."

## CONCLUSION

For the forgoing reasons, Plaintiffs' claims against General Paxton should be dismissed.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/Michael R. Abrams*
MICHAEL R. ABRAMS
Texas Bar No. 24087072
ANNE MARIE MACKIN
Texas Bar No. 24078898
CORY A. SCANLON
Texas Bar No. 24104599
Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
michael.abrams@oag.texas.gov
anna.mackin@oag.texas.gov
cory.scanlon@oag.texas.gov

*Counsel for State Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2020 a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS
Assistant Attorney General
