FILED

NOV 1 2 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2020

No. 20-50407

Lyle W. Cayce
Clerk

TEXAS DEMOCRATIC PARTY; GILBERTO HINOJOSA; JOSEPH DANIEL CASCINO; SHANDA MARIE SANSING; BRENDA LI GARCIA,

*Plaintiffs—Appellees*,

*versus*

GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS; RUTH HUGHS, TEXAS SECRETARY OF STATE; KEN PAXTON, TEXAS ATTORNEY GENERAL,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-438

Before KING, STEWART, and SOUTHWICK, *Circuit Judges*.

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is VACATED, and the cause is REMANDED to the

District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that plaintiffs-appellees pay to defendants-appellants the costs on appeal to be taxed by the Clerk of this Court.

CARL E. STEWART, *Circuit Judge*, CONCURRING IN PART and DISSENTING IN PART.

FILED

NOV 1 2 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2020

Lyle W. Cayce
Clerk

No. 20-50407

---

TEXAS DEMOCRATIC PARTY; GILBERTO HINOJOSA; JOSEPH
DANIEL CASCINO; SHANDA MARIE SANSING; BRENDA LI
GARCIA,

*Plaintiffs—Appellees,*

*versus*

GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS; RUTH
HUGHS, TEXAS SECRETARY OF STATE; KEN PAXTON, TEXAS
ATTORNEY GENERAL,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-438 -FB

---

Before KING, STEWART, and SOUTHWICK, *Circuit Judges.*

LESLIE H. SOUTHWICK, *Circuit Judge*:

The opinion entered on September 10, 2020 is withdrawn.

A Texas statute allows mail-in voting for any voter at least 65 years old but requires younger voters to satisfy conditions, such as being absent from the county on election day or having a qualifying disability. Amid an election-year pandemic, the district court entered a preliminary injunction requiring

No. 20-50407

Texas officials to allow any Texan eligible to vote to do so by absentee ballot. This court stayed the injunction pending appeal. The plaintiffs defend the injunction at this stage of the proceedings only on the basis that the vote-by-mail privilege for older voters is unconstitutional under the Twenty-Sixth Amendment's prohibition against denying or abridging the right to vote on account of age. The statutory provision withstands that challenge. We VACATE and REMAND.

## FACTUAL AND PROCEDURAL BACKGROUND

In Texas, in-person voting is the rule. TEX. ELEC. CODE ch. 64. Early voting by mail is the exception. *Id.* ch. 82. Texas law permits early voting by mail for voters who: (1) anticipate being absent from their county of residence; (2) are sick or disabled; (3) are 65 years of age or older; or (4) are confined to jail. *Id.* §§ 82.001–.004.

The 2020 COVID-19 pandemic prompted Texas state officials to adopt various emergency measures. In March, Governor Greg Abbott declared a state of disaster for all of Texas. He also postponed the May primary runoff election until July. In May, he extended the period for early voting for the July primary to help the election proceed efficiently and safely. Texas Secretary of State Ruth Hughs issued a proclamation in May concerning early voting hours and federal funding to combat the pandemic. Secretary Hughs also issued guidance concerning health and safety measures for in-person voting. The guidance encouraged voters to wear masks, disinfect their hands, and practice social distancing. In June, Secretary Hughs issued additional guidance concerning social distancing and sanitization of polling places.

State-court litigation preceded the current suit. In March, the Texas Democratic Party, its Chairman, and two voters sued a county clerk in Texas

No. 20-50407

state court, and the State intervened. The plaintiffs sought a declaration that under the disability provision, Section 82.002 of the Texas Election Code, "any eligible voter, regardless of age and physical condition" may vote by mail "if they believe they should practice social distancing in order to hinder the known or unknown spread of a virus or disease." Under their interpretation, lack of immunity as well as concern about transmission qualified as a disability for the purpose of eligibility for mail-in voting. After the State intervened, the state court entered an injunction barring Texas officials from "prohibit[ing] individuals from submitting mail ballots based on the disability category" during the pandemic. The State immediately filed a notice of interlocutory appeal, which superseded and stayed the injunction order. *See In re Texas*, 602 S.W.3d 549, 552 (Tex. 2020).

Texas Attorney General Ken Paxton sought to reduce confusion surrounding the state-court action by sending a letter to Texas judges and election officials in early May. It explained: "Based on the plain language of the relevant statutory text, fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Texas Election Code for purposes of receiving a ballot by mail." The letter ordered public officials to refrain from advising voters who lacked a qualifying condition but nonetheless feared COVID-19 to vote by mail. The letter warned third parties that if they advised voters to vote by mail without a qualifying disability, then the party could be subject to criminal liability under the Texas Election Code. The plaintiffs characterize this guidance as a threat underlying some of the claims not before the court today and rely on it for part of their argument opposing sovereign immunity.

After a Texas Court of Appeals reinstated the initial injunction, the State sought an emergency mandamus from the Supreme Court of Texas. On May 27, the Supreme Court of Texas held "that a lack of immunity to COVID-19 is not itself a 'physical condition' for being eligible to vote by mail

3

No. 20-50407

within the meaning of [Section] 82.002(a)." *In re Texas*, 602 S.W.3d at 560.
A voter may "take into consideration aspects of his health and his health
history" in deciding whether to apply to vote by mail, but COVID-19 is not
itself a ground for voting by mail. *Id.* The *In re Texas* court found it
unnecessary to issue a writ of mandamus, *id.* at 561, and the plaintiffs
dismissed that suit with prejudice on June 9.

While the state-court litigation was pending, the plaintiffs filed this
lawsuit in early April in the United States District Court for the Western
District of Texas and added a third voter as a plaintiff. The plaintiffs'
operative complaint requested relief on seven grounds. The plaintiffs'
motion for a preliminary injunction slimmed down the claims and argued that
Texas's statute allowing voting by mail for any persons aged at least 65
violated the First, Fourteenth, and Twenty-Sixth Amendments,[1] and that it
was void for vagueness. They also asserted that the Attorney General's May
letter constituted voter intimidation and suppression of political speech.

On May 19, the district court issued an order requiring no-excuse
mail-in balloting in Texas, meaning that "[a]ny eligible Texas voter who
seeks to vote by mail in order to avoid transmission of COVID-19" could do
so. The court's preliminary injunction prohibited the defendants from
issuing any guidance, threats, or pronouncements, or otherwise taking any
action inconsistent with the order. The district court concluded that the
plaintiffs were likely to succeed on the merits of each of their claims. On the
only claim that remains for us on this appeal, namely, a violation of the
Twenty-Sixth Amendment, the district court applied strict scrutiny to the

---

[1] In their request for a preliminary injunction, the plaintiffs limited the Twenty-
Sixth Amendment grounds to an as-applied challenge seeking relief "[t]o the extent that
the state [was] purporting, in these pandemic circumstances, to apply different voting
burdens based on the voter's age."

No. 20-50407

law. Voters under 65, according to the district court, bear a disproportionate burden because of the age restrictions set out in Section 82.003 of the Texas Election Code, which the court concluded "violates the [Twenty-Sixth] Amendment, as applied, during the COVID-19 pandemic." Going one step further, the district court added that neither a legitimate interest nor a rational basis existed for enforcing the age-based distinction during the pandemic.

Just eight days after entering this injunction, the Supreme Court of Texas issued its decision in *In re Texas*. Meanwhile, the defendants appealed the federal injunction. The defendants also filed an emergency motion for a stay pending appeal and a temporary administrative stay.

In June 2020, a panel of this court that had the responsibility to resolve motions filed in the appeal prior to completion of briefing granted the defendants' motion to stay the district court's preliminary injunction pending the decision on the merits — which we now are entering. *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020). That panel concluded that the defendants were likely to succeed on the merits of each claim. *See id.* at 402–11. As to the Twenty-Sixth Amendment claim, it found "plenty of evidence that the Amendment's most immediate purpose was to lower the voting age from twenty-one to eighteen." *Id.* at 408. Relying on a Supreme Court opinion slightly predating the Amendment, the motions panel concluded that rational-basis review applied to the Texas age-based absentee-voting law. *Id.* at 408–09 (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969)). The court reasoned that giving a benefit of voting by mail to one class does not affect plaintiffs' right to vote because the Twenty-Sixth Amendment concerns only the denial or abridgement of voters' rights. *Id.* at 409. That meant that the plaintiffs were unlikely to succeed on the merits of their Twenty-Sixth Amendment claim,

5

No. 20-50407

just as they were similarly unlikely to succeed on their other claims. Consequently, the district court's injunction was stayed.

We remark here that though we are greatly benefitted by the earlier panel's analysis of the issues before us, under our circuit's procedures, opinions and orders of a panel with initial responsibility for resolving motions filed in an appeal are not binding on the later panel that is assigned the appeal for resolution. *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988). We agree with much but not quite all of the earlier opinion.

## DISCUSSION

The district court granted a preliminary injunction based on four claims for relief — the First, Fourteenth, and Twenty-Sixth Amendments as well as the void-for-vagueness doctrine. The defendants' appeal suggests three jurisdictional bars and challenges all of the bases on which the injunction was granted. The plaintiffs defend the injunction only on their Twenty-Sixth Amendment claim.[2] Unclear, though, is the breadth of the Twenty-Sixth Amendment claim now being made by the plaintiffs. The point of uncertainty is whether the effect of the COVID-19 pandemic, even though it was central to arguments at the district court level, has been withdrawn from our review. We explain the competing indications.

Following this court's decision in June to enter a stay of the preliminary injunction, briefs were filed that guide the decision we are issuing

---

[2] The plaintiffs stated they wished to preserve the right to pursue permanent relief on their other claims and argued that, if we were to reverse the district court on the application of the Twenty-Sixth Amendment, we should vacate the injunction and remand to the district court for further proceedings. That is what we do.

