IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DIVISION OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS DEMOCRATIC PARTY, GILBERTO HINOJOSA, Chair of the Texas Democratic Party, JOSEPH DANIEL CASCINO, SHANDA MARIE SANSING, and BRENDA LI GARCIA, <br> *Plaintiffs,* <br> and <br><br> LEAGUE OF UNITED LATIN AMERICAN CITIZENS, and TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS, <br> *Plaintiff-Intervenors*, <br><br> v. <br><br> RUTH HUGHS, Texas Secretary of State, DANA DEBEAUVOIR, Travis County Clerk, JACQUELYN F. CALLANEN, Bexar County Elections Administrator, <br> *Defendants.* | Case No. __5:20-cv-00438__ |

**AMENDED COMPLAINT OF PLAINTIFF-INTERVENORS LEAGUE OF UNITED LATIN AMERICAN CITIZENS AND TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS**

Plaintiff-Intervenors League of United Latin American Citizens ("LULAC") and Texas League of United Latin American Citizens ("Texas LULAC"), (together, "LULAC Plaintiffs"), by and through their undersigned attorneys, allege as follows:

**INTRODUCTION**

1. This case involves an illegal and unconstitutional attempt to prevent Texans from voting, in particular, minority and younger voters. Defendants have improperly sought to restrict access to absentee ballots, including in the midst of a pandemic, using an unduly narrow vote-by-mail policy to restrict access to vote-by-mail to predominantly non-Hispanic white voters, and to

1

force voters to choose between jeopardizing their health by voting in person or not voting at all. This practice unduly burdens the right to vote, and that burden falls disproportionately on minority voters. Defendants have made absentee ballots freely available to anyone age 65 or older, thus discriminating against younger voters. Because Defendants' actions violate the First, Fourteenth, and Twenty-Sixth Amendments of the United States Constitution and Section 2 of the Voting Rights Act, the LULAC Plaintiffs ask the Court to enjoin Defendants' illegal and unconstitutional activity, and ensure that *all* Texans are able to safely, equally, and meaningfully access the right to vote.

2. The State of Texas confirmed its first case of the novel coronavirus, COVID-19 in March of 2020. Since then, the deadly disease has spread to virtually every Texas community, transmitting itself through close contact with affected individuals, including many who displayed no symptoms of being sick. In response, the State and its local governments, echoing the federal government response, advised Texans to limit in-person contact and social interaction, and began implementing and encouraging other social distancing measures in order to slow the spread of the disease.[1]

3. But even with such social distancing guidelines in place, at least 37,860 Texans had been diagnosed with COVID-19, and at least 1,088 had died by the time this suit was originally filed.[2] The numbers continue to increase daily, particularly with the "re-opening" of the State, such that to date 2,434,200 Texans have been confirmed to have contracted COVID-19, with 2,770 new

---

[1] KXAN Staff, *In Texas, Gov. Abbott Issues Statewide Mandates In Response to COVID-19*, KXAN, Mar. 19, 2020, https://www.kxan.com/news/coronavirus/live-gov-abbott-to-hold-press-conference-on-states-current-efforts-against-covid-19/.

[2] *Texas Case Counts COVID-19 (Coronavirus Disease 2019)*, TEXAS DEP'T OF HEALTH AND HUMAN SERVICES, https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83 (last updated April 15, 2021).

cases diagnosed today. Since the beginning of the pandemic, approximately 48,245 Texans have died as a result of contracting COVID-19.

4. For minority communities, particularly the Latino community, the impact of the disease has been especially devastating. A disproportionate share of Texas Latinos have contracted and died from COVID-19 as compared to their white counterparts. As just one example, as of May 2020 in Travis County, Latino individuals constituted roughly 33 percent of the population but represented approximately 51 percent of all COVID-19 related hospitalizations. To date, although Latino individuals constitute roughly 39.7% of Texas overall, they represent 46.4% of COVID fatalities in Texas.

