# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **TEXAS DEMOCRATIC PARTY, GILBERTO HINOJOSA, Chair of the Texas Democratic Party, JOSEPH DANIEL CASCINO, SHANDA MARIE SANSING, and BRENDA LI GARCIA,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **and** | ) ) | |
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), and TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** | ) ) ) ) ) | |
| **Plaintiff-Intervenors,** | ) ) | |
| **V.** | ) ) | **CIVIL ACTION NO. SA-20-CA-438-FB** |
| **JOHN B. SCOTT, Texas Secretary of State,[1]** | ) ) | |
| **Defendant.** | ) | |

## ORDER REGARDING DEFENDANT'S MOTIONS TO DISMISS

This case of first impression presents two main issues:

1.  Does the clear text of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mean what it says, thus rendering Texas's age restriction on mail-in voting unconstitutional?[2]

2.  Is this Court, irrespective of what it believes the law should be, obligated to follow appellate guidance and the interpretative trend of the evolving concept of judicial deference to state legislatures regarding vote-by-mail procedures?

---

[1] Secretary of State John B. Scott is automatically substituted as defendant for Ruth Hughs, who formerly served as the Texas Secretary of State. *See* FED. R. CIV. P. 25(d). Local election officials, the Texas Governor and Texas Attorney General were previously dismissed as defendants in this action. Plaintiffs and plaintiff-intervenors are collectively referred to as "plaintiffs" unless otherwise noted.

[2] The Fourteenth Amendment guarantees that no person shall be denied equal protection under the law. U.S. CONST. amend. XIV; *see also* Tex. Elec. Code § 82.003 (Texans sixty-five and older can vote-by-mail).

This Court answers the first issue affirmatively in plaintiffs' favor. But there being "many a slip between the cup and the lip,"[3] the Court, based on its reading and interpretation of current caselaw, is compelled to respond "Yes" to the second question, inuring to defendant's benefit. This Court has been presented previously with a conundra of cases in which the law requires results contrary to personal opinions. *See Dutmer v. City of San Antonio*, 937 F. Supp. 587, 589, 595 (W.D. Tex. 1996), and collected cases in Appendix I.

Accordingly, because the judicial handwriting, writ large, is on the constitutional wall, the defendant's motions to dismiss are granted for the reasons stated herein.

## JUDICIAL DEFERENCE TO STATE LEGISLATURES

While the Court agrees with plaintiffs there are procedural differences among the cases cited by defendant,[4] federal courts are expressly deferring to state legislatures.[5] *See* Appendix II. The jury is still out on whether judicial deference will extend to legislative bodies wishing to return to the not-so-halcyon days of yesteryears' poll taxes and literary tests.[6] The concept of judicial deference to state legislatures is not always a *fait accompli* and appears to be applied unevenly. *Compare and contrast Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (giving judicial deference to state

---

[3] The earliest surviving record of this proverb in English is in Richard Taverner's Proverbs of Erasmus, written in 1539. This translation quotes the proverb as "Many thynges fall betwene the cuppe and the mouth. . . . Betwene the cuppe and the lyppes maye come many casualties." *Jennifer Speake, Oxford Dictionary of Proverbs* 202 (Oxford Univ. Press 2015).

[4] Rule 12(b) vs. preliminary injunction or summary judgment.

[5] Some in the academy are not in agreement with the concept of judicial deference. *See e.g.,* Joshua A. Douglas, *Undue Deference to States in the 2020 Election Litigation*, 30 WM. & MARY BILL RTS. J. 59 (2021); Adam Shelton & Anthony Sanders, *A Story of Judicial Deference to the Will of the People*, 15 NYU J.L. & LIBERTY 55 (2021); Joseph S. Diedrich, *Separation, Supremacy, and the Unconstitutional Rational Basis Test*, 66 VILL. L. REV. 249, 255 (2021).

[6] *See Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666-67 (1966) (declaring poll taxes unconstitutional); *Guinn v. United States*, 238 U.S. 347, 364 (1915) (striking down literacy requirements for voting).

legislatures' abortion laws) *with New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (refusing to give judicial deference to State of New York's concealed handgun law) *and Carson v. Makin*, 142 S. Ct. 1987 (2022) (refusing to give judicial deference to Maine's ban on taxpayer tuition assistance payments to religious-backed private schools); *see also Moore v. Harper*, No. 21-1271, 2022 WL 2347621 (U.S. June 30, 2022) (granting petition for writ of certiorari in case raising independent-state-legislature theory to determine whether Supreme Court will defer to North Carolina Legislature for drawing of redistricting maps); *see also McConchie v. Scholz*, Case No. 21-cv-3091, 2021 WL 6197318, at *28 (N.D. Ill. Dec. 30, 2021) (giving judicial deference to Democratic legislature in Illinois with three-judge panel rejecting Republicans' challenge to state legislature's remedial redistricting plan).

The Cynics[7] of antiquity and modernity might base their scepticism of judicial consistency on whose ox is it.[8]

Circuit courts have likewise deferred to state legislatures particularly in voting cases. In *Griffin v. Roupas*, 385 F.3d 1128, 1129-30 (7th Cir. 2004), working mothers sought to expand voting options "that would allow people [to vote] who find it hard for whatever reason to get to the polling place on

---

[7] "Cynics" were members of a Greek philosophical sect who divorced themselves from traditional ways of wealth and social status in order to find happiness in a simple life with whatever was present. WILLIAM DESMOND, CYNICS 1-3 (Vol. 3) (Rutledge Group et al. eds., 2008).

[8] "A Farmer came to a neighboring Lawyer, expressing great concern for an accident which he said had just happened. One of your Oxen, continued he, has been gored by an unlucky Bull of mine, and I should be glad to know how I am to make you reparation. Thou art a very honest fellow, replied the Lawyer, and wilt not think it unreasonable that I expect one of thy Oxen in return. It is no more than justice quoth the Farmer, to be sure; but what did I say?—I mistake—It is *your* Bull that has killed one of *my* Oxen. Indeed says the Lawyer, that alters the case: I must inquire into the affair; and if—*And If!* said the Farmer—the business I find would have been concluded without an *if*, had you been as ready to do justice to others as to exact it from them." NOAH A. WEBSTER, THE AMERICAN SPELLING BOOK 101–02 (Hartford, Hudson & Goodwin 1788) (emphasis in original); *see also Exodus* 21:35 ("And if one man's ox hurt another's, that he die; then they shall sell the live ox, and divide the money of it; and the dead ox also they shall divide.").

election day." The Seventh Circuit found no equal protection violation because, among other reasons, "unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate [legislative] policy, do not violate equal protection." *Id*. at 1132. Continuing this trend toward judicial deference in absentee voting cases, the Seventh Circuit recently determined that a state does not abridge the rights of younger voters in violation of the Twenty-Sixth Amendment by allowing older voters the option to vote by mail, even during the pandemic. *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020). The Supreme Court denied certiorari in both cases. *Griffin*, 125 S. Ct. 1669 (2005); *Tully*, 141 S. Ct. 2798 (2021); *see also* Fifth Circuit and other cases discussed in the following pages and Appendix II.