No. 20-50407

today.  As we just said, the plaintiffs' brief stated that it would defend the
preliminary injunction only on Twenty-Sixth Amendment grounds.  The
plaintiffs asserted "it is not the State's tragic inability to contain the COVID-
19 epidemic that compels affirmance of the District Court's order — it is the
Twenty-Sixth Amendment's unambiguous text that does."  The brief
certainly explains the procedural history of this action in federal court and of
the parallel action in state court; there, the brief places COVID-19 front and
center.  The argument section, though, almost never refers to COVID-19 in
explaining why the Amendment invalidates the relevant Texas Election Code
provision.  There are a few, one might even say stray, usages of the pandemic
to support their arguments.[3]  The defendants in their reply brief classified the
plaintiffs' argument now as being solely a facial challenge.

If in fact the plaintiffs withdrew their reliance on the pandemic and are
instead making a facial challenge, that could transform the appeal into a
constitutional argument that has little relevance to the district court's
reasons for granting a preliminary injunction.  For example, that court's
analysis of harm to the plaintiffs and their likelihood of success on the merits
— two criteria for the preliminary injunction — relied exclusively on the
pandemic.  Yes, a facial challenge would be a legal issue subject to our *de novo*
review had the district court decided it, but that court did not do so.

---

[3] The most we see as to the plaintiffs' legal arguments relying on the pandemic are
the following.  On one page of their brief, they argue it is unconstitutional to require those
younger than 65 to appear at the polls "particularly during the COVID-19 pandemic, while
allowing over-65 voters to cast ballots from the safety of their homes."  Appellee's Br. 27
(citing *Harman v. Forssenius*, 380 U.S. 528, 542 (1965), and *Lane v. Wilson*, 307 U.S. 268,
275 (1939)).  A few pages later, the plaintiffs reject the defendants' argument that the
legislature would rather nobody vote by mail than for everyone to do so; instead, they argue
that nothing supports that the legislature would not wish to "extend that right on a
nondiscriminatory basis during the COVID-19 pandemic (which is the only period relevant
for the preliminary injunction now before this Court)." *Id.* at 34.

No. 20-50407

We need not resolve whether the plaintiffs indeed are now trying to have us consider the facial challenge even though that was not considered by the district court. Appellate rules regarding how we treat absent issues differ depending on whether it is the appellant or the appellee who has neglected them. An appellant can intentionally waive or inadvertently forfeit the right to present an argument by failure to press it on appeal, a higher threshold than simply mentioning the issue. *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007). On the other hand, even an appellee's failure to file a brief does not cause an automatic reversal of the judgment being appealed. By appellate rule, so extreme a lapse does cause the appellee to lose the right to appear at oral argument. FED. R. APP. P. 31(c). We also know that if we disagree with the grounds relied upon by a district court to enter judgment but discover another fully supported by the record, we can affirm on that alternative basis. *Eastus v. ISS Facility Servs., Inc.*, 960 F.3d 207, 211 (5th Cir. 2020).

There are a few cases that consider waiver rules for appellees.[4] For example, the rules against considering an argument not properly presented are more generous for an appellee than for an appellant. *United States v. Guillen-Cruz*, 853 F.3d 768, 777 (5th Cir. 2017). Appellees neither select the issues for the appeal nor file reply briefs, leaving them at a disadvantage in being able to present all favorable arguments on appeal.

We consider the ambiguity in the plaintiffs' briefing to present another variant of these principles. Regardless of whether the plaintiffs were

---

[4] An appellant's failure to raise an issue in an initial appeal constitutes a waiver of having the issue considered on remand; not so for the appellee. *United States v. Smith*, 814 F.3d 268, 272 (5th Cir. 2016). This is a component of the law-of-the-case doctrine. *See* 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.6 (2d ed. April 2020 Update). Simply put, as to waiver, the rules for appellants and appellees are not identical.

No. 20-50407

abandoning the defense of the injunction on the grounds on which it was
issued, and we cannot discern if they were, we will review the validity of the
actual judgment, not some alternative.

We begin with the defendants' arguments about standing, sovereign
immunity, and the political question doctrine.

## I.    *Plaintiffs' standing*

The first jurisdictional question is whether the plaintiffs have standing
to challenge Texas's election law. A plaintiff must show: (1) an injury in fact
to the plaintiff that is concrete, particularized, and actual or imminent; (2)
the injury was caused by the defendant; and (3) the injury would likely be
redressed by the requested judicial relief. *Thole v. U. S. Bank N.A.*, 140 S.
Ct. 1615, 1618 (2020). In the preliminary-injunction context, plaintiffs must
make a "clear showing" of standing to maintain the injunction. *Barber v.
Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). Standing is a question we review
*de novo*. *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000).

This case involves two groups of plaintiffs: (1) three registered Texas
voters under 65 years old who desired to vote in the July 14 Texas Democratic
Primary and the November election; and (2) the Texas Democratic Party and
its Chairman. We have held that, in the context of injunctive relief, one
plaintiff's successful demonstration of standing "is sufficient to satisfy
Article III's case-or-controversy requirement." *Texas v. United States*, 945
F.3d 355, 377–78 (5th Cir. 2019). The voter plaintiffs contend that they suffer
a sufficient injury in fact because they are, unlike older voters, forced to vote
in person and risk contracting or spreading COVID-19. They assert that the
injury is fairly traceable to the defendants' enforcement of Section 82.003,
and that their injury would be redressed by an injunction requiring what they
consider to be non-discriminatory access to mail-in voting.

No. 20-50407

The defendants challenge only the causation prong, arguing that the voter plaintiffs lack standing because their injury is caused by COVID-19, not the defendants. The injury alleged in the brief actually is the result of the combination of COVID-19 and Texas officials' continuing enforcement of Section 82.003 as written. The defendants argue that the officials have no authority to relent in enforcement of the statute.

We conclude that a voter under the age of 65 has clear standing to challenge Section 82.003. In the next section, we will discuss the Secretary's duty to design the required application form for absentee ballots that identifies voter-eligibility categories. TEX. ELEC. CODE § 31.002(a). The Secretary would need to correct the form should the judiciary invalidate the age-based option. Thus, the Secretary of State had a role in causing the claimed injury and is in a position to redress it at least in part. That is enough to confer standing to the voter plaintiffs to sue the Secretary. We need not address the standing of other plaintiffs. *See Texas*, 945 F.3d at 377–78.

## II.    *Defendants' sovereign immunity*

The defendants assert that they are entitled to sovereign immunity. State sovereign immunity prohibits "private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). State officials and agencies enjoy immunity when a suit is effectively against the state. *Id.* Unless waived by the state, abrogated by Congress, or an exception applies, the immunity precludes suit. *Id.*

The plaintiffs contend that sovereign immunity does not bar their Twenty-Sixth Amendment claim under the exception carved out in *Ex parte Young*, 209 U.S. 123 (1908). Suits for injunctive or declaratory relief are allowed against a state official acting in violation of federal law if there is a "sufficient 'connection' to enforcing an allegedly unconstitutional law." *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020).

10

No. 20-50407

This circuit has not spoken with conviction about all relevant details of the "connection" requirement. *Tex. Democratic Party*, 961 F.3d at 400. An *en banc* plurality of this court explained that "the officers [must] have 'some connection with the enforcement of the act' in question or be 'specially charged with the duty to enforce the statute' and be threatening to exercise that duty." *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (*en banc*) (plurality op.). Without a majority, no controlling precedent was made. *See K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). In *K.P.*, we declined to "resolve whether *Ex Parte Young* requires only 'some connection' or a 'special relationship' between the state actor and the challenged statute," because the defendant fell within the exception under either standard. *Id.*

Although the precise scope of the requirement for a connection has not been defined, the plaintiff at least must show the defendant has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quotation marks omitted). That means the official must be "statutorily tasked with enforcing the challenged law." *In re Abbott*, 956 F.3d at 709. Enforcement typically means "compulsion or constraint." *K.P.*, 627 F.3d at 124. A "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" will do. *City of Austin*, 943 F.3d at 1002.

Determining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis, *i.e.*, the official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation. *See, e.g., In re Abbott*, 956 F.3d at 709. This is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials. A "case-by-case approach to the *Young* doctrine has been evident from the start." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 280 (1997).

No. 20-50407

The plaintiffs claim that Section 82.003, the age-based absentee-voting provision, violates the Twenty-Sixth Amendment of the Constitution. The plaintiffs have included the Secretary of State as a defendant, understandable since the Secretary is the "chief election officer of the state." TEX. ELEC. CODE § 31.001. Still, we must find a sufficient connection between the official sued and the statute challenged.

The statutory duties that matter today are the ones for the Secretary regarding applications for absentee ballots. She has the specific and relevant duty to design the application form for mail-in ballots, *id.* § 31.002(a), and to provide that form to local authorities and others who request it. *Id.* § 31.002(b). Additionally, the Secretary must furnish forms to those who request them for distribution to others. *Id.* § 84.013. Because local authorities are required to use the Secretary's absentee-ballot form outside of emergency situations, *id.* § 31.002(d), the Secretary has the authority to compel or constrain local officials based on actions she takes as to the application form. *See City of Austin*, 943 F.3d at 1000.

The Secretary's form currently includes an option for a voter to indicate entitlement to an absentee ballot because that voter is at least 65 years old. It is permissible under *Ex parte Young* for a court to "command[] a state official to do nothing more than refrain from violating federal law." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011). Thus, a finding that the age-based option denies or abridges younger voters' right to vote might lead to prohibiting the Secretary from using an application form that expressed an unconstitutional absentee-voting option.

The plaintiffs present far broader reasons for holding the Secretary to be a proper defendant. The Secretary's general duties under the Code include issuance of directives and instructions, being willing to "assist and advise" local officials, and endeavoring to "obtain and maintain uniformity

12

No. 20-50407

in the application, operation, and interpretation" of the Election Code.
TEX. ELEC. CODE §§ 31.003–.004. We previously interpreted this
provision as "requiring the Secretary to take action with respect to
elections." *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 429 (5th Cir. 1997).
Almost fifty years ago, though, a justice on the Supreme Court of Texas, who
would later be a cherished colleague of ours, wrote that the Secretary's duty
to "obtain and maintain" uniformity in the application of the Election Code
is not "a delegation of authority to care for any [*i.e.*, every] breakdown in the
election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972)
(Reavley, J.). That 1972 opinion suggests the Secretary can address some
breakdowns, *id.*, but today the only ones we need to identify are those relating
to absentee-ballot applications. Even there, some duties fall on other
officials. For example, a local "early voting clerk shall review each
application for a ballot to be voted by mail." TEX. ELEC. CODE §
86.001(a). Also, an "early voting clerk shall mail without charge an
appropriate official application form." *Id.* § 84.012. Though there is a
division of responsibilities, the Secretary has the needed connection.