5. Furthermore, Black and Hispanic Texans face substantial disparities in access to the vaccine as compared to their white counterparts. Nearly 41% of vaccine recipients in Texas are white, while just 21% are Hispanic Texans.[3]

6. Against this backdrop, Texas was one of only four states that failed to provide broad access to vote-by-mail during the pandemic conditions of 2020. Despite the overwhelming response of election officials in other states to ease access to safe and socially distanced methods of voting, Texas refused to broaden access to vote-by-mail and retained its absentee voting rules, which discriminate based on age and disproportionately benefit non-Hispanic white voters.

7. As a result, many Texas voters were forced to choose between voting in person—thereby risking exposure to COVID-19 through contact with voting equipment, election personnel, other voters, and observers—or not at all. This will continue to be the case for many Texans—

---

[3] Melissa Martinez and Sami Sparbar, *As Texas expands COVID-19 vaccination eligibility, racial disparities persist among Black, Hispanic residents*, TEXAS TRIBUNE, Mar. 19, 2021, https://www.texastribune.org/2021/03/19/texas-vaccine-race-disparities/

including the disproportionate share of non-vaccinated Texans—until the pandemic conditions end.

8. Defendants' restrictive vote-by-mail policy violates the Constitution.

9. The Constitution does not permit Defendants to force Texans to choose between their health and their exercise of the fundamental right to vote. But for *most* Texas citizens, including *most* of Texas's Latino citizens, that is precisely what Defendants have done.

10. Rather than permit all Texas citizens to vote by mail, Texas only permits select groups—including *all* individuals over the age of 65—to vote by mail. Even under non-pandemic circumstances, Texas's vote-by-mail restrictions unconstitutionally restrict the right to vote according to age, seriously burden the right to vote of many voters under 65, and disparately impact Latino voters.

11. Defendants' unreasonable restrictions on who may vote by mail impose an undue burden on the LULAC Plaintiffs' members' voting and free speech rights in violation of the First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution. Moreover, because the negative effects of the overly-restrictive criteria are disproportionately felt by Texas's minority communities, they also violate Section 2 of the Voting Rights Act ("VRA").

12. Absent relief from this Court, Defendants' restrictive vote-by-mail policy will continue to prohibit vote-by-mail for a majority of Texans and a majority of Latinos.

13. Defendants' strict outlier vote-by-mail policy—which by design benefits older non-Hispanic white voters—is part of an unfortunate and ongoing pattern and practice in Texas's election laws. The Texas state legislature is currently considering bills that would further restrict Texas Latino citizens' ability to vote by mail. In his 2021 State of the State address, Governor Abbott announced that he was designating "election integrity" as an emergency item for the 2021

legislative session, encouraging legislators to pass new election bills as swiftly as possible. These proposed bills, which include provisions that would erect additional barriers to Texas's vote-by-mail process, will continue the Lone Star State's longstanding history of discrimination against Latino voters. Governor Abbott recently spoke out in support of the legislature's proposed restrictions on mail-in ballots. Governor Abbott's statements and the state legislature's current deliberations suggest that Defendants are keen on stopping Latino and other younger, overwhelmingly minority voters from exercising their right to vote.

14. Defendants' restrictive mail-in voting policy violates LULAC Plaintiffs' members' right to vote. LULAC Plaintiffs respectfully request this Court declare Defendants' restrictive mail-in voting policy unconstitutional, declare that all Texas voters are entitled to vote by mail, enjoin Defendants and all those acting in concert with them from preventing voters from casting their ballots by mail-in ballot in future elections, and from blocking any necessary steps to facilitate mail-in voting, and require Defendant Secretary Hughs to issue guidance to local election officials in compliance with this Court's order.

## PARTIES

15. Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization in the United States. LULAC is a non-profit membership organization with a presence in most of the fifty states, including Texas. It was founded with the mission of protecting the civil rights of Latinos, including voting rights. LULAC participates in civic engagement activity, such as voter registration, voter education, and voter turnout efforts, throughout the United States.