## DISCUSSION FOLLOWING REMAND

### *I. Overview*

Now before the Court on remand from the Fifth Circuit are "the real issue [of] equal protection" and other matters following the determination that "the Texas Legislature's conferring a privilege to those at least age 65 to vote absentee did not deny or abridge younger voters' rights who were not extended the same privilege." *Texas Democratic Party v. Abbott* ("*TDP II*"), 978 F.3d 168, 192, 193 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021). Defendant moves to dismiss plaintiffs' post-remand amended complaints seeking to expand the excuse-free mail-in-voting offered to those at least sixty-five years of age to all Texas voters regardless of age.

Texas law requires most voters to cast their ballots in person either on election day, Tex. Elec. Code ch. 64, or during an early-voting period prescribed by the legislature, *id*. § 82.005. Voters may apply to vote by mail in only one of four instances—if they: (1) anticipate being absent from their county of residence; (2) have a disability that prevents them from appearing at the polling place; (3) are

sixty-five or older; or (4) are confined in jail. Tex. Elec. Code §§ 82.001-.004. "Disability" for the purposes of the election code is defined to allow a qualified voter to vote by mail if the "voter has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health." *Id.* at § 82.002(a).

Plaintiffs filed this action on April 7, 2020, and sought a preliminary injunction which was substantively identical to an injunction that plaintiffs sought in state court. On May 19, 2020, this Court issued its order on the preliminary injunction requiring no-excuse mail-in balloting in Texas. The state defendants appealed and sought a stay of the injunction pending the appeal. A Fifth Circuit Panel granted the stay. *Texas Democratic Party v. Abbott* ("*TDP I*"), 961 F.3d 389, 397 (5th Cir. 2020). On the merits, plaintiffs defended the injunction solely on the grounds of their Twenty-Sixth Amendment claim. The Fifth Circuit merits Panel ultimately vacated the injunction and remanded this case for further proceedings consistent with the opinion on interlocutory appeal. *TDP* II, 978 F.3d at 194. Plaintiffs filed amended complaints. Defendant moves to dismiss the amended complaints, which plaintiffs oppose. This Court requested additional briefing. Supplemental briefs have now been filed by the parties and the issues are properly before this Court.

## II.  Arguments

Plaintiffs bring claims on behalf of eighteen to sixty-four-year-old voters on the basis of age and race. Citing unprecedented challenges posed by the COVID-19 pandemic, plaintiffs allege that Texas's age limitation for voting–on its own and combined with election policies yet to be enacted and the trajectory of the pandemic–discriminates on the basis of age, both facially and as applied, and on the basis of age/race by creating separate classes of voters with lesser rights to access the ballot box.

-5-

Specifically, plaintiffs contend that § 82.003 of Texas Election Code violates the Twenty-Sixth Amendment, the First Amendment, the Fourteenth Amendment, the Fifteenth Amendment, and § 2 of the Voting Rights Act (sometimes referred to as "VRA").

Defendant's motions seek dismissal of the amended complaints under Rule 12(b)(1) for lack of jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defendant moves to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) arguing: (1) plaintiffs lack standing to complain of speculative future election policies and pandemic conditions; (2) plaintiffs' claims regarding unspecified future election policies and pandemic conditions are not ripe; and (3) sovereign immunity bars plaintiffs' claim regarding unspecified "election conditions." Defendant also moves to dismiss for failure to state a claim pursuant to Rule 12(b)(6) arguing: (1) the Fifth Circuit's opinion in this case forecloses plaintiffs' Twenty-Sixth Amendment claim; (2) plaintiffs' claims of unconstitutional race discrimination fail; (3) plaintiffs do not plead a viable claim under § 2 of the VRA; (4) Texas's age restriction on mail-in-voting easily passes the rational-basis review applicable to plaintiffs' challenges; and (5) alternatively, plaintiffs' claims under the First, Fourteenth and Fifteenth Amendments fail even under the more onerous *Anderson/Burdick* test.

Plaintiffs respond that defendant's jurisdictional challenges improperly narrow the scope of their claims. Plaintiffs further contend they have stated claims on the merits upon which relief can be granted sufficient to survive dismissal. This Court first addresses defendant's jurisdictional challenges under Rule 12(b)(1) and then turns to Rule 12(b)(6).

### III.  Dismissal Under Rule 12(b)(1)

Defendant does not contest that the Court has jurisdiction under Rule 12(b)(1) in terms of what is before the Court on remand. Defendant does challenge plaintiffs' standing, and raises ripeness and

sovereign immunity, for alleged speculative matters raised in the amended complaints following remand.  Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a case for lack of subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  Because subject-matter jurisdiction goes to the heart of the Court's power to hear the case, the Court should consider Rule 12(b)(1) challenges before addressing Rule 12(b)(6) challenges *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  In considering a Rule 12(b)(1) motion, the Court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint, undisputed facts, and the Court's resolution of disputed facts. *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010). In other words, the Court may "weigh the evidence and satisfy itself" that subject matter jurisdiction exists. *MDPhysicians & Assocs. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

### A.  Standing

Plaintiffs lack standing to challenge speculative future election policies and pandemic conditions.  Standing is an indispensable element of federal court jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff "must show: (1) an injury-in-fact that is (2) fairly traceable to the defendant's challenged action (causation) and that is (3) redressable by a favorable decision (redressability)." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  All three requirements are "an indispensable part of the plaintiff's case," and the party seeking to invoke federal jurisdiction bears the burden to establish them. *Lujan*, 504 U.S. at 561. To establish injury in fact, "a plaintiff must show he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation omitted).

To the extent plaintiffs allege harm caused by § 82.003 *when combined with* future pandemic conditions and "proposed bills," (docket nos. 141 ¶¶ 15-20, 81, 84, 86, 88, 92, 95), and unenacted "election policies" and future pandemic conditions, (docket no. 142 ¶¶ 35, 46–47, 53–54, 61), such claims are purely "conjectural." *See Lujan*, 504 U.S. at 560. Such assertions do not support any injury to plaintiffs that is concrete and particularized or actual and imminent. *See id.* Further, plaintiffs cannot plausibly claim that injuries from laws not yet enacted are "fairly traceable to the challenged action of [the Secretary]," or redressable by the Secretary. *Id.* Accordingly, plaintiffs lack standing to complain of such speculative harm.

### B. Ripeness

Plaintiffs' claims regarding future pandemic conditions and unspecified bills and election policies are not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements [until a] decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *National Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). Determining whether an issue is ripe for judicial review requires considering "[t]he fitness of the issues for judicial decision and . . . the hardship to the parties of withholding court consideration." *Id.* at 809; *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). This Court declines to analyze policies and laws that have not been enacted or evaluate the pandemic in light of in-person voting in future elections, and plaintiffs have not identified any concrete harm based on future contingent events. Accordingly, these claims are unripe.

### C. *Sovereign Immunity*

Finally, to the extent plaintiffs seek to enjoin undefined "election conditions," those claims are barred by sovereign immunity. "[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Thus, plaintiffs' claims fail unless they fit that exception. *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). As a consequence, *Ex parte Young* applies only when the defendant has sufficient connection to the enforcement of the challenged statute. *See id.*

The Fifth Circuit held in this case that defendant has a sufficient connection to the enforcement of § 82.003 to overcome sovereign immunity for purposes of plaintiffs' interlocutory appeal. *TDP II*, 978 F.3d at 179. However, the Court emphasized that "[d]etermining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis, *i.e.*, the official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.* For example, in other cases, the Fifth Circuit recently determined that defendant lacks the requisite connection to the enforcement of certain statutory provisions relating to other early voting protocols. *See Mi Familia Vota v. Abbott*, 977 F.3d 461, 463–66 (5th Cir. 2020); *Texas Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. 2020). Here, plaintiffs do not plead facts to show defendant's requisite connection to the enforcement of the future "election policies" and "election conditions" about which they complain in their amended complaints following remand. Moreover, plaintiffs cannot

plausibly claim defendant has an enforcement role regarding unspecified laws that have yet "to be enacted" and may never be enacted. Accordingly, sovereign immunity bars any such claim against defendant. For these reasons, defendant's motion to dismiss pursuant to Rule 12(b)(1) is granted such that plaintiffs' claims based on speculative future election policies and pandemic conditions are dismissed for lack of subject matter jurisdiction.