In sum, the Secretary's specific duties regarding the application form
under Section 31.002 are enough for us to conclude that the Secretary has at
least a scintilla of enforcement authority for Section 82.003. We do not need
to consider whether other duties of the Secretary might suffice. Sovereign
immunity does not bar suit against the Secretary in this case.

As to the Governor, we conclude he lacks a sufficient connection to
the enforcement of an allegedly unconstitutional law. *In re Abbott*, 956 F.3d
at 708–09. As the motion's panel in this case stated, the actions the Governor
took — to postpone the May 2020 primary and to expand the early voting
period — were exercises of the Governor's emergency powers unrelated to
the Election Code. The Governor is not "statutorily tasked with enforcing
the challenged law." *Id.* at 709. The challenged Section 82.003 certainly

13

No. 20-50407

operates independently of influence or enforcement from the Governor. As a result, the connection between the Governor and enforcement of the challenged provision is insufficient, and *Ex parte Young* does not apply to him.

As for the Attorney General, whether *Ex parte Young* applies is a closer question. The plaintiffs' only argument as to this official is that, in previous cases, the state of Texas has "concede[d] that the attorney general has a duty to enforce and uphold the laws of Texas." *See City of Austin v. Abbott*, 385 F. Supp. 3d 537, 544 (W.D. Tex. 2019). We have already held that "[t]he required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris*, 739 F.3d at 746 (quotation marks omitted). A general duty to enforce the law is insufficient for *Ex parte Young*.

The plaintiffs also focus us on the letter sent by the Attorney General. True, we applied the *Ex parte Young* exception to this Attorney General after his office sent to a manufacturer numerous "threatening letters" that "intimat[ed] that formal enforcement" of the Texas Deceptive Trade Practices Act "was on the horizon." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392, 397 (5th Cir. 2015). Conversely, we have declined to apply *Ex parte Young* where the Attorney General issued a press release warning that anyone who violated the Governor's recent emergency order would be "met with the full force of the law." *In re Abbott*, 956 F.3d at 709. We explained that "our cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for *Young* purposes." *Id.*

Unlike *NiGen*, the Attorney General's letter in this case was sent to judges and election officials, not to the plaintiffs. The letter did not make a specific threat or indicate that enforcement was forthcoming. Nor did it state

No. 20-50407

that the Texas Democratic Party or the other plaintiffs had violated any specific law, as the letter did in *NiGen*, 804 F.3d at 392. Instead, the letter explained that advising voters to pursue disability-based mail-in voting without a qualifying condition constituted a felony under Sections 84.0041 and 276.013 of the Texas Election Code. As a result, we conclude that the letter here did not "intimat[e] that formal enforcement was on the horizon." *Id.* Instead, it closely reflected the Attorney General's letter in *In re Abbott*, 956 F.3d at 709. Accordingly, the Attorney General lacks a requisite connection to the challenged law, and *Ex parte Young* does not apply to him.

### III.   *Political question doctrine*

The defendants insist the plaintiffs' as-applied challenge based on Texas officials' response to the COVID-19 pandemic presents a nonjusticiable political question. In their view, our answering whether the pandemic presents a need to change election rules to protect voters is a question constitutionally committed to other branches of government. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). The Supreme Court has warned that "lower federal courts should ordinarily not alter . . . election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Further, they argue that we must refrain from judgment out of respect for the executive and legislative branches of the state of Texas. *See Baker*, 369 U.S. at 217. Finally, they assert that there is no "judicially discoverable and manageable standard[]" for resolving whether Texas's age-based absentee-voting law meets constitutional muster in the context of the pandemic. *See id.* The plaintiffs disagree, arguing they have presented a "straightforward constitutional claim" capable of resolution by judicially discoverable and manageable standards.

The motions panel on this case rejected the political question doctrine as an impediment, concluding that it "need not — and will not — consider

No. 20-50407

the prudence of Texas's plans for combating [COVID-19] when holding elections." *Tex. Democratic Party*, 961 F.3d at 398. Instead, resolution of the appeal was said to turn on "whether the challenged provisions of the Texas Election Code run afoul of the Constitution, not whether they offend the policy preferences of a federal district judge." *Id.* at 398–99.

We agree that no political question bars our review of the Twenty-Sixth Amendment challenge. We are tasked with determining whether Section 82.003 of the Texas Election Code violates the Twenty-Sixth Amendment as applied during the pandemic, a question susceptible to judicial resolution without interfering with the political branches of Texas government. Even when "matters related to a State's . . . elective process are implicated by this Court's resolution of a question," as our resolution of this appeal will do, that "is not sufficient to justify our withholding decision of the question." *Elrod v. Burns*, 427 U.S. 347, 351–52 (1976). Judicially discoverable and manageable standards exist to help us determine whether the law runs afoul of the Twenty-Sixth Amendment. Namely, we determine whether the law denies or abridges the plaintiffs' right to vote based on age. If it does, then we will apply an appropriate level of scrutiny. The effects of the pandemic are relevant to answering whether the law denies or abridges the right to vote, but the standards themselves do not yield to the pandemic.

For these reasons, we hold that the political question doctrine does not bar our review of the plaintiffs' challenge. Our analysis will not focus on policy determinations from Texas's executive and legislative officials. Regardless of whether the plaintiffs are presenting on this appeal a facial or as-applied challenge, our analysis does not turn on the effect of the pandemic and therefore avoids a political question.

Because we conclude there are no jurisdictional impediments to the plaintiffs' bringing these claims, we now turn to the merits of the injunction.

No. 20-50407

The defendants in their opening brief challenged all the grounds used by the district court. The plaintiffs defend only on the basis of the Twenty-Sixth Amendment. We exercise our discretion to review only that basis and not examine the alternative grounds to determine if any of them would sustain the judgment. The plaintiffs, as appellees, defend only the one ground, and the parties need a ruling.

We also forewarn on a seeming inconsistency to what we have just said about not ruling on a facial challenge. It is impossible to consider the as-applied challenge based on the pandemic without addressing what is generally required to violate the Twenty-Sixth Amendment. The difference between the two forms of challenge "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). We reach conclusions as to what is necessary to deny or abridge the right to vote on the basis of age, as we can do no other.

IV.    *Twenty-Sixth Amendment*

Section 1 of the Twenty-Sixth Amendment provides: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Section 2 gives Congress enforcement power. Ratified in 1971, the most recent of the voting-rights constitutional amendments has yet to be interpreted in any significant depth. After almost fifty years, apparently it now is time in several jurisdictions.

The parties have widely different interpretations of the Amendment. The plaintiffs contend that the Amendment creates a sweeping prohibition against any age-based denial or abridgment of the right to vote. Further, they contend that any differential treatment in terms of voting on the basis of age

17

No. 20-50407

is a plainly unconstitutional denial or abridgment. Such an interpretation is said to be consistent with the Fifteenth, Nineteenth, and Twenty-Fourth Amendments. Under their reading, Section 82.003 is unconstitutional under the Twenty-Sixth Amendment because it offers mail-in voting to those who are at least age 65 without offering the same benefit to younger voters. Even if not facially unconstitutional, the plaintiffs argue that the election law is unconstitutional as applied "during the COVID-19 pandemic."

The defendants argue that the Twenty-Sixth Amendment was simply an extension of the right to vote to individuals between the ages of eighteen and twenty-one, not to eliminate all age-based distinctions in election-related laws. They further contend that Texas's mail-in ballot rules do not affect the right to vote under the Amendment because the laws neither abridge nor deny the right of voters younger than 65 to vote.

Also divergent are the arguments about the level of scrutiny to give to the challenged provision. Texas argues for rational-basis review, but the district court applied strict scrutiny. Perhaps because another panel of this court entered a stay of the preliminary injunction by finding only rational-basis review applied, *Tex. Democratic Party*, 961 F.3d at 409, the plaintiffs' current briefing exercised some caution by not explicitly identifying a standard. Still, the plaintiffs' disagreement with the motions panel is pressed, as is their belief that some heightened level of scrutiny is required.

A.   *An individual right*

We first examine whether the Twenty-Sixth Amendment confers an individual right to be free from any denial or abridgment of the right to vote.

No. 20-50407

We acknowledge this has not been an issue in the case, but we need to walk through the only recently developing analysis of this Amendment with care.

The language and structure of the Twenty-Sixth Amendment mirror the Fifteenth, Nineteenth, and Twenty-Fourth Amendments.[5] Each of those amendments has been interpreted to provide an individual right to be free from the denial or abridgement of the right to vote based on the classification described in the Amendment. The Fifteenth Amendment prohibits voting laws that "handicap exercise of the franchise" on account of race because the Amendment "nullifies sophisticated as well as simple-minded modes of [racial] discrimination." *Lane v. Wilson*, 307 U.S. 268, 275 (1939). The Nineteenth Amendment "applies to men and women alike and by its own force supersedes inconsistent measures." *Breedlove v. Suttles*, 302 U.S. 277, 283 (1937), *overruled on other grounds by Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668–69 (1966). Likewise, the Twenty-Fourth Amendment provides a right to vote without paying a poll tax. *Harman v. Forssenius*, 380 U.S. 528, 540–41 (1965). These are Supreme Court interpretations of the

---

[5] *Compare* U.S. CONST. amend. XXVI, §§ 1–2 ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age. The Congress shall have power to enforce this article by appropriate legislation."), *with* U.S. CONST. amend. XV, §§ 1–2 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. The Congress shall have power to enforce this article by appropriate legislation."), *and* U.S. CONST. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex. Congress shall have power to enforce this article by appropriate legislation."), *and* U.S. CONST. amend. XXIV, §§ 1–2 ("The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax. The Congress shall have power to enforce this article by appropriate legislation.").