16. LULAC has been recognized and accepted as an organizational plaintiff protecting Latino rights in federal courts across the country, including the United States Supreme Court and the U.S. District Court for the Western District of Texas.

17. Plaintiff Texas LULAC is the Texas chapter of the League of United Latin American Citizens. Plaintiff Texas LULAC was founded in Texas in 1929. Texas LULAC has over 20,000 members in Texas. Texas LULAC's members include registered voters who desire to vote in upcoming Texas elections and seek to do so by mail-in ballot.

18. Texas LULAC regularly engages in voter registration, voter education, and other activities and programs designed to increase voter turnout among its members and their communities. These efforts are key to LULAC's mission of increasing civic participation of its members. Texas LULAC commits time, personnel, and resources to these efforts throughout Texas. Throughout the pandemic, Texas LULAC has had to divert resources away from existing priorities towards educating the Latino community about Defendants' restrictive vote-by-mail policy and helping its members and Latinos generally determine if they are able to vote by mail under that policy. Moreover, Texas LULAC's ability to assist its members and Latinos throughout the state to request and cast mail-in ballots is significantly hampered by Defendants' restrictive vote-by-mail policy limiting access to mail-in ballots to a select few segments of Texas's voting population.

19. Absent federal court intervention, many of Texas LULAC's members will be unable to request and cast mail-in ballots. In an uncertain electoral environment where in-person voting will be either unavailable or unsafe, mail-in ballots are the only option for many Texas LULAC members and other Latinos throughout the state to exercise the franchise without jeopardizing their own health or the health of their families. Even absent any pandemic conditions,

many Texas LULAC members are unduly burdened by their inability to cast their votes by mail while their older, and predominately white, peers can do so freely.

20. Defendant Ruth Hughs is the Texas Secretary of State, and pursuant to Tex. Election Code § 31.001, is the chief election officer of the state. She is sued in her official capacity.

21. Defendant Dana DeBeauvoir is the Travis County Clerk and Election Administrator. She is sued in her official capacity.

22. Defendant Jacquelyn F. Callanen is the Bexar County Elections Administrator. She is sued in her official capacity.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1357; 42 U.S.C. § 1983; and 52 U.S.C. § 10301.

24. LULAC Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' official places of business are within the District, Defendants reside in the District, and all Defendants reside in Texas.

26. The Court has personal jurisdiction over Defendant Secretary of State Hughs. All are residents of the State of Texas and officials for the State of Texas, with official places of business within this District.

27. This Court has personal jurisdiction over Defendants DeBeauvoir and Callanen. Both are residents of Texas and are county officials in Travis and Bexar Counties, respectively, with official places of business within this District.

## FACTUAL ALLEGATIONS

### Background on the Effects of the COVID-19 Pandemic in Texas

28. The virus that causes COVID-19 is highly contagious and spreads through a variety of means, including respiratory droplets and direct contact between individuals. The disease can be spread by symptomatic and asymptomatic carriers, and once contracted, can have a range of effects on the diagnosed individual, from passing without any symptoms at all, to flu-like symptoms, to a severe immune system response that can cause fluid to build in the person's lungs and lead to death. The disease poses a severe risk to all individuals, and youth or relative health do not guarantee immunity to or recovery from this disease, which can be brutal even for those who survive. It is particularly dangerous for those who are elderly, or regardless of age, are immunocompromised, or have other underlying conditions like chronic lung disease, diabetes, obesity, or moderate to severe asthma.[4]

29. COVID-19 spread widely and quickly throughout the world, and has not spared the United States or Texas. On March 13, 2020, outbreak of the pandemic disease caused then-President Trump to declare a national state of emergency, and Governor Abbott to declare a state of disaster in Texas. Both declarations remain in place to this day, and although vaccination rates continue to rise, there is no discernible end to the public health crisis caused by COVID-19 in sight.