## IV.  Dismissal Under Rule 12(b)(6)

Rule 12(b)(6) permits the Court dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the Court presumes the complaint's factual allegations, but not its legal conclusions, are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 680-81 (2009). The Court then determines if the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility requires enough facts to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6) limits the Court's review to the complaint, documents attached to the complaint, and documents attached to the motion that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). This Court turns to the merits of the motions.

### A.  The Twenty-Sixth Amendment

The Fifth Circuit's opinion in this case forecloses plaintiffs' Twenty-Sixth Amendment claim. Although the issue on interlocutory appeal was the preliminary injunction, the Fifth Circuit went beyond considering whether plaintiffs were likely to succeed on the merits of this claim. *See TDP II*, 978 F.3d at 192. The Court announced the standard for adjudicating claims under the Twenty-Sixth Amendment. *Id.* Specifically, the Fifth Circuit held that plaintiffs' claim failed as a matter of law because:

-10-

> [T]he Texas Legislature's conferring a privilege to those at least age 65 to vote absentee did not deny or abridge younger voters' rights who were not extended the same privilege.  Thus, Section 82.003 itself does not violate the Twenty-Sixth Amendment.

*Id*.  In reaching its decision, the Fifth Circuit determined that plaintiffs had failed to show that Texas's age limitation on absentee voting made it "more difficult" for them to vote than it was before the law was enacted in 1971.  *Id.* at 191.  Accordingly, plaintiffs have failed to state a Twenty-Sixth Amendment claim upon which relief can be granted.  And the "law of the case" rule forecloses relitigation of this issue.  *United States v. Lee*, 385 F.3d 315, 321 (5th Cir. 2004).

### B. Discrimination

#### 1. Intentional Discrimination

As part of his Rule 12(b)(6) motion, defendant moves to dismiss plaintiffs' claims that Texas's age limitation on absentee voting was passed with a racially discriminatory purpose.  Plaintiffs respond that they "are no longer pursuing a claim of intentional race discrimination at this time,"  (docket no. 155 at page 2 n.2), but later argue that they have stated such a claim.  In any event, to the extent plaintiffs continue to allege racial discrimination claims under the Equal Protection Clause or the Fifteenth Amendment, they have not pleaded facts to show intentional discrimination based on age by the Texas Legislature as a whole in enacting mail-in-voting in 1975.  As defendant points out, this is a necessary component of those claims.  *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 481-82 (2000) ("Whether under the Fourteenth or Fifteenth Amendment, [the plaintiff] has been required to establish that the State or political subdivision acted with discriminatory purpose.").  While plaintiffs try to fit a square racial peg into a round election hole, this Court cannot see a racial animus cause of action.  *See Johnson v. Waller County*, No. 4:18-CV-03985, 2022 WL 873325, at *41 (S.D. Tex. Mar. 24, 2022)  (seeing no racial animus against Black student voters based on Waller County's failure to

provide polling location on college campus because there was no reason to believe "the adopted schedule had the effect of discriminating on the basis of race (or age)–much less that it was chosen *because* of such an effect") (emphasis in original).

### 2. Discriminatory Effect: § 2 of the Voting Rights Act

Plaintiffs allege Texas's age limitation on absentee voting is tantamount to a vote abridgement or denial that disparately impacts Hispanics aged eighteen to sixty-four.  They contend that, because Texas's population over the age of sixty-five is disproportionately non-Hispanic White, a discriminatory effect can be shown insofar as White voters over the age of sixty-five have better access to absentee mail ballots than do Hispanic voters under the age of sixty-five.  Plaintiffs bring this claim under § 2 of the Voting Rights Act.

Section 2 forbids application of a standard, practice, or procedure in a manner that results in a denial or abridgement of the right to vote on account of race or color.  52 U.S.C. § 10301(a).  A violation is established when:

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  "Mere inconvenience cannot be enough to demonstrate a violation of § 2." *Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321, 2338 (2021).

Plaintiffs rely on *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), to support their § 2 claim.  In *Veasey*, the Fifth Circuit was persuaded that Texas's voter identification law requiring certain specific forms of identification at the polls was tantamount to a § 2 vote denial because it imposed a discriminatory burden on Black voters.  Here, the Fifth Circuit found *Veasey* to be inapposite to the

facts of this case.  *TDP I*, 961 F.3d at 402 n.2.  In the words of the Panel staying this Court's preliminary injunction:

> *Veasey* stated only that Texas's provision of a mail-in ballot did not make up for the burdens that its voter-identification law placed on voting in person.  *See* [830 F.3d ] at 255 ("The district court did not clearly err in finding that mail-in voting is not an acceptable substitute for in-person voting in the circumstances presented by this case.").  *Veasey* nowhere said that the state must provide everyone multiple ways to vote.  And here, unlike in *Veasey*, the state has not placed any obstacles on the plaintiffs' ability to vote in person.  *Veasey* is inapposite.

*Id*.

This conclusion appears to have been reinforced by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021).  Although *Brnovich* did not involve absentee voting, it seems relevant to the extent that the Supreme Court clarified the standards for evaluating challenges to ballot counting and collection laws under § 2 of the Voting Rights Act.  *Id.* at 2347.  *Brnovich* concerned an Arizona law that required voters to vote in the precinct to which they were assigned based on their address, and stated that votes cast in the wrong precinct would not be counted.  *Id*.  The law also made it a crime for any person to knowingly collect an early ballot—either before or after it has been completed.  *Id*.  The *Brnovich* plaintiffs alleged, *inter alia*, that both provisions adversely and disparately affected American Indian, Hispanic, and African American voters in violation of § 2.  *Id*.  The Supreme Court held that the challenged provisions did not violate the VRA.  *Id.* at 2325; *see also id.* at 2333 (discussing *Thornburg v. Gingles*, 478 U.S. 30 (1986)).

The Court acknowledged the state's "indisputably . . . compelling interest in preserving the integrity of its election process." *Id.* at 2347 (quotations omitted).  It found that interest sufficient to defeat the plaintiffs' claim under § 2, "[e]ven if the plaintiffs had shown a disparate burden." *Id*.  The

Court reiterated that § 2 does not impose a "freewheeling disparate-impact regime." *Brnovich*, 141 S. Ct. at 2341. To the contrary, "§ 2(b) of the Voting Rights Act directs us to consider the totality of circumstances that have a bearing on whether a state makes voting equally open to all and gives everyone an equal opportunity to vote—and not the totality of just one circumstance, namely, disparate impact." *Id*. (internal quotations omitted).