No. 20-50407

Fifteenth, Nineteenth, and Twenty-Fourth Amendments predating the 1971 submission and ratification of the Twenty-Sixth Amendment.

We hold that the Twenty-Sixth Amendment confers an individual right to be free from the denial or abridgment of the right to vote on account of age, the violation of which allows for pursuing a claim in court. We now turn to what denial and abridgment in this context mean.

### B.    *Scope of the Twenty-Sixth Amendment's protection*

For Section 82.003 of the Texas Election Code to be constitutional, its granting to those at least 65 years of age an excuse-free right to a mail ballot cannot be a denial or abridgment of not-as-old voters' right to vote, either facially or during the pandemic. Because we conclude that by definition no denial or abridgement has occurred, it is unnecessary for us to assess the applicable level of scrutiny to apply had there been either. On remand, the issue may arise. For that reason, we will discuss levels of scrutiny generally at the end of the opinion.

As we search for the meaning of the key terms, we find direction from a time not too long ago when the Supreme Court began to give meaning to a different amendment long ignored in litigation as this one has been, namely, the Second. *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Court considered how the words and phrases of that amendment had been used and interpreted in other constitutional provisions. *Id.* at 579–81. The Court wrote a lengthy exegesis of each significant term in the Second Amendment and its usage at the time of ratification. *Id.* at 579–95. That time was contemporaneous with the adoption of the Constitution itself. Among its lengthier explanations was the understanding at that time of "keep and bear Arms," and each of the key words had a discernable late-Eighteenth-Century meaning. *Id.* at 581–92. A focus as well was how the same or at least similar terms that also appeared elsewhere in the Constitution had been interpreted.

No. 20-50407

For example, the Second Amendment's phrase "right of the people" was held to guarantee an individual right to possess and carry a weapon in case of confrontation, *id.* at 592, at least in part because the same phrase used in other constitutional provisions "unambiguously refer[s] to individual rights." *Id.* at 579.

Similarly, in the statutory context, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). Different here than in most statutory interpretation contexts, though, are the large gaps in time between the adoption of different amendments that use language similar to each other or to the original Constitution itself.

Just as *Heller* examined such questions as what to "keep and bear arms" meant in the Founding Era, relevant for us is how broad or limited the phrase "right to vote" was interpreted at the time the Amendment was ratified. This will establish our baseline. That meaning is the context for the use of the phrase, and with "textual interpretation, context is everything." ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 37 (1997).

Understanding what the right to vote meant at the time the Twenty-Sixth Amendment was ratified in 1971 is certainly assisted by the 1969 *McDonald* decision. *McDonald*, 394 U.S. at 807–08. A definitive meaning of the right to vote and of denying that right could hardly have been given any closer to the time the Amendment was ratified. In *McDonald*, the Supreme Court held that denying mail-in ballots to incarcerated persons otherwise eligible to vote did not "deny appellants the exercise of the franchise." *Id.* The Court explained that it was "thus not the right to vote that [was] at stake [t]here but a claimed right to receive absentee ballots." *Id.* at 807.

No. 20-50407

We also consider some Congressional sources.  Though we find no utility in examining the individual statements of various members of Congress who spoke to their beliefs — or perhaps only their hopes in guiding future interpretations — as to the meaning of the Amendment, we are willing to examine materials that accurately reflect what Congress was willing to adopt by joint action and present to a President who then was willing to register agreement.  Enacted revisions to statutes are part of "statutory history," not "the sort of unenacted legislative history that often is neither truly legislative (having failed to survive bicameralism and presentment) nor truly historical (consisting of advocacy aimed at winning in future litigation what couldn't be won in past statutes)." *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting).

Congress did not in this instance revise earlier enacted legislation by passing a new bill.  Instead, after the Supreme Court invalidated part of its earlier effort, Congress revised by proposing a constitutional amendment through proper bicameral procedures, then presented it to the states where it was ratified.  We explain.

The Voting Rights Act was adopted in 1965 to ensure that the right to vote would not be denied or abridged on account of race or color.  *See* 52 U.S.C. § 10301.  In the 1970 renewal of the Act, Congress decided to broaden the franchise in another way — by lowering the voting age to eighteen.  *See Oregon v. Mitchell*, 400 U.S. 112, 117 (1970).  The 1970 amendments imposed the change this way: "Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen

No. 20-50407

years of age or older."[6]  The slogan for some who urged this change was "old enough to fight, old enough to vote,"[7] an allusion to the young members of the American military serving in Vietnam.

Perhaps Congress was willing to hazard lowering the voting age by legislation even for state elections because the Supreme Court had upheld the 1965 Voting Right Act's ban on use of literacy tests based on Congress's Fifteenth Amendment enforcement power.  *See South Carolina v. Katzenbach*, 383 U.S. 301 (1966).  Lowering the voting age by federal statute for all elections, though, could not be supported by the same arguments.  The Court in December 1970 held that the 1970 amendment to the Voting Rights Act setting the voting age at eighteen was within Congress's power with respect to federal elections but not as to state and local elections.  *Mitchell*, 400 U.S. at 117–18.[8]  At the time, forty-seven states recognized the right to vote beginning at an age higher than eighteen.  Eric S. Fish, Note, *The Twenty-Sixth Amendment Enforcement Power*, 121 YALE L.J. 1168, 1193 (2012).

The Twenty-Sixth Amendment followed immediately.  Approved by Congress in March of 1971 and ratified by June, the Amendment was the most quickly ratified constitutional amendment in our history.  *Id.* at 1194–95.  This is some indication that the Twenty-Sixth Amendment was at least perceived

---

[6] Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 302, 84 Stat. 314, 318, *invalidated in part by Oregon v. Mitchell*, 400 U.S. 112, 117–18 (1970).

[7] Nancy Turner, Comment, *The Young and the Restless: How the Twenty-Sixth Amendment Could Play a Role in the Current Debate over Voting Laws*, 64 AM. U. L. REV. 1503, 1508 (2015).

[8] Debate on the Voting Rights Act Amendments may have altered the makeup of the Court that would by a 5–4 vote limit the voting-age change.  The Judiciary Committee favorably reported Fifth Circuit Judge G. Harrold Carswell's nomination to the Supreme Court in February 1970, but the Senate gave precedence to considering the amendments in March, a delay that some contend is what allowed opposition to organize and defeat his confirmation in April.  RICHARD HARRIS, DECISION 84, 108, 200–02 (1971).

No. 20-50407

as having a narrower sweep than the other constitutional amendments affecting voting, which in this instance was to fulfill what Congress tried but failed to do in 1970 in lowering the voting age for all elections.

We also look at details of absentee voting nationwide, data that was provided to Congress when it was considering the 1970 Voting Rights Act Amendments as well as what became the Twenty-Sixth Amendment. One 1973 review of the election laws, apparently mirroring but updating research provided to Congress in 1968–69, showed there was much variation.[9] In 1968, only two states were providing a special privilege for older voters to cast absentee ballots; by 1973, there were four.[10] There were other differences:

> Maine has the most sweeping statute; it provides that *any* registered voter may cast an absentee ballot. Presumably, those who are able to vote in person do so, but the statute does not require applicants for absentee ballots to demonstrate an inability to reach the polls. In all other states, voters who wish

---

[9] Note, *The Submerged Constitutional Right to an Absentee Ballot*, 72 MICH. L. REV. 157, 159–61 (1973). Similar data through 1969 was prepared for Congress as shown in the record of Senate hearings cited in the article. *Id.* at 158 n.3. That data provides the absentee-voting landscape from each state based on two compilations by the Legislative Reference Service of the Library of Congress. *Amendments to the Voting Rights Act of 1965: Hearings Before the Subcomm. on Constitutional Rights of the Comm. on the Judiciary on S. 818, S. 2456, S. 2507, and Title IV of S. 2029*, 91st Cong., 1st & 2d Sess. 292–93 (1969–70) (citing ELIZABETH YADLOSKY, LEGIS. REFERENCE SERV., 69–226A, ABSENTEE REGISTRATION AND VOTING: DIGESTS OF MAJOR PROVISIONS OF THE LAWS OF THE FIFTY STATES AND THE DISTRICT OF COLUMBIA (1969), and ELIZABETH YADLOSKY, LEGIS. REFERENCE SERV., A–243, ELECTION LAWS OF THE FIFTY STATES AND THE DISTRICT OF COLUMBIA (1968)). Our thanks to Stuart Carmody of the Congressional Research Service — with Ryan Annison of Senator Roger Wicker's staff as liaison — and to Fifth Circuit Librarians Judy Reedy, Peggy Mitts, and Susan Jones for diligently seeking and obtaining these two long-buried documents.

[10] *Submerged Constitutional Right*, *supra* note 9, at 161 n.18 (Arizona, Michigan, Rhode Island, and Wyoming in 1973); ELECTION LAWS OF THE FIFTY STATES AND THE DISTRICT OF COLUMBIA, *supra* note 9, at 128, 221 (Michigan and Rhode Island in 1968).

No. 20-50407

to cast an absentee ballot must demonstrate that they fall within
a statutory classification.

Although most states provide absentee ballots in all
elections, four restrict their use to general elections. In many
states, eligibility is determined by the voter's actual distance
from his home. The majority of states require absence from the
county of the voter's residence; others require absence from
the state, the city, or the precinct. Some absentee-ballot
legislation encompasses classes of voters who are within the
election district but cannot reach the polls. Almost all states
allow the physically incapacitated to cast absentee ballots.
Some also furnish absentee ballots to students, to election
workers stationed at precincts other than their own, to persons
over sixty-five years of age, and to persons whose religious
beliefs prevent them from attending the polls on election day.[11]

Other variants among the states were permitting absentee voting for
those who participated in the election process itself, or whose religious tenets
prevented attendance at the polls.[12]

Though this data provided to Congress when considering the 1970 and
1971 enactments indicate that almost all states at the time of submission of
the Twenty-Sixth Amendment permitted absentee voting by those who were
temporarily removed from proximity to their polls, there was much variation
— being absent from the precinct, city, county, or state.[13] Those variations

---

[11] *Submerged Constitutional Right*, *supra* note 9, at 159–61 (footnotes omitted).