30. COVID-19 has had a particularly devastating impact on the Texas Latino community, which represents a disproportionate share of COVID-19-related hospitalizations and

---

[4] Ctrs. For Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://ww.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. (last updated Mar. 15, 2021).

8

deaths. In fact, while Latinos constitute roughly 39.7% of Texas overall, they represent 46.4% of COVID-19 fatalities but only 21% of vaccine recipients in Texas.

31. Critically, these official statistics may be underestimating rates of infection among the Latino community due to fear of reporting cases because of a lack of health insurance and fear of exposure to immigration authorities.

**Absentee Voting in Texas**

32. In light of the evident health risks posed by COVID-19, as well as the consensus that social distancing is the most effective method of preventing exposure, the disease has had a significant effect on election administration, in Texas and nationwide. In-person polling locations—at which voters must wait in crowded lines, and interact with other voters, poll workers, observers, and voting equipment—are particularly susceptible as hotspots for contagion, and put at risk the health of any voter who casts their ballot in person.

33. Texas was one of only four states that declined to expand vote-by-mail during the 2020 election. At the same time, the Secretary declined to require people to wear masks at polling places and otherwise failed to take reasonable steps to ensure that in-person voting was conducted safely.

34. Instead, as the pandemic set in, Texas took steps to ensure its election rules would primarily benefit white non-Hispanic voters while burdening Latino and other minority voters in Texas, including by expanding access to voting methods primarily used by white voters, while enforcing prohibitions designed to prevent election administrators in large counties with substantial Black and Latino populations from enacting common sense election administration practices to ensure voters in those counties were not forced to choose between their health and the right to vote. For example, the Secretary enforced Governor Abbott's proclamation prohibiting

counties from opening more than one ballot drop-off location, regardless of geographic or population size, which was announced mere weeks before the election, and after multiple such locations had been opened and utilized by voters to cast their ballots.

35. These practices had a disparate impact on Latino voters in Texas. And the Texas state legislature is currently considering bills that would further restrict Texas Latino citizens' ability to vote by mail. At the same time, these proposed bills include provisions that would enable targeted voter intimidation of Latinos by allowing bystanders to record voters receiving assistance, including language assistance. Thus, these bills would both making in person voting and vote-by-mail less accessible for Latino voters. These bills will continue the Lone Star State's longstanding history of discrimination against Latino voters.

36. Defendants policy permits only four categories of persons to vote safely by mail: individuals who (1) will be away from their county on Election Day and during early voting; (2) are sick or disabled; (3) are 65 years of age or older on Election Day; or (4) are confined in jail, but eligible to vote. Tex. Code §§ 82.001; 82.002; 82.003; 82.004. Unless Texas voters satisfy one of these enumerated excuses ("Eligibility Criteria"), they must vote in person in the upcoming elections, or not at all.

37. Defendants' extreme approach to enforcing the Eligibility Criteria has required and will continue to require many Texas voters to risk their health and safety in order to exercise their fundamental right to vote. Defendants cannot guarantee that no Texan will contract COVID-19 as a result of in-person voting. Nor can Defendants guarantee that no Texan will contract COVID-19 as a result of their family member voting in person. Defendants further cannot guarantee that no Texan will be hospitalized or die as a result of contracting COVID-19 at an in-person polling location. And, for any Texan that does contract COVID-19 at a polling location, Defendants do

not guarantee that they will cover the cost of any necessary medical care. As a result, for a voter that contracts COVID-19 in an effort to exercise their right to vote, the consequences could be devastating.