**This means "voting necessarily requires some effort"—it "takes time and, for almost everyone, some travel"—and it "requires compliance with certain rules." *Id*. at 2338. It means accepting that voters "must tolerate the usual burdens of voting"—and that having to endure such burdens does not mean that our electoral system is no longer "equally open" or fails to "furnish[ ] an equal opportunity to cast a ballot." *Id*. at 2338 (internal quotation omitted). In sum, "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2." *Brnovich*, 141 S. Ct. at 2338 (emphasis added).**

Here, the Fifth Circuit found that the fundamental right to vote remains equally open to all Texas voters regardless of age, even during the pandemic, *see TDP II*, 978 F.3d at 191-93, and that differential access to absentee mail-ballots does not disproportionally burden any Texas voter because all Texas voters can vote in person. *See TDP I*, 961 F.3d at 402 n.2. Thus, that the privilege of voting absentee is not extended to voters who do not qualify for an absentee ballot under § 82.003, appears to be one of the "minor inconveniences" that the Supreme Court held would not overcome Texas's interest in administering elections. *See TDP II*, 978 F.3d at 191 (holding that Texas's age restriction on absentee voting does not violate Twenty-Sixth Amendment because it does not make it "more difficult" for plaintiffs to vote than it was before law was enacted); *TDP I*, 961 F.3d at 402 n.2 (holding that Texas's age restriction on absentee voting does not violate § 2 because it does not place "any obstacles on the

plaintiffs' ability to vote in person"); *see also* TDP II, 978 F.3d at 192-93 ("The record indicates Texas is taking the kinds of precautions" necessary to protect health and safety of in-person voting despite concerns over COVID-19).

Nonetheless, out of an abundance of caution, this Court addresses the specific intersecting claims of age and race discrimination made by plaintiffs in this case. Plaintiffs allege that Texas's age restriction on vote-by-mail eligibility places a discriminatory burden on "younger and minority voters, including many of [their] members," because they are more likely to be under sixty-five and therefore denied the right to vote absentee. (LULAC Am. Compl. ¶ 38-39); *see also* (TDP 2d. Am. Compl. ¶ 6-8, 29, 39). For example, nearly two-thirds of the over sixty-five population in Texas is White. (LULAC Am. Compl. ¶ 38). At the same time, nearly one third of all Hispanic voters in Texas are between the ages of eighteen and twenty-nine. *Id*. As such, the theory is that Texas's age requirement for absentee voting primarily benefits older White voters, while denying the same opportunities to younger Hispanic voters.

Plaintiffs further "allege that younger voters in Texas are more likely to be low income, have less predictable work hours, and be students, which makes it more difficult to vote in person than for older voters who are above retirement age." *Id*. at 43. They also state that Hispanic voters are more susceptible to COVID-19 than other voters. Plaintiffs therefore contend they have sufficiently pleaded that "granting older, White, retired voters the right to vote at home while forcing young, working voters of color to appear in person to vote imposes a discriminatory burden on the basis of race." *Id.*

In *Brnovich*, the Court characterized its opinion as, "for the first time[,] appl[ying] § 2 of the Voting Rights Act . . . to regulations that govern how ballots are collected and counted." Id. at 2330. At the outset, the Court "decline[d] . . . to announce a test to govern all [Voting Rights Act] claims

involving rules . . . that specify the time, place, or manner for casting ballots."  141 S. Ct. at 2336.

Having so qualified its ruling, the Court went on to "identify certain guideposts" that can help courts

decide § 2 cases. *Id*. The five guideposts are:

    1.  "the size of the burden imposed by a challenged voting rule";

    2. "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982";

    3. "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups";

    4. "the opportunities provided by a State's entire system of voting"; and

    5. "the strength of the state interests."

*Id*. at 2338-40.

    The Supreme Court gave great weight to Arizona's interests in enforcing the law.  *Id*. at

2347–48.  The Court further found that each state "indisputably has a compelling interest in preserving

the integrity of its election process." *See id*. at 2347 (quoting *Purcell v. Gonzales*, 549 U.S. 1, 4 (2006)

(per curiam)). And "it should go without saying," the Court continued, "that a state may take action to

prevent election fraud without waiting for it to occur and be detected within its own borders." *Id.* at

2348. Finally, the Court recognized that "[l]imiting the classes of persons who may handle early ballots

to those less likely to have ulterior motives deters potential fraud and improves voter confidence."

*Brnovich*, 141 S. Ct. at 2347.

    *Brnovich* supports the argument that plaintiffs fail to state a viable claim for a § 2 violation.  In

previous opinions in this case, the Fifth Circuit has held:  (1) the fundamental right to vote remains

equally open to all Texas voters, regardless of age; (2) that the privilege of voting absentee is not

extended to voters that do not qualify for an absentee ballot under § 82.003 does not create a difficulty

or obstacle to voting which overcomes Texas's compelling interest in election security, uniformity, and efficiency; (3) inconveniencing individuals to vote in person—early or on election day—ensures the orderly, secure administration of elections within Texas; and (4) Texas has a compelling interest in preventing election fraud, and is not required to demonstrate a history of serious voting fraud issues or an inability to combat voting fraud in other ways.  *See TDP II*, 978 F.3d at 189-194; *TDP I*, 961 F.3d at 402-05.

Plaintiffs also argue that § 82.003's alleged burden on their voting rights is directly tied to Texas's historical discrimination against Hispanics.  Presuming this type of allegation could be sufficient, defendant points out that there is a temporal mismatch between the premises of the allegations and the conclusion plaintiffs ask this Court to reach. Their argument depends on the notion that Hispanics are disfavored because they are younger than White voters.  However, their factual allegations in support of this position are based on current demographics from 2016, 2018, and 2020. Section 82.003 was passed in 1975, alongside measures extending the right to vote to anyone over eighteen, to conform to the Twenty-Sixth Amendment.  *TDP II*, 978 F.3d at 192.  Plaintiffs are not challenging a recently enacted law, but one that has been on the books for nearly fifty years.  *TDP II*, 978 F.3d at 192.  The crux of the assertion is that § 82.003 imposes a burden on the opportunities of Hispanics to participate in elections because the Hispanic population is young.  However, there are no allegations about the relative age of Hispanics and Whites in 1975.

The remaining factors under the *Brnovich* analysis further compel dismissal. Under the analysis in that case, plaintiffs have not alleged anything beyond the "usual burdens of voting" when complying with a rule—age restrictions for mail voting—that does not "depart[ ] from what was standard practice when § 2 was amended in 1982." *Brnovich*, 141 S. Ct. at 2338.  As noted, Texas has been permitting

no-excuse voting to persons sixty-five and older since 1975 (after the Twenty-Sixth Amendment was passed), *TDP II*, 978 F.3d at 192, and  the privilege of absentee voting has historically been extended to the elderly and disabled in a majority of states.  *Id.* at 190.

Moreover, the allegations of the "size of any disparities in a rule's impact on members of different racial or ethnic groups" are of uncertain dimensions and standards.  *Brnovich*, 141 S. Ct. At 2339.   Plaintiffs argue Hispanics have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice because of their race. However, they state their claims on an intersecting bases of race and age, which renders the alleged disparate impact a function of age, not race.  Plaintiffs allege there are more Hispanic voters under the age of sixty-five than there are White voters over the age of sixty-five, but this alone does not create the disparate effect required under § 2.  *Id.* at 2341.  The rest of the allegations are that younger voters in Texas are more likely to be low income, have less predictable work hours, and be students, which makes it more difficult to vote in person than for older voters who are above retirement age.   This alleged disparate impact is a function of age, not race.  Accordingly, it is not actionable under § 2.