[12] Some states allowed absentee voting for election workers. ELECTION LAWS
OF THE FIFTY STATES AND THE DISTRICT OF COLUMBIA, *supra* note 9, at 52
(Florida); *id.* at 74 (Illinois); *id.* at 128 (Michigan). Others allowed absentee voting for
religious reasons. *Id.* at 25 (California); *id.* at 36–37 (Connecticut); *id.* at 275 (Wisconsin).
Many single-state variations existed, such as Mississippi's allowing absentee voting for
those engaged in transportation as a driver, operator, or crewman. *Id.* at 137.

[13] *Submerged Constitutional Right*, *supra* note 9, at 160.

No. 20-50407

were eliminated in part by the 1970 Voting Rights Act Amendments: "[E]ach State shall provide by law for the casting of absentee ballots for . . . President and Vice President . . . by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election," then who timely return their ballots. *See* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 314, 316–17, codified as 52 U.S.C. § 10502(d). The *Mitchell* Court upheld this standardization of the right to an absentee ballot in presidential elections, and it remains the law today. *Mitchell*, 400 U.S. at 119.

The significance we give to this *status quo* for absentee voting at the time of the Twenty-Sixth Amendment is that, despite all the variations in the states, the only congressional insistence in the Voting Rights Act Amendments, which included a provision lowering the voting age for all elections, was to give all voters who were going to be absent on election day a right to vote absentee for a presidential ticket. Deciding whether the Twenty-Sixth Amendment should be interpreted as doing even more is informed by this statutory history.

The Supreme Court distinguished between a right to vote and a right to vote absentee: "It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807. Judge Ho was correct when concurring to the entry of a stay during the pendency of this appeal when he wrote: "For nearly a century, mail-in voting has been the exception — and in-person voting the rule — in Texas." *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring).

In summary, the right to vote in 1971 did not include a right to vote by mail. In-person voting was the rule, absentee voting the exception. Though we identify this historical context for the Amendment, certainly our

No. 20-50407

imperative is to focus on the text. "Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). Even "small gestures can have unexpected consequences," *id.*, which is relevant when considering whether the nearly forgotten Twenty-Sixth Amendment invalidates any age-based limitation on voting today.

We now consider when the right to vote is "denied" or "abridged."

### 1.  *To deny the right to vote*

Before ratification, the Supreme Court held that the right to vote was not "denied" where there was no indication that the challengers were "in fact absolutely prohibited from voting." *McDonald*, 394 U.S. at 807–08 & n.7. After ratification, the Court held that a person's right to vote is denied when an election law "absolutely prohibits them from voting." *Goosby v. Osser*, 409 U.S. 512, 521 (1971). Under the Twenty-Sixth Amendment, then, "denied" means "prohibited." There has been no denial here.

### 2.  *To abridge the right to vote*

To abridge is "[t]o reduce or diminish." *Abridge*, BLACK'S LAW DICTIONARY 7 (10th ed. 2014). Evaluating whether there has been a *denial* of a right will rarely involve a comparison. On the other hand, "[i]t makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000). More, later, on *Bossier Parish*. We are not focused today on how important that right is, but it is one of importance, central to a democratic system. Instead, we are seeking a clear understanding of the right itself, from which we then can determine whether something the government has done in its election rules has abridged the right.

The plaintiffs insist that an abridgment occurs any time a new election law makes voting more difficult for one age group than it is for another.

No. 20-50407

Under that construct, when Texas in 1975 legislated a privilege for older voters to cast absentee votes without needing to claim a reason such as being out of the county, it abridged younger voters' rights even though no change was made as to them.[14] In essence, a new baseline for voting arises with each new election rule. If some category of voters has more limited rights after the change in comparison to other categories, an abridgement has occurred.

Our first reaction is that this seems an implausible reading of "abridge." Conceptually, plaintiffs are converting the Twenty-Sixth Amendment into the positive assertion that voting rights must be identical for all age groups at all times. Any indulgence solely for one age group of voters would fail; voters of all ages must get the same indulgence.[15] The Amendment, though, is a prohibition against adopting rules based on age that deny or abridge the rights voters already have. Indeed, neither the Twenty-Sixth Amendment nor the related amendments we have been discussing are written in terms of granting a positive right to vote. Instead, they each are phrased in the negative, namely, that the right to vote shall not be denied or abridged based on the relevant reason. *See* DAVID SCHULTZ, ELECTION LAW AND DEMOCRATIC THEORY 87 (2016). More consistent with the text of the Twenty-Sixth Amendment is for us to evaluate whether younger voters' rights were reduced by the addition of a privilege for older voters.

The point just made, though, needs to take into account a possible exception. We return to the *Bossier Parish* decision concerning the Fifteenth Amendment. After stating that a baseline for measuring abridgements was

---

[14] Addressed later is the specific assertion in support of the preliminary injunction that the privilege abridges the younger voters' right in the context of the pandemic.

[15] We borrow the term "indulgence" from Justice Scalia, who used it to refer to accommodations offered to some but not all voters based on a perceived special need. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring).

No. 20-50407

necessary, the Court continued by distinguishing two parts of the Voting Rights Act. Section 5 proceedings, the since-invalidated requirement that certain states had to preclear any election law changes with the Department of Justice, "uniquely deal only and specifically with changes in voting procedures." *Bossier Parish*, 528 U.S. at 334 (emphasis omitted). On the other hand, challenges to voting practices generally, *i.e.*, not necessarily a recent change, under Section 2 of the Act or under the Fifteenth Amendment, had a broader reach:

> In § 2 or Fifteenth Amendment proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative: If the *status quo* "results in [an] abridgement of the right to vote" or "abridge[s] [the right to vote]" relative to what the right to vote *ought to be*, the status quo itself must be changed.

*Id.* The Court then stated that "abridging" for purposes of the Fifteenth Amendment refers to discrimination more generally, not just to retrogression. *Id.* That certainly makes sense, as litigation under the Fifteenth Amendment went far beyond just challenging recent changes but sought to dismantle longstanding discrimination in voting.

Even if this concept applies to the Twenty-Sixth Amendment, *i.e.*, that abridging goes beyond just looking at the change but also at the validity of the state's voting rules generally, we see no basis to hold that Texas's absentee-voting rules as a whole are something that ought not to be.

Secondly, we examine the two Supreme Court decisions on which plaintiffs rely in defining "abridge" in this manner. The earlier of the opinions used the Fifteenth Amendment to invalidate an Oklahoma voter registration system. *Lane*, 307 U.S. at 270, 275. When Oklahoma was admitted as a state in 1907, it imposed a literacy test that, because of how it

29

No. 20-50407

was administered, effectively denied most black Oklahomans the right to vote. *Id.* at 269.  The test was invalidated by the Supreme Court.  *Id.* Oklahoma then devised a registration system providing that those who voted in the 1914 Oklahoma elections remained eligible thereafter, but those who had been eligible and failed to vote had to register within a 12-day window in 1916.  *Id.* at 271.  Thus, voters who had been eligible in 1914 had much different rules applied to them depending on their race.  White voters who had not been subject to barriers of law or custom in 1914 remained eligible to vote, while black voters had a registration window that briefly opened, then closed tight.  The plaintiff was a black potential voter who had been old enough but failed to register in 1916; in 1934, he was rejected when he sought to register.  *Id.*  The Court invalidated the registration scheme, explaining that the Fifteenth Amendment prohibits "onerous procedural requirements which effectively handicap exercise of the franchise."  *Id.* at 275.  Plaintiffs latch on to the phrase "effectively handicap," but we fail to see that when Texas granted a privilege to older voters, it was reducing or handicapping the rights of younger voters.  It failed to enhance rights for younger voters, but that is not the equivalent of abridging.

Three decades later, the Supreme Court held that Virginia abridged the right to vote in violation of the Twenty-Fourth Amendment when voters were required to choose between paying a poll tax or filing a certificate of residence.  *Forssenius*, 380 U.S. at 531–33.  Somewhat similarly to the Oklahoma response to invalidating literacy tests, Virginia adopted the alternatives because of the imminent prohibition of poll taxes for federal elections by the Twenty-Fourth Amendment.  *Id.* at 531.  Under the new state law, someone wishing to vote in a federal election could either pay the poll tax applicable to state elections or instead file every election year at least "six months before the election, a notarized or witnessed certificate attesting that they have been continuous residents of the State since the date of registration

No. 20-50407

(which might have been many years before under Virginia's system of permanent registration) and that they do not presently intend to leave the city or county." *Id.* at 541. The Court held that to demonstrate the invalidity of the measure, "it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* The Twenty-Fourth Amendment eliminated "all requirements impairing the right to vote in federal elections by reason of failure to pay the poll tax," and Virginia could not impose the tax even just as an alternative. *Id.* at 544.

*Forssenius* invalidated the law requiring voters choose between paying an unconstitutional tax or engaging in an onerous registration. The plaintiffs emphasize the Court's calling the registration an invalid "material requirement," but here, too, the plaintiffs seek more than can be found in one of the Court's opinions. The Twenty-Fourth Amendment provides that the right to vote in federal elections "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." When Virginia imposed a material requirement of registration within a certain time period prior to every election, it did not grant a privilege to one class of voters while leaving other classes untouched. It was mandating that every voter either pay the poll tax or register. It was unconstitutional to require that choice.

Rejecting the plaintiffs' arguments, we hold that an election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting *more difficult* for that person than it was before the law was enacted or enforced. As the Court has held, the "core meaning" of "abridge" is to "shorten," and shortening "necessarily entails a comparison." *Bossier Parish*, 528 U.S. at 333–34. Abridgment of the right to vote applies to laws that place a barrier or prerequisite to voting, or otherwise make it more difficult to vote, relative to the baseline.