38. The consequences of voting in person will not be equally shared among Texas's demographic populations. Most Texas voters that are eligible to vote by mail are white. Indeed, some estimates suggest that nearly two out of every three voters older than 65—*i.e.*, most of the absentee-eligible population in Texas—are white.[5] And, of course, given the Eligibility Criteria, the vast majority of absentee voters are over 65. This means that the younger and minority voters, including many of LULAC Plaintiffs' members, are disproportionately harmed by Defendants' enforcement of the Eligibility Criteria. Nearly a third of Texas's Latino voters are between the ages of 18–29.[6]

39. Indeed, 22% of non-Hispanic white voters in Texas are older than age 65, and thus may vote by mail, while only 11.4% of Latino voters. And while non-Hispanic white voters are 52.2 percent of the total potential voter population, they represent 67.5 percent of the potential voter population over 65. By contrast, Latino voters make up 29.3 percent of the total potential voter population, but only 19.0 percent of the potential voter population over 65.[7]

40. For Latino voters, the consequences of having to vote in person are particularly stark. For example, a higher prevalence of multigenerational households in the Texas Latino

---

[5] Alexa Ura & Ryan Murphy, *Why Is Texas Voter Turnout So Low? Demographics Play a Big Role*, TEXAS TRIBUNE, Feb. 23, 2018, https://www.texastribune.org/2018/02/23/texas-voter-turnout-electorate-explainer/.
[6] Stephanie Presch, *The Growing Latino Vote In Texas: Battleground of the Future*, UNIDOS US, 2016, https://www.unidosus.org/issues/voting/articles/latino-vote-texas.
[7] Chris Warshaw, Allowing Only Older Americans to
Vote by Mail Leads to Severe Racial Disparities, ELECTION LAW BLOG, July 1, 2020, https://electionlawblog.org/?p=112733

community means that younger Latino voters who contract COVID-19 at the polls risk bringing the disease home to their vulnerable elderly family members. In addition, a higher prevalence of chronic conditions like hypertension and diabetes in the Latino community could lead to complications and increased risk of death from COVID-19 for Latino voters who contract COVID-19 at the polls—and for the family members they risk exposing to the disease thereafter.[8] And, given the disproportionately high rate of Texas Latinos lacking health insurance—27% of Latinos compared to 12% of non-Hispanic whites[9]—the economic costs resulting from the contracting COVID-19 at a polling site could also be ruinous for Latino voters and their families, even if they survive the disease itself.

41. For Texas's Latino voters, the choice between voting in person while risking exposure to a deadly disease, and not voting at all, is not just an inconvenient one. It imposes an undue burden on voters' exercise of their fundamental right to vote.

42. Even absent pandemic conditions, Texas's vote-by-mail policy sets up a starkly racially disparate system of access to the right to vote. Even prior to the pandemic, vote-by-mail has been increasingly the method of chosen voting by Americans. Yet, in Texas, whether you can utilize this method depends on your age and, given the skewed age demographics by race in Texas, non-Hispanic white Texans have far greater access to this option.

43. Mail voting is a crucial option for low-income voters that juggle demanding and less predictable work and childcare schedules that make in-person voting more difficult. It is likewise an important method for students. Once again, these voters in Texas are

---

[8] Ctrs. For Disease Control and Prevention, https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf.

[9] Matthew Buttgens, et al., *The Uninsured In Texas: Statewide and Local Area Views*, URBAN INSTITUTE, Dec. 2018, https://www.urban.org/sites/default/files/publication/99498/uninsured_in_texas_2.pdf.

disproportionately voters of color. Yet, unlike several other states (among the minority that retain eligibility criteria for mail voting at all), Texas lacks eligibility criteria that would enable voters whose working hours overlap with polling hours or students who attend school outside the county to vote by mail.

44. Texas has an established mail-in ballot system. That system is already open to *all* voters over the age of 65. Texas does not have any substantial interest in depriving its younger and minority voters of the ability to vote by mail, during this health crisis or otherwise, when it extends that option liberally to older voters; nor does any interest in the integrity of the election *require* such a deprivation.

## CAUSES OF ACTION

### Count 1
### Race and Language Minority Discrimination,
### Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301

45. Plaintiff-Intervenors reallege and incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

46. Texas's Latino voters are particularly susceptible to contracting and dying from COVID-19. Latino voters' increased susceptibility to the dangers of COVID-19 is directly tied to social and historical conditions stemming from discrimination.