Plaintiffs' other factual allegations of disparate impact similarly fail to state a Voting Rights Act claim.  The allegation that Hispanic voters are more susceptible to COVID-19 than other voters may prove to be true, but this argument fails to take into account age, and the arguments regarding work and student status fail to take into account race.  Moreover, Texas law requires employers to provide paid leave if needed to vote. Tex. Elec. Code § 276.004.  Texas law also provides numerous other options to vote besides at the polls on election day. In particular, voters may vote early in person for nearly two weeks in most elections. *Id*. § 85.001.  Additionally, to the extent that students live away from their county of registration, they can vote absentee under a different provision. *Id*. § 82.001. Under the

analysis in *Brnovich*, Texas cannot be faulted if these voters choose not to take advantage of the other avenues available to them to cast their ballot, including requesting paid time off from an employer.  And the "the state interest served by a challenged voting rule" is strong.  *Brnovich*, 141 S. Ct. at 2339.  For these reasons, defendant's Rule 12(b)(6) motions to dismiss plaintiffs' claims brought under § 2 of the Voting Rights Act must be granted.

### 3.  *Non-Racial Discrimination*

Plaintiffs allege that Texas's age restriction on absentee voting imposes a substantial burden on their fundamental right to vote, in violation of the First and Fourteenth Amendments and they have sufficiently pleaded that the age-restriction violates equal protection by permitting one class of Texans to vote absentee and denying otherwise qualified voters the same privilege.  Defendant moves to dismiss these claims under Rule 12(b)(6), arguing that § 82.003 passes the rational-basis review applicable to challenges under the First and Fourteenth Amendments to the United States Constitution.

The Fifth Circuit did not decide the applicable standard of review that this Court must apply to plaintiffs' constitutional claims but noted in dicta that "age-based distinctions are evaluated [under rational-basis review] in the usual case" and that "we have not seen any authority to support that it would require strict scrutiny as the district court initially applied." *TDP II*, 978 F.3d at 194.  "On the other hand," the merits Panel continued, "some courts have applied what is known as the *Anderson/Burdick* balancing analysis to claims that an election law violates equal protection and have provided noteworthy reasons for doing so." *Id.*

Yet, the Fifth Circuit did determine that Texas's age restriction on absentee-voting does not deny or abridge the fundamental right to vote despite the pandemic. *Id.* at 192-93.  Therefore, defendant makes a persuasive argument that the law does not impact the right to vote at all, and rational-basis

scrutiny applies under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969).

Moreover, another panel of the Fifth Circuit, considering a different challenge to Texas's rules for

delivering absentee ballots during COVID, cited *TDP I* and discussed why the *McDonald* standard of

review is the proper scrutiny to be applied in this case:

> Neither Plaintiffs nor the district court have cited any authority suggesting that a State must afford every voter multiple infallible ways to vote. **As we explained in *TDP I*, mail-in ballot rules that merely make casting a ballot more inconvenient for some voters are not constitutionally suspect. 961 F.3d at 405. The principle holds true even if "circumstances beyond the state's control, such as the presence of the [coronavirus,]" or, here, possible postal delays, make voting difficult. *Id.*; see also *McDonald*, 394 U.S. at 810 & n.8, 89 S. Ct. 1404 (explaining that a State is not required to extend absentee voting privileges to all classes of citizens, even those for whom "voting may be extremely difficult, if not practically impossible," such as persons caring for sick relatives or businessmen called away on business).** We cannot conclude that speculating about postal delays for hypothetical absentee voters somehow renders Texas's absentee ballot system constitutionally flawed.

*Texas League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 146 (5th Cir. 2020) (emphasis

added), *dismissing appeal as moot but denying motion to vacate previous order*, No. 20-50867, 2021

WL 1446828, at *1 (5th Cir. Feb. 22, 2021).

Under this most lenient test, a law need only "bear some rational relationship to a legitimate

state end." *McDonald*, 394 U.S. at 809.  In utilizing its "broad powers to determine the conditions

under which the right of suffrage may be exercised," Texas has not absolutely prohibited younger voters

from voting, *TDP I*, 961 F.3d at 404, or "create[d] a barrier to voting that makes it more difficult for

the challenger to exercise her right to vote relative to the status quo."  *TDP II*, 978 F.3d at 192.

Therefore, the Texas Legislature's decision to open absentee voting only to those Texans who are most

likely to benefit from it bears a rational relationship to the state's legitimate interest in "helping older

citizens to vote and guarding against election fraud." *TDP I*, 961 F.3d at 402-03.  Thus, although Texas

could make voting more accessible by extending absentee-voting privileges to all Texans, particularly during COVID-19, "its failure to do so 'hardly seems arbitrary.'" *Id.* at 405 n.33 (quoting *McDonald*, 349 U.S. at 809-10).  In sum, under the law of this case, (1) Texas does not absolutely prohibit younger voters from voting; (2) Section 82.003 is a rational way to facilitate the exercise of the franchise for Texans who are more likely to face everyday barriers to movement; and (3) the Equal Protection Clause is not offended simply because some groups find voting more convenient than do plaintiffs because of Texas's mail-in ballot rules, "even where voting in person may be extremely difficult, if not practically impossible, because of circumstances beyond the state's control, such as the presence of the Virus." *See id.* at 402-04, 405.

### 4. *Anderson/Burdick*

Alternatively, this Court considers this case under the balancing test set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), which is one in which this Court must weigh the burden that a state regulation imposes on the right to vote against the state's interest in enacting the regulation.  The Supreme Court in *Burdick* acknowledged the fundamental nature of the right to vote but recognized it does not follow "that the right to vote in any manner . . . [is] absolute."  504 U.S. at 433.  State laws governing the administration of elections will "invariably impose some burden upon individual voters," so courts must employ a balancing analysis for constitutional challenges to such laws.  *Id.* at 433-34.  Specifically, courts should "weigh 'the character and magnitude of the asserted injury'" to voting rights "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789).  The Supreme Court further instructed in *Anderson* that courts "must not only determine the legitimacy and strength of each of those interests" but also "consider the extent to which

those interests make it necessary to burden the plaintiff's rights."  460 U.S. at 789.

Plaintiffs argue § 82.003 impermissibly burdens their ability vote under the *Anderson/Burdick* analysis because they are required to vote in person regardless of what other barriers they may face, such as difficulty finding child care, a global pandemic, or an hourly job that precludes them from voting in person during business hours.  (Docket no. 155 at page 13).  It is undisputed that Texas's age-based eligibility requirement for mail-in-ballots inconveniences some voters under sixty-five who would like to vote by mail.  However, this Court cannot assess Texas's age-based absentee voting provision in isolation and instead must consider Texas's electoral plan as a whole.  *Burdick*, 540 U.S. at 434-37; *see also Brnovich*, 141 S. Ct. at 2339 ("Thus, where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means.").