31

No. 20-50407

On the other hand, a law that makes it *easier* for others to vote does not abridge any person's right to vote for the purposes of the Twenty-Sixth Amendment. That is not to say that a state may always enact such a law, but it does not violate the Twenty-Sixth Amendment.

Sophisticated attempts to circumvent this rule could arise. The Supreme Court, though, has these constitutional amendments "nullif[y] sophisticated as well as simple-minded modes of impairing the right guaranteed." *See Forssenius*, 380 U.S. at 540–41 (quotation marks omitted). Courts will be able to respond properly to any artful efforts.

We now examine some of the caselaw urged upon us by the plaintiffs. We have discussed *Lane* and *Forssenius* already and concluded they do not counsel a different approach. We now review some other decisions in which other courts considered claimed violations of the Fifteenth, Twenty-Fourth, or Twenty-Sixth Amendments. Soon after the Twenty-Sixth Amendment was ratified, the Supreme Court of California held that California's registration rule that compelled young voters living apart from their parents to retain their parents' voting residence violated the Twenty-Sixth Amendment. *Jolicoeur v. Mihaly*, 488 P.2d 1, 2 (Cal. 1971). That decision is not binding on this court, but we examine it for its persuasive value. The court held that the word "abridge" was defined as to "diminish, curtail, deprive, cut off, [or] reduce." *Id.* at 4. The registration rule compelled the newly enfranchised voters either to travel to their parents' district to register and vote, or to vote by absentee. *Id.* The court held that it was "clear" that the law "abridged petitioners' right to vote in precisely one of the ways that Congress sought to avoid — by singling minor voters out for special treatment and effectively making many of them vote by absentee ballot." *Id.* at 7. Unlike the generally older voters who were not in college, these students could not register to vote where they lived. We agree with *Jolicoeur* to the extent it means that a voting scheme that adds barriers primarily for younger

32

No. 20-50407

voters constitutes an abridgement due to age.

We also consider a decision by the Supreme Court of Colorado, which held that the Twenty-Sixth Amendment applied to participation in a ballot-initiative process. *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 222–23 (Colo. 1972). The court invalidated a law that prevented persons younger than twenty-one from signing and circulating petitions. *Id.* at 223. Although this case did not involve voting, the suit did involve prohibiting political participation based on age. We do not necessarily endorse using the Twenty-Sixth Amendment in this context, but the Colorado court's doing so does not create a result contrary to our holding here.

The final decision we examine is one that the district court cited in the present case. *See United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979). The 1978 district court opinion applied strict scrutiny to a claim under the Twenty-Sixth Amendment. *Texas*, 445 F. Supp. at 1261. There, a local county clerk refused to allow college students to register to vote, effectively disenfranchising 973 of the 1000 applicants. *Id.* at 1249. The district court held that this refusal violated the Twenty-Sixth Amendment. The invalidation of this practice is consistent with our analysis, but lesser scrutiny would have reached the same outcome. Further, the Supreme Court's summary affirmance of the district court's result is not a summary endorsement of the district court's reasoning.

We hold, based on the meaning of the word "abridged," that the right to vote under the Twenty-Sixth Amendment is not abridged unless the challenged law creates a barrier to voting that makes it more difficult for the challenger to exercise her right to vote relative to the *status quo*, or unless the *status quo* itself is unconstitutional. Thus, conferring a privilege on one category of voters does not alone violate the Twenty-Sixth Amendment.

No. 20-50407

C.    *The Texas Election Code and the Twenty-Sixth Amendment*

It has taken much discussion, but we finally arrive at the dispositive question: Does Section 82.003 of the Texas Election Code deny or abridge the plaintiffs' voting rights during the pandemic? The statutory background for voting in Texas prior to election day is the following. Early voting was first permitted in 1917. *In re Texas*, 602 S.W.3d at 558. Gradually adding classes of voters to those who qualify for absentee voting, the state did not extend no-excuse absentee voting to persons 65 and older until 1975, after the adoption of the Twenty-Sixth Amendment. *Id.* (citing Act of May 30, 1975, 64th Leg., R.S., ch. 682, § 5, 1975 Tex. Gen. Laws 2080, 2082). This right is now codified in the challenged Section 82.003.

For all the reasons we already have discussed, the Texas Legislature's conferring a privilege to those at least age 65 to vote absentee did not deny or abridge younger voters' rights who were not extended the same privilege. Thus, Section 82.003 itself does not violate the Twenty-Sixth Amendment.

We now consider if the pandemic affects the validity of that age-based privilege. We start with what the Texas Supreme Court stated regarding the extent of that state's adjustment of its election rules during the pandemic. That court held that "a voter can take into consideration aspects of his health and his health history that are physical conditions in deciding whether, under the circumstances, to apply to vote by mail because of disability." *Id.* at 560. Further, "elected officials have placed in the hands of the voter the determination of whether in-person voting will cause a likelihood of injury due to a physical condition." *Id.* at 561. The "lack of immunity to COVID-19, without more, is not a 'disability' as defined by the Election Code." *Id.* at 550. Although "lack of immunity" alone is not a Section 82.002 disability, *In re Texas* shows that voters with an underlying physical condition making them more vulnerable to the virus, rather than fear of COVID-19 alone, may

No. 20-50407

apply to vote by mail under that section.  This undermines the plaintiffs' as-
applied argument because at-risk voters of any age can utilize the Texas
Election Code's disability provision to mitigate the risk of COVID-19.

The record indicates Texas is taking the kinds of precautions for
voting that are being used in other endeavors during the pandemic.  None of
them guarantees protection.  There are quite reasonable concerns about
voting in person, but Texas's mandating that many continue to vote in that
way does not amount to an absolute prohibition of the right to vote.  As to
abridgement, voters under age 65 did not have no-excuse absentee voting
prior to the pandemic.  Further, requiring many to vote in person during this
crisis, with safety measures being imposed and some flexibility as to
"disability" being shown, does not amount to an unconstitutional *status quo*.
The real issue here is equal protection, and that is not before us.

We will remand.  Before we send this case on its way, we pause to
discuss the concept of levels of scrutiny.  The decision in June to grant a stay
in this case was based on a holding that "employing *McDonald*'s logic leads
inescapably to the conclusion that rational-basis review applies."  *Tex.
Democratic Party*, 961 F.3d at 409 (citing *McDonald*, 394 U.S. at 807–08).
The Supreme Court's 1969 *McDonald* opinion, predating the 1971
Amendment at the center of our analysis, was a challenge by pretrial
detainees who were either charged with nonbailable offenses or could not
afford bail.  *McDonald*, 394 U.S. at 803.  They had no right under Illinois law
to an absentee ballot due to their detention, despite that they had not been
convicted of the charged offenses.  *Id.*  The claim was that the state made an
arbitrary distinction, violative of equal protection, between those physically
incapacitated by illness who could vote absentee and those judicially
incapacitated who could not.  *Id.* at 806.  The Court concluded that no
heightened scrutiny was needed because the state's distinction did not
"impact" the detainees' "fundamental right to vote."  *Id.* at 807.  The right

No. 20-50407

to vote had not been denied because there was no evidence that Illinois would
not provide alternative means for the detainees to vote, as the state might
"furnish the jails with special polling booths or facilities on election day, or
provide guarded transportation to the polls themselves for certain inmates,"
or offer other options. *Id.* at 808 & n.6.

We are hesitant to hold that *McDonald* applies. One reason is that the
decision predated the ratification of the Twenty-Sixth Amendment, which
means it did not consider the potential — argued by the plaintiffs here — that
the Amendment requires the same heightened analysis as *McDonald* stated
applied to classifications based on race and wealth. *See id.* at 807. Further,
the Court seemed to analyze only whether the challenged action "den[ied]
appellants the exercise of the franchise." *Id.* at 807–08. The Twenty-Sixth
Amendment prohibits age-based denials but also abridgments of the right to
vote. In addition, the Supreme Court interpreted a post-*McDonald* limitation
on absentee voting as potentially violative of equal protection even though,
like the statute in *McDonald*, it left open other options for voting. *Am. Party
of Tex. v. White*, 415 U.S. 767, 794–95 (1974) (discussing *McDonald*). No
party's brief cited *American Party* either to the motions panel or to us, and
only an amicus brought it to our attention.

There has been no denial or abridgement of a right to vote under the
Twenty-Sixth Amendment.  On remand, equal protection questions may
come to the fore.  Though we cannot, in the current posture of this appeal,
decide the issue of the proper scrutiny to give to this statutory provision
under equal protection analysis, we need to take one further step so the issue
can be considered on remand in light of this opinion. Before granting a stay,
the motions panel had to decide the likelihood of the defendants' success on
appeal on each of the grounds on which the district court relied in issuing a
preliminary injunction. It held both that *McDonald* applied and that rational-
basis review was appropriate. In our more limited opinion today, though, by

36

No. 20-50407

concluding that no denial or abridgment of the right to vote under the Twenty-Sixth Amendment ever occurred, we had no denial or abridgement to scrutinize. We have uncertainties about *McDonald* and do not wish that the earlier necessity for a preliminary decision on the merits by the motions panel control the remand on an issue we never reached. We therefore use our authority as the panel resolving the merits to declare that the holdings in the motions panel opinion as to *McDonald* are not precedent.

To be clear, we are not stating, even as *dicta*, that rational basis scrutiny is incorrect. Indeed, age-based distinctions are evaluated in that manner in the usual case. *See Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). On the other hand, some courts have applied what is known as the *Anderson-Burdick* balancing analysis to claims that an election law violates equal protection, and they provide noteworthy reasons for doing so. *See, e.g., Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020) (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)). The right level of scrutiny for an equal protection claim on remand is for the district court initially to analyze. An answer now by us would be only *dicta*. Even so, we state that we have not seen any authority to support that it would require strict scrutiny as the district court initially applied.