47. As a result of their unique vulnerability to COVID-19 and as a result of their disproportionate exclusion from the age-based eligibility criteria, Texas Latinos will be disproportionately disenfranchised by Defendants' actions requiring them to either risk infection by voting in person or not vote at all unless they meet Defendants' narrowly defined Eligibility Criteria.

48. Even absent pandemic conditions, Texas's restrictions on vote-by-mail access deprive Texas Latinos of an equal opportunity to participate in elections as their non-Hispanic white peers. The Eligibility Criteria ensure that non-Hispanic white voters will disproportionately benefit from blanket access to vote-by-mail compared to Latino voters. At the same time, Latino voters face socio-economic circumstances—the result of longstanding discrimination—that make their lack of access to vote-by-mail *more* burdensome. Thus, the Eligibility Criteria guarantee laxer rules for voting for non-Hispanic white voters who face fewer other barriers to voting while restricting voting access for Latino voters who already face steep barriers to the ballot box.

49. Texas's restrictions on mail-in ballots violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because they result in the denial of the right to vote on account of race and language minority status, insofar as, under the totality of the circumstances, LULAC Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the political process.

50. Texas's restrictions on mail-in ballots violate Section 2 because they deny and abridge the right to vote on account of race and language minority status.

**Count 2**
**Violation of Fundamental Right to Vote**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**

51. Plaintiff-Intervenors reallege and incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

52. LULAC Plaintiffs' members and other Latinos in Texas have a fundamental right to vote under the First and Fourteenth Amendments to the United States Constitution. Where the operation of an election law is alleged to cause a deprivation of such a fundamental right,

the court "must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interest put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). In assessing right to vote claims, courts consider both the severity of the injury and whether the restriction at issue is discriminatory in application.

53. Texas already guarantees *some* of its citizens the right to vote by mail in any election. Texas's Eligibility Criteria ensure that Texas voters' have sharply different options for voting depending on their age, resulting in sharp racial disparities as well. For many voters, including those who work during ordinary polling hours, lack of access to vote by mail severely burdens their ability to cast a ballot. In the context of an ongoing global pandemic, these burdens were exponentially magnified. Defendants' failure to extend the right to vote by mail to *all* citizens, unconstitutionally denies or abridges the fundamental right to vote of Texas's absentee ineligible voters, including many of LULAC Plaintiffs' members, in violation of the First and Fourteenth Amendments to the Constitution.

54. Making LULAC Plaintiffs and their members, including those who are at increased risk of complications from COVID-19 and those whose schedules make in-person voting untenable or burdensome, choose between voting in person—thereby risking their health, safety, or abdicating other responsibilities—or not voting at all because they do not meet the State's Eligibility Criteria for mail-in voting, violates LULAC Plaintiffs' right to vote under the First and Fourteenth Amendments to the Constitution.

55. There is no state interest in favor of enforcing Texas's prohibition against mail-in voting without excuse that justifies the burden placed on LULAC Plaintiffs' constitutional right to vote. Defendants may not deprive LULAC Plaintiffs of their fundamental right to vote—secured to them by the First and Fourteenth Amendments to the United States Constitution—by enforcing their unduly restrictive vote-by-mail policy.

**Count 3**
**Denial of the Fundamental Right to Vote in Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**
**42 U.S.C. § 1983**

56. Plaintiff-Intervenors reallege and incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

57. The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also id.* at 106-07 (finding that voting procedures that "vary not only from county to county but indeed within a single county" are not "sufficient [to] guarantee[] equal treatment"); *see, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

58. "[P]ermitting absentee voting by some classes of voters and denying the privilege to other classes of otherwise qualified voters in similar circumstances, without affording a comparable alternative means to vote, is an arbitrary discrimination violative of the Equal Protection Clause." *American Party of Texas v. White*, 415 U.S. 767, 795 (1974). This is so even when such voters are not absolutely prohibited from exercising the franchise absent the

right to vote by mail. *See id*. at 794-95 (holding that Texas could not require minority party voters to vote-in-person while allowing majority party voters the option to vote in person or by mail).