Texas law allows voting by mail for all Texans who qualify in one of four categories, including voters who are disabled, are age sixty-five or older, expect to be absent from the county on election day, and are incarcerated.  Tex. Elec. Code §§ 82.001–.004.  Texas also allows for early in-person voting for seventeen days leading up to most elections, *id.* § 82.005; requires employers to provide paid time-off work to vote, *id.* § 276.004; and during the pandemic, "the period for early voting by personal appearance was doubled," *TDP I*, 961 F.3d at 394; safety measures were imposed and "at risk voters of any age can utilize the Texas Election Code's disability provision to mitigate the risk of COVID-19," *TDP II*, 978 F.3d at 192-93; alleviating almost all of plaintiffs' reasons for no-excuse voting by mail.  Moreover, "at risk voters of any age can utilize the Texas Election Code's disability provision to mitigate the risk of COVID-19." *Id.* at 192.  Taken together, under the law of this case, Texas's voting scheme has a slight impact on Texans in selecting their preferred manner of voting, but it does not

severely restrict the right to vote altogether. *TDP II*, 978 F.3d at 188 ("An abridgement [does not occur] any time a new election law makes it more difficult for one age group than it is for another"); *TDP I*, 961 F.3d at 404 n.32 ("[T]he *state* has not placed any obstacles on the plaintiffs' ability to vote in person.") (emphasis in original).

Plaintiffs specifically reference difficult childcare and working arrangements. A similar equal protection claim brought by working mothers was dismissed by the Seventh Circuit under Rule 12(b)(6). In *Griffin v. Roupas*, 385 F.3d 1128, 1129 (7th Cir. 2004), the plaintiffs argued that the United States Constitution required absentee voting because of the burden plaintiffs would otherwise face in getting to the polls on election day. The claim was dismissed because the burden imposed on plaintiffs was minimal given the other voting options available to them, including early voting and an Illinois state law requiring employers to give employees time off if needed to vote, and the statute was rationally related to combating voter fraud. *Id*. at 1130-31. The Seventh Circuit, citing to the Fifth Circuit, concluded that "[u]navoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Id*. at 1132 (citing *Apache Bend Apartments, Ltd. v. United States Through I.R.S.*, 964 F.2d 1556, 1569 (5th Cir. 1992)). The Court also determined that the "striking of the balance between discouraging fraud and other abuses and encouraging turnout **is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.**" *Id*. at 1131 (emphasis added). The Supreme Court denied plaintiffs' petition for writ of certiorari. *Griffin*, 544 U.S. 923 (2005).

Turning to the state's interest, Texas has identified two main factors in support of its decision to allow some, but not all, Texans to vote absentee: discouraging fraud and providing the maximum

protection "for Texans who are more likely to face everyday barriers to movement" and who "have a greater risk of becoming seriously ill or dying from [COVID-19.]" *TDP I*, 961 F.3d at 405.   "[W]ith safety measures imposed and some flexibility as to 'disability' being shown," there has been no showing of unconstitutional *status quo*.  *TDP II*, 978 F.3d at 193.  Accordingly, Texas's legitimate interests in ensuring safe and accurate voting procedures are sufficient to outweigh any limited burden on the right of Texas voters under sixty-five to vote as they choose caused by the state's age-restricted absentee voting scheme.

### C.  *Tully v. Okeson*

Although the matter was heard at the preliminary injunction stage, *Tully v. Okeson*, 977 F.3d 608, 617-18 (7th Cir.), *cert. denied*, 114 S. Ct. 2798 (2020), is instructive.  There, the Seventh Circuit considered "whether Indiana's age-based absentee voting law abridges 'the right . . . to vote' protected by the Twenty[-]Sixth Amendment or merely affects a privilege to vote by mail." *Id.* at 613.  Like the Fifth Circuit, the Seventh Circuit concluded that Indiana's law does not violate the Twenty-Sixth Amendment. *Id.* at 614.  The Seventh Circuit also rejected an argument that "hypothetical laws similarly restricting the ability of African-Americans or women or the poor to vote by mail would violate the Fifteenth, Nineteenth, and Twenty-Fourth Amendments."  *Id.*

In doing so, the Seventh Circuit found Indiana's absentee voting laws passed rational basis review based on the state's legitimate interest in preventing voter fraud and 'open[ing] up absentee voting only to those Hoosiers who are most likely to benefit from it." *Id.* at 616.  The Seventh Circuit also found that Indiana's voting scheme was equally sound under the *Anderson/Burdick* test because "Indiana's legitimate interests in ensuring safe and accurate voting procedures are sufficient to outweigh

any limited burden on Hoosiers' right to vote as they choose caused by the state's restricted absentee voting scheme." *Id.* at 617-18.

This Court recognizes that the Seventh Circuit looked to the content of the "right to vote," *Tully*, 977 F.3d at 614, whereas the Fifth Circuit concentrated on the meaning of the word "abridge." *TDP II*, 978 F.3d at 188-92. However, given that the circuit courts arrived at the same conclusion, these differences in reasoning and focus do not create a split which would justify this Court reaching a different result. Moreover, given the rulings by the Fifth Circuit on preliminary review, and concepts of *stare decisis* and the judicial chain of command, this Court finds plaintiffs have failed to state a claim under the rational basis or *Anderson/Burdick* standards of review applicable to defendant's motions to dismiss.

### D.  *Johnson v. Waller County*

This case did not involve absentee voting and rulings were made following a bench trial, *Johnson v. Waller County*, No. 4:18-CV-03985, 2022 WL 873325 (S.D. Tex. Mar. 24, 2022), but this Court finds it instructive on the issue of voting challenges based on pairing age and race. Black students at Prairie View A&M University ("PVAMU") alleged that allocating fewer hours and places for early voting violated their rights under the Voting Rights Act, as well as under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments of the United States Constitution. *Id.* at *1. Following a bench trial, the District Court determined that "the "adoption by Waller County of the schedule and locations for early voting in the 2018 general election–as asserted by Plaintiffs to be less favorable to PVAMU students between the ages of eighteen and twenty–can't be said to have denied or abridged their right to vote under the Twenty-Sixth Amendment." *Id.* at *56 (citing *TDP II*, 978 F.3d at 194; *Tully*, 977 F.3d at 613-14). The District Court also determined that Waller County did not violate § 2 of the VRA. *Id.*

at *35, *54 (citing *Brnovich*, 141 S. Ct. at 2338; *Veasey*, 830 F.3d at 273).  The Court reasoned that plaintiffs' claims under § 2 and the Twenty-Sixth Amendment boiled down to arguments over relative convenience for early voting, which were rejected in *TDP II* and *Tully*.  *Id.* at *35-*42, *56.

Particularly relevant to this case, the Court also declined to recognize a hybrid claim for discrimination based on the blending of rights under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments.  *Johnson*, 2022 WL 873325, at *56-*58.  There, as here, plaintiffs alleged they were being discriminated against on the intersecting bases of age and race.  *Id.* at *57.  The Court found that plaintiffs' claims failed as a matter of law, pointing out that the discrimination analysis must "proceed rigorously under each particular Amendment" as opposed to "amalgamating Amendments to discern new or differentiated rights."  *Id.*  (citing *Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980)).

The Court further found that plaintiffs had put forth no facts of discrimination where independent action under each Amendment would not redress their grievance*s.*  *Id.* at *58.  In so doing, the Court noted the difficulty in recognizing "a hybrid action" combining the Fourteenth, Fifteenth, and Twenty-Sixth Amendments.  *Id.*  "For instance," the Court explained:

> if Waller County didn't discriminate against *all* student voters but only against *Black* student voters, a claim would clearly sound under the Fifteenth Amendment.  Likewise, if Waller county didn't discriminate against *all* Black voters but only against Black *student* voters, a claim would clearly sound under the Twenty-Sixth Amendment.