In sum, the plaintiffs claim that the Twenty-Sixth Amendment prohibits allowing voters who are at least 65 years old to vote by mail without excuse. This claim fails because conferring a benefit on another class of voters does not deny or abridge the plaintiffs' Twenty-Sixth Amendment right to vote. The preliminary injunction was not properly granted on the plaintiffs' Twenty-Sixth Amendment claim as it has been defended here.

We VACATE the injunction and REMAND for further proceedings consistent with this opinion.

37

No. 20-50407

CARL E. STEWART, *Circuit Judge*, concurring in part and dissenting in part:

Before us is an appeal of a preliminary injunction issued in July 2020 by the District Court in the Western District of Texas. The preliminary injunction required Texas officials to allow any Texan eligible to vote to do so by mail. In April, Plaintiffs filed this lawsuit requesting relief on seven grounds: race and language discrimination in violation of the Voting Rights Act, race discrimination and non-race discrimination in violation of the Fourteenth Amendment, race discrimination in violation of the Fifteenth Amendment, denial of free speech under the First Amendment, denial of due process for vagueness, and violation of the Twenty-Sixth Amendment. Plaintiffs' motion for a preliminary injunction narrowed the claims. They argued that Texas's election statute, § 82.003 (allowing no-excuse voting for voters 65 and older) was void for vagueness and violated the First, Fourteenth, and Twenty-Sixth Amendments. After conducting a hearing, the district court determined in a seventy-three-page opinion that Plaintiffs were likely to succeed on all their claims, including their Twenty-Sixth Amendment claim, especially in light of the tremendous threat to public health posed by the COVID-19 pandemic. The district court noted that "COVID- 19 has become one of the leading causes of death in the United States. Data to date in Texas demonstrates higher than expected infection rates in younger persons." Regarding the Twenty-Sixth Amendment claim, the district court stated:

> The Court concludes, that the COVID-19 pandemic, younger voters bear a disproportionate burden because the age restrictions of [§ 82.003], that [§ 82.003] is a government classification based on age and discriminates against voters under the age of 65 based on age, and that [§ 82.003] violates the [Twenty-Sixth] Amendment, as applied, during the COVID-19 pandemic.

No. 20-50407

Defendants appealed the preliminary injunction order and a motions panel of this court granted a motion to stay the injunction pending appeal. *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). The panel noted that § 82.003 "facially discriminates on the basis of age," *id.* at 402, but concluded that the state officials were likely to show that the statute's "age distinction survives." *Id.* at 406.

The issue before us now on appeal is whether the district court erred in issuing this preliminary injunction, and to resolve this appeal, we must consider three jurisdictional arguments: whether Plaintiffs have standing, whether Defendants can claim sovereign immunity, and whether this lawsuit poses a nonjusticiable political question. As to the merits, we must determine whether the court erred when it determined that Plaintiffs were likely to succeed on their Twenty-Sixth Amendment claim, as applied.

The panel majority ably considers these jurisdictional questions, and I concur in their resolution of these threshold issues. However, because I differ with the panel majority in their determination that § 82.003 does not violate the Twenty-Sixth Amendment, I dissent as to that claim.

A district court's ultimate decision to issue a preliminary injunction is reviewed for abuse of discretion, but "a decision grounded in erroneous legal principles is reviewed *de novo.*" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001). A plaintiff must establish four elements to secure a preliminary injunction:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*See Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006).

No. 20-50407

The statute in question facially discriminates based on age, which in the context of the pandemic leads to dramatically different outcomes for different age groups. A consideration of the statute under the plain text of the Twenty-Sixth Amendment leads me to conclude that the statute, as applied during the pandemic, is likely unconstitutional and that therefore the district court did not err in determining Plaintiffs have a substantial likelihood of success on the merits. I further conclude that the district court did not abuse its discretion in deciding that the other three factors were met and in issuing the preliminary injunction. Therefore, I respectfully dissent.

*I. Twenty-Sixth Amendment Analysis*

"The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. Though few courts have interpreted the meaning of "denied or abridged" in the context of the Twenty-Sixth Amendment, the phrase has been interpreted in the context of the Fifteenth and Nineteenth Amendments. In the absence of an unambiguous definition, much effort has been devoted to unearthing the legislative history of the Twenty-Sixth Amendment. In my view, neither precedent nor legislative history compels a narrow definition of "abridged."

Neither party argues that Section 82.003 denies individuals the right to vote by permitting some individuals to vote via mail-in ballot. Plaintiffs argue that the statute abridges voting rights through a facial classification that permits individuals 65 years and older to vote via mail-in ballot. Defendants argue on appeal that the statute does not abridge the right to vote by giving the benefit of mail-in ballots to certain members of the electorate. The definition of abridge is central to this appeal.

As the panel majority notes, Black's Law Dictionary defines abridge as "[t]o reduce or diminish." *Abridge*, Black's Law Dictionary 7 (10th ed.

40

No. 20-50407

2014). The panel majority concludes that because no voter is made worse off by Texas's mail-in ballot provisions, the State of Texas has not abridged voting rights. The panel majority holds that "an election law abridges a person's right to vote for the purpose of the Twenty-Sixth Amendment only if it makes voting more difficult for that person than it was before the law was enacted or enforced."

Precedent supports a different outcome. The panel majority cites *Reno v. Bossier Parish School* for the proposition that "abridge" requires a comparison to a baseline. *See* 528 U.S. 320, 334 (2000) (discussing the use of baseline comparisons in preclearance proceedings under § 5 of the Voting Rights Act); *see* Maj. Op. at 27. They further explain that plaintiffs cannot prevail under the Twenty-Sixth Amendment without proof that their voting rights were reduced by the addition of a *privilege* for older voters. *See* Maj. Op. at 33 (emphasis added). What the panel majority refers to as a privilege here has been recognized as a right in other contexts. *See Am. Party of Tex. v. White*, 415 U.S. 764, 796 (1974) (holding that a state's decision to only offer absentee ballots to major party primary voters violated the Equal Protection Clause).

Furthermore, the panel majority misreads *Reno*. While *Reno* holds that the appropriate comparison in preclearance proceedings is between the status quo and the proposed changes, *Reno* expressly identifies a broader definition of abridge within § 2 of the Voting Rights Act and the Fifteenth Amendment. *Reno,* 528 U.S. at 334. In the context of the Fifteenth Amendment, *Reno* indicates that the proper comparison is a hypothetical one—one between the status quo and what the hypothetical right to vote "ought to be". *Id.* "If the status quo 'results in [an] abridgement of the right to vote' or 'abridge[s] [the right to vote]' relative to what the right to vote ought to be, the status quo itself must be changed." *Id. Luft v. Evers* considered *Reno* and persuasively offered what the baseline should be in cases

41

No. 20-50407

challenging voter qualification and election mechanisms—an equal opportunity to participate. 963 F.3d 665, 672 (7th Cir. 2020) (citing *Reno*, 528 U.S. at 334).

Section 82.003 fails to treat members of the electorate equally with regard to mail-in voting. This unequal treatment is discriminatory in normal times and dangerous in the time of a global pandemic. Though all individuals can seemingly vote in person, those without the opportunity to vote by mail have less opportunity to participate than others. Though *Luft* interpreted § 2 of the Voting Rights Act in respect to protected classes, there is little reason to think the term "abridge" should carry a distinct meaning within the Twenty-Sixth Amendment.

In *South Carolina v. Katzenbach*,[1] the Supreme Court held that Congress has broad authority to enforce § 1 of the Fifteenth Amendment ("the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."). 383 U.S. 301, 325 (1966). The Court stated that § 1 "has always been treated as self-executing and has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are *discriminatory on their face* or in practice." *Id.* at 305 (emphasis added). Though *Katzenbach* predates the Twenty-Sixth Amendment, § 1 of the Fifteenth Amendment and § 1 of the

---

[1] *South Carolina v. Katzenbach* refused to invalidate § 5 of the 1965 Voting Rights Act, which required that for certain jurisdictions to make changes to a "standard, practice, or procedure with respect to voting," they must seek a declaratory judgment that those policy changes do not have the purpose or effect of abridging or denying the right to vote on the basis of race. 383 U.S. 301, 337 (1966) (quoting 42 U.S.C. § 1973c(a)). The Supreme Court has since held that the formula of the Voting Rights Act which determines if a state is covered is unconstitutional but declined to issue a holding on § 5 itself. *Shelby Cty. Ala. v. Holder*, 570 U.S. 529, 556 (2013).

No. 20-50407

Twenty-Sixth Amendment both include language prohibiting states from denying or abridging the right to vote. *Katzenbach* interprets "deny or abridge" as invalidating procedures that are facially discriminatory or applied in a discriminatory manner with regard to race. *Katzenbach* does not cabin its language to the word "deny" but rather interprets the phrase in total to prevent an array of discriminatory practices including facial classifications. *Katzenbach* supports a broad understanding of "deny or abridge" that is inconsistent with the panel majority's holding.

The Seventh Circuit also construed "denial or abridgment" in the context of § 2(a) of the Voting Rights Act. *Luft v. Evers*, 963 F.3d at 672. The court states that § 2 was violated when the voting system was "not equally open to participation by members of a protected class so that groups members have less opportunity than other members of the electorate to participate." *Id.* The court recognized an equality requirement in § 2(b) of the Voting Rights Act that requires states to treat voters equally with regard to their opportunity to participate in the electoral process. *Id.*

*Reno*, *Katzenbach*, and *Luft* persuade me to read "denial or abridge" in the Twenty-Sixth Amendment as generally prohibiting states from depriving individuals of the equal opportunity to vote based on a protected status. The panel majority does not cite any case that compels an understanding of "abridge" in the context of a voting rights amendment that requires a plaintiff's position to be worsened. Though the panel majority relies on *Lane v. Wilson* and an "onerous procedural requirement" as violative of the Fifteenth Amendment, the Supreme Court does not state that such an onerous procedural requirement is *necessary* to find abridgment. 307 U.S. 268, 275 (1939). In fact, *Lane* states that "[t]he Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Id.* In this case, we have straightforward facial discrimination, while *Lane* dealt with a

No. 20-50407

complicated scheme with severely discriminatory impacts without a facial classification.