59. Texas's Eligibility Criteria for Absentee Voting denies Texas voters equal access to voting by mail based on their age, and disproportionately privileges older, non-Hispanic white voters while denying access to vote-by-mail to younger, Latino voters, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count 4
### Age Discrimination in Voting
### Twenty-Sixth Amendment
### 42 U.S.C. § 1983

60. Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

61. Texas's Eligibility Criteria and Defendants' restrictive vote-by-mail policy abridges Texas voters' right to vote based on age. In the context of the pandemic, it is particularly untethered from practical realities. A healthy 65-year-old will vote by mail without difficulty while an immunocompromised 25-year-old cannot even though the latter individual faces at least equal danger in casting an in-person ballot. But even absent pandemic conditions, facial discrimination on voting access on the basis of age violates the Twenty-Sixth Amendment.

62. The abridgement of the right to vote based on age is unconstitutional facially and as applied to LULAC Plaintiffs and its members during these pandemic circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

  A. Declare that Defendants' enforcement of the narrow vote-by-mail eligibility policy, facially and as applied in the context of the pandemic, to exclude Texas voters from casting mail-in ballots unless they meet Defendants' interpretation of the Eligibility Criteria, is unconstitutional and violates the First, Fourteenth, and Twenty-Sixth Amendments;

  B. Declare that Defendants' enforcement of their narrow vote-by-mail eligibility policy, facially and as applied in the context of the pandemic, to exclude Texas voters from casting mail-in ballots unless they meet Defendants' interpretation of the Eligibility Criteria, violates Section 2 of the Voting Rights Act;

  C. Preliminarily and permanently enjoin Defendants, their agents, employees, and any other persons acting in concert with them, from enforcing the Eligibility Criteria in an unconstitutional or unlawful manner, including enjoining Defendants from utilizing these Eligibility Criteria;

  D. Preliminarily and permanently enjoin Defendants from excluding any eligible voter from casting a mail-in ballot, whether or not the voter meets the Eligibility Criteria for the duration of the COVID-19 pandemic;

  E. Preliminarily and permanently order Defendants to take additional reasonable steps necessary for facilitating mail-in voting in the context of a pandemic, including broadly publicizing the relief granted by this Court by all reasonable means, ensuring that county election administrators abide by the relief granted by this Court, instructing and training election officials as to the relief granted by this Court;

  F. Award Plaintiffs their reasonable attorneys' fees and costs;

  G. Order such other and further relief as may be just under the circumstances.

| | |
|---|---|
| DATED: April 16, 2021 | Respectfully submitted, |
| | /s/ Luis Roberto Vera, Jr. |
| Danielle M. Lang* | Luis Roberto Vera, Jr. |
| Molly E. Danahy* | |
| Jonathan Diaz* | LULAC National General Counsel |
| Campaign Legal Center | Law Offices of Luis Roberto Vera, Jr. & Associates |
| 1101 14th St. NW, Ste. 400 | |
| Washington, DC 20005 | 1325 Riverview Towers |
| Telephone: (202) 736-2200 | 111 Soledad |
| Facsimile: (202) 736-2222 | San Antonio, TX 78205-2260 |
| dlang@campaignlegal.org | Telephone: (210) 225-3300 |
| mdanahy@campaignlegal.org | lrvlaw@sbcglobal.net |
| jdiaz@campaignlegal.org | |

*Admitted pro hac vice*

*Counsel for* LULAC *Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on April 16, 2021, the foregoing Amended Complaint of Plaintiff-Intervenors was filed via the Court's ECF/CM system, which will serve a copy on all counsel of record.

                                                /s/ Luis Roberto Vera, Jr.
                                                Luis Roberto Vera, Jr.