*Id.* (emphasis in original).

This Court must reach the same result here, even though the procedural posture is the motion to dismiss stage.  Plaintiffs do not explain how unconstitutional discrimination against Hispanic voters age eighteen to sixty-four can exist even in the absence of discrimination against Hispanic voters over

age sixty-five.  Without such an explanation, plaintiffs "simply concede[] that any such discrimination is . . . on the basis of their age," and would be "redressable, if at all, under standards applicable to the Twenty-Sixth Amendment, with nothing suggesting such claim should be subject to analysis under the Fourteenth and Fifteenth Amendments."  *Johnson*, 2022 WL 873325, at *58.

As in *Johnson*, this Court concludes that the hybrid claims at issue do not assert violation of a cognizable, independent right as pleaded.  *See id.*  As addressed above, plaintiffs have not sufficiently alleged any violation of their rights under the First, Fourteenth, Fifteenth, or Twenty-Sixth Amendments when considered individually.  Moreover, their post-remand complaints do not "credibly establish that some amalgamation of intersecting rights either exists or—perhaps more importantly—reveal any concern regarding some aspect of discrimination unaccounted for by those Amendments."  *Id.*  Accordingly, *Johnson* presents another basis to conclude that plaintiffs have failed to state a claim for discrimination against them as a specific class of Hispanic voters in Texas aged eighteen to sixty-four.

## CONCLUSION

Our barnacle encrusted ship of state sails upon unchartered seas.  On what shore it lands or breaks on the rocks to sink into the waters of history can only be decided by "We the People," who persevere to overcome the perceived barriers imposed on their sacred right.  Those who surrender without an effort and to apathy cast a vote also by their absence, and the electoral consequences which follow.

"My faith in the Constitution is whole, it is complete, it is total.  I am not going to sit here and be an idle spectator to the diminution, the subversion, the destruction of the Constitution."[9]  Were

---

[9]  Barbara C. Jordan, Opening Statement to the House Judiciary Committee Proceedings on Impeachment of Richard Nixon, 93rd Cong., 2d Sess. 111 (July 25, 1974) (image of archived notes courtesy of the National Archives and Records Administration, available at https://history.house.gov/HouseRecord/Detail/15032449722).

Member of Congress Jordan with us now, she, like others, would perhaps feel that faith shaken. Her words should once again resonate, inspiring the exercise of voting, no matter the burden nor where one lies on the political spectrum.

While these may not be the "times that try men's souls,"[10] significant numbers of American women find it a trying time for their anatomical autonomy. Others find it a time of celebration.[11] American men are about evenly divided.[12] The current Pandora's Box[13] of litigation can be addressed by significant majorities in the electoral process on either side of a particular issue.[14]

Judicial decisions, even those of the Supreme Court, can be overruled or affirmed in a venue called the voting booth. Accordingly, matters can be decided by those who exercise: the right to vote, that is. In the physical realm it is called "use it or lose it."

The remedy for those with diminished trust in the judicial process is ballots not bullets nor the front yards of Justices and Judges. We are the fallible umpires who call the legal balls and strikes as best we can to create a level playing field. Please leave us home alone.

---

[10] THOMAS PAINE, THE AMERICAN CRISIS 1 (Dec. 23 1776), https://www.ushistory.org/Paine/crisis.htm.

[11] There are about 100 million U.S. citizen women 18 or older. Https://www.infoplease.com/census. Sixty two percent (62%) or 62 million disapprove of the *Dobbs* decision overruling *Roe*. Http://pewreseargh.org (polling conducted July 6, 2022). Inferentially, 38 million others approve of the Court's decision.

[12] Fifty-two percent (52%) of American men believe abortion should be legal in most cases. *Id.*

[13] "Pandora's Box" is a metaphor referring to something that produces unpredictable or endless results, which may prove harmful. According to Greek mythology, the god Zeus gave the beautiful Pandora a box, which she was told never to open. As soon as he was out of sight, Pandora took off the top, and out swarmed all the troubles of the world, never to be recaptured. Https://www.merriam-webster.com/dictionary/Pandora's%20box.

[14] The Supreme Court's decision in *Dobbs* to end constitutional protection for abortion "opened the gates for a wave of litigation." Https://apnews.com/article/abortion-politics (June 27, 2022). The activity has focused on "trigger laws" adopted in 13 states designed to take effect immediately upon the ruling in *Dobbs*, old anti-abortion laws left on the books in some states and unenforced under *Roe*, and newer abortion restrictions which were stayed pending a ruling in *Dobbs*. *Id.*; *see also* Judges Rule on State Abortion Restrictions, Shape Impact of *Roe* Ruling on States, DALLAS MORNING NEWS, July 12, 2022 (News/Politics) ("Trigger Laws Like the One in Texas are Key in Legal Fights Over Reproductive Rights in Wake of Supreme Court Ruling").

-28-

Yes, it is burdensome to be a citizen in a democracy and inconvenient to go to the polls, though those who gave their lives so we could, would wonder why they did if we don't.  Democracy dies not always by conquering armies but by the slow death of sloth.

Had der Führer and his minions prevailed, no one would be burdened with voting.  Some of that regime redeemed themselves by becoming United States citizens and contributing to this nation.[15]  The descendants of others reap the harvest of riches and benefits of the American Dream but choose not to till and nurture the soil of democracy by obtaining voting citizenship and its responsibilities.  They also sew the seeds of democracy's demise and are complicit in any rights lost.

Once asked at the close of the Constitutional Convention, "Well Doctor what have we got a republic or a monarchy.  A republic replied the Doctor if you can keep it."[16]

Time will tell.

Defendant's motions to dismiss are GRANTED.

It is so ORDERED.

SIGNED this 22nd day of July, 2022.

FRED BIERY
UNITED STATES DISTRICT JUDGE

---

[15] Wernher von Braun, a former member of the Nazi Party and SS, became an American citizen and pioneer of space technology in the United States.  Https://www.britannica.com/biography/Wernher-von-Braun.

[16] The response is attributed to Benjamin Franklin.  PAPERS OF DR. JAMES MCHENRY ON THE FEDERAL CONVENTION OF 1787, *reprinted in* 11 AM. HIST. REV. 3, 618 (1906) (Oxford Univ. Press), *available at* https://www.jstor.org/stable/1836024.

# APPENDIX I

*See Minella v. City of San Antonio*, 368 F. Supp. 2d 642, 644 (W.D. Tex. 2005); *Save Our Aquifer v. City of San Antonio*, 237 F. Supp. 2d 271, 272-73 & n.3 (W.D. Tex. 2002)*; Perkins v. Alamo Heights Indep. School Dist.*, 204 F. Supp. 2d 991, 998 (W.D. Tex. 2002); *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.d. 433, 439 (W.D. Tex. 1999).