The panel majority also cites *Harman v. Forssenius*, which similarly outlines an unconstitutional method of burdening voters. 380 U.S. 528 (1965). *Harman* also cites *Lane* for the proposition that the Twenty-Fourth Amendment "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed." *Id.* at 540–41 (internal quotations omitted). *Harman* concludes that the Twenty-Fourth Amendment does not require an outright poll tax, but that a violation can be found if it is shown that the statute "imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 541. In this case, I see both a facial classification and a material requirement to vote in person imposed on younger voters. *Harman* seems to stand for the proposition that this material requirement suffices when the statute itself does not plainly violate the Amendment but does not suggest that it is *necessary*.

Suffice it to say, I respectfully differ with my panel colleagues about how these Supreme Court cases should be read and construed in the context of this case.

Though the legislative history here is unclear, there are more legislative arguments in favor of construing "abridge" broadly than there are in favor of construing the term narrowly. On balance, I conclude that the legislative history does not favor the panel majority's holding.

In 1970, Congress attempted to lower the voting age from 21 to 18, which was invalidated in *Oregon v. Mitchell.* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 302, 84 Stat. 314, 318, invalidated in part by *Oregon v. Mitchell*, 400 U.S. 112 (1970). The Twenty-Sixth Amendment was ratified the following year. Eric S. Fish, Note, *The Twenty-Sixth Amendment*

44

No. 20-50407

*Enforcement Power*, 121 Yale L.J. 1168, 1194–95 (2012). The Twenty-Sixth Amendment did more than merely raise the voting age in a constitutionally permissible manner. Congress's 1970 effort to lower the voting age stated:

> Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 302, 84 Stat. 314, 318, invalidated in part by *Oregon v. Mitchell*, 400 U.S. 112 (1970).

Several legislators expressed the intent to have the Twenty-Sixth Amendment create protections against discrimination akin to those in the Fifteenth and Nineteenth Amendments. *See, e.g.*, 117 Cong. Rec. H7534 (daily ed. March 23, 1971) (statement of Rep. Richard Poff) ("What does the proposed constitutional amendment accomplish? It does not grant the right to vote to all citizens 18 years of age or older. Rather, it guarantees that citizens who are 18 years of age or older shall not be *discriminated against* on account of age. Just as the 15th amendment prohibits racial discrimination in voting and just as the 19th amendment prohibits sex discrimination in voting, the proposed amendment would prohibit age discrimination in voting . . . In this regard, the proposed amendment would protect not only an 18-year-old, but also the 88-year-old . . . ") (emphasis added); 117 Cong. Rec. H7539 (daily ed. Mar. 23, 1971) (statement of Rep. Claude Pepper) ("What we propose to do . . . is exactly what we did in . . . the 15th amendment and . . . the 19th amendment . . ."; *see also id.* at H7533 (Rep. Emanuel Celler noting that the Twenty-Sixth Amendment is "modeled after similar provisions in the 15th amendment . . . and the 19th amendment . . .").

The content and naming of the 1970 Voting Rights Amendment also indicates that Congress considered regularized access to absentee ballots a

No. 20-50407

significant part of "voting rights." § 5 of the Voting Rights Act concerned evaluating practices and procedures for potential abridgement, and most likely the method by which a person is permitted to vote would constitute such a practice or procedure. This persuades me that the right to vote should be construed more broadly than the mere right to cast a ballot in person.

The panel majority relies on various aspects of statutory and legislative history as support for its holding. The panel majority also cites *McDonald v. Board of Election Commissioners of Chicago* for the proposition that the framers understood the right to vote as the right to cast a ballot. 394 U.S. 802, 807 (1969). I am unpersuaded that *McDonald* controls the outcome of this case. *McDonald* affirmed a summary judgment grant in favor of Illinois on inmates' Equal Protection Claims. *Id.* at 809, 810. The inmates argued that their rights were violated by the state's refusal to provide them with mail-in ballots, and the court granted the motion noting that there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote." *Id.* at 807. *McDonald* is a limited holding on its own terms because it is based on a lack of evidence in the record. To be sure, *McDonald* has not been overruled by the Supreme Court. However, that truism is unremarkable; the Court does not routinely overrule its cases. The point is that *McDonald* has limited vitality for the purposes of this appeal.

Beyond *McDonald*'s limited scope, the Supreme Court has limited *McDonald* at least three times. *See Goosby v. Osser*, 409 U.S. 512, 521–22 (1973) (discussion of *McDonald*'s inapplicability in a situation where there was greater evidence); *see O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) (same); *see Am. Party* 415 U.S. at 794-95. *American Party* held that Texas violated the Fourteenth Amendment by allowing some party primary voters to cast absentee ballots while requiring other party primary voters to vote in person. *Id.* at 794.

No. 20-50407

I conclude that the options granted to voters to cast their vote are part of "the right to vote" under the Twenty-Sixth Amendment. By giving younger voters fewer options, especially in the context of a dangerous pandemic where in-person voting is risky to public health and safety, their voting rights are abridged in relation to older voters who do not face this burden.[2] This implicates the Twenty-Sixth Amendment.

## II. Scrutiny Analysis

As the panel majority observes, there remains a question of what level of scrutiny the district court should have applied to § 82.003. In *McDonald*, the Supreme Court applied rational-basis review to a law burdening the right to vote by mail. 394 U.S. at 808–09.[3] But in *Anderson v. Celebrezee*, 460 U.S. 780 (1983) and *Burdick v. Takusi*, 504 U.S. 428 (1992), the Supreme Court articulated a framework that "applies strict scrutiny to a State's law that

---

[2] The burden is severe. During the primaries, the pandemic led to a shortage in polling workers as individuals seek to avoid exposure to COVID-19. Elections Adm'rs and Cty. Br. at 23. Moreover, "securing an adequate number of polling places has been a challenge" since facilities that normally serve as election precincts are not large enough to accommodate social distancing. *Id.* This in turn has led to crowding and long lines at the polls, which increased the risk of exposure to the virus. *Id.* 22–23. And more people have gotten sick. For instance, following the Wisconsin primary, health officials identified 52 people who tested positive for COVID-19 after either voting in person or working at a polling site. NAACP Legal Defense Fund Br. at 12 (citing The Latest: 52 Positive Cases Tied to Wisconsin Election, The Associated Press (Apr. 28, 2020), https://apnews.com/b1503b5591c682530d1005e58ec8c267). Other individuals may have contracted the virus while voting, but were never tested. There is reason to think that forcing millions of voters under the age of 65 to vote in person on November 3, 2020 may place them in significant danger.

[3] In addition to the reasons offered by the panel majority for why rational basis may not be the correct standard of review here, I agree with then Chief Judge Frank Coffin who opined: "It is difficult to believe that [the Twenty-Sixth Amendment] contributes no added protection to that already offered by the Fourteenth Amendment" for age discrimination. *See Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1367 (1st Cir. 1975). Consequently, a heightened standard of review is likely warranted here.

No. 20-50407

severely burdens ballot access and intermediate scrutiny to a law that imposes lesser burdens." *Esshaki v. Whitmer*, 813 F. App'x 170, 171 (6th Cir. 2020).

Even if strict scrutiny is not the appropriate standard to be applied here, as the district court applied to Plaintiffs' Twenty-Sixth Amendment claim, Defendants have not identified an interest in the application of § 82.003 during the pandemic that would allow that application to withstand any level of judicial review. Defendants argue that Texas's interest in preventing voter fraud justifies its limitations of voting by mail to individuals 65 years or older, but they do not present any evidence, let alone argue, that voters 64 years or younger present any more risk of committing voter fraud than those over that age threshold. Indeed, the risk of fraud is exceedingly rare. As the district court found, between 2005 and 2018, there were just 73 prosecutions of voter fraud in Texas out of millions of votes casted. In two-thirds of the states, *any* qualified voter can vote absentee without providing an excuse. National Conference of State Legislatures, *Voting Outside the polling Place: Absentee, All-Mail and Other Voting at Home Options*, https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx. However, "[n]one of these states have experienced widespread fraud as a result of mail-in voting." NAACP Legal Defense Fund Br. 16 n.18 (citing The Brennan Center, The False Narrative of Vote-by-Mail Fraud, https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud). Hence, I am not convinced that allowing the district court's order to stand would cause "widespread voter fraud and election chaos." *See* Tarrant Cty. GOP Br. 1–2.

To the extent there is any risk of voter fraud, Texas has mechanisms in place to protect the integrity of its elections. For instance, to obtain an absentee ballot, a Texas voter must provide identifying information, under penalty of perjury, that allows election officials to confirm the applicant is eligible to vote. *See* Elections Adm'rs and Cty. Br. 10 (citing Tex. Elec. Code

No. 20-50407

§ 84.001). Texas also has a variety of criminal sanctions available to deter any misuse of absentee ballots. *See, e.g.,* Tex. Elec. Code § 84.0041 (providing that a person is liable for "intentionally caus[ing] false information to be provided on an application for ballot by mail"), 276.013 (providing that an individual is liable for knowingly or intentionally causing a ballot to be obtained under false pretenses).

Given the dearth of evidence of voter fraud and the ample tools available to promote election integrity, Defendants have not identified a legitimate government interest in enforcing § 82.003 within the context of a global pandemic.

### III. Remaining Preliminary Injunction Factors

As Plaintiffs are likely to succeed on the merits of their argument that § 82.003 violates the Twenty-Sixth Amendment for the aforementioned reasons, I now turn to the other injunction factors.

The district court concluded that Plaintiffs faced a substantial threat of irreparable injury, noting the serious dangers posed by in-person voting during the pandemic. The district court found that the threatened harm if the injunction is denied outweighs Defendants' concerns about voter fraud, which the district court determined were "unsupported." The district court finally determined that granting the injunction was in the public interest by safeguarding constitutional rights and limiting the spread of disease. The district court did not abuse its discretion in reaching these findings.

The preliminary injunction was properly issued, and for that reason, I respectfully dissent.