# APPENDIX II

Supreme Court Abortion Case: Upheld Mississippi Statute 6 to 3 and Overruled *Roe* 5 to 4

The Supreme Court in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), upheld a Mississippi statute banning abortions after 15 weeks and struck down *Roe v. Wade*, 410 U.S. 959 (1973).  In giving judicial deference to state abortion legislation, the Supreme Court determined that:

> States may regulate abortion for legitimate reasons, and when such regulations are challenged under the Constitution, courts cannot "substitute their social and economic beliefs for the judgment of legislative bodies." *Ferguson v. Skrupa*, 372 U.S. 726, 729-30 (1962); *see also Dandridge v. Williams*, 397 U. S. 471, 484–486 (1970); *United States v. Carolene Prods. Co*., 304 U. S. 144, 152 (1938) [(giving judicial deference to Congress's ban on shipping imitation mild product in interstate commerce].  That respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance. *See, e.g., Board of Trustees of Univ. of Ala. v. Garrett*, 531 U. S. 356, 365–368 (2001) ("treatment of the disabled"); *Glucksberg*, 521 U. S., at 728 ("assisted suicide"); *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 32–35, 55 (1973) ("financing public education").

*Id.* at 2283-84 (quoting *Ferguson*, *Dandridge* and *Carolene*, wherein Supreme Court gave judicial deference to state laws regulating lawyers and reducing per capita benefits to children in largest families, and Congress's ban on shipping imitation milk products in interstate commerce; citing *Rodriguez*, wherein Supreme Court gave judicial deference to local policy which created structural educational inequities tied to wealth).  In concluding, the *Dobbs* Court stated:

> We end this opinion where we began. Abortion presents a profound moral question. The Constitution does not prohibit the citizens of each State from regulating

or prohibiting abortion. *Roe* and *Casey* arrogated that authority. We now overrule those decisions and **return that authority to the people and their elected representatives.**

*Id.* at 2284 (emphasis added); *but* see *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111

(2022) (refusing to give judicial deference to New York's "proper cause" standard for granting

unrestricted license to carry handgun in public under which applicant had to demonstrate special need

for self-protection distinguishable from that of general community); *Carson v. Makin*, 142 S. Ct. 1987

(2022) (refusing to give judicial deference to nonsectarian requirement of Maine's tuition assistance

program).

Recent Supreme Court Decisions in Voting Cases

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250-51 (2022) (granting certiorari and issuing per curiam decision without hearing oral arguments finding that addition of majority-Black district for Wisconsin General Assembly was not supported by strong basis for believing it was required by Voting Rights Act).

*Merrill v. Milligan*, 142 S. Ct. 879, 882 (2022) (staying lower court's injunctions ordering Alabama's Republican-led legislature to redraw electoral map which had been faulted for racial bias).

*Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 28 (2020) (refusing to enjoin Seventh Circuit decision that stayed district court's order extending absentee ballot receipt deadline by six days).

*Merrill v. People First of Ala.*, 141 S. Ct. 25, 27 (2020) (staying lower court's decision that put on hold Alabama's ban on curbside voting, even though several Alabama counties sought to offer it).

*Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (reversing lower court ruling invalidating South Carolina's witness requirement for absentee ballots thereby reinstating state's rule that absentee ballots need witness signature).

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020) (reversing lower court's decision extending absentee ballot receipt deadline for Wisconsin primary due to COVID-19 pandemic).

<u>There Have also Been Recent Rulings by the Supreme Court Which Favor Democrats, Though These Affirmed State Court Rulings as Opposed to Legislative Acts</u>

*Toth v. Chapman*, 142 S. Ct. 1355 (2022) (denying Republican requests to stay lower court rulings adopting court-drawn boundaries for Pennsylvania's house districts to replace electoral maps devised by Republican-controlled legislature).

*Moore v. Harper*, 142 S. Ct. 1089 (2022) (denying Republican requests to stay lower Court rulings that adopted Court-drawn boundaries for North Carolina's 14 house districts to replace electoral maps devised by Republican-controlled legislature in North Carolina), *cert. granted*, No. 21-1271, 2022 WL 2347621 (U.S. June 30, 2022).

<u>Fifth Circuit: Voting Cases</u>

*Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022) (holding that district court erred in finding Secretary was proper defendant in suit challenging Texas Election Code provisions governing mail-in voting postage, postmark and receipt, and signature verification requirements).

*Texas League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) (reversing district court's judgment rejecting Texas Governor Greg Abbott's directive to allow only one ballot drop off location per county), *dismissing appeal as moot but denying motion to vacate previous order,* No. 20-50867, 2021 WL 1446828, at *1 (5th Cir. Feb. 22, 2021).

*Richardson v. Hughs*, 978 F.3d 220, 224 (5th Cir. 2020) (granting stay and rejecting district court order that would have required Texas to allow voters to cure signature mismatch, instead permitting Texas to simply reject those ballots), *rev'd in part & vacated in part*, *Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022) (holding that district court erred in finding Secretary was proper defendant under *Ex parte Young* and reversing district court's order granting partial summary judgment on constitutional claims, vacating preliminary injunction and remanding for further proceedings).

*Texas All. for Retired Ams. v. Hughs*, 976 F.3d 564, 565, 568 (5th Cir. 2020) (rejecting district court decision that stayed new Texas law that eliminated straight-ticket voting finding that new law, not yet in force, constituted "status quo" and thereby demonstrating Fifth Circuit's deference to legislative judgment on this matter), *rev'd in part & vacated in part*, *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669 (5th Cir. 2022) (holding that district court erred in finding Secretary was proper defendant under *Ex parte Young* and reversing district court's preliminary injunction order enjoining straight-ticket voting).

*Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (deferring to Texas when staying lower court order imposing mask mandate for poll workers).

Other Circuits: Voting Cases

*Tully v. Okeson*, 977 F.3d 608, 618 (7th Cir. 2020) (affirming District Court decision which rejected plaintiff's challenge to Indiana's absentee voting laws), *cert denied*, 141 S. Ct. 2798 (2021).

*A. Philip Randolph Institute of Ohio v. LaRose*, 831 F. App'x 188, 190, 192 (6th Cir. 2020) (reversing lower Court decision that would have required Ohio Secretary of State to allow counties to offer multiple ballot drop box locations and explaining that having only one place for voters to deliver their ballots "is unlikely to harm anyone").

*Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378, 393-94 (6th Cir. 2020) (refusing to invalidate Tennessee's absentee balloting rules); *id.* at 392 ("Make no mistake: today's majority opinion is yet another chapter in the concentrated effort to restrict the vote. To be sure, it does not cast itself as such—invoking instead the disinterested language of justiciability—but this only makes today's majority opinion more troubling. As a result of today's decision, Tennessee is free to—and will—disenfranchise hundreds, if not thousands of its citizens who cast their votes absentee by mail. Masking today's outcome in standing doctrine obscures that result, but that makes it all the more disquieting. I will not be a party to this passive sanctioning of disenfranchisement.") (Moore, J., dissenting) (internal quotations omitted).

*Priorities USA v. Nessel*, 978 F.3d 976, 983 (6th Cir. 2020) (reversing district court order that stayed Michigan's state ban on paying someone to provide transportation to polls and crediting state's interest in preventing fraud).

Arizona Superior Court Declined GOP's Motion for Preliminary Injunction Asking Court to Stop Use of No-Excuse Mail-in Ballots in November 2022 Election

*Arizona Republican Party v. Hobbs*, No. CV-22-00594 (Sup. Ct. Ariz. June 6, 2022) ("Is the Arizona legislature prohibited by the Arizona Constitution from enacting voting laws that include no-excuse mail-in voting?  The answer is no.") (judgment entered on June 9, 2022) (available at https://mohavecourts.az.gov)*, appeal filed*, June 15, 2022.